

AK

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

# Exhibit A-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

DONAVETTE ELY, individually and as next
friend to minor plaintiff N.G.,

                              Plaintiff,

        v.

Meta Platforms, Inc., Facebook Holdings,
LLC, Facebook Operations, LLC, Facebook
Payments, Inc., Facebook Technologies, LLC,
Instagram, LLC, & Siculus, Inc.,

                              Defendants.

**COMPLAINT**

JURY TRIAL DEMANDED

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................1

II.    JURISDICTION AND VENUE .................................................................5

III.   PARTIES .....................................................................................................6

IV.   GENERAL FACTUAL ALLEGATIONS...................................................8

       A.    Teenagers Are Particularly Vulnerable to the Perils of Excessive Social Media Use. ....................................................................8

       B.    Meta Knowingly Exploits Teenage Vulnerabilities for Unjust Gain...............15

       C.    Plaintiff Expressly Disclaims Any and All Claims Seeking to Hold Defendants Liable as the Publisher or Speaker of Any Content Provided, Posted, or Created by Third Parties. ..................................................21

V.    PLAINTIFF-SPECIFIC ALLEGATIONS ...............................................21

VI.   CAUSES OF ACTION .............................................................................21

VII.  TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS .....................84

VIII. DEMAND FOR A JURY TRIAL .............................................................84

IX.   PRAYER FOR RELIEF ...........................................................................85

## I.    INTRODUCTION

1.     Over the last two decades, more and more of our lives have moved onto social media platforms and other digital public spaces. In this vast, still largely unregulated universe of digital public spaces, which are privately owned and primarily run for profit, there exists tension between what is best for technology companies' profit margins and what is best for the individual user (especially the predictable adolescent user) and for society. Business models are often built around maximizing user engagement, not to ensure that users engage with the platform and one another in safe and healthy ways. Technology companies focus on maximizing time spent, not time well spent. In recent years, there has been growing concern about the impact of digital technologies, particularly social media, on the mental health and wellbeing of adolescents. Many researchers argue that social media facilitates cyberbullying, contributes to obesity and eating disorders, instigates sleep deprivation to achieve around-the-clock platform engagement, encourages children to negatively compare themselves to others and develop a broad discontentment for life, and has been connected to depression, anxiety, self-harm, and ultimately suicide ideation, suicide attempts, and completed suicide.

2.     This matter arises from an egregious breach of the public trust by Defendant Meta Platforms, Inc. ("Meta"). Meta was originally incorporated in Delaware on July 29, 2004, as "TheFacebook, Inc." On September 20, 2005, the company changed its name to "Facebook, Inc." On October 28, 2021, the company assumed its current designation. While Plaintiff has attempted to identify the specific Meta subsidiary(s) that committed each of the acts alleged in this Complaint, Plaintiff was not always able to do so, in large part due to ambiguities in Meta's and its subsidiaries' own documents, public representations, and lack of public information. However, upon information and belief, Meta oversees the operations of its various platforms and subsidiaries, some of which have been identified and are listed below. For this reason, unless otherwise specified, the shorthand "Meta" contemplates the apparent control that Defendant Meta Platforms, Inc. wields over the subject social networks' overall operations and, therefore, further refers to its various subsidiaries and predecessors. To the extent this assumption is incorrect, the knowledge of which Meta subsidiary, current or former, is responsible for specific conduct is

1

knowledge solely within Defendants' possession, the details of which Plaintiff should be permitted to elucidate during the discovery phase.

3.      Meta knowingly exploited its most vulnerable users—children throughout the world—to drive corporate profit. Meta operates the world's largest family of social networks, enabling billions of users worldwide to connect, view, and share content through mobile devices, personal computers, and virtual reality headsets. A user does not have to pay to create an account. Instead of charging account holders to access the platform, Meta became one of the world's most valuable companies from the sale of advertisement placements to marketers across its various platforms and applications. For example, upon information and belief, Meta generated $69.7 billion from advertising in 2019, more than 98% of its total revenue for the year. Meta can generate such revenues by marketing its user base to advertisers. Meta collects and analyzes data to assemble virtual dossiers on its users, covering hundreds if not thousands of user-specific data segments. This data collection and analysis allows advertisers to micro-target advertising and advertising dollars to very specific categories of users, who can be segregated into pools or lists using Meta's data segments. Only a fraction of these data segments come from content that is explicitly designated by users for publication or explicitly provided by users in their account profiles. Many of these data segments are collected by Meta through surveillance of each user's activity on the platform and off the platform, including behavioral surveillance that users are not even aware of, like navigation paths, watch time, and hover time. At bottom, the larger Meta's user database grows, the more time the users spend on the database, and the more detailed information that Meta can extract from its users, the more money Meta makes.

4.      Defendants have intentionally designed their products to maximize users' screen time, using complex algorithms designed to exploit human psychology and driven by advanced computer algorithms and artificial intelligence available to two of the largest technology companies in the world. Defendants have progressively modified their products to promote problematic and excessive use that they know threatens the actuation of addictive and self-destructive behavioral patterns.

5. Two Meta products, the www.Facebook.com ("Facebook") and www.Instagram.com ("Instagram") websites and respective interrelated apps (collectively "Meta 2"), rank among the most popular social networking products, with more than two billion combined users worldwide. It is estimated that nine out of ten teens use social media platforms, with the average teen using the platforms roughly three hours per day. Given the delicate, developing nature of the teenage brain and Meta's creation of social media platforms designed to be addictive, it comes as no surprise that we are now grappling with the ramifications of Meta's growth-at-any-cost approach, to wit, a generation of children physiologically entrapped by products the effects of which collectively result in long-lasting adverse impact on their rapidly evolving and notoriously precarious mental health.

6. As of October 2021, Facebook had roughly 2.91 billion monthly active users, thus reaching 59% of the world's social networking population, the only social media platform to reach over half of all social media users. Instagram has become the most popular photo sharing social media platform amongst teenagers and young adults in the United States, with over 57 million users below the age of eighteen, meaning that 72 percent of America's youth use Instagram.

7. A user's "feed" on both Facebook and Instagram is comprised of an endless series of photos, videos, text captions, and comments posted by accounts that the user follows, along with advertising and content specifically selected and promoted by Instagram and Facebook.

8. Instagram also features a "discover" page where a user is shown an endless feed of content that is selected by an algorithm designed by Instagram based upon the users' data profile: demographics, prior activity in the platform, and other data points. Meta has added similar features to Facebook on the apps "menu" and "watch" sections.

9. Over the past decade or so, Meta has added features and promoted the use of auto-playing short videos and temporary posts on Facebook and Instagram, with the former being referred to as "Reels" while the latter is referred to as Instagram "Stories."

10. Facebook and Instagram notify users through text and email of activity that might be of interest, which is designed to and does prompt users to open Facebook and Instagram and be

3

exposed to content selected by the platforms to maximize the length of time and amount of content viewed by the user. Facebook and Instagram include many other harm causing features, as discussed below.

11. Plaintiff brings claims of strict liability based upon Defendants' defective design of their social media products that renders such products not reasonably safe for ordinary consumers in general and minors in particular. It is technologically feasible to design social media products that substantially decrease the incidence and magnitude of harm to ordinary consumers and minors arising from their foreseeable use of Defendants' products with a negligible increase in production cost.

12. Plaintiff also brings claims for strict liability based on Defendants' failure to provide adequate warnings to minor users and their parents of the danger of mental, physical, and emotional harms arising from the foreseeable use of their social media products.

13. Plaintiff also brings claims for common law negligence arising from Defendants' unreasonably dangerous social media products and their failure to warn of such dangers. Defendants knew or, in the exercise of ordinary care, should have known that their social media products were harmful to a significant percentage of their minor users and failed to re-design their products to ameliorate these harms or warn minor users and their parents of dangers arising out of the foreseeable use of their products. Defendants intentionally created an attractive nuisance to children, but simultaneously failed to provide adequate safeguards from the harmful effects they knew were occurring.

14. The addictive qualities of Defendants' products and their harmful algorithms are not fully known or appreciated by minor users or their parents. Like others, Plaintiff only recently learned the truth about Meta's increasingly detrimental effect on teenagers when Frances Haugen, a former Facebook employee turned whistleblower, came forward with internal documents showing that Meta was aware that its platforms and products cause significant harm to its users,

4

especially children. Rather than making meaningful changes to safeguard the health and safety of its adolescent users, Meta has consistently chosen to prioritize profit over safety by continuing to implement and require its users to submit to product components that increase the frequency and duration of users' engagement, resulting in the pernicious harms described in greater detail below.

## II.    JURISDICTION AND VENUE

15.    This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and Plaintiff and Defendants are residents of different states.

16.    This Court has specific personal jurisdiction over Defendants Facebook and Instagram because these Defendants transact business in the State of Alabama and purposely avail themselves of the benefits of transacting business with Alabama residents. Plaintiff's claims set forth herein arise out of and/or relate to Defendants' activities in the State of Alabama and purposeful availment of the benefits of transacting business here and the exercise of personal jurisdiction by this Court comports with traditional notions of fair play and substantial justice.

17.    Defendants interface with a significant percentage of the population of the State of Alabama relating to use of the products at issue in this case, and interact extensively with—send messages, notifications, and communications to—and provide a myriad of other interactive services and recommendations to users Defendants expect and know to be in the State of Alabama.

18.    Defendants advertise extensively in Alabama, through contractual relationships with third-party "partners" who advertise on their behalf via electronic and internet-based platforms and devices. Meta also has agreements with cell phone manufacturers and/or providers and/or retailers, who often pre-install its products on mobile devices prior to sale and without regard to the age of the intended user of each such device. That is, even though Defendants are prohibited from providing their products to users under the age of 13, by encouraging and allowing

its product to be installed indiscriminately on mobile devices, it actively promotes and provides access to its product to the underage users in Alabama for whom those devices are intended.

19.     Defendants have earned millions of dollars in annual revenue from their Alabama-related activities over the last several years arising from the use of their defective and inherently dangerous social media products by Alabama residents, including Plaintiff.

20.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Southern District of Alabama.

### III.     PARTIES

**Plaintiff**

21.     Plaintiff Donavette Ely is an individual residing in Mobile, Alabama, and the custodial parent of her eighteen-year-old daughter N.G. Plaintiff brings this suit on behalf of herself and on behalf of N.G., pursuant to FED. R. CIV. P. 17.

**Defendant Meta Platforms, Inc.**

22.     Meta is a Delaware corporation and multinational technology conglomerate, having its principal place of business in Menlo Park, California.

23.     Meta develops and maintains social media platforms, communication platforms, and electronic devices. These platforms and products include Facebook (its self-titled app, Messenger, Messenger Kids, Marketplace, Workplace, etc.), Instagram (and its self-titled app), and a line of electronic virtual reality devices called Oculus Quest (soon to be renamed "Meta Quest"). Meta's subsidiaries include, but may not be limited to: Facebook Holdings, LLC (Delaware); Facebook Operations, LLC (Delaware); Facebook Payments Inc. (Delaware); Facebook Technologies, LLC (Delaware); FCL Tech Limited (Ireland); Instagram, LLC (Delaware); Novi Financial, Inc. (Delaware); Runways Information Services Limited (Ireland); Scout Development LLC (Delaware); Siculus, Inc. (Delaware); and a dozen other entities whose identity or relevance is presently unclear.

**Subsidiary Defendants**

24.     Facebook Holdings, LLC ("Facebook 1") was incorporated in Delaware on March 11, 2020, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 1 is primarily a holding company for entities involved in Meta's supporting and international endeavors, and its principal place of business is in Menlo Park, California.

25.     Facebook Operations, LLC ("Facebook 2") was incorporated in Delaware on January 8, 2012, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 2 is likely a managing entity for Meta's other subsidiaries, and its principal place of business is in Menlo Park, California.

26.     Facebook Payments, Inc. ("Facebook 3") was incorporated in Florida on December 10, 2010, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 3 manages, secures, and processes payments made through Meta, among other activities, and its principal place of business is in Menlo Park, California.

27.     Facebook Technologies, LLC ("Facebook 4") was incorporated in Delaware as "Oculus VR, LLC" on March 21, 2014, and acquired by Meta on March 25, 2014. Facebook 4's principal place of business is in Menlo Park, California, and it develops Meta's virtual and augmented reality technology, such as the Oculus Quest line of products (soon to be renamed "Meta Quest"), among other technologies related to Meta's various platforms.

28.     Instagram, LLC ("Instagram") was founded by Kevin Systrom and Mike Krieger in October 2010. In April 2021, Meta purchased the company for $1 billion (later statements from Meta have indicated the purchase price was closer to $2 billion). Meta reincorporated the company on April 7, 2012, in Delaware. Currently, the company's principal place of business is in Menlo Park, CA. Instagram is a social media platform tailored for photo and video sharing.

7

29.     Siculus, Inc., ("Siculus") was incorporated in Delaware on October 19, 2011, and is a wholly owned subsidiary of Meta. Siculus supports Meta platforms by constructing data facilities and other projects. Siculus's principal place of business is in Menlo Park, CA.

## IV.    GENERAL FACTUAL ALLEGATIONS

### A.    Teenagers Are Particularly Vulnerable to the Perils of Excessive Social Media Use.

30.     Emerging research shows that the human brain is still developing during adolescence in ways consistent with adolescents' demonstrated psychosocial immaturity. Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotion regulation, and impulse control. The frontal lobes—and, in particular, the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control, and executive decision-making. These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses. MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature. During childhood and adolescence, the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated with white fatty tissue called myelin. Second, during childhood and adolescence, the brain is undergoing "pruning"—the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and into young adulthood. In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition. As such, the part of the brain that is critical for control of impulses and emotions and mature,

8

considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

31. Because adolescence is the period when sophisticated, essential inhibitory control functions are being established, the onset of prolonged exposure to toxic content during adolescence is particularly concerning. The extended development of the prefrontal cortex results in an adolescent brain that is largely undeveloped, highly malleable, and overwhelmingly vulnerable to long-term, irremediable effects of adverse influences, including addiction and a fractured psychological well-being.

32. The algorithms in Defendants' social media products exploit minor users' diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency caused by users' incomplete brain development. Defendants know, or in the exercise of reasonable care should know, that because their minor users' frontal lobes are not fully developed, such users are much more likely to sustain serious physical and psychological harm through their social media use than adult users. Nevertheless, Defendants have failed to design their products with any protections to account for and ameliorate the psychosocial immaturity of their minor users.

33. Adolescents see themselves as increasingly unique. Paradoxically, as part of their individuation, they conform by faithfully mimicking the behavior of peers. Indeed, in defining their own emerging identity, adolescents aspire to be viewed as mature adults, and this leads them to affiliate with and emulate the personalities, images, behaviors, and preferences of those that they would like to become. During the teenage years, relationships with family members often take a back seat to peer groups and appearance. Teens crave to identify with their peer group, achieve social approval, and become "popular." Many teens feel deep insecurity and are self-conscious. They feel people are constantly focused on them, examining them, and judging them about everything they say and do. They struggle with the inexorable desire to be accepted and

admired by their teen peers, and their biggest fear is to not fit in. This myopic desire to fit in predispositions teenagers to frequently engage in upward social comparison processes, that is, identifying and observing others that appear to be experiencing more positive outcomes, and consequently feeling worse about themselves and their own perceived shortcomings.

34.     Today's adolescents are part of Generation Z (which is loosely defined as people born between 1997 and 2012)—they are the first generation of consumers to have grown up in an entirely post-digital era, and thus are "digitally native." The oldest members of this demographic cohort are just turning 24 this year; however, the substantial majority are believed to be still going through adolescence. Members of Generation Z spend upwards of 3 hours per day on the internet, and another 3 hours per day using social media. According to a 2018 survey by Pew Research Center, 45 percent of high school students said they used a social-media platform daily, and 24 percent said that they were online "almost constantly."[1]

35.     One way that Meta's platforms addict minors is as follows: When minors use design features such as "likes" it causes their brains to release euphoria-causing dopamine. However, as soon as dopamine is released, their euphoria is countered by dejection: minor users' brains adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated. In normal stimulatory environments, neutrality is restored after this dejection abates. However, Defendants' algorithms are designed to exploit users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria.

36.     Eventually, as this pattern continues over a period of days, weeks, and months, the neurological baseline to trigger minor users' dopamine responses increases. Minors then continue to use Facebook and Instagram, not for enjoyment, but simply to feel normal. When minor users

---

[1] Monica Anderson and JingJing Jiang, *Teens, Social Media and Technology* (February 3, 2022, last visited at 11:20 AM CST) https://www.pewresearch.org/internet/2018/05/31/teens-social-media-technology-2018/.

attempt to stop using Defendants' social media products, they experience the universal symptoms of withdrawal from any addictive substance including anxiety, irritability, insomnia, and craving.

37.     Addictive use of social media by minors is psychologically and neurologically analogous to addiction to internet gaming disorder. Gaming addiction is a recognized in the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5) (used by mental health professionals to diagnose mental disorders) and is a recognized mental health disorder by the World Health Organization and International Classification of Diseases. The diagnostic symptoms of social media addiction among minors are the same as the symptoms of addictive gaming promulgated in DSM 5 and include:

a.      Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when device is taken away or use is not possible (sadness, anxiety, irritability).

b.      Tolerance, the need to spend more time using social media to satisfy the urge.

c.      Inability to reduce social media usages, unsuccessful attempts to quit gaming.

d.      Giving up other activities, loss of interest in previously enjoyed activities due to social media usage.

e.      Continuing to use social media despite problems.

f.      Deceiving family members or others about the amount of time spent on social media.

g.      The use of social media to relieve negative moods, such as guilt or hopelessness; and

h.      Jeopardizing school or work performance or relationships due to social media usage.

11

38.     Defendants' advertising profits are directly tied to the amount of time that its users spend online. Thus, Defendants enhance advertising revenue by maximizing users' time online through a product design that addicts them to the platform, in part by directing them to content that is progressively more stimulating. However, reasonable minor users and their parents do not expect that online social media platforms are psychologically and neurologically addictive.

39.     Defendants' products could feasibly report the frequency and duration of their minor users' screen time to their parents at negligible cost. This would enable parents to track the frequency, time, and duration of their minor child's social media, identify and address problems arising from such use, and better exercise their rights and responsibilities as parents.

40.     Social comparisons on social media are frequent and are especially likely to be upward, as social media provides a continuous stream of information about other people's accomplishments.[2] Past research suggests that social comparisons occur automatically; when individuals encounter information about another person, their own self-perceptions will be affected. The sheer number of posts in a News Feed, each offering a thumbnail sketch of each person's carefully curated and predominantly ostentatious content, yields numerous opportunities for social comparison. Although people do not typically post false information about themselves online, they do engage in selective self-presentation and are more likely to post eye-catching content. As a result, individuals browsing their News Feeds are more likely to see posts about friends' exciting social activities rather than dull days at the office, affording numerous opportunities for comparisons to seemingly better-off others. Individuals with vacillating levels of self-esteem and certitude, characteristics notoriously endemic to the teenage cohort, are particularly oriented to making frequent and extreme upward social comparisons on social media,

---

[2] Jin Kyun Lee, *The Effects of Social Comparison Orientation on Psychological Well-Being in Social Networking Sites: Serial Mediation of Perceived Social Support and Self-Esteem* (2020), https://link.springer.com/content/pdf/10.1007/s12144-020-01114-3.pdf

which in turn threatens their mental health. Social-media-induced social comparison often results in a discrepancy between the ideal self and the real self, thus evoking a sense of depression, deprivation, and distress, resulting in an overall aggravation of one's mental state.[3] Since the early 2000s, studies have shown that frequent upward social comparison results in lower self-esteem and reduced overall mental health.[4] It has also long been known that individuals who are more likely to engage in self-comparison are likewise more likely to have negative outcomes when using social media. To cope with wavering self-esteem, digitally native adolescents often become envious of others and resort to cyberbullying to deconstruct the point of comparison's perceived superiority and preserve an increasingly delicate ego. These natural dynamics in youth are exacerbated to psychologically injurious levels by Meta's platforms' progressively toxic environment worsened by its 2018 shift to engagement-based ranking, which is discussed in further detail below.

41.     The dangers associated with teenager's proclivity to engage in protracted upward social comparison while on social media is compounded by Meta's deft and discreet construction of an atmosphere capable of exploiting the impulse control issues of even the most mature adults, thereby unleashing upon the public a product that is predictably highly addictive. Some of Meta's key features that make the platforms highly addictive include the use of intermittent variable rewards ("IVR") and its Facial Recognition System ("FRS").

42.     IVR is a method used to addict a user to an activity by spacing out dopamine triggering stimuli with dopamine gaps—a method that allows for anticipation and craving to

---

[3] This schism between the ideal self and the real self, and the attendant dissatisfaction with reality, is further exacerbated by Meta's use of physical-augmentation technology, which allows users to utilize photo and video filters to make remove blemishes, make the face appear thinner, and lighten the skin-tone, all to make themselves appear more "attractive."

[4] Claire Midgley, *When Every Day is a High School Reunion: Social Media Comparisons and Self-Esteem* (2020), https://www.researchgate.net/publication/342490065_When_Every_Day_is_a_High_School_Reunion_Social_Media_Comparisons_and_Self-Esteem

develop and strengthens the addiction with each payout. The easiest way to understand this term is by imagining a slot machine. You pull the lever (intermittent action) with the hope of winning a prize (variable reward). In the same way, you refresh Meta's feeds, endure the brief delay, and then learn if anyone has tagged you in a photo, mentioned you in a post, sent you a message, or liked, commented on, or shared either of your posts. As explained below, Meta spaces out notifications of likes and comments into multiple bursts (dopamine gaps), rather than notifying users in real time, to maximize the platforms' addictiveness.

43.     Engineered to meet the evolving demands of the "attention economy,"[5] a term used to describe the supply and demand of a person's attention, which is a highly valuable commodity for internet websites, in February 2009, Meta introduced perhaps its most conspicuous form of IVR: its "Like" button; Instagram launched that same year and came ready-made with a like function shaped as a heart. Additional features of Meta's IVR include its delay-burst notification system, comments, posts, shares, and other dopamine-triggering content. Instagram's notification algorithm delays notifications to deliver them in spaced-out, larger bursts. Facebook likely uses a similar feature. These designs take advantage of users' dopamine-driven desire for social validation and optimizes the balance of negative and positive feedback signals to addict users.

44.     Other psychological manipulations used to intertwine social media users include, but are not limited to: (1) the FRS system, which has already collected for distribution to various third-parties a billion individual facial recognition templates and is otherwise used by Meta to identify and tag people in photos;  (2) Meta's use of wavy dots to reflect that someone is currently writing you a message, which is designed to keep you on the platform until you receive the message or shorten the time for you to return and check for a message; and (3) the concept of social reciprocity, a variance of quid pro quo, pursuant to which Meta alerts you when someone has read

---

[5] The business model is simple: The more attention a platform can pull from its users, the more effective its advertising space becomes, allowing it to charge advertisers more.

your message, which encourages the receivers to respond—because the sender knows the message has been read—and simultaneously prompts the sender to return to check for the seemingly inevitable response. In sum, this perilous amalgamation of intense psychological vulnerability and targeted exploitation foreseeably results in an increased risk of a variety of harms for today's youth, including, but not limited to, social media addiction, withdrawal—from friends, family, and social and academic advancement—lack of focus, anxiety, body dysmorphia, eating disorders, death resulting from eating disorders, depression, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, self-harm, and suicide among other harms.

**B.      Meta Knowingly Exploits Teenage Vulnerabilities for Unjust Gain.**

45.      Enacted in 1998 and finalized by a U.S. Federal Trade Commission rulemaking in 2000, the Children's Online Privacy Protection Act, or "COPPA," regulates the conditions under which commercial web sites that either target children under age 13 or have actual knowledge of children under age 13 using their site can collect and use information about them. As a result of COPPA, website operators must obtain "verifiable parental consent" from parents prior to the collection and use of information about children under age 13. Meta has chosen to avoid these obligations by purporting to ban all those younger than 13 through its terms of service.

46.      Meta states that children under the age of thirteen are prohibited from having Meta accounts, but Meta knowingly lacks effective age-verification protocols. Since at least 2011, Meta has known that its age-verification protocols are largely inadequate, then estimating that it removes 20,000 children under age 13 from Facebook every day. The problem has not been remediated, as Meta removed at least six hundred thousand underage users in 2021. Zuckerberg himself has stated that, notwithstanding the spirit of COPPA, younger children should be allowed to get on Facebook.

47.      Defendants do not charge their users to use their platforms, but instead receive money from advertisers who pay a premium to target advertisements to specific categories of people as studied and sorted by Meta's algorithms. Thus, Defendants generate revenue based upon

15

the total time spent on the application, which directly correlates with the number of advertisements that can be shown to each user.

48.     Meta, as originally conceived, ostensibly functioned like an enormous virtual bulletin board, where content was published by authors. But Meta has evolved over time with the addition of numerous features and products designed by Meta to engage users. The earliest of these—the search function and the "like" button—were primarily user-controlled features. In more recent years, however, Meta has taken a more active role in shaping the user-experience on the platform with more complex features and products. The most visible of these are curated recommendations, which are pushed to each user in a steady stream as the user navigates the website, and in notifications sent to the user's smartphone and email addresses when the user is disengaged with the platform. These proprietary Meta products include News Feed (a newsfeed of stories and posts published on the platform, some of which are posted by your connections, and others that are suggested for you by Meta), People You May Know (introductions to persons with common connections or background), Suggested for You, Groups You Should Join, and Discover (recommendations for Meta groups to join). These curated and bundled recommendations are developed through sophisticated algorithms. As distinguished from the earliest search functions that were used to navigate websites during the Internet's infancy, Meta's algorithms are not based exclusively on user requests or even user inputs. Meta's algorithms combine the user's profile (e.g., the information posted by the user on the platform) and the user's dossier (the data collected and synthesized by Meta to which Meta assigns categorical designations), make assumptions about that user's interests and preferences, make predictions about what else might appeal to the user, and then make very specific recommendations of posts and pages to view and groups to visit and join based on rankings that will optimize Meta's key performance indicators.

49.     Equipped with ample information about the risks of social media, the ineffectiveness of its age-verification protocols, and the mental processes of teens, Meta has

expended significant effort to attract preteens to its products, including substantial investments in designing products that would appeal to children ages 10-to-12. Meta views pre-teens as a valuable, unharnessed commodity, so valuable that it has contemplated whether there is a way to engage children during play dates.[6] Meta's unabashed willingness to target children, in the face of its conscious, long-standing, plainly deficient age-verification protocols demonstrates the depths to which Meta is willing to reach to maintain and increase its profit margin.

50.     Faced with the potential for reduction in value due to its declining number of users, in or around early 2018, Meta (and likely Meta 2) revamped its interface to transition away from chronological ranking, which organized the interface according to when content was posted or sent, to prioritize Meaningful Social Interactions, or "MSI," which emphasizes users' connections' interactions, e.g., likes and comments, and gives greater significance to the interactions of connections that appeared to be the closest to users. To effectuate this objective, Facebook developed and employed an "amplification algorithm" to execute engagement-based ranking, which considers a post's likes, shares, and comments, as well as a respective user's past interactions with similar content, and exhibits the post in the user's newsfeed if it otherwise meets certain benchmarks. The algorithm covertly operates on the proposition that intense reactions invariably compel attention. As it measures reactions and contemporaneously immerses users in the most reactive content, and negative content routinely elicits passionate reactions, the algorithm effectively works to steer users toward the most negative content.

51.     Meta CEO Zuckerberg publicly recognized this in a 2018 post, in which he demonstrated the correlation between engagement and sensational content that is so extreme that it impinges upon Meta's own ethical limits, with the following chart:[7]

---

[6] Georgia Wells and Jeff Horwitz, *Facebook's Effort to Attract Preteens Goes Beyond Instagram Kids, Documents Show* (2021), https://www.wsj.com/articles/facebook-instagram-kids-tweens-attract-11632849667

[7] Mark Zuckerberg, *A Blueprint for Content Governance and Enforcement*, FACEBOOK, https://www.facebook.com/notes/751449002072082/ (last visited January 8, 2022).



52.     The algorithm controls what appears in each user's News Feed and promotes content that is objectionable and harmful to many users. In one internal report, Meta concluded that "[o]ur approach has had unhealthy side effects on important slices of public content, such as politics and news," with one data scientist noting that "[t]his is an increasing liability." In other internal memos, Meta concluded that because of the new algorithm, "[m]isinformation, toxicity, and violent content are inordinately prevalent." Other documents show that Meta employees also discussed Meta's motive for changing its algorithm—namely, that users began to interact less with the platform, which became a worrisome trend for Meta's bottom line. Meta found that the inflammatory content that the new algorithm was feeding to users fueled their return to the platform and led to more engagement, which, in turn, helped Meta sell more of the digital ads that generate most of its revenue. All told, Meta's algorithm optimizes for angry, divisive, and polarizing content because it'll increase its number of users and the time users stay on the platform per viewing session, which thereby increases its appeal to advertisers, thereby increasing its overall value and profitability.

53.     Upon information in belief, at least as far back as 2019, Meta initiated, *inter alia*, a Proactive Incident Response experiment, which began researching the effect of Meta on the mental

health of today's youth.[8] Meta's own in-depth analyses show significant mental-health issues stemming from the use of Instagram among teenage girls, many of whom linked suicidal thoughts and eating disorders to their experiences on the app.[9] Meta's researchers have repeatedly found that Instagram is harmful for a sizable percentage of teens that use the platform. In an internal presentation from 2019, Meta researchers concluded that "[w]e make body issues worse for one in three teen girls," and "[t]eens blame Instagram for increases in the rate of anxiety and depression." Similarly, in a March 2020 presentation posted to Meta's internal message board, researchers found that "[t]hirty-two percent of teen girls said that when they feel bad about their bodies, Instagram made them feel worse." Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of "suicide and self-injury" worse. Seventeen percent of teen-girl Instagram users say the platform makes "[e]ating issues" worse. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

54.     Meta is aware that teens often lack the ability to self-regulate. Meta is further aware that, despite the platforms' adverse impact to teenage users' well-being, the absence of impulse control often renders teens powerless to oppose the platforms' allure. Meta is conscious of the fact that the platform dramatically exacerbates bullying and other difficulties prevalent within the high school experience, as the reach of the same now affects users within the ideally otherwise safe confines of the home. The advent of social media largely occurred after today's parents became adults, the consequence being a large swath of parents that lack the context needed to appreciate

---

[8] *See Protecting Kids Online: Testimony from a Facebook Whistleblower*, United States Senate Committee on Commerce, Science, & Transportation, Sub-Committee on Consumer Protection, Product Safety, and Data Security, https://www.c-span.org/video/?515042-1/whistleblower-frances-haugen-calls-congress-regulate-facebook

[9] *See* Wall Street Journal Staff, *The Facebook Files* (2021), https://www.wsj.com/articles/the-facebook-files-11631713039?mod=bigtop-breadcrumb

the contemporary perils of Meta and Instagram, who are likewise ill-equipped to offer advice sufficient to effectively mitigate against it.

55. The shift from chronological ranking to the algorithm modified the social networking environment in such a way that it created a new iteration of the Meta experience, one that is profoundly more negative, one that exploits some of the known psychological vulnerabilities of Facebook's most susceptible patronage, to wit, juveniles, resulting in a markedly enlarged threat to the cohort's mental health and the related frequency of suicidal ideation.

56. Excessive screen time is harmful to adolescents' mental health, sleep patterns, emotional well-being. Defendants' products lack any warnings that foreseeable product use can disrupt healthy sleep patterns, or specific warnings to parents when their child's product usage exceeds healthy levels or occurs during sleep hours, rendering the platforms unreasonably dangerous. Reasonable and responsible parents are not able to accurately monitor their child's screen time because most adolescents own or can obtain access to mobile devices and engage in social media use outside their parents' presence.

57. Meta professes to have implemented protective measures to counteract the well-established dangers of its sites' customized, doggedly harmful content; however, its protocols apply only to content conveyed in English and removes only three-to-five percent of harmful content. Meta knows its quality-control and age-verification protocols are woefully ineffective, but Meta is either unwilling or incapable of properly managing its platforms. This is consistent with its established pattern of recognizing, and subsequently ignoring, the needs of its underage users and its obligation to create a suitable environment accessible only by its age-appropriate users, all in the interest of reaping obscene profit.

**C.**     **Plaintiff Expressly Disclaims Any and All Claims Seeking to Hold Defendants Liable as the Publisher or Speaker of Any Content Provided, Posted, or Created by Third Parties.**

58.     Plaintiff seeks to hold Defendants accountable for their own alleged acts and omissions. Plaintiff's claims arise from Defendants' status as the designer and marketer of dangerously defective social media products, not as the speaker or publisher of third-party content.

59.     Plaintiff alleges that Defendants failed to warn minor users and their parents of known dangers arising from anticipated use of their social media platforms. None of Plaintiff's claims rely on treating Defendants as the publisher or speaker of any third-party's words. Plaintiff's claims seek to hold Defendants accountable for their own allegedly wrongful acts and omissions, not for the speech of others or for any attempts by Defendants to restrict access to objectionable content.

60.     Plaintiff is not alleging that Defendant is liable for what third-parties have said, but for what Defendants did or did not do.

61.     None of Plaintiff's claims for relief set forth herein require treating Defendants as a speaker or publisher of content posted by third parties. Rather, Plaintiff seeks to hold Defendants liable for their own speech and their own silence in failing to warn of foreseeable dangers arising from the anticipated use of their products. Defendants could manifestly fulfill their legal duty to design reasonably safe products and furnish adequate warnings of foreseeable dangers arising out of their products, without altering, deleting, or modifying the content of a single third-party post or communication.

## V.     PLAINTIFF-SPECIFIC ALLEGATIONS

62.     Plaintiff N.G. is a eighteen-year-old girl who has been a heavy user of the Meta platform(s).

63.     Shortly after registering to use the Meta platform(s), Plaintiff began engaging in addictive and problematic use of the platform(s). N.G.'s interest in any activity other than viewing and posting on the Meta platform(s) progressively declined.

64.     Prompted by the addictive design of Defendants' product(s), and the constant notifications that Defendants' platform(s) pushed to N.G. 24 hours a day, N.G. began getting less and less sleep.

65.     As a proximate result of her addiction to the Meta platform(s), and specifically due to recommendations and content Defendants selected and showed to N.G., a minor user of the Meta platform(s), N.G. subsequently developed injuries including, but not limited to, attempted suicide, multiple periods of suicidal ideation, depression, anxiety, an eating disorder, social media compulsion, and a reduced inclination or ability to sleep.

66.     Defendants have designed the Meta platform(s), including through the use of disappearing or time-sensitive messaging features, to frustrate parents like Donavette Ely from exercising their rights and duties as parents to monitor and limit their children's use of the Meta platform(s).

67.     Defendants have designed the Meta platforms(s) to allow minors to use, become addicted to, and abuse their products without the consent of the users' parents, like Donavette Ely.

68.     Defendants have specifically designed the Meta platform(s) to be attractive nuisances to underage users but failed to exercise the ordinary care owed to underage business invitees to prevent the rampant, foreseeable, and deleterious impact on minor users that access the Meta platform(s).

69.     Neither Donavette Ely nor N.G. were aware of the addictive and mentally harmful effects of the Meta platform(s) when N.G. began to use the products.

70.     Defendants not only failed to warn N.G. and Donavette Ely of the dangers of addiction, sleep deprivation, and problematic use of the Meta platform(s), but misrepresented the

safety, utility, and non-addictive properties of their products. For example, the head of Instagram testified under oath at a December 8, 2021, Senate Committee hearing that Instagram does not addict its users.

71.     As a result of N.G.'s extensive and problematic use of the Meta platform(s), she has developed numerous mental health conditions that she still struggles with until this day.

## VI.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### ALABAMA EXTENDED MANUFACTURERS LIABILITY DOCTRINE

72.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

73.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Alabama. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Alabama.

74.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used, which are defective and unreasonably dangerous.

75.     Facebook and Instagram were designed and intended to be used as social media platforms.

76.     Facebook and Instagram are defective in their design in that they are not reasonably fit, suitable or safe for their intended purpose, especially as related to adolescent users, and/or their foreseeable risks exceed the benefits associated with their design.

77.     The defective condition of Facebook and Instagram rendered it unreasonably dangerous and/or not reasonably safe, and Facebook and Instagram were in this defective condition when they were released to the public.

78.     Facebook and Instagram as designed were unreasonably dangerous, posed a substantial likelihood of harm, and were therefore defective because of reasons enumerated in the complaint, including, but not limited to, risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

79.     Facebook and Instagram were expected to and did reach Plaintiff without substantial change in the condition in which they were signed, manufactured, labeled, marketed, promoted, supplied, and otherwise released into the stream of commerce.

80.     The Facebook and Instagram products were used for their intended purposes, and the products were not materially altered or modified prior to their use.

81.     DEFENDANTS defectively designed the platforms to specifically appeal to and addict minors and young adults, who were particularly unable to appreciate the risks posed by the platforms, and particularly susceptible to harms from those products.

82.     DEFENDANTS effectively designed the platforms to be addictive and take advantage of the chemical reward system of users' brains (especially young users) to create addiction and additional mental and physical health harms.

83.     DEFENDANTS defectively designed platforms (Facebook and Instagram) that are inherently dangerous because they included features making the product addictive and likely to cause the mental and physical health harms listed above. These features include, but are not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and

24

augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

84.     DEFENDANTS defectively designed the platforms and DEFENDANTS failed to test as to the safety of features they developed and implemented for use in the platforms. Once DEFENDANTS did perform some product testing and had knowledge of ongoing harm to Plaintiff, they failed to adequately remedy the product defects or warn Plaintiff.

85.     Facebook and Instagram do not perform as safely as a reasonable and ordinary consumer would reasonably assume and reasonably expect. Facebook and Instagram pose a risk of serious mental and physical health injuries as listed above.

86.     The risks inherent in the design of Facebook and Instagram significantly outweigh any benefits of such design.

87.     DEFENDANTS could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, such as by designing products without the harm causing features listed above, that were less addictive, less likely to cause mental health harms, while still providing an optimal social media experience and facilitating social connection.

88.     DEFENDANTS could have limited the duration of login sessions to prevent harmful, extended use of the platforms and could have designed the platforms to logout for a period of time if excessive use occurred. It is well established in research that to effectively stay connected socially, a person only needs a limited amount of use time.  Instead, DEFENDANTS designed a product that uses behavioral engineering to maximize the number of use sessions and length of use per session, resulting in serious harm to Plaintiff.

89.     DEFENDANTS could have used technology to enable user-level access restrictions so that use was tied to a user's age verification, restricting those underaged from using the platforms, or other youth protecting features.

90.     DEFENDANTS could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, including, but not limited to:

a.      Designing platforms that did not include the features listed above while still fulfilling the social, interest, and business networking purposes of a social media platform;

b.      Default protective limits to length of use, frequency of use, or content types;

c.      Opt-in restrictions to length of use, frequency of use, or content types;

d.      Session time limits;

e.      Blocks to use during certain times of day (such as morning, during work or school periods, or during evenings);

f.      Session time notifications, warnings, or reports;

g.      Warning of health effects of use and extended use upon sign-up;

h.      Parental controls;

i.      Notification to parents regarding their child's extensive use, use during sleep hours, or exposure to harmful content on the platform,

j.      Self-limiting tools;

k.      Implementing labels on images and videos that have been edited through the platform;

l.      Age-based content filtering;

m.      General content filtering;

n.      Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content (*e.g.*, content that causes negative social comparison and misleading lack of realism) such as in the

genres of lifestyle, influencer, beauty, fitness, success flaunting, and/or heavily edited images and videos;

o.   Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content, such as inappropriate or salacious content;

p.   Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as controversial, political, or emotionally weighted content;

q.   Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as content encouraging or promoting eating disorders, depressive thinking, self-harm, or suicide;

r.   Informational labelling about the misleading and unrealistic nature of the content on a user's feed and the resulting feed composite because of content editing and algorithmic recommendation, presentation, and sorting;

s.   Chronological presentation of content rather than algorithmic; and

t.   Many other less harmful alternatives.

91.   Instead, DEFENDANTS designed platforms that aggressively addict users with algorithms and features that increase addictiveness, use time, frequency of use, attention stealing, engagement with the platform, mental health harms, and profit to Meta, all to the detriment of users' wellbeing.

92.   It is reasonable for parents to expect that social media products that actively promote their platforms to minors will undertake reasonable efforts to notify parents when their child's use becomes excessive, occurs during sleep time, or exposes the child to harmful content. Defendants could feasibly design the products to identify minor users who are using the product excessively, using it during sleeping hours, or being exposed to harmful content, and notify their parents, at negligible cost.

93.     Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

94.     The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

95.     The features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

96.     The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

97.     These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such

as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

98. DEFENDANTS failed to design the product with adequate warnings about the likely harms of use.

99. Plaintiff used Facebook and Instagram as intended or in reasonably foreseeable ways. DEFENDANTS specifically intended for minors to use its products and were aware that minors were doing so.

100. Plaintiff's injuries—physical, emotional and economic—were reasonably foreseeable to DEFENDANTS at the time of the products' design, marketing, and operation.

101. Facebook and Instagram were defective and unreasonably dangerous when they left DEFENDANTS' sole possession/control and were offered to users. The defects continued to exist through use by consumers, including Plaintiff, who used the products without any substantial change in the products' condition.

102. Plaintiff was injured as a direct and proximate result of Defendants placement of the products into the stream of commerce, her use of the platforms as intended and designed, and the platform's defective design as described herein. The defective design of Facebook and Instagram was the proximate cause of Plaintiff's harms.

103. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the social media induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SECOND CAUSE OF ACTION
## PRODUCTS LIABILITY - NEGLIGENT DESIGN

104.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

105.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Alabama. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Alabama.

106.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

107.    Facebook and Instagram were designed and intended to be used as social media platforms.

108.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly so with minors and young adults.

109.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

110.    DEFENDANTS owed a duty to all reasonably foreseeable users to design a safe product.

111.    DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram because the products were addictive; had mental, cognitive, and physical health impacts; and had a likelihood of causing social media addiction, depression, body

dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

112.    DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram by negligently designing the platforms with physically and mentally harmful features including, but not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

113.    Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

114.    The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

115.     The features combine to create a user interface of endless, auto-playing image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

116.     The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

117.     These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive, content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

118.     Potential health harms from these features include, among other types of harm, social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

119.     DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram by negligently designing Facebook and Instagram to specifically appeal to minors, who were particularly unable to appreciate the risks posed by the platforms.

120.     DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs that would make the product less addictive and harmful to minors.

121.     DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs to minimize these harms, including but not limited to:

      a.  Designing platforms that did not include the features listed above while still fulfilling the social, interest, and business networking purposes of a social media platform;

      b.  Default protective limits to length of use, frequency of use, or content types;

      c.  Opt-in restrictions to length of use, frequency of use, or content types;

      d.  session time limits;

      e.  Blocks to use during certain times of day (such as morning, during work or school periods, or during evenings);

      f.  Session time notifications, warnings, or reports;

      g.  Warning of health effects of use and extended use upon sign-up;

      h.  Parental controls;

      i.  Self-limiting tools;

      j.  Implementing labels on images and videos that have been edited through the platform;

      k.  Age-based content filtering;

      l.  General content filtering;

      m.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content (by causing negative social comparison and misleading lack of realism) such as in the genres of lifestyle, influencer, beauty, fitness, success flaunting, and/or heavily edited images and videos;

33

n. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as inappropriate or salacious content;

o. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as controversial, political, or emotionally weighted content;

p. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as content encouraging or promoting eating disorders, depressive thinking, self-harm, or suicide;

q. Informational labelling about the misleading and unrealistic nature of the content on a user's feed and the resulting feed composite because of content editing and algorithmic presentation/sorting;

r. Chronological presentation of content rather than algorithmic;

s. Many other less harmful alternatives.

122.    DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs that could have reduced mental and physical harms to users, especially youth. Instead, DEFENDANTS designed platforms that aggressively addict users with algorithms and features that increase addictiveness, use time, frequency of use, attention stealing, engagement with the platform, mental health harms, and profit to Meta, all to the detriment of users' wellbeing.

123.    DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost-effective, reasonably feasible alternative designs utilizing technology to enable user-level access restrictions so that use was tied to a user's age verification, restricting those underaged from using the platforms, or other youth-protecting features.

124.    A reasonable company under the same or similar circumstances would have designed a safer product.

125.   Plaintiff was harmed directly and proximately by the platforms DEFENDANTS' failure to use reasonable care in the design of Facebook and Instagram. Such harm includes attempted suicide, multiple periods of suicidal ideation, depression, anxiety, an eating disorder, social media compulsion, and a reduced inclination or ability to sleep, among other harmful effects.

126.   The design of Facebook and Instagram was a proximate cause of Plaintiff's harms.

127.   Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## THIRD CAUSE OF ACTION
## PRODUCTS LIABILITY - NEGLIGENT FAILURE TO WARN

128.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

129.   Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Alabama. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Alabama.

130.   At all relevant times, the DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

131.   The DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

132.   The DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers

of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

133.   The DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks, including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

134.   The DEFENDANTS owed a duty to all reasonably foreseeable users to disclose the risks associated with the use of Facebook and Instagram.

135.   The DEFENDANTS breached their duty of care by failing to use reasonable care in providing adequate warnings in the platforms' sign-up warnings, and through marketing, promoting and advertising of the platforms including that, according to its own research:

> a.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;
>
> b.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;
>
> c.  Facebook makes body-image issues worse for one-third of girls;
>
> d.  Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;
>
> e.  Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse;
>
> f.  Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

36

136.   Facebook and Instagram are also defective for failing to warn users that:

   a.   Engagement-based ranking and intermittent variable rewards are:

      i.   highly addictive,

      ii.   promote harmful social comparison,

      iii.   promote negative, controversial, and/or emotionally activating content,

      iv.   promote negative, harmful, and/or dangerous interest groups and/or content creators,

      v.   encourage bullying and conflict,

      vi.   can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

      vii.   present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

   b.   Face tracking and augmentation (image and video filters):

      i.   inflict unrealistic and biased beauty standards upon users, and

      ii.   cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

   c.   The platforms cause the mental and physical health harms as listed above;

   d.   The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

   e.   The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features; and

   f.   The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

137.   The failure of DEFENDANTS to adequately warn about its defective products, and its efforts to misleadingly advertise through conventional and social media avenues, created a

danger of injuries described herein that were reasonably foreseeable at the time of design, development, coding, operation, and dissemination of the platforms.

138. Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

139. Rather than warning users of likely harms, DEFENDANTS regularly fine-tune the platforms to aggressively socially and psychologically engineer new and ongoing users to increase addiction and exposure to their platforms, causing and increasing physical and psychological harm. The platforms encourage users to recruit more users across their personal electronic contacts.

140. The failure of DEFENDANTS to adequately warn about its defective products— and its efforts to misleadingly advertise through conventional, online, and peer-to-peer avenues— created a danger of injuries described herein that were reasonably foreseeable at the time of design, distribution, and operation of the platforms.

141. At all relevant times, DEFENDANTS could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the products in advertising, at point of dissemination/account registration, and at various intervals of the user interface.

142. A reasonable company under the same or similar circumstances would have warned and instructed of the dangers.

143. Plaintiff was injured as a direct and proximate result of DEFENDANTS' failure to warn and instruct because she would not have used Facebook and Instagram had she received adequate warnings and instructions that the platforms could cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating

disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

144.    Meta's lack of adequate and sufficient warnings and instructions, and its inadequate and misleading advertising, was a substantial contributing factor in causing the harm to Plaintiff.

145.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FOURTH CAUSE OF ACTION
## PRODUCTS LIABILITY – NEGLIGENT MANUFACTURING

146.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

147.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Alabama. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Alabama.

148.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

149.    The platforms DEFENDANTS had a duty to use exercise reasonable care, in the development, coding, operation, maintained, inspecting, testing, and dissemination of Facebook and Instagram.

150.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram carelessly developed, coded, operated, maintained, inspected,

tested, and disseminated was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner.

151.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram improperly developed, coded, operated, maintained, inspected, tested, and disseminated.

152.    Without limitation, examples of DEFENDANTS' breaching their duty to exercise reasonable care in development, management, maintenance, testing, and inspecting include:

     a.  Failure to follow Good Manufacturing Practices ("GMPs");

     b.  Failure to inspect and test the computer programming underlying the platforms and features for errors, unintended output, or unintended executed results of a nature that could cause users harm;

     c.  Failure to adequately inspect/test Facebook and Instagram during the development process;

     d.  Failure to test the mental and physical health impacts of their platforms and product features, especially in regards to minors;

     e.  Failure to implement procedures that would measure and confirm the behavioral and mental health impact of the platforms;

     f.  Failure to timely establish procedures or practices to prevent Facebook and Instagram from having unintended mental and physical health consequences.

     g.  Failure to test and research the actual user health impact cause by the *interaction* of the algorithm and other harm causing features listed above;

     h.  Failure to test the platforms' output to users given various user inputs;

     i.  Failure to adequately test the user health result of specific computer coding and programs that constitute the platforms and their features.

153.    A reasonable manufacturer under the same or similar circumstances would have implemented appropriate manufacturing procedures to better ensure the quality of their product.

154.    Plaintiff was injured as a direct and proximate result of the platforms DEFENDANTS failure to use reasonable care in the development, coding, operation, maintenance, inspection, testing, and dissemination.

155.    DEFENDANTS negligent development, coding, operation, maintenance, inspection, testing, and dissemination of Facebook and Instagram was a substantial factor in causing Plaintiff's harms.

156.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**FIFTH CAUSE OF ACTION**
**NEGLIGENCE AND/OR GROSS NEGLIGENCE**

157.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

158.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Alabama. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Alabama.

159.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

160.    Facebook and Instagram were the types of products that could endanger others if negligently made or promoted.

161.    DEFENDANTS had a duty of reasonable care in designing, manufacturing, coding, inspecting, testing, marketing, advertising, promoting, supplying, disseminating and/or making publicly available the platforms to avoid causing harm to those that used Facebook and Instagram.

162.    DEFENDANTS knew, or should have known by the exercise of reasonable care, the risks to users of the platforms, of mental and physical health harms.

163.    DEFENDANTS knew, or should have known by the exercise of reasonable care, that minors and young people would be attracted to these products.

164.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

165.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

166.    DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

167.    DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, programmed, assembled, inspected, tested, marketed, advertised, promoted, operated, managed, maintained, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

168.    DEFENDANTS knew or should have known that Facebook and Instagram would cause harm to users if the following features, among others, were included: (1) engagement-based

42

ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

169.    DEFENDANTS knew or should have known that engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

170.    DEFENDANTS knew or should have known that the collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

171.    DEFENDANTS knew or should have known that the features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social

comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

172.    DEFENDANTS knew or should have known that the combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

173.    DEFENDANTS knew or should have known that these features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

174.    DEFENDANTS knew or should have known that Facebook and Instagram could cause serious risk of harm, particularly to young persons and minors.

175.    DEFENDANTS were negligent, reckless and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm.

176.    The negligence and extreme carelessness of DEFENDANTS includes, but is not limited to, the following:

      a. Failure to perform adequate testing of the Facebook and Instagram prior to marketing to ensure safety, including long-term testing of the product, and testing for physical and mental health injuries;

      b. Failure to warn consumers that Facebook and Instagram had not been adequately tested or researched prior to marketing to ensure safety;

      c. Failure to take reasonable care in the design of Facebook and Instagram;

      d. Failure to use reasonable care in the production/development of Facebook and Instagram;

e. Failure to use reasonable care in the operation of Facebook and Instagram;

f. Failure to use reasonable care in the coding/assembly of Facebook and Instagram;

g. Failure to use reasonable care in advertising, promoting, and marketing Facebook and Instagram;

h. Failure to use reasonable care in the dissemination of Facebook and Instagram without adequate warnings;

i. Use of a design that includes features that cause mental and physical harm, including, but not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes," comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments;

j. Use of a design, engagement-based ranking and intermittent variable rewards that DEFENDANTS knew or should have known that are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users;

k. Use of design features that DEFENDANTS knew or should have known would interact to multiply the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways;

l. Use of design features that DEFENDANTS knew or should have known would combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users;

m. Use of design features that DEFENDANTS knew or should have known would result in presenting to users a false reality—it presents to users a world which is constantly controversial and negative; most other people are exceedingly more attractive than the user, and most other people are more successful and/or competent than the user;

n. Failure to inspect Facebook and Instagram for them to operate properly and avoid addiction, overuse, or mental health harms;

45

o. Failure to reasonably and properly test and properly analyze the testing of Facebook and Instagram under reasonably foreseeable circumstances;

p. Failure to warn consumers about the dangers associated with use of Facebook and Instagram, in that it was unsafe, causes social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects;

q. Failure to subsequently remedy harm-causing features of the platforms after Meta had actual knowledge of harm to users;

r. Failure to provide any instructions regarding a safe manner, frequency, and length of use of the platforms per day;

s. Failure of DEFENDANTS to verify the age of consumers creating accounts and using Facebook and Instagram;

t. Failure to recall Facebook and Instagram;

u. All other failures, acts and omissions set forth herein.

177. DEFENDANTS' acts and omissions constitute gross negligence, because they constitute a total lack of care and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm to Plaintiff.

178. DEFENDANTS acted and/or failed to act willfully, and with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions had a great probability of causing significant harm and in fact resulted in such harm to Plaintiff.

179. Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. After fine-tuning the product to addict users using features that also result in serious mental health and physical harms, DEFENDANTS reasonably should have foreseen the emotional distress this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them.

180.     Defendants intentionally created an attractive nuisance to children, but simultaneously failed to provide adequate warnings or safeguards from the harmful effects they knew were occurring.

181.     Plaintiff was injured as a direct and proximate result of negligence and/or gross negligence as described herein. Such harm includes attempted suicide, multiple periods of suicidal ideation, depression, anxiety, an eating disorder, social media compulsion, and a reduced inclination or ability to sleep, which may cause or contribute to additional disease.

182.     DEFENDANTS' negligence and/or gross negligence were a substantial factor in causing and or contributing to Plaintiff's harms.

183.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### SIXTH CAUSE OF ACTION
### NEGLIGENT MISREPRESENTATION

184.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

185.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Alabama. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Alabama.

186.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

47

187.    DEFENDANTS were negligent, reckless and careless and owed a duty to Plaintiff to make accurate and truthful representations regarding Facebook and Instagram, DEFENDANTS breached their duty, thereby causing Plaintiff to suffer harm.

188.    DEFENDANTS represented to Plaintiff—via the media, advertising, website, social media, and promotions, among other misrepresentations described herein—that:

    a.  Facebook and Instagram were safe and were not harmful;

    b.  Long-term, frequent, prolonged use was harmless;

    c.  Facebook and Instagram increased social connectivity, rather than causing feelings of isolation; and

    d.  An inaccurate and misleading portrayal of the platforms mental and physical health impact;

189.    DEFENDANTS omitted/failed to ever inform Plaintiff and other consumers, by any media, that, according to its own research:

    a.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c.  Facebook makes body-image issues worse for one-third of girls;

    d.  Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e.  Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

    f.  Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

190.    Meta also omitted to inform users that, as it knew or should have known:

    a.  Engagement-based ranking and intermittent variable rewards are

        i.  highly addictive,

        ii.  promote harmful social comparison,

    iii. promote negative, controversial, and/or emotionally activating content,

    iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,

    v.  encourage bullying and conflict,

    vi. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

    vii. present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

  b. Face tracking and augmentation (image and video filters):

    i. inflict unrealistic and biased beauty standards upon users, and

    ii. cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

  c. The platforms cause the mental and physical health harms as listed above;

  d. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

  e. The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

  f. The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

191. These representations were false and omissions were material. The platforms are unsafe and were known by Meta to cause mental and physical health harms, especially in youth, such as social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

192.    DEFENDANTS knew or should have known these representations were false and negligently made them without regard for their truth.

193.    Through DEFENDANTS' incredible power as the premier social media company (and/or association with that company), they have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

194.    DEFENDANTS had a duty to accurately provide this information to Plaintiff. In concealing this information from Plaintiff, DEFENDANTS breached their duty. DEFENDANTS also gained financially from this concealment, and because of their breach.

195.    DEFENDANTS intended for Plaintiff to rely on these representations.

196.    Each of these misrepresentations were material at the time they were made. Each of the misrepresentations concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to sign up for or use Facebook and Instagram.

197.    DEFENDANTS have yet to disclose or correct these misrepresentations about Facebook and Instagram.

198.    Plaintiff reasonably relied on these representations and were harmed as described herein. Plaintiff's reliance on DEFENDANTS' representation was a substantial factor in causing Plaintiff's harms. Had DEFENDANTS told Plaintiff the truth about the safety and algorithmic framework of the platforms, Plaintiff would not have registered with them or used them.

199.    DEFENDANTS' acts and omissions as described herein were committed in reckless disregard of Plaintiff's rights, interests, and well-being to enrich DEFENDANTS.

200.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' negligent misrepresentations regarding Facebook and Instagram as described herein. Such harm includes attempted suicide, multiple periods of suicidal ideation, depression, anxiety, an eating disorder, social media compulsion, and a reduced inclination or ability to sleep, among other harms.

201.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SEVENTH CAUSE OF ACTION
### FRAUD

202.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

203.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Alabama. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Alabama.

204.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

205.    DEFENDANTS' marketing, promotions and advertisements contained deceptive and/or misleading statements, implications, images, and portrayals that the platforms were safe, improved social connectivity, and improved the mental and physical health of its users. For example, Meta's investor relations page states that "Facebook's mission is to give people the power to build community and bring the world closer together. People use Facebook to stay connected with friends and family, to discover what's going on in the world, and to share and express what

51

matters to them."[10] In actuality, Facebook and Instagram pose a serious risk to users' mental and physical health, which Meta has long known.

206. DEFENDANTS' marketing, promotions and advertisements failed to disclose that the platforms, by contrast, were likely to cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms.

207. The omissions were misleading and deceptive standing alone and were particularly deceptive in light of Meta's marketing, promotions and advertising of Facebook and Instagram as positive for users mental and physical health.

208. DEFENDANTS represented to Plaintiff—via the media, internet, advertising, its website, the platforms themselves, other social media, and promotions—that:

    a. Facebook and Instagram were safe and were not harmful;

    b. Facebook and Instagram were positive and beneficial to a users' wellbeing, improved social connectivity, and improved the mental and physical health of its users;

    c. Long-term, frequent, prolonged use was harmless;

    d. Facebook and Instagram increased social connectivity, rather than causing feelings of isolation;

    e. An inaccurate and misleading portrayal of the platforms mental and physical health impact; and

    f. Other misrepresentations described herein.

209. DEFENDANTS omitted/failed to ever inform Plaintiff and other consumers, by any media, that, according to its own research:

---

[10]https://investor.fb.com/resources/default.aspx#:~:text=Facebook%20Investor%20Relations%3F-
,What%20is%20Facebook's%20mission%20statement%3F,express%20what%20matters%20to%20them.

g. At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

h. Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

i. Facebook makes body-image issues worse for one-third of girls;

j. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

k. Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

l. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

210. Meta also omitted/failed to inform users that, as it knew or should have known:

m. Engagement-based ranking and intermittent variable rewards are:

    i. highly addictive,

    ii. promote harmful social comparison,

    iii. promote negative, controversial, and/or emotionally activating content,

    iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,

    v. encourage bullying and conflict,

    vi. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

    vii. present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

n. Face tracking and augmentation (image and video filters):

    i. inflict unrealistic and biased beauty standards upon users, and

    ii. cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

o. The platforms cause the mental and physical health harms as listed above;

     p.   The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors; and

     q.   The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features.

211.    These representations were false and material. These omissions also communicated falsehoods and were material. The platforms are unsafe and were known by Meta to cause mental and physical health harms, especially in youth, such as social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

212.    The above representations were communicated to Plaintiff.

213.    Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

214.    DEFENDANTS' conduct was fraudulent and deceptive because their misrepresentations and omissions had the capacity to, were likely to, and, in fact, did deceive reasonable consumers including the Plaintiff. Reasonable consumers, including the Plaintiff, would have found it material to their purchasing decisions that the platforms' products posed unreasonable risks of substantial mental and bodily injury, including addiction resulting from the use of the products. Knowledge of these facts would have been a substantial factor in Plaintiff's decisions to purchase and consume Facebook and Instagram.

215.    DEFENDANTS owed Plaintiff a duty to disclose these facts because they were known and/or accessible exclusively to DEFENDANTS, who have had exclusive and superior

knowledge of the facts; because the facts would be material to reasonable consumers; because the platforms pose an unreasonable risk of substantial mental and bodily injury; and because the platforms made partial representations concerning the same subject matter as the omitted facts.

216. Plaintiff reasonably and justifiably relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the platforms' misrepresentations and omissions.

217. DEFENDANTS knew or should have known that its misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

218. DEFENDANTS' misrepresentations and/or omissions were a substantial factor in causing Plaintiff's harms. Plaintiff was injured as a direct and proximate result of DEFENDANTS' fraudulent conduct as described herein.

219. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## EIGHTH CAUSE OF ACTION
## FRAUDULENT CONCEALMENT

220. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

221. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Alabama. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Alabama.

222. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

223. DEFENDANTS had a duty to disclose material facts about Facebook and Instagram to Plaintiff.

224. DEFENDANTS fraudulently and deceptively marketed Facebook and Instagram to Plaintiff as safe, healthful, or not harmful, and beneficial to user mental health and social connectedness when DEFENDANTS knew it to be untrue.

225. DEFENDANTS fraudulently and deceptively downplayed or minimized any risk associated with its platforms and product features. DEFENDANTS and others worked together to pitch news stories or other media content designed to downplay the risks of its platforms, suggesting that any concern was overblown, or a panic. These tactics mimic those used by the tobacco industry to sow seeds of doubt and confusion among the public, to initiate new users, to keep customers using Facebook and Instagram, and to avoid regulation or legislative efforts to control Meta.

226. Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

227. DEFENDANTS fraudulently and deceptively concealed that Facebook and Instagram can cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms.

228.   DEFENDANTS fraudulently and deceptively concealed they had not adequately researched or tested the platforms and its features to assess its safety before offering it on the market and promoting it to young people and adults.

229.   DEFENDANTS fraudulently and deceptively concealed that the platforms were powerfully addictive.

230.   DEFENDANTS further failed to disclose to Plaintiff that the platforms are designed to create and sustain an addiction. DEFENDANTS also manipulated the platforms algorithms and features in ways that could and would impact their addictiveness and mental health impact, and DEFENDANTS did so without notifying Plaintiff. DEFENDANTS actively concealed the innerworkings of its platforms and their mental health impacts.

231.   DEFENDANTS concealed from Plaintiff that, according to its own research:

a.   At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

b.   Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

c.   Facebook makes body-image issues worse for one-third of girls;

d.   Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

e.   Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

f.   Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

232.   DEFENDANTS also concealed from Plaintiff that:

a.   Engagement-based ranking and intermittent variable rewards are:

i.   highly addictive,

ii.   promote harmful social comparison,

iii.   promote negative, controversial, and/or emotionally activating content,

57

<ol type="i" start="4">
<li>promote negative, harmful, and/or dangerous interest groups and/or content creators,</li>
<li>encourage bullying and conflict,</li>
<li>can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and</li>
<li>present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);</li>
</ol>

b. Face tracking and augmentation (image and video filters):

<ol type="i">
<li>inflict unrealistic and biased beauty standards upon users, and</li>
<li>cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;</li>
</ol>

c. The platforms cause the mental and physical health harms as listed above;

d. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e. The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features; and

f. The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

233. Each of these misrepresentations and omissions were material at the time they were made. Each of the misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to register or use the platforms.

234. Plaintiff did not know of the facts that DEFENDANTS concealed.

235. DEFENDANTS intended to deceive Plaintiff and the public by concealing these facts.

236.    DEFENDANTS had a duty to accurately provide this information to Plaintiff. In concealing this information from Plaintiff, DEFENDANTS breached their duty. DEFENDANTS also gained financially from this concealment, and because of their breach.

237.    DEFENDANTS had ample opportunities to disclose these facts to Plaintiff, through advertising, on its websites, platforms, and on other social media. DEFENDANTS concealed material information at all relevant times, through today. DEFENDANTS have yet to disclose the truth about Facebook and Instagram.

238.    Plaintiff relied to her detriment on DEFENDANTS' fraudulent omissions. Had Plaintiff been adequately informed of the material facts concealed from her regarding the safety of the platforms, and not intentionally deceived by DEFENDANTS, she would not have signed up for or used Facebook and Instagram.

239.    DEFENDANTS' fraudulent concealment was a substantial factor in Plaintiff's harms as described herein, including: attempted suicide, multiple periods of suicidal ideation, depression, anxiety, an eating disorder, social media compulsion, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

240.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' fraudulent conduct as described herein.

241.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## NINTH CAUSE OF ACTION
## CONSPIRACY TO COMMIT FRAUD

242.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

243. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Alabama. Plaintiff pleads this Cause of Action under all applicable product liability and conspiracy, statutes, and the common law of the State of Alabama.

244. DEFENDANTS entered into an agreement to advance their financial interests by injuring Plaintiff. Specifically, DEFENDANTS worked in concert to maintain and maximize the number of users addicted to Facebook and Instagram to ensure a steady and growing customer base.

245. DEFENDANTS sought to accomplish this objective by: (1) designing a product that was intended to addict its users to dopamine-triggering stimuli on its electronic platforms (similar to electronic gambling platforms); (2) marketing, advertising, promoting and misbranding that platform to consumers, including the vulnerable youth market; and (3) defrauding regulators and the public to advance their interests.

246. Plaintiff's addiction to the platforms was a primary object of the Conspiracy. DEFENDANTS orchestrated efforts with a unity of purpose to addict this generation of teenagers and young adults to its platforms by way of unlawful conduct in marketing, promoting, manufacturing, designing, and disseminating Facebook and Instagram that substantially contributed to the Plaintiff's injuries as alleged herein.

247. DEFENDANTS further conspired with one another by setting out to entice and lure new users of the platforms as a wrongful, unlawful, and tortious means to make a profit.

248. Plaintiff demands the applicable relief set forth in the Prayer for Relief below.

249. DEFENDANTS' conspiracy involved:

    a. Developing social media platforms to be as addictive as possible, regardless of mental and physical health impacts;

60

    b.  Suppressing internal and external efforts to research the harmful effects of those platforms;

    c.  Suppressing internal and external efforts to inform consumers of the harmful effects of those platforms;

    d.  Making knowingly false and misleading representations and omissions to government organizations, personnel, legislators, and regulators, including at congressional hearings; and

    e.  Engaging in lobbying efforts and political donations to discourage office holders from performing oversight of its platforms.

250.   DEFENDANTS' conduct violated state law and constituted a conspiracy to harm Plaintiff. Plaintiff brings a cause of action for conspiracy to commit fraud under applicable state statutory and common law.

251.   DEFENDANTS' conspiracy to commit fraud was a substantial factor in causing Plaintiff's harms. Plaintiff was injured, as described herein, as a direct and proximate result of DEFENDANTS' unlawful conspiracy as described herein.

252.   Plaintiff demands judgment against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## TENTH CAUSE OF ACTION
## UNJUST ENRICHMENT

253.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

254.   Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Alabama. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Alabama.

255.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

256.    DEFENDANTS concealed from Plaintiff that, according to its own research:

a.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

b.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

c.  Facebook makes body-image issues worse for one-third of girls;

d.  Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

e.  Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

f.  Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

257.    DEFENDANTS also concealed from Plaintiff that:

g.  Engagement-based ranking and intermittent variable rewards are:

    i.  highly addictive,

    ii.  promote harmful social comparison,

    iii.  promote negative, controversial, and/or emotionally activating content,

    iv.  promote negative, harmful, and/or dangerous interest groups and/or content creators,

    v.  encourage bullying and conflict,

    vi.  can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

    vii.  present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

     h.  Face tracking and augmentation (image and video filters):

         i.  inflict unrealistic and biased beauty standards upon users, and

         ii.  cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

     i.  The platforms cause the mental and physical health harms as listed above;

     j.  The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

     k.  The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

     l.  The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

258.    DEFENDANTS received a measurable benefit at the expense of Plaintiff in the form of ad revenue and other revenue derived from consumers use of Facebook and Instagram.

259.    DEFENDANTS appreciated, recognized, and chose to accept the monetary benefits Plaintiff's registration and use of the platforms conferred onto DEFENDANTS at the Plaintiff's detriment. These benefits were the expected result of DEFENDANTS acting in their pecuniary interests at the expense of its users.

260.    The harm causing features listed above were the same platform components that increased Meta's revenue—addiction and overuse of the platforms directly creates increased ad revenue for the company. The benefit to Meta came directly at the expense of the Plaintiff's time, mental wellness, and physical health.

261.    There is no justification for DEFENDANTS' enrichment. It would be inequitable, unconscionable, and unjust for DEFENDANTS to be permitted to retain these benefits because the benefits were procured because of their wrongful conduct.

262.     DEFENDANTS wrongfully obfuscated the harm caused by their conduct. Thus, Plaintiff, who mistakenly enriched DEFENDANTS by relying on DEFENDANTS' fraudulent representations, could not and did not know the effect that using Facebook and Instagram would have on Plaintiff's health.

263.     Plaintiff is entitled to restitution of the benefits DEFENDANTS unjustly retained and/or any amounts necessary to return Plaintiff to the position she occupied prior to dealing with DEFENDANTS. Due to the sprawling, decades-long concern about the impacts of technology and the internet on mental and physical health, and litigation commonly following injuries afflicted using the internet, and other notice they have received because of lawsuits filed against them, DEFENDANTS are reasonably notified that Plaintiff would expect compensation from DEFENDANTS' unjust enrichment stemming from their wrongful actions.

264.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## ELEVENTH CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTY

265.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

266.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Alabama. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Alabama.

267.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available,

and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

268. DEFENDANTS violated state law for breach of express warranties and Plaintiff herein will bring a cause of action for breach of express warranty under applicable State common law.

269. Upon information and belief, DEFENDANTS expressly warranted through public statements, press releases, advertisements, marketing materials, sign-up notices, clickwrap (and/or browsewrap or scrollwrap), and descriptions that the platforms Facebook and Instagram were safe for their intended use and that they were safe for youth to use.

270. Upon information and belief, DEFENDANTS expressly warranted to consumers, like Plaintiff, through written or electronic statements, descriptions, and affirmations of fact on its websites, advertising, and marketing materials that Facebook and Instagram would improve users' mental health, sense of community, and emotional connectedness with others.

271. These affirmations of fact became the basis of the bargain between DEFENDANTS and Plaintiff, thereby creating express warranties that Facebook and Instagram would conform to Meta's affirmations of fact, representations, promises, and descriptions.

272. As described herein, the platforms actually use features that cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms, which may cause or contribute to additional disease.

273. These express communications contained misrepresentations and failed to warn of the serious and known risks of Facebook and Instagram as alleged herein.

274.    When DEFENDANTS made these express warranties, they knew the intended purposes of Facebook and Instagram and warranted the product to be, in all respects, safe and proper for such purposes.

275.    DEFENDANTS authored the documents and/or made the statements upon which these warranty claims were based and, in doing so, defined the terms of those warranties. The Facebook and Instagram platforms made available by DEFENDANTS did not conform to DEFENDANTS' promises, descriptions or affirmations and were not adequately designed, developed, tested, promoted and/or fit for the ordinary purposes for which they were intended.

276.    All of the aforementioned written or electronic materials are known to DEFENDANTS and in their possession, and it is Plaintiff's belief that these materials shall be produced by DEFENDANTS and made part of the record once discovery is completed.

277.    DEFENDANTS' breach of these express warranties were a substantial factor in causing Plaintiff's harms.

278.    As a direct and proximate result of DEFENDANTS' breach of these warranties, Plaintiff suffered serious injuries and/or sequelae thereto as alleged herein.

279.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## TWELFTH CAUSE OF ACTION
## BREACH OF AN IMPLIED WARRANTY OF MERCHANTABILITY

280.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

281.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's

66

resident State, Alabama. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Alabama.

282.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

283.    DEFENDANTS at all times were merchants with respect to the Facebook and Instagram platforms provided to Plaintiff and were in the business of programming, developing, disseminating, and operating such products.

284.    Each platform Meta provided comes with an implied warranty that it will be merchantable and fit for the ordinary purpose for which it would be used.

285.    The ordinary intended purposes of the platforms—and the purpose for which they are marketed, promoted, and made available—is to serve as safe social media platforms and allow users to connect with friends, create new and palatable association with strangers, and groups online.

286.    The platforms are not fit for that use—or any other use—because they pose significant risks of substantial mental and physical injury resulting from the use of the products. When used as intended or reasonably foreseeable, Facebook and Instagram adversely impact, worsen, or aggravate users' mental health.

287.    Due to these and other features, the platforms are not fit for their ordinary, intended use and Facebook and Instagram are in fact defective and fail to conform to the platforms implied warranties.

288.    DEFENDANTS have unlawfully breached the platforms implied warranty of merchantability because Facebook and Instagram were not in merchantable condition when made

available, were defective when made available, and do not possess even the most basic degree of fitness for ordinary use.

289.   Despite having received notice of these defects, DEFENDANTS continue to misrepresent the nature of its products and breach its implied warranties.

290.   Plaintiff has had sufficient direct dealings with the platforms DEFENDANTS via its website, apps, platforms, or through retailers acting as agents authorized to distribute Facebook and Instagram (Apple/the "App Store") to establish privity between the platforms.

291.   Further, Plaintiff was a third-party beneficiary of the platforms' agreements with other entities for the distribution of Facebook and Instagram to consumers. Specifically, Plaintiff is the intended beneficiary of the platforms' implied warranties. The platforms' products are manufactured with the express purpose and intent of being made accessible to consumers.

292.   Plaintiff would not have used Facebook and Instagram, or would not have registered or used on the same terms, had she known the facts these Defendants failed to disclose.

293.   DEFENDANTS' breach of these warranties were a substantial factor in causing Plaintiff's harms.

294.   Plaintiff was injured as a direct and proximate result of DEFENDANTS' breach of implied warranties of merchantability. Plaintiff has been harmed by DEFENDANTS' failure to deliver merchantable products in the form of addiction and other negative health consequences.

295.   Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## THIRTEENTH CAUSE OF ACTION
## FITNESS FOR A PARTICULAR PURPOSE

296.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

297.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Alabama. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Alabama.

298.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

299.    DEFENDANTS violated state law for breach of implied warranties and Plaintiff herein will bring a cause of action for breach of implied warranty of fitness for a particular purpose under applicable State common law.

300.    Plaintiff intended to use Facebook and Instagram as safe social media platforms and to improve Plaintiff's mental health, sense of community, and emotional connectedness with others.

301.    DEFENDANTS knew at that time of account registration, and/or had reason to know, the particular purpose for which the products were required by Plaintiff, as evidenced by DEFENDANTS' written and/or electronic statements, descriptions, and affirmations of fact on its websites, print or electronic advertising, marketing materials, sign-up notices, and clickwrap (and/or browsewrap or scrollwrap) that Facebook and Instagram would improve users' mental health, sense of community, and emotional connectedness with others.

69

302.    DEFENDANTS knew at that time of account registration, and/or had reason to know, that Plaintiff was relying on DEFENDANTS' skill or judgment to select or furnish suitable social media platforms.

303.    DEFENDANTS did not effectively exclude or modify this implied warranty at any point during users' registration and interface with the platforms.

304.    As described herein, DEFENDANTS breached this implied warranty because the platforms use features that cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms, which may cause or contribute to additional disease.

305.    DEFENDANTS knew the Plaintiff's intended purposes for Facebook and Instagram and impliedly warranted the product to be, in all respects, safe and proper for such purposes.

306.    DEFENDANTS authored the documents and/or made the statements upon which these warranty claims were based and, in doing so, defined the terms of those warranties. The Facebook and Instagram made available by DEFENDANTS did not conform to DEFENDANTS' promises, descriptions or affirmations and were not adequately designed, developed, tested, promoted and/or fit for the particular purposes for which they were intended.

307.    All of the aforementioned written or electronic materials are known to DEFENDANTS and in their possession, and it is Plaintiff's belief that these materials shall be produced by DEFENDANTS and made part of the record once discovery is completed.

308.    DEFENDANTS' breach of these implied warranties were a substantial factor in causing Plaintiff's harms.

309.     As a direct and proximate result of DEFENDANTS' breach of these warranties, Plaintiff suffered serious injuries and/or sequelae thereto as alleged herein.

310.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FOURTEENTH CAUSE OF ACTION
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

311.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

312.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Alabama. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Alabama.

313.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

314.     DEFENDANTS knew, or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

315.     DEFENDANTS knew, or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

316.     DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause severe emotional

71

distress when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

317.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are fine-tuned to addict users, and forcefully cause physical and mental health harms.

318.    DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

319.    DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, assembled, inspected, tested, marketed, advertised, promoted, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

320.    DEFENDANTS knew or should have known that Facebook and Instagram could cause serious harm, including severe emotional distress, particularly to young persons and minors.

321.    DEFENDANTS knew or should have known that many of the youth who were encouraged to use the platforms had preexisting mental health issues and/or eating disorders who were at enhanced risk of harm by utilizing the misleadingly described platforms, which misrepresented the mental health effects of the platforms and failed to warn of the products' features' impacts and risks.

72

322.     DEFENDANTS were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm, including severe emotional distress.

323.     DEFENDANTS' acts and omissions were extreme and outrageous because they constitute a total lack of care, recklessness, and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm and severe emotional distress to Plaintiff.

324.     DEFENDANTS acted with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions were extreme and outrageous, had a great probability of causing severe emotional distress, and in fact resulted in such harm to Plaintiff.

325.     Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. DEFENDANTS were aware of the risks their platforms posed, as listed herein. After fine-tuning the platforms to be addictive, attention-grabbing, and attention-holding, DEFENDANTS reasonably should have foreseen the emotional distress, mental, and physical issues this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them. Particularly, DEFENDANTS should have foreseen that young people would be particularly susceptible to experiencing severe emotional distress.

326.     Plaintiff was injured as a direct and proximate result of the reckless, extreme, and outrageous conduct as described herein. Such harm includes attempted suicide, multiple periods of suicidal ideation, depression, anxiety, an eating disorder, social media compulsion, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

73

327.     DEFENDANTS' conduct, as described above, was intentional, reckless, wanton, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire lack of care and a conscious and depraved indifference to the consequences of their conduct—including to the health, safety, and welfare of their consumers—and warrants an award of punitive damages.

328.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FIFTEENTH CAUSE OF ACTION
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

329.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

330.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Alabama. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Alabama.

331.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

332.     DEFENDANTS knew, or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

333.     DEFENDANTS knew, or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

74

334. DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause severe emotional distress when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

335. DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are fine-tuned to addict users, and forcefully cause physical and mental health harms.

336. DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

337. DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, assembled, inspected, tested, marketed, advertised, promoted, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

338. DEFENDANTS knew or should have known that Facebook and Instagram could cause serious risk of harm, including severe emotional distress, particularly to young persons and minors.

339. DEFENDANTS knew or should have known that many of the youth who were encouraged to use the platforms had preexisting mental health issues and/or eating disorders who

75

were at enhanced risk of harm by utilizing the misleadingly described platforms, which misrepresented the mental health effects of the platforms and failed to warn of the products' features' impacts and risks.

340.    DEFENDANTS were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm, including severe emotional distress.

341.    DEFENDANTS' acts and omissions were extreme and outrageous because they constitute a total lack of care, recklessness, and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm and severe emotional distress to Plaintiff.

342.    DEFENDANTS acted with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions were extreme and outrageous had a great probability of causing severe emotional distress and in fact resulted in such harm to Plaintiff.

343.    Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. DEFENDANTS were aware of the risks their platforms posed, as listed herein. After fine-tuning the platforms to be addictive, attention-grabbing, and attention-holding, DEFENDANTS reasonably should have foreseen the emotional distress, mental, and physical issues this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them. Particularly, DEFENDANTS should have foreseen that young people would be particularly susceptible to experiencing severe emotional distress.

344.    Plaintiff was injured as a direct and proximate result of the negligent, reckless, extreme, and outrageous conduct as described herein. Such harm includes attempted suicide,

multiple periods of suicidal ideation, depression, anxiety, an eating disorder, social media compulsion, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

345.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SIXTEENTH CAUSE OF ACTION
## NEGLIGENT FAILURE TO RECALL/RETROFIT

346.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

347.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Alabama. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Alabama.

348.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

349.    DEFENDANTS knew, or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

350.    DEFENDANTS knew, or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

351.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause social media addiction,

depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, which may cause or contribute to additional disease.

352.    Defendants owed a duty to the users of the Facebook and Instagram, including Plaintiff, to exercise reasonable care in conducting their business to properly and reasonably design, research, develop, manufacture, produce, process, assemble, inspect, supply, distribute, deliver, broker, market, warn, maintain, repair, modify, recall, retrofit, engineer, test, recommend, advertise, and/or make available Facebook and Instagram.

353.    Defendants also owed a continuing duty to Plaintiff to remove, recall, or retrofit the unsafe and/or defective platforms across the United States (including in Plaintiff's state).

354.    As discussed, Defendants knew or reasonably should have known that the platforms were dangerous and not safe for use (without added protective measures and/or removal of harm causing features, if at all).

355.    Defendants knew or, in the exercise of reasonable and ordinary care, should have known that the platforms were defective and unsafe for Plaintiff, who is a person likely to use the platforms for the purpose and in the manner for which the platforms were intended to be used and for purposes reasonably foreseeable to Defendants.

356.    However, at all times, Defendants negligently breached said duties and unreasonably and negligently allowed the platforms to be used by Plaintiff without proper recall or retrofit or warning.

357.    Defendants have also not made any reasonable effort to remove and/or retrofit the serious safety risk posed by the platforms to consumers.

358.    In failing to properly recall and/or retrofit Facebook and Instagram, or even warn of the serious safety risks the platforms pose to consumers and the public, Defendants have failed

78

to act as a reasonable manufacturer, designer, or distributer would under the same or similar circumstances and failed to exercise reasonable care.

359.    Plaintiff was injured as a direct and proximate result of the negligent conduct as described herein. Such harm includes attempted suicide, multiple periods of suicidal ideation, depression, anxiety, an eating disorder, social media compulsion, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

360.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SEVENTEENTH CAUSE OF ACTION
### MEDICAL MONITORING

361.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

362.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident state, Alabama. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Alabama.

363.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

364.    Facebook and Instagram cause or exacerbate mental and physical health harms, including, but not limited to, depression, anxiety, suicidal ideation, self-harm, thoughts of self-

harm, and eating disorders, among other harmful effects, which may cause or contribute to additional disease.

365. According to Meta's internal research:

    a. At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b. Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c. Facebook makes body-image issues worse for one-third of girls;

    d. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e. Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse;

    f. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

366. Facebook and Instagram cause harm by the following product effects:

    a. Engagement-based ranking and intermittent variable rewards are:

        i. highly addictive,

        ii. promote harmful social comparison,

        iii. promote negative, controversial, and/or emotionally activating content,

        iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,

        v. encourage bullying and conflict,

        vi. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

        vii. present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

    b. Face tracking and augmentation (image and video filters):

        i. inflict unrealistic and biased beauty standards upon users, and

80

      ii.   cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c.   The platforms cause the mental and physical health harms as listed above;

d.   The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e.   The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

f.   The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

367.    Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

368.    The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

369.    The features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or

lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

370.    The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

371.    These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

372.    Potential health harms from these features include, among other types of harm, social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

373.    As a direct and proximate result of DEFENDANTS' conduct, Plaintiff has developed mental and physical health issues that will require life-long monitoring treatment.

374.    As a direct and proximate result of DEFENDANTS' conduct, Plaintiff has a significantly increased risk of developing a serious latent disease and/or injury, suffering further injury at an unknown date in the future. Such injuries include the development and/or exacerbation of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by

suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

375. Monitoring procedures exist that makes the early detection and prevention of the above technology-related and/or induced diseases and mental health issues possible. Many of the above physical and mental issues can lead to other physical and mental health injuries long-term that can be detected and prevented by existing medical and psychological testing and treatment.

376. For example, eating disorders can cause hormone/growth problems, heart problems, neurological problems, abnormal cell growth, and cancer. Anxiety can lead to social impairment, relationships, suicide risk, more frequent hospitalizations, substances abuse (prescribed and non-prescribed), unemployment, somatoform. Nearly all the other kinds of harms listed above commonly lead to other health issues.

377. These procedures are different from that normally recommended in the absence of the exposure. These monitoring procedures include non-routine surveillance studies, laboratory testing, and physical examinations, and would be reasonably necessary according to contemporary scientific principles.

378. Plaintiff has suffered physical, mental, and emotional harms. Anxiety, depression, sleep deprivation, eating disorders (and many of the other harms listed above) are well-known to cause long-lasting conditions, hidden conditions, and health problems that do not manifest fully until much later in life. Existing medical research indicates that these issues can cause permanent digestive tract injury, brain injury, cardiovascular disorders, and many other harms. The injuries such products cause on the human body has already been inflicted in its users, such as Plaintiff, but the full extent of the injury will not manifest until later in Plaintiff's life. Thus, because of DEFENDANTS' conduct, it is reasonably necessary that Plaintiff be placed under periodic screening and/or diagnostic testing beyond that normally recommended in the absence of the issues Plaintiff has suffered due to use of these platforms.

379.    Plaintiff demand judgment against DEFENDANTS for medical monitoring damages to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

380.    Such other relief as the Court deems proper.

## VII.    TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS

381.    Through the exercise of reasonable diligence, Plaintiff did not and could not have discovered that Facebook and Instagram caused her injuries and/or sequelae thereto because, at the time of these injuries and/or sequelae thereto, the cause was unknown to Plaintiff.

382.    Plaintiff did not suspect and had no reason to suspect Facebook and Instagram caused her injuries and/or sequelae thereto until less than the applicable limitations period prior to the filing of this action.

383.    In addition, DEFENDANTS' fraudulent concealment has tolled the running of any statute of limitations. Through their affirmative misrepresentations and omissions, DEFENDANTS actively concealed from Plaintiff the risks associated with the defects of Facebook and Instagram and that these products caused her injuries and/or sequelae thereto. Through their ongoing affirmative misrepresentations and omissions, DEFENDANTS committed continual tortious, and fraudulent acts.

384.    As a result of DEFENDANTS' fraudulent concealment, Plaintiff was unaware and could not have reasonably known or learned through reasonable diligence that she had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of DEFENDANTS' acts and omissions.

## VIII.    DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a trial by jury.

84

## IX.    PRAYER FOR RELIEF

Plaintiff prays for judgment against DEFENDANTS to the full extent of the law, including but not limited to:

1.      Entering judgment for Plaintiff and against DEFENDANTS;

2.      Entering an Order that Defendants are jointly and severally liable;

3.      Damages to compensate Plaintiff for injuries sustained as a result of the use of the platforms, including, but not limited to, physical pain and suffering, mental anguish, loss of enjoyment of life, emotional distress, expenses for hospitalizations and medical treatments, other economic harm that includes, but is not limited to, lost earnings and loss of earning capacity;

4.      Awarding actual and compensatory damages;

5.      Awarding statutory damages in the maximum amount permitted by law;

6.      Awarding exemplary, treble, and/or punitive damages in an amount in excess of the jurisdictional limits;

7.      Awarding reasonable attorneys' fees;

8.      Awarding experts' fees;

9.      Awarding costs of litigation;

10.     Awarding pre-judgment and post-judgment interest at the lawful rate;

11.     A trial by jury on all issues of the case;

12.     Awarding medical monitoring costs or programs; and

13.     Any other relief as this court may deem equitable and just, or that may be available.

DATED:  July 5, 2022

Respectfully Submitted,

**Defendants To Be Served as Follows**:

**Meta Platforms, Inc.**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

**Facebook Holdings, LLC**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

**Facebook Operations, LLC**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

**Facebook Payments, Inc.**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

**Facebook Technologies, LLC**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

**Instagram, LLC.**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

**Siculus, Inc.**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

*/s/ Clinton Richardson*
Andy D. Birchfield, Jr.(3625-C48A)
Jennifer K. Emmel (*pro hac vice*)*
Joseph G. VanZandt (7655-U14D)
Clinton Richardson (0876-H41T)
Seth Harding (*pro hac vice*)*
BEASLEY ALLEN CROW METHVIN
PORTIS & MILES, LLC 234
Commerce Street
Montgomery, AL 36103
Tel:  334-269-2343
Andy.Birchfield@BeasleyAllen.com
Joseph.VanZandt@BeasleyAllen.com
Clinton.Richardson@BeasleyAllen.com
Seth.Harding@BeasleyAllen.com

*/s/ Michael M. Weinkowitz*
Michael M. Weinkowitz (*pro hac vice*)* LEVIN SEDRAN & BERMAN
510 Walnut Street
Suite 500
Philadelphia, PA 19106
Tel: (215) 592-1500
MWeinkowitz@lfsblaw.com

*Attorneys for Plaintiff*

**\*pro hac vice applications forthcoming**

86

# Exhibit A-2

Laura Marquez-Garrett, SBN 221542
laura@socialmediavictims.org
SOCIAL MEDIA VICTIMS LAW CENTER
1390 Market St, Suite 200
San Francisco, CA 94102
Ph: 206-294-1348

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| BLAIR ARANDA and GREGORIO ARANDA, individually, and BLAIR ARANDA as the Personal Representative of the Estate of Brantley Aranda,<br><br>Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC., formerly known as FACEBOOK, INC.,<br><br>Defendants. | CIVIL ACTION NO.<br><br>COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP<br><br><br><br><br><br>JURY DEMAND |

"In these digital public spaces, which are privately owned and tend to be run for profit, there can be tension between what's best for the technology company and what's best for the individual user or for society. Business models are often built around maximizing user engagement as opposed to safeguarding users' health and ensuring that users engage with one another in safe and healthy ways. . . ."

*Protecting Youth Mental Health,* The U.S. Surgeon General's Advisory (December 7, 2021)

Plaintiffs Blair Aranda and Gregorio Aranda, individually, and Blair Aranda, as the Personal Representative of the Estate of Brantley Aranda, bring this action against Meta Platforms, Inc., formerly known as Facebook, Inc. ("Meta"), and allege as follows:

## I.     INTRODUCTION

### A.     Plaintiffs' Claims

1.     This product liability action seeks to hold Meta responsible for causing and contributing to burgeoning mental health crisis perpetrated upon the children and teenagers of the United States by Defendants and, specifically, for injuries Meta caused Brantley Aranda resulting in his wrongful death.

2.     Brantley suffered injuries proximately caused by Meta's unreasonably dangerous and defective Facebook product, including but not limited to, addiction, anxiety, anger, depression, self-harm, suicidal ideation, and ultimately death. On September 4, 2019, after struggling with the harmful effects of Defendants' social media products, 17-year-old Brantley died by suicide.

3.     Meta's social media product likewise caused foreseeable harms to Plaintiffs Blair and Gregorio Aranda. Blair and Gregorio Aranda did not consent to Meta distributing or otherwise providing their child with access to harmful social media products and were emotionally and financially harmed by Meta's addictive design and distribution and provision of harmful social media products to their minor child.

4.     Meta's Facebook product contains unique product features which are intended to and do encourage addiction, and unlawful content and use of said products, to the detriment of Meta's minor users.

5.     Meta programs and operates its algorithms and social media products to engagement and profits over user safety. This includes designing and distributing inherently dangerous products that appeal to kids, and operating algorithms and other technologies in a manner that promotes and amplifies harmful content.

6.     Plaintiffs suffered several emotional, physical, and financial harms as a result—all of which are a symptom of the current health crisis among American youth and,

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

by natural and foreseeable extension, American families, caused by certain, harmful social media products such as the ones at issue in this case.

**B.      Meta Knows or Should Know of the Harm Its Products Cause**

7.      In late 2021, a Facebook whistleblower disclosed thousands of internal Meta documents to the United States Securities Exchange Commission (the "SEC") and Congress. The Facebook Papers prove known dangerous designs and design defects as well as operational decisions and calculations, and a causal relationship between use of Meta's various social media products in their current form and resulting addiction, anxiety, depression, eating disorders, exploitation and grooming, and what Meta internally refers to as "SSI" (Suicide and Self Injury). Examples of the Facebook papers include and can be found at the following locations, to name only some examples:

8.      The Wall Street Journal and Digital Wellbeing published several of the Facebook Papers in November 2021,[1] including but not limited to,

    a.    <u>Social Comparison: Topics, celebrities, Like counts, selfies</u> [Jan 2021 internal document reporting findings in a 9-country user survey (n=100,000) in Australia, Brazil, France, Germany, Great Britain, India, Japan, Korea, USA].

    b.    <u>Appearance-based Social Comparison on Instagram</u> [Feb 2021 internal document reporting finding from a 10-country user survey (n=50,590) across Australia, Brazil, France, Germany, Great Britain, India, Japan, Korea, Mexico, USA].

    c.    Mental Health Findings: Deep dive into the reach, intensity, Instagram impact, self-reported usage and support of mental health issues [2019 internal document reporting findings from a 6-country user survey (n=22,410) across Brazil, India, Indonesia, Japan, Turkey, USA].

    d.    <u>Teen Girls Body Image and Social Comparison on Instagram – An Exploratory Study in the US</u> [2020 internal document reporting findings from a one-country (US) qualitative research study (n = 15 for focus groups) with young Instagram users (aged 13-21, supplemented by online diaries (n = 10) and video interviews (n = 7)].

    e.    <u>Teen Mental Health Deep Dive</u> [2019 internal document reporting findings from a 2-country (UK and US) qualitative research study (n = 40 in-person interviews, with follow-up video calls (n = 8) with young Instagram users (aged 13-17), supplemented by online survey (n = 2,503)].

---

[1] https://digitalwellbeing.org/the-facebook-files-on-instagram-harms-all-leaked-slides-on-a-single-page/

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

  f. <u>Teens and Young Adults on Instagram and Facebook</u> [2021 internal document reporting findings from a five-country study (Australia, France, Great Britain, Japan, USA) with user data].

 9. Gizmodo has been publishing the Facebook Papers, several at a time, also starting in November 2021,[2] including but not limited to,

  a. Why We Build Feeds

  b. Is Ranking Good

  c. Big Levers Ranking Experiment

  d. [LAUNCH] Civic Ranking: Engagement-Based Worth Your Time

  e. MSI Metric Note Series

  f. The Meaningful Social Interactions Metric Revisited: Part 2

  g. The Meaningful Social Interactions Metric Revisited: Part 4

  h. The Meaningful Social Interactions Metric Revisited: Part 5

  i. Meaningful Social Interactions Useful Links

  j. MSI Documentation

  k. Evaluating MSI Metric Changes with a Comment-Level Survey

  l. Surveying The 2018 Relevance Ranking Holdout

  m. Overview of MSI + Pages and Survey Research

  n. Is Multi-Group Picker "Spammy?"

  o. Filtering Out Engagement-Bait, Bullying, and Excessive Comments From MSI Deltoid Metric

  p. [LAUNCH] Using p(anger) to Reduce the Impact Angry Reactions Have on Ranking Levers

  q. Planned MSI Metric Changes in 2020

  r. MSI Metric Changes for 2020 H1

  s. Should We Reduce the MSI Weight of Sticker Comments?

  t. Max Reshare Depth Experiment

  u. "Understand This Post's Ranking" —How I Miss Thee!

---

[2] https://gizmodo.com/facebook-papers-how-to-read-1848702919

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

v.   Facebook and Responsibility

w.   The Surprising Consequences to Sessions and MSI Caused by Turning Off Video Autoplay on News Feed

x.   One-Go Summary Post for Recent Goaling and Goal Metric Changes for News Feed

y.   News Feed UXR Quarterly Insights Roundup

z.   What Happens If We Delete Ranked Feed?

aa.  News Feed Research: Looking Back on H2 2020

bb.  Content from "Political" Pages in In-Feed Recommendations

cc.  Political Content in In-Feed Recommendations (IFR)

dd.  In-Feed Recommendations HPM —April 15 2021

10.   These documents and articles referencing these documents are incorporated by reference into this Complaint. The sole reason they are not attached is length and file size. However, the contents of these documents and other Facebook Papers is material to Plaintiffs' claims.

11.   What the Facebook Papers also establish, is that Meta's social media products—including Facebook—are highly addictive and harmful to a significant population of all users, including and especially teens; that certain design features that serve no functional purpose (for example, "likes," filters, and product designs that actively encourage addiction) are harming users; and that algorithms and algorithm-driven product features are dangerous and harmful by design and as designed.

12.   Despite knowledge of the dangerous and harmful characteristics of their products, Meta has made and continue to make calculated cost-benefit business decisions and is consistently prioritizing its already astronomical profits over human life.

C.   **The Social Media Epidemic Among Children**

13.   On December 7, 2021, the United States Surgeon General issued an advisory cataloging a dramatic increase in teen mental health crises including suicides, attempted suicides, eating disorders, anxiety, depression, self-harm, and inpatient admissions. Between 2007 and 2018, for example, suicide rates among youth ages 12 to 16 in the U.S. increased

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

a staggering 146 percent. Several cities across the United States have been experiencing teen suicide rates in the range of 1 every year or other year, which is an absolute crisis for our country—the death by suicide of a child is something that should be an exception and not a rule. The incidence of serious depression and dissatisfaction with life in this age group has likewise increased dramatically, and there is no question that these harms relate in no small part to companies like Defendants.

14. The most significant and far-reaching change to the lives of young people in the last ten years has been the widespread adoption of social media platforms and prominently, for purposes of this lawsuit, the Facebook product, which is designed and distributed by Meta.

15. By 2014, 80 percent of high-school students said they used social media daily, and 24 percent said that they were online "almost constantly."

16. In April of 2018, an estimated 47% of all American teens aged 13 to 14 used Facebook and an estimated 54% of all American teens aged 15 to 17 used Facebook.[3] This equates to millions of at-risk teenage Facebook users in the United States alone.

17. Teens make up a significant percentage of all social media users and, in the United States, they represent Meta's only significant opportunity for growth due to saturation of the adult market. Meta sees them as a gateway for other potential users, that is, they use U.S. teens to recruit parents and adult relatives as well as younger siblings – including pre-teen siblings Meta is not permitted to provide accounts to but to whom Meta does provide accounts, by simply refusing to verify age and identification on the front end and then by turning a blind eye where possible and in the interest of profits. On information and belief, U.S. teens also are the most lucrative for Meta when it comes to advertising revenue.

**D. Disparities Between Public Statements and Harm to Children**

18. Peer reviewed studies and available medical science have also identified a particular type of social media and electronic device use associated with major mental health

---

[3] https://www.statista.com/statistics/419360/us-teen-facebook-users-age-reach/

6

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

injuries, including depression, self-harm, eating disorders, suicide attempts and ideation, dissatisfaction with life, depression, and sleep deprivation. Large observational studies and experimental results also point to heavy use of certain social media products as cause of increased depression, suicidal ideation, and sleep deprivation among teenagers, particularly teenage girls. Meta has spent years publicly denying these findings—while internally confirming them.

19. Specifically, Meta leadership has vehemently denied that its products are harmful or addictive. Meta has gone to great lengths to assure the world that its social media products are safe, and makes extensive safety-related representations in its Terms of Service for Facebook (effective January 4, 2022),

- **Combat harmful conduct and protect and support our community:** People will only build community on Meta Products if they feel safe and secure. We work hard to maintain the security (including the availability, authenticity, integrity, and confidentiality) of our Products and services. We employ dedicated teams around the world, work with external service providers, partners and other relevant entities and develop advanced technical systems to detect potential misuse of our Products, harmful conduct towards others, and situations where we may be able to help support or protect our community, including to respond to user reports of potentially violating content. If we learn of content or conduct like this, we may take appropriate action based on our assessment that may include – notifying you, offering help, removing content, removing or restricting access to certain features, disabling an account, or contacting law enforcement. We share data across **Meta Companies** when we detect misuse or harmful conduct by someone using one of our Products or to help keep Meta Products, users and the community safe. For example, we share information with Meta Companies that provide financial products and services to help them promote safety, security and integrity and comply with applicable law. Meta may access, preserve, use and share any information it collects about you where it has a good faith belief it is required or permitted by law to do so. For more information, please review our **Privacy Policy**.

*See* Facebook Terms of Service, ¶ 1.

20. Despite Meta's representations that it is providing a "safe and secure" platform and that it utilizes its technology to the utmost to keep its users safe, Meta's own internal research proves the opposite. The Facebook Papers include years' worth of studies and reports discussing the fact that Facebook is addictive and harmful, and that use of Facebook can and does lead to serious mental health issues in a significant number of users, including things like anxiety, depression, sleep deprivation, and what Meta refers to

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

internally as "SSI" – which stands for Suicide and Self Injury.[4]

21. Meta has denied for years that its products are harmful or addictive while, in fact, its products *are* harmful and addictive, and Meta knows it. Meta knew the truth and chose to conceal it and to not disclose to the public or parents of young users, as Meta knew that such disclosure would prevent it from further growth and development of these products and product features.

22. Moreover, Meta's Facebook social media product contains unique product features which are intended to and do encourage addiction, and unlawful content and use of said products, to the detriment of Meta's minor users and their families. To name only one example, at all times relevant, when a use tried to leave Facebook they would get a series of messages intended to aggressively convince them to stay. This includes photos of loved ones with captions letting the user know that they would no longer be able to keep in touch if they chose to de-activate. In short, addicted users often try to deactivate their account as a means of detoxing from Meta's addictive social media product, in response to which Meta has designed a product feature that dissuades those addicted users from detoxing. These Facebook features and designs have nothing whatsoever to do with functionality of the product, communication, or third-party content – they are aimed solely at keeping users addicted to the product, no matter how harmful that addiction may be.

23. Meta knows exactly the harms that its Facebook product has caused and is still causing yet remains focused on maintaining and increasing user engagement which translates into greater profits for Meta. On information and belief, there have been studies dating back almost a decade on related topics, which studies are not known or, in some cases, even made available to the general public; but Meta knew or should have known about these studies as, often times, they related to the products being designed and developed by Meta and Meta's scientists and/or engineers.[5]

---

[4] *See https://digitalwellbeing.org/the-facebook-files-on-instagram-harms-all-leaked-slides-on-a-single-page/* ("'SSI' stands for suicide and self-injury.")
[5] *See, e.g.*, Sept. 30, 2021, Senate Hearing Transcript, at 1:07:47 (reference to study published in National Academy of Sciences "way back in 2014.").

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

24.     Meta also knows that its recommendations and other product features, that is, features whereby Meta promotes and/or send content to users and otherwise tries to connect users who, in fact, are often complete strangers, result in disproportionate harms to vulnerable users including children and teens. Yet Meta continues to reap astronomical profits at the expense of these users.

25.     For example, Meta has an algorithm that recommends "People You May Know" to users, which means that Meta suggests to users other users they may want to "friend" or "follow." These recommendation systems serve the singular purpose of making more money for Meta in that they are meant to keep users engaged through connections, which connections are suggested, prompted, and encouraged by Meta. But also, which connections involve complete strangers and where Meta's own recommendation system frequently makes and perpetuates harmful recommendations, as they did in the case of Brantley Aranda and millions of other teens.

26.     Likewise, Meta knows that its recommendation algorithms are responsible for the exposure of young users to harmful groups – including and, as relevant for purposes of this lawsuit, self-harm, eating disorder, even suicide-promoting groups which Meta, through its algorithms, actively recommends to children and teens on a regular basis.

27.     Meta also knows that its Facebook product is contributing to teen depression, anxiety, even suicide and self-harm. Why doesn't it change these harmful product features and stop utilizing algorithms in connection, at least, with teen accounts? Because Meta's top priority is growth and competition concerns, and Meta sees acquiring and retaining teens as essential to its survival. Teenagers spend significantly more time on social media than adults (both total time and user sessions—which are usage patterns linked to addiction), represent Meta's greatest (if not only) growth opportunity in the US, and can be used by Meta to recruit older and younger family members and friends.

28.     Meta also believes that teens are the best way to capture household adults and children. Pre-teens look to their older siblings in terms of which social media products to use and how to use them, and often obtain guidance from them to open their first account, while

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

parents and grandparents are influenced by teen household members and open accounts to participate in their child's life.

29.     Meta knew that its product was harming millions of its users, up to and including what Meta refers to as SSI (Suicide and Self-Injury). Yet Meta leadership chose *repeatedly* to ignore its own research and reject the recommendations of a small number of employees in favor of its own economic interests. In September of 2017, the New York Times published an article titled "Facebook's Frankenstein Moment,"[6] which discussed the fact that Facebook was enabling advertisers to target users with offensive terms. In that article, former Meta CEO, Sheryl Sandberg, was quoted as saying "We never intended or anticipated this functionality being used this way – and that is on us." Meta leadership lied or, at best, made material omissions meant to lull Americans into trusting Meta so that it could continue increasing its own growth and engagement with zero oversight and at the *anticipated* expense of human life.

30.     Specifically, there were many ways in which Meta employees could have anticipated, should have anticipated, and did anticipate harms that Meta's social media products – including and specifically Facebook – were causing. Meta leadership simply chose to ignore employees tasked with safety (referred to internally by Meta as "integrity") and refused to make changes in the interest of its bottom line.

31.     Meta launched new products and designs without safety testing, despite knowing that its products can cause harm.

32.     Meta launched new products and designs *even when* testing or analysis was done and red flags were raised internally about potential harms to users.

33.     Meta refused to fix identified harms, even when those harms were likely to cause suicide and self-injury in Meta's youngest users – children and teens.

34.     Instead of addressing known harms and risks to users, Meta leadership has taken to ridiculing and ostracizing conscientious employees who try to sound the alarm, as

---

[6] https://www.nytimes.com/2017/09/21/technology/facebook-frankenstein-sandberg-ads.html

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

means of silencing potential opposition.

35.     Meta anticipated the harms its products would cause, and moved forward with them anyway, resulting in the harms at issue in this complaint.

36.     Meta also knows that constant comparison on social media is the reason' why there are higher levels of anxiety and depression in young people. Harmful social comparison is the result of social media's design and operation, not some third-party publisher. For example, addictive design elements that are intended to and do addict young users, *i.e.* push notifications, reward systems, continuous scroll feature, and the "like" button; harmful social comparison features that serve no informational purpose, *i.e.* filters and the "like" button; and decisions Meta makes with regard to the types of advertisements and other content Meta promotes and amplifies, and even which users it will direct that content towards in its goal of increasing engagement at any cost.  These are deliberate choices being made by Meta, and Meta alone.

37.     The Facebook product includes multiple product features that cause harm to teen users. For example, product features that enable users to like or love other user's content results in increased addiction and social comparison harms.

38.     Meta's Direct Message feature also restrictions when it comes to teens and children. Meta encourages children and teens to use its social media product, then its makes those children and teens accessible to strangers (for example, by permitting public profiles and/or viewing of content posted by these children and teens), then it provides predators with a direct means of communication (Direct Messaging features).

39.     On information and belief, Meta is incredibly guarded when it comes to the types of data it collects, to the point where it will not even disclose certain, critical information to parents and/or police and other law enforcement upon request.

40.     Meta knows that teens are more vulnerable and suffer harms from use of its social media products at higher rates than adult users. Meta also knows that teens access social media longer and more often than adults. Advertisers are willing to pay a premium for unfettered access to child and teens so Meta, in turn, works hard to make its social media

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

products as appealing to teens as possible, even though they are harmful to teens.

**E.    Meta Focuses on Profits Over Safety**

41.    Meta knows the harmful impact its Facebook social media product has. Instead of warning users and/or re-designing its product to make it safer, however, Meta chooses enhancing profits over protecting human life.

42.    The problematic use identified in medical literature is precisely the type of use Meta has designed its products to encourage through psychological manipulation techniques—sometimes referred to as persuasive design—that is well-recognized to cause all the hallmarks of clinical addiction.

43.    Meta slowly switched its News Feed (in its Facebook and Instagram products) from maximizing time-spent to maximizing sessions, even though it knew that maximizing sessions is harmful to its users. Meta also knows that its "like" button causes harmful social comparison, and results in anxiety and depression in teens. Meta has repeatedly refused to protect its users from harm for fear of offending other users, decreasing teen engagement, and/or losing revenue from its advertisers as a result.

44.    Ultimately, Meta has control over its technology and product design and how it is used and implemented. Meta can protect children, but in every case, Meta has chosen instead to make its Facebook product more popular and more accessible – at the cost of the health and wellbeing of their young users. In other words, Meta knows that its products are harmful and dangerous, could make them less harmful and less dangerous, but opt instead for attracting and retaining new users (valuing profits ahead of safety).

45.    In other words, Meta is perfectly capable of enforcing its own Terms of Service, Community Standards, and other guidelines, with minimal cost. It can adjust controls in a manner that would better protect its users, especially children and teens, from certain, significant harms caused by Meta's user setting options, recommendations, and other algorithmic-driven product features. Yet, Meta repeatedly conducts its engagement-driven, cost-benefit analysis and repeatedly chooses profit over human life. That is not a choice Meta has the right to make.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

46.     Meta leadership has structured its three main groups—integrity, growth, and engagement—in a manner that actively frustrates and prevents the integrity group from making meaningful changes for the protection of its users. More to the point, Meta leadership places no such barriers when it comes to growth and engagement. Instead, Meta develops and implements products and product features in a manner that deliberately fails to account for the safety of its users—including millions of children and teens in the US alone.

47.     Upon information and belief, Meta senior leadership repeatedly refuses to take action on serious integrity issues unless it believes that it has no other choice—that is, Meta will not fix product defects (even where needed to save human lives) unless it its convinced that the financial and public opinion cost of doing nothing will be greater than the impact on its revenue of doing what is legally and ethically required.

48.     Nor does Meta intend to make the changes necessary to protect young users. For example, after the Facebook Whistleblower came forward and the first products liability lawsuits were filed, Meta began making small product changes, in an effort to mimize the impact of the truth about the harmfulness of its products. But Meta's new claims of prioritizing user safety are as false as the prior ones.

**F.     Overview of Claims**

49.     Plaintiffs bring claims of strict liability based upon Meta's defective design of its Facebook social media product that renders such product not reasonably safe for ordinary consumers or minor users. It is technologically feasible to design social media products that substantially decrease both the incidence and magnitude of harm to ordinary consumers and minors arising from their foreseeable use of Meta's product with a negligible increase in production cost.

50.     Meta has consistently and knowingly placed its own profit over the health and welfare of its teen and child users, recognizing astronomical gains at their expense.

51.     Plaintiffs also bring claims for strict liability based on Meta's failure to provide adequate warnings to minor users and their parents of danger of mental, physical, and emotional harms arising from foreseeable use of its Instagram social media product. The

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

addictive quality of Facebook and its harmful algorithms are unknown to minor users and their parents.

52.     Plaintiffs also bring claims for common law negligence arising from Meta's unreasonably dangerous Facebook social media product and its failure to warn of such dangers. Meta knew, or in the exercise or ordinary care should have known, that its social media product was harmful to a significant percentage of its minor users and failed to redesign its product to ameliorate these harms. Meta also failed to warn minor users and their parents of foreseeable dangers arising out of use of its Facebook product.

53.     Meta's own former and/or current developers often do not allow their own children and teenagers to use the Facebook product. For many years, Meta has had actual knowledge that its Facebook social media product is dangerous and harmful to children but actively concealed these facts from the public and government regulators and failed to warn parents about this known harm for continued economic gain.

54.     Plaintiffs bring claims for fraud and fraudulent concealment. Meta spent years lying to Congress and the public about the nature of its products and harms they cause. Meta made affirmative statements and material omissions of fact designed to lull potential users into trusting that their social media products were safe, and that Meta was prioritizing user safety over its own profits, and Plaintiffs reasonably relied on those affirmative statements and material omissions of fact. Meta not only knew that its statements were false, but Meta and its leadership actively concealed the truth by lying to the public and, further, by creating a corporate culture of fear – conscientious Meta employees were made to believe that they would be ruined and not believed, and that their actions would result in others not being able to effectuate change from the inside if they revealed the truth. Meta knew that its products were not safe and that children like Brantley Aranda would be harmed by their use. Had Plaintiffs known the truth, they would never have allowed Brantley Aranda to use Meta's Facebook social media product.

55.     Plaintiffs' claims do not arise from third party content, but rather, Defendants' product features and designs, including but not limited to algorithms and other product

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

features that addict minor users, amplify and promote harmful social comparison, affirmatively select and promote harmful content to vulnerable users based on their individualized demographic data and social media activity, direct harmful content in great concentrations to vulnerable user groups, put minor users in contact with dangerous adult predators, enable and encourage minors to hide harmful content from their family and friends, encourage and facilitate exploitation and abuse of minors through marketing, recommendation and messaging features, and data policies involving the concealment and/or destruction of information necessary to the protection of minors, and otherwise prioritize engagement (and Defendants' profits) over user safety.

## II. PARTIES

56.     Plaintiffs Blair and Gregorio Aranda are individuals residing in Jonesboro, Louisiana, and Plaintiff Blair Aranda is in the process of being appointed the administrator of the Estate of her son, Brantley Aranda, who died on September 4, 2019. Plaintiffs have not entered into any User Agreements or other contractual relationship with Meta in connection with Brantley Aranda's use of its social media product. As such, in prosecuting this action Plaintiffs are not bound by any arbitration, forum selection, choice of law, or class action waiver set forth in said User Agreement(s). Additionally, as Personal Representative of the Estate of Brantley Aranda, Plaintiff Blair Aranda expressly disaffirms all User Agreements with Meta into which her son may have entered.

57.     Defendant Meta Platforms, Inc., formerly known as Facebook, Inc., is a Delaware corporation with its principal place of business in Menlo Park, CA. Defendant Meta Platforms owns and operates the Facebook and Instagram social media platforms, application that are widely available to users throughout the United States.

## III. JURISDICTION AND VENUE

58.     This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, and Plaintiff and Defendants are residents and citizens of different states.

59.     This Court has personal jurisdiction over Defendant Meta because it

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

is headquartered and has its principal place of business in the State of California. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendant Meta's principal places of business is in the Northern District of California.

## IV. DIVISIONAL ASSIGNMENT

60. The case is properly assigned to the San Francisco Division pursuant to Civ. L. R. 3-2(c)–(d) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in San Mateo County, where Defendant Meta Platforms, Inc. maintains its primary place of business.

## V. FACTUAL ALLEGATIONS

### A. Facebook Background and Products

61. Facebook is an American online social network service that is part of the Meta Platforms. Facebook was founded in 2004, at which time, Facebook was nothing like the product it is today. In fact, when Facebook was first founded, only students at certain colleges and universities could use the social media product – and verification of college enrollment was required to access the social media product. This verification mechanism was a product feature having nothing to do with communication or operation of the Facebook social media product; and further, if that verification mechanism had been kept in place, Brantley Aranda would not have become addicted to the Facebook social media product, which addiction and related harms ultimately lead to his death.

62. In 2005, Facebook expanded and became accessible to students at twenty-one universities in the United Kingdom and others around the world. Meta launched a high school version of its Facebook product, which Meta CEO and majority shareholder, Mark Zuckerberg referred to as the next logical step. Even then, however, high school networks required an invitation to join.

63. Facebook later expanded eligibility to employees of several companies, including Apple Inc. and Microsoft. On December 11, 2005, Facebook added universities in Australia and New Zealand to its network and, in September 2006, Facebook opened itself up to everyone. At the time, Facebook claimed that it was open only to persons aged 13 and

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

older and with a valid email address, *however,* on information and belief, Facebook made the decision to no longer require verification of age and/or identity and did not actually verify user email address, such that underage users could literally enter nonsense email addresses and would be provided by Meta with access to a Facebook account.

64. Meta's history proves that Meta knows how to implement product features meant to restrict access to persons above a certain age or even employed in certain industries and at certain companies. Meta's initial audience was limited to college students and older, but in 2006, Meta made the deliberate, business decision to instead begin distributing its product to everyone in the world with wi-fi access, regardless of the consequences.

65. Facebook then underwent a series of significant product changes, aimed at increasing user engagement and product growth, but again, without regard to user safety. To name only some examples,

a. In February 2009, Facebook launches the "like" button.

b. In August and October of 2011, Facebook launches Facebook Messenger.

c. In September 2011, Facebook increases the character limit for status updates from 500 to 5,000 (and later to 63,206) and starts allowing people to subscribe to non-friends.

d. In January 2012, Facebook starts showing advertisements in its news feed, called Feature Posts at the time.

e. In June 2012, Facebook launches Facebook Exchange (FBX), a real-time bidding ad system where advertisers can bid on users based on third-party websites visited by the users (as tracked by a cookie on the third-party website).

f. In June 2013, Facebook launches Stickers.

g. In March 2014, Facebook's facial recognition algorithm (DeepFace) reaches near-human accuracy in identifying faces.

h. In April 2014, Facebook launches anonymous login so people can use its product without giving Facebook their data.

i. In March 2015, makes clear that it wants to be an integrated bunch of apps, each fulfilling a somewhat different role. At the time, the company's leading applications include Facebook (its main app), Messenger, and externally built and acquired apps like Instagram and WhatsApp. Facebook announces changes to Facebook Messenger to make it more of a platform, things like a new real-time comments system, embeddable videos, and spherical video.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

j.  In June and July 2015, Facebook makes changes to its news feed algorithm, including use of information on how long people hover on a particular item to gauge levels of interest, in addition to activities it was already using (*i.e.* likes, comments, shares) as part of its algorithm and to determine what content to show Facebook users.

k.  In August 2015, Facebook launches its live-streaming product.

l.  In April 2016, Facebook launched more tools for Facebook apps and Facebook Live; in addition, it is now considering the time that a person spends reading content *off* Facebook as part of its news feed algorithm process.

m.  In November 2016, Facebook launches games for its social media product, so users can play without having to install new apps.

n.  In November 2017, Facebook launches Facebook Creator, which is an app for mobile video posts that helps with content creation.

o.  In November 2007, Facebook launches Facebook Beacon, which is part of Facebook's advertisement system that sends data from external websites to Facebook for the purpose of allowing targeted advertisements and allowing users to share their activities with friends.

66.  Throughout these product changes, re-designs, and launches, Facebook founder and CEO, Mark Zuckerberg, made public statements assuring the world that safety was Meta's (then Facebook) top priority. For example, in February of 2017, he made a post on his personal Facebook titled "Building Global Community," in which he talked at length about how Meta is focused on safety, how it intends to use its AI to the fullest to keep users safe, and how amazing Facebook is for bringing communities together, promoting critically important social groups, and other statements that we now know to be untrue, and profoundly dangerous, given what was actually happening at Facebook and what Mr. Zuckerberg knew about the harms his products were causing American youth. He wrote,

To our community,

On our journey to connect the world, we often discuss products we're building and updates on our business. Today I want to focus on the most important question of all: are we building the world we all want?

History is the story of how we've learned to come together in ever greater numbers -- from tribes to cities to nations. At each step, we built social infrastructure like communities, media and governments to empower us to achieve things we couldn't on our own.

18

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

Today we are close to taking our next step. Our greatest opportunities are now global -- like spreading prosperity and freedom, promoting peace and understanding, lifting people out of poverty, and accelerating science. Our greatest challenges also need global responses -- like ending terrorism, fighting climate change, and preventing pandemics. Progress now requires humanity coming together not just as cities or nations, but also as a global community.

This is especially important right now. Facebook stands for bringing us closer together and building a global community. When we began, this idea was not controversial. Every year, the world got more connected and this was seen as a positive trend. Yet now, across the world there are people left behind by globalization, and movements for withdrawing from global connection. There are questions about whether we can make a global community that works for everyone, and whether the path ahead is to connect more or reverse course.

This is a time when many of us around the world are reflecting on how we can have the most positive impact. I am reminded of my favorite saying about technology: "We always overestimate what we can do in two years, and we underestimate what we can do in ten years." We may not have the power to create the world we want immediately, but we can all start working on the long term today. In times like these, the most important thing we at Facebook can do is develop the social infrastructure to give people the power to build a global community that works for all of us.

For the past decade, Facebook has focused on connecting friends and families. **With that foundation, our next focus will be developing the social infrastructure for community -- for supporting us, for keeping us safe, for informing us, for civic engagement, and for inclusion of all**.

Bringing us all together as a global community is a project bigger than any one organization or company, but Facebook can help contribute to answering these five important questions:

- How do we help people build supportive communities that strengthen traditional institutions in a world where membership in these institutions is declining?

- **How do we help people build a safe community that prevents harm**, helps during crises and rebuilds afterwards in a world where anyone across the world can affect us?

- How do we help people build an informed community that exposes us to new ideas and builds common understanding in a world where every person has a voice?

19

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

- How do we help people build a civically-engaged community in a world where participation in voting sometimes includes less than half our population?

- How do we help people build an inclusive community that reflects our collective values and common humanity from local to global levels, spanning cultures, nations and regions in a world with few examples of global communities?

My hope is that more of us will commit our energy to building the long term social infrastructure to bring humanity together. The answers to these questions won't all come from Facebook, but I believe we can play a role.

**Our job at Facebook is to help people make the greatest positive impact while mitigating areas where technology and social media can contribute to divisiveness and isolation**. Facebook is a work in progress, and we are dedicated to learning and improving. **We take our responsibility seriously, and today I want to talk about how we plan to do our part to build this global community**.

**Supportive Communities**

Building a global community that works for everyone starts with the millions of smaller communities and intimate social structures we turn to for our personal, emotional and spiritual needs.

Whether they're churches, sports teams, unions or other local groups, they all share important roles as social infrastructure for our communities. They provide all of us with a sense of purpose and hope; moral validation that we are needed and part of something bigger than ourselves; comfort that we are not alone and a community is looking out for us; mentorship, guidance and personal development; a safety net; values, cultural norms and accountability; social gatherings, rituals and a way to meet new people; and a way to pass time.

In our society, we have personal relationships with friends and family, and then we have institutional relationships with the governments that set the rules. A healthy society also has many layers of communities between us and government that take care of our needs. When we refer to our "social fabric", we usually mean the many mediating groups that bring us together and reinforce our values.

However, there has been a striking decline in the important social infrastructure of local communities over the past few decades. Since the

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

1970s, membership in some local groups has declined by as much as one-quarter, cutting across all segments of the population.

The decline raises deeper questions alongside surveys showing large percentages of our population lack a sense of hope for the future. It is possible many of our challenges are at least as much social as they are economic -- related to a lack of community and connection to something greater than ourselves. As one pastor told me: "People feel unsettled. A lot of what was settling in the past doesn't exist anymore."

**Online communities are a bright spot, and we can strengthen existing physical communities by helping people come together online as well as offline**. **In the same way connecting with friends online strengthens real relationships, developing this infrastructure will strengthen these communities, as well as enable completely new ones to form.**

A woman named Christina was diagnosed with a rare disorder called Epidermolysis Bullosa -- and now she's a member of a group that connects 2,400 people around the world so none of them have to suffer alone. A man named Matt was raising his two sons by himself and he started the Black Fathers group to help men share advice and encouragement as they raise their families. In San Diego, more than 4,000 military family members are part of a group that helps them make friends with other spouses. These communities don't just interact online. They hold get-togethers, organize dinners, and support each other in their daily lives.

We recently found that more than 100 million people on Facebook are members of what we call "very meaningful" groups. These are groups that upon joining, quickly become the most important part of our social network experience and an important part of our physical support structure. For example, many new parents tell us that joining a parenting group after having a child fits this purpose.

**There is a real opportunity to connect more of us with groups that will be meaningful social infrastructure in our lives**. **More than one billion people are active members of Facebook groups, but most don't seek out groups on their own -- friends send invites or Facebook suggests them**. If we can improve our suggestions and help connect one billion people with meaningful communities, that can strengthen our social fabric.

Going forward, we will measure Facebook's progress with groups based on meaningful groups, not groups overall. **This will require not only helping people connect with existing meaningful groups, but also enabling community leaders to create more meaningful groups for people to connect with**.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

The most successful physical communities have engaged leaders, and we've seen the same with online groups as well. In Berlin, a man named Monis Bukhari runs a group where he personally helps refugees find homes and jobs. Today, Facebook's tools for group admins are relatively simple. We plan to build more tools to empower community leaders like Monis to run and grow their groups the way they'd like, similar to what we've done with Pages.

Most communities are made of many sub-communities, and this is another clear area for developing new tools. A school, for example, is not a single community, but many smaller groups among its classes, dorms and student groups. Just as the social fabric of society is made up of many communities, each community is made of many groups of personal connections. We plan to expand groups to support sub-communities.

We can look at many activities through the lens of building community. Watching video of our favorite sports team or TV show, reading our favorite newspaper, or playing our favorite game are not just entertainment or information but a shared experience and opportunity to bring together people who care about the same things. **We can design these experiences not for passive consumption but for strengthening social connections**.

Our goal is to strengthen existing communities by helping us come together online as well as offline, as well as enabling us to form completely new communities, transcending physical location. When we do this, beyond connecting online, we reinforce our physical communities by bringing us together in person to support each other.

A healthy society needs these communities to support our personal, emotional and spiritual needs. In a world where this physical social infrastructure has been declining, we have a real opportunity to help strengthen these communities and the social fabric of our society.

**Safe Community**

As we build a global community, this is a moment of truth. Our success isn't just based on whether we can capture videos and share them with friends. **It's about whether we're building a community that helps keep us safe -- that prevents harm, helps during crises, and rebuilds afterwards.**

Today's threats are increasingly global, but the infrastructure to protect us is not. Problems like terrorism, natural disasters, disease, refugee crises, and climate change need coordinated responses from a worldwide vantage point. No nation can solve them alone. A virus in one nation can quickly spread to others. A conflict in one country can create a refugee crisis across

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

continents. Pollution in one place can affect the environment around the world. Humanity's current systems are insufficient to address these issues.

Many dedicated people join global non-profit organizations to help, but the market often fails to fund or incentivize building the necessary infrastructure. I have long expected more organizations and startups to build health and safety tools using technology, and I have been surprised by how little of what must be built has even been attempted. **There is a real opportunity to build global safety infrastructure, and I have directed Facebook to invest more and more resources into serving this need.**

For some of these problems, **the Facebook community is in a unique position to help prevent harm**, assist during a crisis, or come together to rebuild afterwards. This is because of the amount of communication across our network, our ability to quickly reach people worldwide in an emergency, and the vast scale of people's intrinsic goodness aggregated across our community.

**To prevent harm, we can build social infrastructure to help our community identify problems before they happen. When someone is thinking of committing suicide or hurting themselves, we've built infrastructure to give their friends and community tools that could save their life.** When a child goes missing, we've built infrastructure to show Amber Alerts -- and multiple children have been rescued without harm. And we've built infrastructure to work with public safety organizations around the world when we become aware of these issues. **Going forward, there are even more cases where our community should be able to identify risks related to mental health, disease or crime**.

To help during a crisis, we've built infrastructure like Safety Check so we can all let our friends know we're safe and check on friends who might be affected by an attack or natural disaster. Safety Check has been activated almost 500 times in two years and has already notified people that their families and friends are safe more than a billion times. When there is a disaster, governments often call us to make sure Safety Check has been activated in their countries. But there is more to build. We recently added tools to find and offer shelter, food and other resources during emergencies. Over time, our community should be able to help during wars and ongoing issues that are not limited to a single event.

To rebuild after a crisis, we've built the world's largest social infrastructure for collective action. A few years ago, after an earthquake in Nepal, the Facebook community raised $15 million to help people recover and rebuild -- which was the largest crowdfunded relief effort in history. We saw a similar effort after the shooting at the Pulse nightclub in Orlando when people across the country organized blood donations to help victims they

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

had never met. Similarly, we built tools so millions of people could commit to becoming organ donors to save others after accidents, and registries reported larger boosts in sign ups than ever before. **Looking ahead, one of our greatest opportunities to keep people safe is building artificial intelligence to understand more quickly and accurately what is happening across our community.**

There are billions of posts, comments and messages across our services each day, and since it's impossible to review all of them, we review content once it is reported to us. **There have been terribly tragic events -- like suicides, some live streamed -- that perhaps could have been prevented if someone had realized what was happening and reported them sooner.** **There are cases of bullying and harassment every day, that our team must be alerted to before we can help out. These stories show we must find a way to do more.** Artificial intelligence can help provide a better approach. **We are researching systems that can look at photos and videos to flag content our team should review.** This is still very early in development, but we have started to have it look at some content, and it already generates about one-third of all reports to the team that reviews content for our community.

**It will take many years to fully develop these systems.** Right now, we're starting to explore ways to use AI to tell the difference between news stories about terrorism and actual terrorist propaganda so we can quickly remove anyone trying to use our services to recruit for a terrorist organization. This is technically difficult as it requires building AI that can read and understand news, but we need to work on this to help fight terrorism worldwide. As we discuss keeping our community safe, it is important to emphasize that part of keeping people safe is protecting individual security and liberty. We are strong advocates of encryption and have built it into the largest messaging platforms in the world -- WhatsApp and Messenger. Keeping our community safe does not require compromising privacy. Since building end-to-end encryption into WhatsApp, we have reduced spam and malicious content by more than 75%.

The path forward is to recognize that a global community needs social infrastructure to keep us safe from threats around the world, and that our community is uniquely positioned to prevent disasters, help during crises, and rebuild afterwards. **Keeping the global community safe is an important part of our mission -- and an important part of how we'll measure our progress going forward.**

**Informed Community**

The purpose of any community is to bring people together to do things we couldn't do on our own. To do this, we need ways to share new ideas and

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

share enough common understanding to actually work together. Giving everyone a voice has historically been a very positive force for public discourse because it increases the diversity of ideas shared. But the past year has also shown it may fragment our shared sense of reality. It is our responsibility to amplify the good effects and mitigate the bad -- to continue increasing diversity while strengthening our common understanding so our community can create the greatest positive impact on the world.

The two most discussed concerns this past year were about diversity of viewpoints we see (filter bubbles) and accuracy of information (fake news). I worry about these and we have studied them extensively, but I also worry there are even more powerful effects we must mitigate around sensationalism and polarization leading to a loss of common understanding.

Social media already provides more diverse viewpoints than traditional media ever has. Even if most of our friends are like us, we all know people with different interests, beliefs and backgrounds who expose us to different perspectives. **Compared with getting our news from the same two or three TV networks or reading the same newspapers with their consistent editorial views, our networks on Facebook show us more diverse content**.

But our goal must be to help people see a more complete picture, not just alternate perspectives. We must be careful how we do this. Research shows that some of the most obvious ideas, like showing people an article from the opposite perspective, actually deepen polarization by framing other perspectives as foreign. A more effective approach is to show a range of perspectives, let people see where their views are on a spectrum and come to a conclusion on what they think is right. Over time, our community will identify which sources provide a complete range of perspectives so that content will naturally surface more.

**Accuracy of information is very important**. We know there is misinformation and even outright hoax content on Facebook, and we take this very seriously. We've made progress fighting hoaxes the way we fight spam, but we have more work to do. We are proceeding carefully because there is not always a clear line between hoaxes, satire and opinion. In a free society, it's important that people have the power to share their opinion, even if others think they're wrong. Our approach will focus less on banning misinformation, and more on surfacing additional perspectives and information, including that fact checkers dispute an item's accuracy.

While we have more work to do on information diversity and misinformation, I am even more focused on the impact of sensationalism and polarization, and the idea of building common understanding. **Social media is a short-form medium where resonant messages get amplified**

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

**many times**. This rewards simplicity and discourages nuance. At its best, this focuses messages and exposes people to different ideas. At its worst, it oversimplifies important topics and pushes us towards extremes.

Polarization exists in all areas of discourse, not just social media. It occurs in all groups and communities, including companies, classrooms and juries, and it's usually unrelated to politics. **In the tech community, for example, discussion around AI has been oversimplified to existential fear-mongering**. **The harm is that sensationalism moves people away from balanced nuanced opinions towards polarized extremes**.

If this continues and we lose common understanding, then even if we eliminated all misinformation, people would just emphasize different sets of facts to fit their polarized opinions. That's why I'm so worried about sensationalism in media.

Fortunately, there are clear steps we can take to correct these effects. For example, we noticed some people share stories based on sensational headlines without ever reading the story. In general, if you become less likely to share a story after reading it, that's a good sign the headline was sensational. If you're more likely to share a story after reading it, that's often a sign of good in-depth content. We recently started reducing sensationalism in News Feed by taking this into account for pieces of content, and going forward signals like this will identify sensational publishers as well. **There are many steps like this we have taken and will keep taking to reduce sensationalism and help build a more informed community.**

Research suggests the best solutions for improving discourse may come from getting to know each other as whole people instead of just opinions -- something Facebook may be uniquely suited to do. If we connect with people about what we have in common -- sports teams, TV shows, interests -- it is easier to have dialogue about what we disagree on. When we do this well, we give billions of people the ability to share new perspectives while mitigating the unwanted effects that come with any new medium.

A strong news industry is also critical to building an informed community. Giving people a voice is not enough without having people dedicated to uncovering new information and analyzing it. There is more we must do to support the news industry to make sure this vital social function is sustainable -- from growing local news, to developing formats best suited to mobile devices, to improving the range of business models news organizations rely on.

**Connecting everyone to the internet is also necessary for building an informed community**. For the majority of people around the world, the

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

debate is not about the quality of public discourse but whether they have access to basic information they need at all, often related to health, education and jobs.

**Finally, I want to emphasize that the vast majority of conversations on Facebook are social, not ideological. They're friends sharing jokes and families staying in touch across cities. They're people finding groups, whether they're new parents raising kids or newly diagnosed patients suffering from a disease together. Sometimes it's for joy, coming together around religion or sports. And sometimes it's for survival, like refugees communicating to find shelter**.

Whatever your situation when you enter our community, **our commitment is to continue improving our tools to give you the power to share your experience**. By increasing the diversity of our ideas and strengthening our common understanding, our community can have the greatest positive impact on the world.

**Civically-Engaged Community**

Our society will reflect our collective values only if we engage in the civic process and participate in self-governance. There are two distinct types of social infrastructure that must be built:

The first encourages engagement in existing political processes: voting, engaging with issues and representatives, speaking out, and sometimes organizing. Only through dramatically greater engagement can we ensure these political processes reflect our values.

The second is establishing a new process for citizens worldwide to participate in collective decision-making. Our world is more connected than ever, and we face global problems that span national boundaries. As the largest global community, Facebook can explore examples of how community governance might work at scale.

The starting point for civic engagement in the existing political process is to support voting across the world. It is striking that only about half of Americans eligible to vote participate in elections. This is low compared to other countries, but democracy is receding in many countries and there is a large opportunity across the world to encourage civic participation.

In the United States election last year, we helped more than 2 million people register to vote and then go vote. This was among the largest voter turnout efforts in history, and larger than those of both major parties combined. In every election around the world, we keep improving our tools to help more people register and vote, and we hope to eventually enable hundreds of

27

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

millions of more people to vote in elections than do today, in every democratic country around the world.

Local civic engagement is a big opportunity as well as national. Today, most of us do not even know who our local representatives are, but many policies impacting our lives are local, and this is where our participation has the greatest influence. Research suggests reading local news is directly correlated with local civic engagement. This shows how building an informed community, supportive local communities, and a civically-engaged community are all related.

Beyond voting, the greatest opportunity is helping people stay engaged with the issues that matter to them every day, not just every few years at the ballot box. We can help establish direct dialogue and accountability between people and our elected leaders. In India, Prime Minister Modi has asked his ministers to share their meetings and information on Facebook so they can hear direct feedback from citizens. In Kenya, whole villages are in WhatsApp groups together, including their representatives. In recent campaigns around the world -- from India and Indonesia across Europe to the United States -- we've seen the candidate with the largest and most engaged following on Facebook usually wins. Just as TV became the primary medium for civic communication in the 1960s, social media is becoming this in the 21st century.

This creates an opportunity for us to connect with our representatives at all levels. In the last few months, we have already helped our community double the number of connections between people and our representatives by making it easier to connect with all our representatives in one click. When we connect, we can engage directly in comments and messages. For example, in Iceland, it's common to tag politicians in group discussions so they can take community issues to parliament.

Sometimes people must speak out and demonstrate for what they believe is right. From Tahrir Square to the Tea Party -- our community organizes these demonstrations using our infrastructure for events and groups. On a daily basis, people use their voices to share their views in ways that can spread around the world and grow into movements. The Women's March is an example of this, where a grandmother with an internet connection wrote a post that led her friends to start a Facebook event that eventually turned into millions of people marching in cities around the world.

Giving people a voice is a principle our community has been committed to since we began. As we look ahead to building the social infrastructure for a global community, we will work on building new tools that encourage thoughtful civic engagement. Empowering us to use our voices will only become more important.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Inclusive Community**

Building an inclusive global community requires establishing a new process for citizens worldwide to participate in community governance. I hope that we can explore examples of how collective decision-making might work at scale.

**<u>Facebook is not just technology or media, but a community of people</u>**. That means we need Community Standards that reflect our collective values for what should and should not be allowed. **<u>In the last year, the complexity of the issues we've seen has outstripped our existing processes for governing the community</u>**. We saw this in errors taking down newsworthy videos related to Black Lives Matter and police violence, and in removing the historical Terror of War photo from Vietnam. We've seen this in misclassifying hate speech in political debates in both directions -- taking down accounts and content that should be left up and leaving up content that was hateful and should be taken down. Both the number of issues and their cultural importance has increased recently.

This has been painful for me because I often agree with those criticizing us that we're making mistakes. These mistakes are almost never because we hold ideological positions at odds with the community, but instead are operational scaling issues. Our guiding philosophy for the Community Standards is to try to reflect the cultural norms of our community. When in doubt, we always favor giving people the power to share more.

There are a few reasons for the increase in issues we've seen: cultural norms are shifting, cultures are different around the world, and people are sensitive to different things.

**<u>First, our community is evolving from its origin connecting us with family and friends to now becoming a source of news and public discourse as well</u>**. With this cultural shift, our Community Standards must adapt to permit more newsworthy and historical content, even if some is objectionable. For example, an extremely violent video of someone dying would have been marked as disturbing and taken down. However, now that we use Live to capture the news and we post videos to protest violence, our standards must adapt. **<u>Similarly, a photo depicting any child nudity would have always been taken down -- and for good reason -- but we've now adapted our standards to allow historically important content like the Terror of War photo</u>**. These issues reflect a need to update our standards to meet evolving expectations from our community.

Second, our community spans many countries and cultures, and the norms are different in each region. It's not surprising that Europeans more

29

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

frequently find fault with taking down images depicting nudity, since some European cultures are more accepting of nudity than, for example, many communities in the Middle East or Asia. With a community of almost two billion people, it is less feasible to have a single set of standards to govern the entire community so we need to evolve towards a system of more local governance.

Third, even within a given culture, we have different opinions on what we want to see and what is objectionable. I may be okay with more politically charged speech but not want to see anything sexually suggestive, while you may be okay with nudity but not want to see offensive speech. Similarly, you may want to share a violent video in a protest without worrying that you're going to bother friends who don't want to see it. And just as it's a bad experience to see objectionable content, it's also a terrible experience to be told we can't share something we feel is important. This suggests we need to evolve towards a system of personal control over our experience.

**Fourth, we're operating at such a large scale that even a small percent of errors causes a large number of bad experiences**. We review over one hundred million pieces of content every month, and even if our reviewers get 99% of the calls right, that's still millions of errors over time. **Any system will always have some mistakes, but I believe we can do better than we are today**.

**I've spent a lot of time over the past year reflecting on how we can improve our community governance**. Sitting here in California, we're not best positioned to identify the cultural norms around the world. Instead, we need a system where we can all contribute to setting the standards. Although this system is not fully developed, I want to share an idea of how this might work.

The guiding principles are that the Community Standards should reflect the cultural norms of our community, that **each person should see as little objectionable content as possible**, and each person should be able to share what they want while being told they cannot share something as little as possible. The approach is to combine creating a large-scale democratic process to determine standards with AI to help enforce them.

The idea is to give everyone in the community options for how they would like to set the content policy for themselves. Where is your line on nudity? On violence? On graphic content? On profanity? What you decide will be your personal settings. We will periodically ask you these questions to increase participation and so you don't need to dig around to find them. For those who don't make a decision, the default will be whatever the majority of people in your region selected, like a referendum. Of course you will always be free to update your personal settings anytime.

30

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

With a broader range of controls, content will only be taken down if it is more objectionable than the most permissive options allow. Within that range, content should simply not be shown to anyone whose personal controls suggest they would not want to see it, or at least they should see a warning first. Although we will still block content based on standards and local laws, our hope is that this system of personal controls and democratic referenda should minimize restrictions on what we can share.

**It's worth noting that major advances in AI are required to understand text, photos and videos to judge whether they contain hate speech, graphic violence, sexually explicit content, and more**. **At our current pace of research, we hope to begin handling some of these cases in 2017, but others will not be possible for many years**.

Overall, it is important that the governance of our community scales with the complexity and demands of its people. **We are committed to always doing better**, even if that involves building a worldwide voting system to give you more voice and control. Our hope is that this model provides examples of how collective decision-making may work in other aspects of the global community.

**This is an important time in the development of our global community, and it's a time when many of us around the world are reflecting on how we can have the most positive impact**.

History has had many moments like today. As we've made our great leaps from tribes to cities to nations, we have always had to build social infrastructure like communities, media and governments for us to thrive and reach the next level. At each step we learned how to come together to solve our challenges and accomplish greater things than we could alone. We have done it before and we will do it again.

**I am reminded of President Lincoln's remarks during the American Civil War: "We can succeed only by concert. It is not 'can any of us imagine better?' but, 'can we all do better?' The dogmas of the quiet past, are inadequate to the stormy present. The occasion is piled high with difficulty, and we must rise with the occasion. As our case is new, so we must think anew, act anew."**

**There are many of us who stand for bringing people together and connecting the world. I hope we have the focus to take the long view and build the new social infrastructure to create the world we want for generations to come**.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

It's an honor to be on this journey with you. Thank you for being part of this community, and thanks for everything you do to make the world more open and connected.

Mark

https://www.weforum.org/agenda/2017/02/mark-zuckerberg-building-a-global-community-that-works-for-everyone/ (emphasis added).

67.     In fact, at the time this was written, Meta employees were already reporting to management that Facebook was causing harmful dependencies. Meta was already marketing to children under 13, despite clear legal mandates that it could not allow children under 13 on its social media product. And Meta leadership, Mr. Zuckerberg himself, was actively rejected proposed re-designs intended to minimize the harms to child and teen users, users like Brantley Aranda.

68.     Meta's recommendation-based feeds and product features were promoting harmful content. Meta's algorithms are programmed to prioritize number of interactions and not quality of interactions. Worded otherwise, Meta promotes and amplifies content based on engagement objectives and not the health and well-being of their users, which renders its social media products inherently dangerous and defective, particularly when used by teens and children.

69.     Meta exerts unprecedented levels of manipulation and control over users and is knowingly directing harmful content to users as a matter of its algorithmic programming and settings Meta chooses as part of its prioritization of engagement over user safety.

70.     And while certain of Meta's systems and designs necessarily involve and/or incorporate advertising and third-party content, it is the Meta product itself and not the ads or content causing user harm. That it is, it is not content harming millions of Meta users, but rather, the extreme and calculated way in which Meta identifies and amplifies such content in its effort to increase engagement.

71.     Meta also, at the same time CEO Mark Zuckerberg was touting the importance and helpful function of Meta's group recommendations algorithm, was recognizing internally the massive number of truly harmful and horrific groups on its social

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

media platform – and the fact that its algorithm was directing users, including children and teens, to these harmful groups. That is, these children and teens would never have been exposed to such harmful content but for Meta's systems and its programming of those systems to prioritize engagement over user safety.

72.    Moreover, Meta has conducted social comparison studies, *see, e.g.*, *Social Comparison: Topics, celebrities, Like counts, selfies* (January 2021) and *Appearance Based Social Comparison on Instagram* (February 2021),[7] to identify the types of algorithmically promoted content most harmful to social media users, and the degree of harm that content causes. Meta routinely identifies harmful categories, then just as routinely determines that promotion of such content is a large part of what makes social media products appealing to teens. Meta decides against making its current product safer as a result. In other words, the promotion of harmful content has become so central to Meta's business models that Meta regularly opts to conceal the truth and continue harming users instead of making its products safer and less harmful.

73.    Facebook profile and privacy settings also cause harm. Users' profiles on Facebook may be public or private, which is a product feature over which Meta exercises complete control. On public profiles, any user can view the photos, videos, and other content posted by the user. On private profiles, the user's content may only be viewed by the user's followers, which the user must approve. At all times relevant, Facebook profiles were public by default and Facebook allowed all users to message and send follow requests to underage users. But even now, when Meta claims that it is defaulting certain categories of users on certain of its social media products into private profiles, all a user need do is change the profile setting and, once again, Meta will allow all users to message and send follow requests to underage users. Meta can protect users from this specific harm, can do so immediately, and chooses to not do so as a matter of engagement and growth.

74.    Permitting public profiles for underage users serves no critical purpose in

---

[7] See *https://digitalwellbeing.org/the-facebook-files-on-instagram-harms-all-leaked-slides-on-a-single-page/*

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

terms of product functionality but, instead, it increases user engagement during onboarding (when a user first starts using a social media product) by increasing user connections and generally by providing all users with greater access to other users, in this case, irrespective of their age. Unfortunately for young children and teens, a numerically significant percentage of those would-be connections are harmful. Defendants are aware of these harms and have opted to not make necessary and cost-effective changes to prevent it.

75. Meta's Messenger settings also permit and encourage harm to vulnerable users. Harmful and dangerous interactions occur because of the Facebook Messaging product, which is integrated with the Facebook app. Specifically, Meta's chosen settings provide predators and other bad actors with direct and unsupervised access to children and teens. Again, however, Meta opts for engagement over safety.

76. Meta's push notifications and emails encourage addictive behavior and are designed specifically to increase use of its social media products. In the case of Instagram, Defendant Meta collects individualized data – not just about the user, but also about the user's friends and contacts – and then selects content and notification frequency for its users and notifies them via text and email. Meta's notifications to individual users are specifically designed to, and do, prompt them to open Instagram and view the content Instagram selected, increasing sessions, and resulting in greater profits to Instagram. More to the point, even the format of these notifications has been designed and re-designed with the specific purpose of pulling users back onto the social media platform—irrespective of a user's health or wellbeing.

77. Facebook also incorporates several product features that serve no functionality purpose, but that do make Meta's product more appealing to children and teens, such as "likes" and in-app games, while simultaneously increasing social comparison pressure and resulting harm. The harm from these product features does not relate to a single "like" or filter, or any specific series of content or potential content. Rather, it is the product itself. Meta knows that its products are causing harm.

78. Facebook also creates images and GIFs for users to post on their videos and

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

pictures. Meta has also acquired publishing rights to thousands of hours of music, which it provides to its users to attach to the videos and pictures that they post on Facebook. The GIFs, images, and music are integral to the user's Facebook post and are, in fact, designed to encourage posting. Indeed, in many cases, the only content in a user's Facebook post is the image, GIF or music supplied by Meta. When users incorporate images, GIFs, and music supplied by Meta into their postings, Meta is functioning as a co-publisher of such content. A Facebook user who incorporates images, GIFs or music supplied by Meta into their post is functionally equivalent to a novelist who incorporates illustrations into their story. Instagram can no longer characterize the images, GIFs, and music it supplies to its users as third-party content, just as the novelist cannot disclaim responsibility for illustrations contained in their book. Meta has made the deliberate decision to collaborate with its users in this regard and, as evidenced by Meta's internal documents, Meta's decision is motivated by the fact that such collaboration results in increased engagement and more profits for Meta itself.

79. Meta directly profits from the content its users create in collaboration with Meta, as described above.

80. Meta knows that it is harming teens yet, when faced with recommendations that will reduce such harms, Meta's leadership consistently opts for prioritization of profit over the health and well-being of its teen users—that is, the millions of teen users who continue to use its inherently dangerous and defective social media product every, single day.

81. Meta's products are used by many millions of children every day.

**B.  Meta's Applications Are Products**

82. There is no dispute that the Facebook social media product is designed and manufactured by Meta and further, Meta refers to Facebook as a product.

83. Meta's social media products are designed to be used by minors and are actively marketed to minors across the United States. Meta markets to minors through its own marketing efforts and design, and through their approval and permission to advertisers

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

who create and target ads to young users. Internal Meta documents establish that Meta spends millions of dollars researching, analyzing, and experimenting with young children to find ways to make its product more appealing and addictive to these age groups, as these age groups are seen as the key to Meta's long-term profitability and market dominance.

## C. Meta's Business Model is Based on Maximizing User Screen Time and Meta Knows That Facebook is Addictive

84. Meta and its leadership have repeatedly represented to the public and governments around the world that their Facebook product is safe and not addictive

85. In February of 2017, Meta founder and CEO Mark Zuckerberg made the lengthy "Building Global Community" post on his personal Facebook (*see supra*) in which he talked at length about how Meta is focused on safety, how it intends to use its AI to the fullest to keep users safe, and how amazing Facebook is for bringing communities together and promoting critically important social groups.

86. In September of 2017, Meta founder and CEO Mark Zuckerberg spoke out on the issue of opioid addiction, making general addiction-related statements, including that "Communities all across the country have a long road ahead, but as someone told me at the end, 'I'm hopeful because we're talking about it.' Me too." [8]

87. In April of 2018, Meta founder and CEO Mark Zuckerberg testified under oath to Congress that Meta does not design its products to be addictive and that he is not concerned with social media addiction as it relates to teens. He stated,

> I view our responsibility as not just building services that people like but as building services that are good for people and good for society as well … we study a lot of effects of well-being, of our tools, and broader technology, and like any tool there are good and bad uses of it. What we find in general is that if you are using social media to build relationships then that is associated with all the long term measures of well-being that you'd intuitively think of … but if you are using the internet and

---

[8] https://www.northpointrecovery.com/blog/mark-zuckerberg-discusses-view-addiction-facebook/

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

social media to just passively consume content and are not engaging with other people then it doesn't have those positive effects and it could be negative.[9]

88.    These are just some examples of the representations Meta was making to users, and the Plaintiffs in this case, about the safety of its Facebook social media product.

89.    In truth, Meta had been studying its "addicting" product mechanics during these same time frames and Meta leadership—including and specifically Meta CEO Mark Zuckerberg—had actual knowledge that its Facebook product was addictive and harmful to children and teens.

90.    In fact, in 2017 Meta was actively attending and presenting at an annual conference held in Silicon Valley starting in 2014, known as the Habit Summit and the stated purpose of which was to teach product manufacturers how to make their products more habit forming. Meta not only knew that Facebook was addictive, it designed it that way.

91.    Meta's tests during those same periods of time were confirming that Meta already knew … which is that many teen users felt like they were physically unable to stop using Facebook, even though they had begun to realize that it was not good for them.

92.    Meta was fully aware that its Facebook product was addictive, and also, that this this "Facebook addiction" was having the greatest impact on millions of U.S. teens.

93.    In short, Meta employees and Meta leadership know that Facebook is addictive and harmful, in part, because it was designed that way (addictive design) and, also, because the billions of dollars Meta has spent researching user addiction has said so. Meta has never released this information on addiction and/or problematic use to the public; instead, its leadership lied repeatedly to Congress and to parents of its tens of millions of teen users.

94.    Meta advertises its product as "free," because it does not charge its users for downloading or using its product. What many users do not know is that, in fact, Meta makes a profit by finding unique and increasingly dangerous ways to capture user attention and target advertisements to its users. Meta receives revenue from advertisers who pay a

---

[9] https://www.youtube.com/watch?v=AB4mB-K7-xY

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

premium to target advertisements to specific demographic groups of users in the applications including, and specifically, users under the age of 18. Meta also receives revenue from selling its users' data to third parties

95.     The amount of revenue Meta receives is based upon the amount of time and user engagement on its platforms, which directly correlates with the number of advertisements that can be shown to each user. In short, Meta opted for user engagement over the truth and user safety

96.     Facebook is built around a series of design features that do not add to the communication and communication utility of the application, but instead seek to exploit users' susceptibility to persuasive design and unlimited accumulation of unpredictable and uncertain rewards (including things like "likes" and "followers" and "views"). This design is unreasonably dangerous to the mental well-being of underage users' developing minds and was harmful to Brantley Aranda.

97.     Meta has also employed thousands of engineers to help make its products maximally addicting. One example is Facebook's "pull to refresh" feature, which is based on how slot machines operate. It creates an endless feed, designed to manipulate brain chemistry, and prevent natural end points that would otherwise encourage users to move on to other activities

98.     Meta does not warn users of the addictive design of its product. On the contrary, Meta actively conceals the dangerous and addictive nature of its product, lulling users and parents into a false sense of security – as it did with Blair and Gregorio Aranda. This includes consistently playing down its products' negative effects on teens in public statements and advertising, making false or materially misleading statements concerning product safety, and refusing to make its research public or available to academics or lawmakers who have asked for it.

99.     Meta spends billions of dollars marketing its products to minors and has deliberately traded in user harm for the sake of its already astronomical revenue stream.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

## D. Defendants Have Designed Complex Algorithms to Addict Teen Users and Their Business Models Are Based on Maximizing User Screen Time

100. Meta has intentionally designed its product to maximize users' screen time, using complex algorithms designed to exploit human psychology and driven by the most advanced computer algorithms and artificial intelligence available to the largest technology companies in the world.

101. Meta has designed and progressively modified its product to promote problematic and excessive use that they know is indicative of addictive and self-destructive use. More specifically, Meta knows that many teens feel as though they cannot stop their use of Meta's product, even though they want to stop.

102. One of these features, present in Facebook, is the use of complex algorithms to select and promote content that is provided to users in an unlimited and never ending "feed." Meta is well-aware that algorithm-controlled feeds promote unlimited "scrolling"— a type of use those studies have identified as detrimental to users' mental health. However, this type of use allows Meta to display more advertisements and obtain more revenue

103. Meta has also designed algorithm-controlled feeds to promote content most likely to increase user engagement, which often means content that Meta knows to be harmful to its users. This is content that users might otherwise never see but for Meta's affirmative pushing of such content to their accounts.

104. In the words of one, high-level departing Meta employee,

In September 2006, Facebook launched News Feed. In October 2009, Facebook switched from chronological sorting to an algorithmic ranking. 10 years later, in July 2019, Sen. Josh Hawley introduced a bill to the US Senate that would ban features in app feeds, such as infinite scroll.

The response in 2006 was largely positive; the response in 2009 was negative from a vocal minority, but still largely positive; the response in 2019 was largely "lol, wut?" If I had to guess, the response to government regulation around engagement centric information feeds in 2026 will be "Omg finally".

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

"Why We Build Feeds" (October 4, 2019), at p. 1.[10]

105.  The addictive nature of Meta's product and the complex and psychologically manipulative design of its algorithms is unknown to ordinary users. It was unknown to Plaintiffs as well.

106.  Meta goes to significant lengths to prevent transparency, including posing as a "free" social media platform, burying advertisements in personalized content, and making knowingly false public statements about the safety of its product.

107.  Meta also has developed unique product features that are designed to limit, and that do limit, parents' ability to monitor and prevent problematic use by their children.

108.  Meta's addiction-driven algorithms are designed to be content neutral. They adapt to the social media activity of individual users to promote *whatever* content will trigger a particular user's interest and maximize their screen time. That is, prior to the point when Meta has addicted its user and is then able to influence user preferences, its algorithm designs do not distinguish, rank, discriminate, or prioritize between types of content. For example, if the algorithm can increase User One engagement with elephants and User Two engagement with moonbeams, then Meta's algorithm design will promote elephant content to User One and moonbeam content to User Two. Meta's above-described algorithms are solely quantitative devices and make no qualitative distinctions between the nature and type of content they promote to users – as long as those promotions increaser user engagement.

**B. Minor Users' Incomplete Brain Development Renders Them Particularly Susceptible to Manipulative Algorithms with Diminished Capacity to Eschew Self-Destructive Behaviors and Less Resiliency to Overcome Negative Social Media Influences**

109.  The human brain is still developing during adolescence in ways consistent with adolescents' demonstrated psychosocial immaturity. Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotional regulation, and

---

[10] https://www.documentcloud.org/documents/21600853-tier1_rank_exp_1019

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

impulse control.

110.     The frontal lobes—and, in particular, the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control, and executive decision-making. These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses. MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature.

111.     During childhood and adolescence, the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated with white fatty tissue called myelin. Second, during childhood and adolescence, the brain is undergoing "pruning"—the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and into young adulthood.

112.     In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition. As such, the part of the brain that is critical for control of impulses and emotions and for mature, considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

113.     The algorithms in Meta's social media products exploit minor users' diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency caused by users' incomplete brain development. Meta knows that because its minor users' frontal lobes are not fully developed, such users are much more likely to sustain serious physical and psychological harm through their social media use than adult users. Nevertheless, Meta has failed to design its product with any protections to

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

account for and ameliorate the psychosocial immaturity of its minor users. On the contrary, Meta specifically designs its product with these vulnerabilities in mind.

**E.    Meta Misrepresents the Addictive Design and Effects of Facebook**

114.    At all times relevant, Meta has advertised and represented that its Facebook product is appropriate for use by teens and has stated in public comments that its product is not addictive and was not designed to be addictive. Meta knows that those statements are untrue.

115.    Meta did not warn users or their parents of the addictive and mentally harmful effects that the use of its product was known to cause amongst minor users, like Brantley Aranda. On the contrary, Meta has gone to significant lengths to conceal and/or avoid disclosure of the true nature of its product.

**F.    Plaintiffs Expressly Disclaim Any and All Claims Seeking to Hold Meta Liable as the Publisher or Speaker of Any Content Provided, Posted, or Created by Third Parties**

116.    Plaintiffs seeks to hold Meta accountable for its own alleged acts and omissions. Plaintiffs' claims arise from Meta's status as the designer and marketer of dangerously defective social media products, as well as Meta's own statements and actions, not as the speaker or publisher of third-party content.

117.    Meta has designed its product to be addictive. For example, Meta has developed and modified product features like the continuous loop feed and push notifications, to incentivize users to stay on its Facebook product as long as possible and to convince users to log back on. Meta's algorithm even calculates the most effective time to send such notifications, which in the case of teen users often means in the middle of the night and/or during school hours. Essentially, the times they are least likely to have access to Meta's social media product, which also—as Meta knows—are the times that their health and well-being necessitate them not being on Meta's social media product. Meta's product is designed to and does addict users on a content neutral basis, and it addicted Brantley Aranda on a content neutral basis.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

118. Meta's algorithm structure is by itself harmful to users, again, irrespective of content. For example, a primary purpose of Meta's algorithm design is to determine individual user preferences first so that Meta can then influence user behavior and choices second—which is particularly dangerous in the case of teens.

119. It is clear from Meta's records that Meta uses its product both to "experiment" on and test its users in ways heretofore unimagined, but also, it seeks to control user behavior through product features and capabilities and for the specific purpose of acquiring and retaining users.

120. On a content neutral basis, the manipulation and control Meta knowingly wields over its users daily is profoundly dangerous.

121. Meta's Integrity Team employees regularly provide Meta leadership with warnings and recommendations, which Meta leadership regularly ignores. As explained in the employee departure memos previously discussed, Meta imposes insurmountable hurdles when it comes to making their existing and in-development products safer, while it imposes no user safety requirements when it comes to making its products more engaging.

122. Meta is responsible for these harms. These harms are caused by Meta's designs and design-decisions, and not any single incident of third-party content. Meta's Integrity Team employees flagged these issues for Meta leadership countless times and were consistently ignored.

123. Meta failed to warn minor users and their parents of known dangers arising from anticipated use of its Facebook product. These dangers are unknown to ordinary consumers but are known to Meta and its employees. Moreover, these dangers do not arise from third-party content contained on Meta's social media platform. This lawsuit does not involve a suit against a web browser provider for making available third-party content.

124. While it may be a third-party creates a particular piece of harmful content, the teens harmed by Facebook are not being harmed by a single piece of harmful content. They are being harmed by the dependency Meta engineers as well as Facebook's algorithmic programming and business decisions to show teens a constant barrage of harmful content to

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

obtain more advertising revenue and increase engagement

125.    Brantley Aranda and children like him do not open Facebook accounts in the hopes of becoming addicted. Nonetheless, such children *do* become addicted, leading them to engage in foreseeable addict behaviors, such as lying to their parents, hiding their use of Facebook, losing control and becoming irritable, and feeling like they want to stop using Facebook but being unable to stop to the point where they continue to keep using even though they want to stop. These and other behaviors can and do result in serious harm to Facebook's minor users

126.    Brantley Aranda and children like him do not start using Facebook in the hopes of being exposed to product features that cause harm to them. Yet Facebook use involves harmful forms of social comparison and inevitably pushes such children towards harmful "rabbit holes," causing anxiety, depression, anger, self-harm, and suicidal ideation—harms Meta itself has acknowledged repeatedly in internal documents.

127.    The harms at issue in this case do not relate to or arise from third party content, but rather, Meta's product features and designs, including algorithms that (a) addict minor users to Meta's product; (b) amplify and promote harmful social comparison through Instagram product features; (c) affirmatively select and promote harmful content to vulnerable users based on its individualized demographic data and social media activity; and (d) put minor users in contact with unknown, adult users. Indeed, the foregoing are merely examples of the kinds of harms at issue in this case

128.    Meta's product is addictive on a content neutral basis. Meta designs and operates its algorithms in a manner intended to and that does change behavior and addict users, including through a natural selection process that does not depend on or require any specific type of third-party content.

129.    Meta has designed other product features for the purpose of encouraging and assisting children in evasion of parental oversight, protection, and consent, which features are wholly unnecessary to the operation of Meta's product. This includes but is not limited to Meta's failure to check identification or verify validity of user-provided email credentials,

while simultaneously implementing product design features (such as easier ability to switch between accounts) to ensure easy access by children and teens, irrespective of consent.

130.    In fact, the *only* reason Brantley Aranda was allowed to have a Facebook account at the age of 16 was because Plaintiff Blair Aranda knew that his friends were opening Facebook accounts without parental consent via school device. Blair Aranda knew that she could not physically prevent him from opening a Facebook account and using Meta's social media product, as Facebook's design made such protection of her son impossible.

131.    Meta also promotes, encourages, and/or otherwise contributes to the development of harmful content. This Complaint quotes from just a few of the thousands of Meta documents disclosed by the Facebook Whistleblower, which establish this – and Plaintiffs believe they will uncover tens of thousands more through discovery in this case.

132.    Meta also approves ads that contain harmful content, for example, and as discussed at the Senate hearing held on October 5, 2021,[11]

---

[11] https://www.rev.com/blog/transcripts/facebook-whistleblower-frances-haugen-testifies-on-children-social-media-use-full-senate-hearing-transcript

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

**Senator Mike Lee: (01:21:34)**
Now, since that exchange happened last week, there are a number of individuals and groups, including a group called the Technology Transparency Project or TTP, that have indicated that that part of her testimony was inaccurate. That it was false. TTP noted that TTP had conducted an experiment just last month, and their goal was to run a series of ads that would be targeted to children ages 13 to 17, to users in the United States. Now, I want to emphasize that TTP didn't end up running these ads. They stopped them from being distributed to users, but Facebook did in fact approve them. As I understand it, Facebook approved them for an audience of up to 9.1 million users, all of whom were teens.

**Senator Mike Lee: (01:22:31)**
I brought a few of these to show you today. This is the first one I wanted to showcase. This first one has a colorful graphic encouraging kids to, "Throw a Skittles party like no other," which as the graphic indicates, and as the slang jargon also independently suggests, this involves kids getting together randomly to abuse prescription drugs. The second graphic displays an ana tip. That is a tip specifically designed to encourage and promote anorexia. It's on there. Now the language, the ana tip itself independently promotes that. The ad also promotes it in so far as it was suggesting. These are images you ought to look at when you need motivation to be more anorexic, I guess you could say. Now the third one invites children to find their partner online and to make a love connection. "You look lonely. Find your partner now to make a love connection."

133. In other words, Meta approves advertisements "designed to encourage and promote anorexia," encouraging children to abuse prescription or illegal drugs, and other clearly harmful and dangerous content, which ads Meta then targets specifically at children in exchange for payment from the advertisers.

134. Meta utilizes private information of its minor users to "precisely target [them] with content and recommendations, assessing what will provoke a reaction," including encouragement of "destructive and dangerous behaviors."[12] Again, Meta specifically selects and pushes this harmful content, for which it is then paid, and does so both for that direct profit and also to increase user engagement, resulting in more profits down the road. "That's

---

[12]   *See*   https://www.rev.com/blog/transcripts/facebook-whistleblower-frances-haugen-testifies-on-children-social-media-use-full-senate-hearing-transcript. ("October 5, 2021, Senate Hearing Transcript"), Mr. Chairman Blumenthal at 00:09:02.

46

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

how [Meta] can push teens into darker and darker places."[13] Meta "knows that its amplification algorithms, things like engagement based ranking ... can lead children ... all the way from just something innocent like healthy recipes to anorexia promoting content over a very short period of time."[14] Meta has knowledge that its product and the content they are encouraging and helping to create is harmful to young users and chooses "profits over safety." [15]

135.    Meta has information and knowledge that can determine with reasonably certainty each user's age, habits, and other personal information, regardless of what information the user provides at the time of account setup. Meta can also determine on a mass scale and with reasonably certainty which of its users are teens, regardless of what information they provide at the time of account setup. Meta has used this capability for its own economic gain. The Facebook Papers reference various technologies Meta has developed for this precise purpose over the last several years.

136.    None of Plaintiffs' claims rely on treating Meta as the publisher or speaker of any third party's words or content. Plaintiffs' claims seek to hold Meta accountable for its own allegedly wrongful acts and omissions, not for the speech of others or for Meta's good faith attempts to restrict access to objectionable content.

137.    Plaintiffs are not alleging that Meta is liable for what the third parties said, but for what Meta did.

138.    None of Plaintiffs' Claims for Relief set forth herein treat Meta as a speaker or publisher of content posted by third parties. Rather, Plaintiffs seek to hold Meta liable for its own speech and its own silence in failing to warn of foreseeable dangers arising from anticipated use of its product. Meta could manifestly fulfill its legal duty to design a reasonably safe social media product and furnish adequate warnings of foreseeable dangers arising out of the use of its products without altering, deleting, or modifying the content of a

---

[13] *Id.*
[14] October 5, 2021, Senate Hearing Transcript, Ms. Francis Haugen at 00:37:34.
[15] *Id.* at 02:47:07.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

single third- party post or communication. Some examples include,

    a. Not using its addictive and inherently dangerous algorithm in connection with any account held by a user under the age of 18.

    b. Not permitting any targeted advertisements to any user under the age of 18.

    c. Fixing or removing all features that currently do not implement the tools Meta uses to identify and remove harmful content (particularly since Meta knows that its algorithms and other systems are pushing these higher risk features disproportionately to protected classes).

    d. Prioritizing internally its removal of harmful content over the risk of losing some user engagement (as Meta represents it does already but, in fact, does not) – *i.e.* users who might be offended when Meta takes down what it believes to be harmful content.

    e. Requiring identification upon opening of a new account, and restricting users under the age of 18 to a single account.

    f. Requiring verification by email when a user opens a new account. Not requiring verification allows underage users to access Facebook and does not stop bad actors. Meta employees have recognized this shortcoming and have recommended change.

    g. Immediate suspension of accounts where Meta has reason to know that the user is under the age of 13, including when the user declares that they are under the age of 13 in their bio or comments and where Meta determines an "estimated" age of under 13 based on other information it collects; and not allowing the account to resume until the user provides proof of age and identity and/or parental consent.

    h. Suspension of accounts where Meta has reason to know that the user is over the age of 18, but where they are providing information to suggest that they are minors and/or are representing themselves as minors to other Instagram users; and not allowing the account to resume until the user provides proof of age and identity

    i. Launching Project Daisy, meaning that each user could see their own likes but would be unable to see the likes on any other user's posts and comments.

48

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

j.  Instituting advertising safeguards to ensure that Meta is not profiting directly from or otherwise pushing or endorsing harmful advertising content.

k.  Requiring that all teen user accounts be set to private and not allowing any user under the age of 18 to change user settings to public.

l.  Not permitting direct messaging with any user under the age of 18 if that minor user is not already on a user's friend list.

m.  Requiring parental consent and restricting account access for users under the age of 18 to prevent usage at night and during regular school hours.

139.  These are just some examples, all of which could be accomplished easily and/or at commercially reasonable cost. Meta itself has discussed and considered many of these, but its leadership ultimately declined to make such product changes because such changes—while better for the health and wellbeing of Facebook users—could result in a relatively small decrease to Meta's more than $200 billion in annual revenue.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

**G.    Brantley Aranda's Death was Proximately Caused by Defendants' Social Media Products**



140.    Brantley Aranda was born December 30, 2001, and grew up in Jonesboro, Louisiana.

141.    He was extremely smart, creative, funny, and loved learning. As a child he was his parents' and grandparents' tag along, always observing what other people were doing and always trying to help. When he was about two years old, a pest control company sprayed

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

for bugs. Afterwards, Brantley went from window to window pretending to spray for bugs. When he got a bit older his parents got him his own set of hammers, to help his pepaw around the house and he followed Pepaw everywhere trying to help – and occasionally hitting himself or his Pepaw with the hammer instead of whatever it was he wanted to fix.

142.    Brantley wanted to be a fighter pilot when he grew up and doted on his two younger brothers up until the he died. All three boys were born in December, and Brantley often told his brothers that they were the best birthday and Christmas presents he ever got.

143.    Brantley got his first cell phone in 2016, for his 15th birthday; however, that device did not have internet access. When Plaintiff Blair Aranda called the provider (AT&T) she told them that she just needed a phone for texting and calls, and not the internet.

144.    The Aranda family also had a family computer; however, Brantley was not allowed to use the computer for social media, and he was only allowed to use it when his parents were around. The boys would earn computer time with chores, for example, fifteen minutes for cleaning their room or an hour for mowing, and even more time if they went over to their grandparents' house (Memaw and Pepaw) to help.

145.    To their knowledge, Brantley did not open his first Facebook account until May of 2018, when he was 16 years old. But Plaintiffs cannot be certain as Meta designs its products to evade parental authority and control.

146.    What Plaintiffs do know is that Brantley had some computer access at school in his 8th grade year, but that access was limited. Things changed when Brantley started 9th grade, however, as everything was then done on computers and the kids were allowed access to the internet once their assignments were complete. Unfortunately for Plaintiffs' Blair and Gregorio Aranda, Brantley was a strong student and often finished his assignments quickly – which meant considerable internet access via school devices.

147.    Blair Aranda complained to the school, but nothing changed.

148.    In May of 2018, Brantley Aranda was telling his mother about how all his friends were opening social media accounts, without their parents' knowledge, and were accessing those accounts at school. Because it was May, Brantley had finished most of his

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

testing, which meant that he had even more time to be on the school computers unsupervised.

149. To obtain some control over Brantley's use of social media and because Blair Aranda understood from Meta's marketing and public statements, as well as its Community Guidelines and other representations about safety and use of technology to enforce its rules and keep children safe, Plaintiff Blair Aranda told Brandley that he could open a Facebook account. She told him that she would need to always have access to his password and that his use would be limited. Brantley enthusiastically agreed and, to his parents' knowledge, this is when he opened his first Facebook account – May of 2018.

150. Discovery on Facebook will be required to confirm whether this was, in fact, his first Facebook account – as Meta's social media product design permits children to create accounts with parental permission or oversight.

151. Either way, Brantley still did not have internet access on his cell phone, so the only social media access known to his parents at that time was during earned computer time and, of course, at school when he was allowed to use school devices. It is unknown whether Brantley was using any of his friends' devices or other sources to access social media, though Meta will have this information and it can also be obtained in discovery.

152. Brantley's Facebook use coincided with a gradual but steady decline in his mental health. He went from a confident and outgoing young man to someone who was uncomfortable in social situations and anxious. It was a slow but steady change, and Plaintiffs could not identify the source. Brantley had become addicted to social media.

153. Unbeknownst to Plaintiffs, Facebook's harmful social comparison products and the constant and harmful images Meta pushed to Brantley via algorithms and targeted advertising – actions for which Facebook profited as direct result – were having a foreseeable and harmful impact on Brantley's self-image and self-esteem, resulting in some anxiety, difficulty with focus, and, in retrospect, likely even thoughts of suicide and self-injury. These are the precise types of harms Meta identified *internally* as harms use of its social media products can cause, including and specifically as among young users.

154. Meta knew that its Facebook product could and was causing this harm but

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

failed to disclose any of its findings on these issues outside the confines of its company. On the contrary, it fostered a corporate culture of silence by fear. *See, e.g. infra*, FBP 32/13, *Comms FYI on New York Times story* (January 2020), p. 2-7, FBP 02/02, *departure letter*, dated September 7, 2020, p. 20.

155. Meta also knew or should have known that it was causing this harm to Brantley, including based on his usage information and patterns—which Meta collects and closely tracks—and content to which it was repeatedly exposing him via unsolicited methods, such as content Facebook pushes to its young users. This was not communication between multiple users, but advertisements and similar content Meta alone was pushing to Brantley as part of its business model and product operations.

156. More to the point, Meta has designed its proprietary systems in a manner that enables Meta to benefit incredibly from its algorithmic programming and the content it directs to young users; whereas, on information and belief, Meta may or will claim that it cannot now ascertain the precise programming and or content utilized in connection with individual users. Discovery as to Meta's systems and its retention policies and processes, as well as the design of its systems to benefit from but not retain certain data points, will be material in this case – and material to finding out precisely what Meta is doing to American teens. Nonetheless, there is ample evidence and admissions in the Facebook Papers, which make clear that Meta was knowingly pushing harmful content to children in manners and quantities Meta itself recognized as being inherently dangerous for user health and wellbeing.

157. Meta prioritized profits over the well-being of a substantial number of children to whom it was marketing and providing its social media products. In the words of the Facebook whistleblower, Meta is morally bankrupt – and the Facebook papers prove it.

158. In or about April 2019, Brantley began having issues with his cell phone. Texts to his girlfriend were not going through. Brantley tried a factory reset of his device in late April 2019, but it the issue did not resolve.

159. In or about May 2019, Brantley got a new cell phone and this one had internet access. He was 17 years old at the time.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

160.     Plaintiff Blair Aranda tried to discourage Facebook use on his new cell phone by telling Brantley that they had a limited phone plan, and that it would cost more if he used the internet. Brantley quickly figured out that this was not the case.

161.     Plaintiffs Blair and Gregorio Aranda also spoke with Brantley about the dangers of the internet. This was not a social media specific discussion, because they did not know that Facebook itself was the greatest danger to their son.

162.     Blair and Gregorio cautioned their son to stay away from pornography, and to not trust or engagement with strangers. When it came to video games, Blair Aranda observed as Brantley did not engage with and ignored strangers who tried to engage with him. She hoped and trusted that he would use the same judgment when it came to the internet more generally. She did not like that he had internet access, and she still did not like that he had any social media accounts at all – she did not fully understand social media but knew that she could not stop him based on how Defendants designed their products.

163.     Saying no to social media was not a choice Meta provided to Plaintiffs, nor is it a choice Meta provides to any parent. Meta makes its products available to underage children and teens and designs its products to thwart parental control and consent.

164.     When Brantley got his new phone, Plaintiffs also instituted rules to make sure that Brantley would go to sleep instead of staying up on his phone. He had to plug his phone in at a location he could not reach from his bed, and Blair Aranda would often check in on Brantley at night when she was up late.

165.     At first, his phone was across the room. Then Brantley asked if he could plug it in on a high shelf next to his bed, as that was the location of his outlet. Blair agreed but continued to check in on him from time to time.

166.     While Blair Aranda never caught her son awake and on his phone in the middle of the night, she now knows that this is precisely what Brantley was doing. After Brantley's death, Blair discovered that he had been up at all hours–often as late as 4 a.m.–on Facebook and Facebook Messenger, which resulted in sleep deprivation and mental harm.

167.     Meta tracks usage of its social media products and, on that basis, had actual

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

knowledge of this excessive and harmful use by a minor user.

168. Meta also affirmatively promotes and amplifies harmful content to users and did so to Brantley. To name only one example, in June of 2019 Brantley and his then-girlfriend broke up. Just after the breakup, Brantley told Blair Aranda that Facebook had started to show him articles and content about relationships, things with titles like "How to keep your relationship." This content was unwanted by Brantley and caused emotional harm. Brantley did not want or search for this content; instead, Meta's controlled and pushed this content to Brantley based on its exploitation of Brantley's most private and personal data. It did so as part of a calculated attempt to increase Brantley's usage of and dependency on its Facebook social media product.

169. Meta had also been making recommendations to Brantley and others in Brantley's "friend" network since he first opened a Facebook account. These recommendations included Facebook groups and content, as well as Facebook users Meta determined it should connect with Brantley and/or members of his "friend" network which then often, and because of how Meta designs its recommendation algorithms, would recommend those persons to Brantley directly. The user recommendations are made by a product called "People You May Know" or "PYMK."

170. In Brantley's case, these Meta products – the recommendation algorithms – were promoting and amplifying to Brantley harmful users, user groups, and content specific recommendations – including adult and minor users who began encouraging Brantley to engage in self-harm and even suicide. These are individuals and content Brantley would never have been exposed to but for Meta's recommendation products and decisions to promote these specific users and groups, and this specific content to Brantley.

171. As Brantley's Meta-driven exposure to these harms increased, so did his mental health, in a manner that was both foreseeable by Meta and fatal to Brantley.

172. In the summer of 2019, Brantley started complaining of shortness of breath and other symptoms. Plaintiffs were not certain whether these were the result of him vaping (which habit they did not know about until the summer of 2019) or his anxiety, or both.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

Plaintiffs took Brantley to specialists in the hopes of finding out what was wrong.

173.    Brantley's parents became increasingly worried about a possible heart condition, but doctors found nothing wrong other than orthostatic hypertension, and told him to eat more salt.

174.    In June 2019, Blaire Aranda learned that Brantley had engaged in self-harm. His parents put him in counseling, hoping to get to the bottom of what was happening. Again, they did not know about his social media dependency, or the harmful content being directed to him by Meta, and without this information, counseling was not enough. Brantley was becoming more dependent on Facebook and was on Facebook and Facebook Messenger all hours of the day and night, without his parents' knowledge or consent.

175.    What Meta knew or should have known, but Plaintiffs did not know and could not reasonably have discovered, is that Brantley was severely sleep deprived and had become increasingly withdrawn and anxious because of his Facebook dependency and the multiple features and functions of the Facebook product designed to encourage that dependency – all for the sake of Meta's growing and astronomical profits.

176.     In fact, Meta was also sending Brantley emails and push notifications in the middle of the night, while he was in school, and at other times designed to affirmatively push Brantley to log back into Facebook and to increase his dependency on the Facebook social media product – which is what happened. Internal Meta documents confirm these design objectives.

177.    What Meta also knew or should have known, but Plaintiffs did not know and could not reasonably have discovered, is that when you separate an addicted child from social media, for even a few hours, it puts them in vulnerable and emotionally unstable place. This is a foreseeable consequence of addiction.

178.    On September 4, 2019, Brantley Aranda got in trouble for fighting with his brother. Plaintiff Gregorio Aranda took his cell phone as consequence for his behavior.

179.    The family attended Wednesday night church, as the always tried to do, and Blair Aranda noticed Brantley writing something during the sermon, which assumed were

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

notes on the sermon itself. It turned out to be a suicide note.

180.    Brantley asked to go home after church. Blair stayed to cook food—which was typical after Wednesday night church, through Brantley usually stayed to help. She agreed to let him go home with his grandparents instead, as they live close to Plaintiffs.

181.    Blair Aranda expected Brantley to stay with his grandparents, but he told them that he had homework to do so he returned to Plaintiffs' home instead.

182.    When Blair Aranda arrived home after church, she found Brantley with a bullet in his chest. He was still alive when she found him, but quickly passed. His suicide note read, "I'm sorry for everything."

183.    Brantley Aranda died on September 4, 2019, ten days into his senior year of high school and less than four months after obtaining access to the Facebook social media product on a personal cell phone device.

184.    The harmful dependency Meta knowingly created, and the harmful content Meta promoted and amplified via its recommendation systems and algorithms proximately caused Brantley Aranda's death.

185.    Without access to social media, Brantley Aranda had no distraction, only his thoughts and everything he felt like he was going through because of Meta's social media product design and process, its engineered dependency, and the resulting and foreseeable impact of sleep deprivation, depression, and anxiety.

186.    After Brantley's death, Blair Aranda started to look for answers. She hoped to find out more through Brantley's Facebook activity, so wrote to Facebook and requested his messages. Facebook agreed but when it sent the content none of the memes or photos were included. She asked again but received the same incomplete product in response and was told by Meta that this was the most they would provide.

187.    Blair then went directly to Brantley's Facebook account and took screen shots of every message on Facebook Messenger. It was not until September of 2021, when the Facebook whistleblower came forward, that any of it began to make sense.

188.    Brantley's death was the proximate result of psychic injury caused by his

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

addictive use of Facebook, and as set forth above.

189. But for Meta's refusal to conduct a reasonable age verification or confirm parental consent for minor users, Brantley Aranda would not have been exposed to the harmful features and design of Meta's Facebook product.

190. But for certain product features, such as Facebook's "like" feature, Brantley Aranda would not have experienced the anxiety and depression that stem from harmful social comparison designs.

191. But for Meta's recommendation systems as well as content promotion and amplification, public profile, and direct messaging settings, Brantley Aranda would not have been exposed to users encouraging and content prompting self-harm and suicide – content Meta knew about or should have known about yet recommended and pushed to young and "vulnerable" users like and including Brantley Aranda.

192. But for Facebook's endless feed and explore features, and other product designs, Brantley Aranda would not have experienced the harmful dependencies that these features were designed to promote.

193. Throughout the period of Brantley's Facebook use, Plaintiffs were unaware of the addictive and mentally harmful effects of Facebook. There were also not aware of the resulting sleep deprivation and incredibly harmful emotional impact those factors were having on Brantley physical and mental health. They were also not aware of the algorithm products that were affirmatively connected Brantley with and otherwise suggesting and directing him to harmful users, groups, and content – users, groups, and content to which Brantley would not have been exposed by for Meta's affirmative conduct, which was intended to connect Brantley with as many users and groups and as much content as possible as a means of increasing his dependency and engagement to the Facebook product.

194. Meta designed Facebook to frustrate and prevent parents like Blair and Gregoria Aranda from exercising their rights and duties as parents to monitor and limit their child's use of their social media products.

195. Meta not only failed to warn Plaintiffs of these dangers, known only to Meta,

but affirmatively misrepresented the safety, utility, and addictive properties of its Facebook product to minor users and their parents in a manner that was designed to, and reasonably did, create reliance on those same minor users and their parents to their detriment.

## VI.     PLAINTIFF'S CLAIMS

### COUNT I - STRICT PRODUCT LIABILITY (Design Defect)

196.     Plaintiff reallege each and every allegation contained in paragraphs 1 through 195 as if fully stated herein.

197.     Under Restatement (Second) of Torts § 402(a) and California law, one who sells any product in a defective condition unreasonably dangerous to the user is subject to liability for physical harm thereby caused to the user if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition which it was sold.

198.     Meta's Facebook product is defective because the foreseeable risks of harm posed by the product's design could have been reduced or avoided by the adoption of a reasonable alternative design by Meta and the omission of the alternative design renders the product not reasonably safe. These defective conditions rendered this product unreasonably dangerous to persons or property and existed at the time the product left Meta's control, reached the user or consumer without substantial change in the condition and its defective condition was a cause of Plaintiffs' injuries.

199.     Meta designed, manufactured, marketed, and sold a social media product that was unreasonably dangerous because it was designed to be addictive to the minor users to whom Meta actively marketed and because the foreseeable use of Meta's Facebook product causes mental and physical harm to minor users.

200.     Defendants' products were unreasonably dangerous because they contained numerous design characteristics that are not necessary for the utility provided to the user but are unreasonably dangerous and implemented by Defendants solely to increase the profits they derived from each additional user and the length of time they could keep each user dependent on their product.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

**A. Inadequate Safeguards From Harmful and Exploitative Recommendations and Promotions**

201.   Facebook is defectively designed.

202.   As designed, Facebook algorithms and other product features are not reasonably safe because they affirmatively direct minor users to harmful and exploitative content while failing to deploy feasible safeguards to protect vulnerable teens from such harmful exposures. It is feasible to design an algorithm and technologies that substantially distinguish between harmful and innocuous content and protect minor users from being exposed to harmful content without altering, modifying, or deleting any third-party content posted on Meta's social media product. It is also feasible to design a social media product that does not use algorithms in connection with minor user accounts and/or only uses limited algorithms when responding to specific, user-generated inquiries, as opposed to what Meta does now, which is select, promote, amplify, recommend, and organize and present in an overwhelming and harmful manner massive amounts of harmful and exploitative content to teens and children in the interest of engagement and corporate profits. The cost of designing these products to incorporate such safeguards would be negligible while benefit would be high in terms of reducing the quantum of mental and physical harm sustained by minor users and their families.

203.   As designed, Facebook algorithms and other product features are not reasonably safe because they affirmatively direct and recommend minor users to harmful Facebook groups and other users, while failing to deploy feasible safeguards to protect vulnerable teens from such harmful exposures. It is feasible to design an algorithm and technologies that do not make harmful connection recommendations to minor users, or any connection recommendations at all; it is feasible to design and algorithm and technologies that do not recommend harmful Facebook groups to minor users, or any group recommendations at all; and it is feasible to restrict access to minor users by strangers and adult users via direct messaging, to restrict and limit such access to users already on a minor user's "friend" list, or to prevent such access altogether. Facebook knows that these product

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

features cause a significant number of harms to its minor users, such as sexual exploitation, bullying, and the type of encouragement of self-harm and suicide at issue in this case.

204.    Meta also engages in conduct, outside of the algorithms and related technologies themselves, designed to promote harmful and exploitative content as a means of increasing Meta's revenue from advertisements. This includes but is not limited to efforts to encourage advertisers to design ads that appeal to minors, including teens like Brantley Aranda; and product design features intended to attract and engage minor users to these virtual spaces where harmful ad content is then pushed to those users in a manner intended to increase user engagement, thereby increasing revenue to Meta at the direct cost of user wellbeing.

205.    Reasonable users (and their parents) would not expect that Meta products would knowingly expose them to such harmful content and/or that Meta's products would direct them to harmful content at all, much less in the manipulative and coercive manner that they do. Meta has and continues to knowingly use its algorithms and other technologies on users in a manner designed to affirmatively change their behavior, which methods are particularly effective on (and harmful to) Meta's youngest users.

**B.    Failure to Verify Minor Users' Age and Identity**

206.    Facebook is defectively designed.

207.    As designed, Meta's product is not reasonably safe because they do not provide for adequate age verification by requiring users to document and verify their age and identity.

208.    Adults frequently set up user accounts on Meta's social media product posing as minors to groom unsuspecting minors to exchange sexually explicit content and images, which frequently progresses to sexual exploitation and trafficking.

209.    Minor users of social media and their parents do not reasonably expect that prurient adults set up fraudulent accounts on Meta's social media product and pose as minors for malign purposes.

210.    Moreover, reasonably accurate age and identity verification is not only

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

feasible but widely deployed by online retailers and internet service providers. Meta not only can estimate the age of its users, but it does.

211. The cost of incorporating age and identify verification into Meta's product would be negligible, whereas the benefit of age and identity verification would be a substantial reduction in severe mental health harms, sexual exploitation, and abuse among minor users of Meta's product.

**C.   Inadequate Parental Control and Monitoring**

212. Facebook is defectively designed.

213. Meta's product is also defective for lack of parental controls, permission, and monitoring capability available on many other devices and applications.

214. It is feasible to design a social media product that requires parental consent for users under the age of 18 and prohibits users under the age of 13.

215. Instead, Meta's product is designed with specific product features intended to prevent and/or interfere with parents' reasonable and lawful exercise of parental control, permission, and monitoring capability available on many other devices and applications.

**D.   Intentional Direction of Minor Users to Harmful and Exploitative Content**

216. Facebook is defectively designed.

217. Default "recommendations" communicated to new teenage users, including Brantley Aranda, purposefully steered him toward content Meta knew to be harmful to children of his age and gender

218. Ad content pushed to new teenage users, including Brantley Aranda, because of their age and vulnerability, purposefully steer those users toward content Meta knows to be harmful to children of their age and gender.

**E.   Inadequate Protection of Minors from Sexual Exploitation and Abuse**

219. Facebook is defectively designed.

220. Meta's product is not reasonably safe because it does not protect minor users from sexually explicit content and images or report sex offenders to law enforcement or allow users' parents to readily report abusive users to law enforcement.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

221.    Parents do not expect their children will use Meta's product to exchange sexually explicit content and images, and minor users do not expect that prurient adults pose as minors for malign purposes or that exchange of such content will be deleterious to their personal safety and emotional health.

222.    Minor users of Meta's product lack the cognitive ability and life experience to identify online grooming behaviors by prurient adults and lack the psychosocial maturity to decline invitations to exchange salacious material.

223.    Meta's product is unreasonably dangerous and defective as designed because it allows minor children to use "public" profiles, in many cases default "public" profiles, that can be mass messaged by anonymous and semi-anonymous adult users for the purposes of sexual exploitation, and grooming, including the sending of encrypted, disappearing messages and cash rewards through Meta's integrated design features.

**F.    Design of Addictive Social Media Products**

224.    Facebook is defectively designed.

225.    As designed, Meta's social media product is addictive to minor users as follows: When minors use design features such as "likes" it cause their brains release dopamine which creates short term euphoria. However, as soon as dopamine is released, minor users' brains adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated and their euphoria is countered by dejection. In normal stimulatory environments, this dejection abates, and neutrality is restored. However, Meta's algorithms are designed to exploit users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria. As this pattern continues over a period of months and the neurological baseline to trigger minor users' dopamine responses increases, they continue to use Instagram, not for enjoyment, but simply to feel normal. Once they stop using Instagram, minor users experience the universal symptoms of withdrawal from any addictive substance including anxiety, irritability, insomnia, and craving.

226.    Addiction is not restricted to a substance abuse disorders. Rather, the working definition of addiction promulgated in the seminal article *Addictive behaviors:*

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

*Etiology and Treatment* published by the American Psychological Association in its 1988 *Annual Review of Psychology* defines addiction as,

> a repetitive habit pattern that increases the risk of disease and/or associated personal and social problems. Addictive behaviors are often experienced subjectively as 'loss of control' – the behavior contrives to occur despite volitional attempts to abstain or moderate use. These habit patterns are typically characterized by immediate gratification (short term reward), often coupled with delayed deleterious effects (long term costs). Attempts to change an addictive behavior (via treatment or self-initiation) are typically marked with high relapse rates.

227.    Addiction researchers agree that addiction involves six core components: (1) salience—the activity dominates thinking and behavior; (2) mood modification—the activity modifies/improves mood; (3) tolerance—increasing amounts of the activity are required to achieve previous effects; (4) withdrawal—the occurrence of unpleasant feelings when the activity is discontinued or suddenly reduced; (5) conflict—the activity causes conflicts in relationships, in work/education, and other activities; and (6) relapse—a tendency to revert to earlier patterns of the activity after abstinence or control.

228.    Social media addiction has emerged as a problem of global concern, with researchers all over the world conducting studies to evaluate how pervasive the problem is.  Addictive social media use is manifested when a user (10 becomes preoccupied by social media (salience); (2) uses social media in order to reduce negative feelings (mood modification); (3) gradually uses social media more and more in to get the same pleasure from it (tolerance/craving); (4) suffers distress if prohibited from using social media (withdrawal); (5) sacrifices other obligations and/ or cases harm to other important life areas because of their social media use (conflict/functional impairment); and (6) seeks to curtail their use of social media without success (relapse/loss of control).

229.    The Bergen Facebook Addiction Scale (BFAS) was specifically developed by psychologists in to assess subjects' social media use using the aforementioned addiction criteria, and is by far the most widely used measure of social media addiction.  Originally designed for Facebook, BFAS has since been generalized to all social media. BFAS has been translated into dozens of languages, including Chinese, and is used by researchers

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

throughout the world to measure social media addiction.

230. BFAS asks subjects to consider their social media usage with respect to the six following statements and answer either (1) very rarely, (2) rarely, (3) sometimes, (4) often, or (5) very often,

231. You spend a lot of time thinking about social media or planning how to use it.

232. You feel an urge to use social media more and more.

233. You use social media in order to forget about personal problems.

234. You have tried to cut down on the use of social media without success.

235. You become restless or troubled if you are prohibited from using social media.

236. You use social media so much that it has had a negative impact on your job/studies.

Subjects who score a "4" or "5" on at least 4 of those statements are deemed to suffer from social media addiction.

237. Addictive use of social media by minors is psychologically and neurologically analogous to addiction to internet gaming disorder as described in the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5), which is used by mental health professionals to diagnose mental disorders. Gaming addiction is a recognized mental health disorder by the World Health Organization and International Classification of Diseases and is functionally and psychologically equivalent to social media addition. The diagnostic symptoms of social media addiction among minors are the same as the symptoms of addictive gaming promulgated in DSM 5 and include:

238. Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when device is taken away or not possible (sadness, anxiety, irritability).

a. Tolerance, the need to spend more time using social media to satisfy the urge.

b. Inability to reduce social media usages, unsuccessful attempts to quit gaming.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

c. Giving up other activities, loss of interest in previously enjoyed activities due to social media usage.

d. Continuing to use social media despite problems.

e. Deceiving family members or others about the amount of time spent on social media.

f. The use of social media to relieve negative moods, such as guilt or hopelessness.

g. and Jeopardized school or work performance or relationships due to social media usage.

239. Meta's advertising profit is directly tied to the amount of time that its users spend online, and its algorithms and other product features are designed to maximize the time users spend using the product by directing them to content that is progressively more and more stimulative. Meta enhances advertising revenue by maximizing users' time online through a product design that addicts them to the platform. However, reasonable minor users and their parents do not expect that on-line social media platforms are psychologically and neurologically addictive.

240. It is feasible to make Meta's product less addictive and less harmful to minor users by limiting the frequency and duration of access and suspending service during sleeping hours.

241. At negligible cost, Meta could design software that limits the frequency and duration of minor users' screen use and suspends service during sleeping hours; the benefit of minor users maintaining healthy sleep patterns would be a significant reduction in depression, attempted and completed suicide and other forms self-harm among this vulnerable age cohort.

**G.     Inadequate Notification of Parents of Dangerous and Problematic Social Media Usage by Minor Users**

242. Facebook is defectively designed.

243. Meta's product is not reasonably safe as designed because it does not include any safeguards to notify users and their parents of usage that Meta knows to be problematic

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

and likely to cause negative mental health effects to users, including excessive passive use and use disruptive of normal sleep patterns. This design is defective and unreasonable because:

244.    It is reasonable for parents to expect that social media companies that actively promote their platforms to minors will undertake reasonable efforts to notify parents when their child's use becomes excessive or occurs during sleep time. It is feasible for Meta to design a product that identifies a significant percentage of its minor users who are using the product more than three hours per day or using it during sleeping hours at negligible cost.

245.    Meta's product is not reasonably safe as designed because, despite numerous reported instances of child sexual solicitation, exploitation, and other abuses by adult users, Meta has not undertaken reasonable design changes to protect underage users from this abuse, including notifying parents of underage users when they have been messaged or solicited by an adult user or when a user has sent inappropriate content to minor users. Meta is aware of these harms.

246.    Meta's entire business is premised upon collecting and analyzing user data and it is feasible to use Meta's data and algorithms to identify and restrict improper sexual solicitation, exploitation, and abuse by adult users.

247.    Moreover, it is reasonable for parents to expect that platforms such as Facebook, which actively promote its services to minors, will undertake reasonable efforts to identify users suffering from mental injury, self-harm, or sexual abuse and implement technological safeguards to notify parents by text, email, or other reasonable means that their child is in danger. In fact, it is not just reasonable, it is what Meta was actually doing – it was lulling parents into believe that it was using its technologies and AI to protect their children, not to exploit and profit from them which is what actually happened.

248.    As a proximate result of these dangerous and defective design attributes of Meta's product, Brantley suffered severe and fatal mental harm. Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, of these defective design in Meta's product until late 2021 at the absolute soonest.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

249.    As a result of these dangerous and defective design attributes of Meta's product, Plaintiffs Blair and Gregorio Aranda have suffered emotional distress and pecuniary hardship due to their child's mental harm resulting from his social media addiction.

250.    Meta is further liable to Plaintiffs for punitive damages based upon the willful and wanton design of its product that was intentionally marketed and sold to underage users, whom they knew would be seriously harmed through their use of Facebook.

**COUNT II – STRICT PRODUCT LIABILITY (Failure to Warn)**

251.    Plaintiff reallege each and every allegation contained in paragraphs 1 through 244 as if fully stated herein.

252.    Meta's product is defective because of inadequate instructions or warnings because the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the manufacturer and the omission of the instructions or warnings renders the product not reasonably safe. This defective condition rendered the product unreasonably dangerous to persons or property, existed at the time the product left Meta's control, reached the user or consumer without substantial change in the condition in which it was sold, and was a cause of Plaintiffs' injury.

253.    Meta's product is unreasonably dangerous and defective because it contains no warning to users or parents regarding the addictive design and effects of Facebook.

254.    Meta's social media product relies on highly complex and proprietary algorithms that are both undisclosed and unfathomable to ordinary consumers, who do not expect that social media platforms are physically and/or psychologically addictive.

255.    The magnitude of harm from addiction to Meta's product is horrific, ranging from simple diversion from academic, athletic, and face-to-face socialization to sleep loss, severe depression, anxiety, self-harm, and suicide.

256.    Meta had actual knowledge of such harms.

257.    Meta's product is unreasonably dangerous because it lacks any warnings that foreseeable product use can disrupt healthy sleep patterns or specific warnings to parents when their child's product usage exceeds healthy levels or occurs during sleep hours.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

Excessive screen time is harmful to adolescents' mental health and sleep patterns and emotional well-being. Reasonable and responsible parents are not able to accurately monitor their child's screen time because most adolescents own or can obtain access to mobile devices and engage in social media use outside their parents' presence.

258.    It is feasible for Meta's product to report the frequency and duration of their minor users' screen time to their parents without disclosing the content of communications at negligible cost, whereas parents' ability to track the frequency, time and duration of their minor child's social media use are better situated to identify and address problems arising from such use and to better exercise their rights and responsibilities as parents.

259.    Meta knew about these harms, knew that users and parents would not be able to safely use its product without warnings, and failed to provide warnings that were adequate to make the product reasonably safe during ordinary and foreseeable use by children.

260.    As a result of Meta's failure to warn, Brantley Aranda suffered severe mental harm, leading to physical injury and death because of his use of Facebook.

261.    As a result of Meta's failure to warn, Plaintiffs Blair and Gregorio Aranda, suffered emotional distress and pecuniary hardship due to their child's mental harm and death resulting from his harmful and dependent use of Facebook.

262.    Meta is further liable to Plaintiffs for punitive damages based upon its willful and wanton failure to warn of known dangers of its product that was intentionally marketed and sold to teenage users, whom they knew would be seriously harmed through their use of Facebook.

### COUNT III – NEGLIGENCE

263.    Plaintiff reallege each and every allegation contained in paragraphs 1 through 256 as if fully stated herein.

264.    At all relevant times, Meta had a duty to exercise reasonable care and caution for the safety of individuals using its product, such as Brantley Aranda.

265.    Meta owes a heightened duty of care to minor users of its social media product because adolescents' brains are not fully developed, which results in a diminished capacity

to make good decisions regarding their social media usages, eschew self-destructive behaviors, and overcome emotional and psychological harm from negative and destructive social media encounters.

266.    As a product manufacturer marketing and selling products to consumers, Meta owed a duty to exercise ordinary care in the manufacture, marketing, and sale of its product, including a duty to warn minor users and their parents of hazards that Meta knew to be present, but not obvious, to underage users and their parents.

267.    As a business owner, Meta owes its users who visit Meta's social media platform and from whom Meta's derive billions of dollars per year in advertising revenue a duty of ordinary care substantially similar to that owed by physical business owners to its business invitees.

268.    Meta was negligent, grossly negligent, reckless and/or careless in that they failed to exercise ordinary care and caution for the safety of underage users, like Brantley Aranda, using its Facebook product.

269.    Meta was negligent in failing to conduct adequate testing and failing to allow independent academic researchers to adequately study the effects of its product and levels of problematic use amongst teenage users. Meta has extensive internal research indicating that its product is harmful, causes extensive mental harm and that minor users are engaging in problematic and addictive use that their parents are helpless to monitor and prevent.

270.    Meta was negligent in failing to provide adequate warnings about the dangers associated with the use of social media products and in failing to advise users and their parents about how and when to safely use its social media platform and features.

271.    Meta was negligent in failing to fully assess, investigate, and restrict the use of Instagram by adults to sexually solicit, abuse, manipulate, and exploit minor users of its Instagram product.

272.    Meta is negligent in failing to provide users and parents the tools to ensure its social media product is used in a limited and safe manner by underage users.

273.    As a result of Meta's negligence, Brantley Aranda suffered severe mental

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

harm from his use of Facebook.

274. As a result of Meta's negligence, Plaintiffs Blair and Gregorio Aranda suffered emotional distress and pecuniary hardship due to their child's mental harm and death resulting from his harmful and dependent use of Facebook.

275. Meta is further liable to Plaintiffs for punitive damages based upon its willful and wanton conduct toward underage users, including Brantley Aranda, whom it knew would be seriously harmed through the use of its social media product.

## COUNT VII – FRAUD and FRAUDULENT CONCEALMENT

276. Plaintiffs reallege each and every allegation contained in paragraphs 1 through 269 as if fully stated herein.

277. At all times relevant, Meta designed, developed, operated, marketed, made publicly available, and benefitted from its Facebook social media product and therefore owed a duty of reasonable care to avoid causing harm to those that it used it.

278. Meta's marketing, promotions, and advertisements contained deceptive and/or misleading statements, implications, images, and portrayals that the Facebook product was safe, improved social connectivity, and improved the mental and physical health of its users. For example, in February of 2017, Facebook founder and CEO, Mark Zuckerberg, posted a manifesto on his Facebook page titled "Building Global Community," in which he talked at length about how Meta is focused on safety, how it intends to use its AI to the fullest to keep users safe, and how amazing Facebook is for bringing communities together, promoting critically important social groups.

279. In April of 2018, Meta founder and CEO Mark Zuckerberg testified under oath to Congress that Meta does not design its products to be addictive and that he is not concerned with social media addiction as it relates to teens. He stated

> I view our responsibility as not just building services that people like but as building services that are good for people and good for society as well … we study a lot of effects of well-being, of our tools, and broader technology, and like any tool there are good and bad uses of it. What we find in general is that if you are using social media to build relationships then that is associated with all the long term measures of well-being that you'd intuitively think of … but if you are using the internet and

71

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

social media to just passively consume content and are not engaging with other people then it doesn't have those positive effects and it could be negative.[16]

280. Meta's fraud continued long after Brantley Aranda's death. In November of 2020, for example, Mark Zuckerberg again testified under oath to Congress that Meta does not design its products to be addictive and that research on addictiveness of social media has not been conclusive.[17]

281. In March of 2021, Mark Zuckerberg testified under oath to Congress that Instagram is not addictive and that it does not cause harm to children and teens.[18]

282. On September 30, 2021, Meta's Head of Safety, Antigone Davis, testified under oath to Congress that Instagram is not addictive[19] and repeatedly denied the existence of causal research regarding harms to teens from Instagram use and testified that Meta's overreaching goal is child safety: "We work tirelessly to put in place the right policies, products, and precautions so [young users] have a safe and positive experience."[20]

283. On December 8, 2021, Instagram's president Adam Mosseri provided written testimony and testified under oath to Congress that Instagram is not addictive[21] and he downplayed the significance of the documents disclosed by the Facebook Whistleblower, characterizing Meta's numerous studies as involving input from small numbers of teens and not measuring "causal relationships between Instagram and real-world issues."[22] He testified that Meta's overarching goal is child safety. [23]

284. Meta's Terms of Use also represent that Meta is "Fostering a positive,

---

[16] https://www.youtube.com/watch?v=AB4mB-K7-xY

[17] https://www.tampafp.com/great-news-facebook-is-not-designed-to-be-addictive-according-to-zuckerberg/

[18] https://www.congress.gov/117/meeting/house/111407/documents/HHRG-117-IF16-Transcript-20210325.pdf, at p. 67, 107, 175.

[19] https://www.rev.com/blog/transcripts/facebook-head-of-safety-testimony-on-mental-health-effects-full-senate-hearing-transcript ("Sept. 30, 2021, Senate Hearing Transcript"), at 2:06:35; *see also id.* at 02:07:44 and 02:07:59 (Ms. Davis also denied that Meta's business model includes getting users engaged for longer amounts of time).

[20] *Id.* at 24:58, 01:47:29, 1:48:07, 1:48:20, 2:10:47, 33:46, and 40:41.

[21] https://www.commerce.senate.gov/2021/12/protecting-kids-online-instagram-and-reforms-for-young-users, recording of December 8, 2021 Senate Hearing.

[22] https://www.commerce.senate.gov/services/files/3FC55DF6-102F-4571-B6B4-01D2D2C6F0D0, written Testimony of Adam Mosseri, Head of Instagram, dated December 8, 2021.

[23] https://www.npr.org/2021/12/08/1062576576/instagrams-ceo-adam-mosseri-hears-senators-brush-aside-his-promises-to-self-poli

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

inclusive, and safe environment," and represent that Meta uses its "teams and systems … to combat abuse and violations of our Terms and policies, as well as harmful and deceptive behavior. We use all the information we have—including our information—to try to keep our platform secure."

285. The sheer volume and specificity of these statements are indicative and reflective of the lengths to which Meta leadership was willing to go to deceive and/or mislead a substantial percentage of the global population. Meta leadership fed these sorts of deceptive and/or misleading statements to the public for years, to convince people that its products were safe for use by teenagers, like Brantley Aranda. When in fact, Meta knew that its products were not safe. Meta knew that its products are addictive and harmful to a significant portion of users, including teen girls, like Brantley Aranda.

286. Meta's public statements and other marketing and advertising materials failed to disclose the truth, in fact, Meta has gone to considerable lengths to conceal the truth. This includes creating a corporate culture that convinced thousands of Meta employees that if they went public with what they knew they would lose their careers, no one would believe them, and that Meta would then lock down internal communications in a manner that would make it impossible for the employees left behind to work toward effectuating change from the inside. When in fact, Meta never intended to allow change from the inside. It intended to pursue engagement and growth at the expense of human lives and did everything it could to hide these facts from the world.

287. Meta lied about the harm its products are causing.

288. Meta's omissions were also misleading and deceptive in every respect, for example, talking about how its social media products make some users' lives better and ignoring the fact that its products are causing serious (even fatal) harms to other users. Meta has an internal term, SSI, which stands for Suicide and Self-Injury. Meta was internally discussing the fact that its product worsens and causes Suicide and Self-Injury in some of its youngest users yet failed to disclose and actively concealed this information. SSI stands for Suicide and Self Injury, which is perhaps how Meta leadership slept at night … by ignoring

73

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

the fact that they were knowingly distributing products that were resulting in the death of children. To name only one example from the Facebook Papers:

289.    In September of 2017, former Meta CEO, Sheryl Sandberg, was asked about a Meta product that enabled advertisers to target users with offensive terms. In response, Meta CEO, Sheryl Sandberg, apologized and vowed that the company would adjust its ad-buying tools to prevent similar problems in the future. She also represented that "We never intended or anticipated this functionality being used this way — and that is on us."[24]

290.    What the former Meta CEO deliberately failed to mention was that the identified product defect was among the less harmful of countless defects known to Meta at that time. She failed to tell the public that Meta was aware of the harms its products were causing, including Suicide and Self-Injury harms, but refused to implement safety tools and other cost-effective fixes for fear of decreasing engagement and, in turn, corporate profits.

291.    Meta had actual knowledge of the harms its Facebook product was causing, knew or should have known that it was causing those harms to Brantley Aranda, and made a deliberate decision to continue the course regardless. Meta could have prevented Brantley's death, a death Meta itself caused, but chose engagement and growth instead.

292.    Meta failed to disclose, and spent years actively concealing, the fact that its Facebook social media product causes addiction, sleep deprivation, anxiety, depression, anger, self-harm, suicidal ideation, and suicide, among other harms.

293.    These representations were false and material, as were Meta's omissions. These representations were communicated to Plaintiffs via the media, the internet, advertising, websites, and the platforms themselves and Plaintiffs reasonably relied on these representations to their detriment. Meta intended for members of the public, including plaintiffs, to rely on these misrepresentations and omissions, and Plaintiffs did, and these misrepresentations and omissions were a substantial factor in causing Plaintiffs' harm.

---

[24] https://www.nytimes.com/2017/09/21/technology/facebook-frankenstein-sandberg-ads.html

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Meta for relief as follows:

a) Past physical and mental pain and suffering of Brantley Aranda, in an amount to be more readily ascertained at the time and place set for trial;

b) Loss of enjoyment of life, in an amount to be more readily ascertained at the time and place set for trial;

c) Past medical care expenses for the care and treatment of the injuries sustained by Brantley Aranda, in an amount to be more readily ascertained at the time and place set for trial;

d) Past and future impairment to capacity to perform everyday activities;

e) Plaintiff's pecuniary loss and loss of Brantley Aranda's services, comfort, care, society, and companionship to Blair and Gregorio Aranda;

f) Loss of future income and earning capacity of Brantley Aranda;

g) Punitive damages;

h) Reasonable costs and attorney and expert/consultant fees incurred in prosecuting this action; and

i) Such other and further relief as this Court deems just and equitable.

Dated: July 20, 2022.

SOCIAL MEDIA VICTIMS LAW CENTER PLLC


By:*/s/ Laura Marquez-Garrett*
Laura Marquez-Garrett, SBN 221542
laura@socialmediavictims.org
Matthew Bergman
matt@socialmediavictims.org
Glenn Draper
glenn@socialmediavictims.org

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

821 Second Avenue, Suite 2100
Seattle, WA 98104
Telephone: (206) 741-4862
Facsimile: (206) 957-9549

SEEGER WEISS LLP
Christopher A. Seeger
cseeger@seegerweiss.com
Christopher Ayers
cayers@seegerweiss.com
55 Challenger Road
Ridgefield Park, NJ 07660
Telephone: 973-639-9100
Facsimile: 973-679-8656

Robert H. Klonoff
klonoff@usa.net
2425 S.W. 76th Ave.
Portland, Oregon 97225
Telephone: (503) 702-0218
Facsimile: (503) 768-6671

*Attorneys for Plaintiffs*

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

# Exhibit A-3

Laura Marquez-Garrett, SBN 221542
laura@socialmediavictims.org
SOCIAL MEDIA VICTIMS LAW CENTER
821 Second Avenue, Suite 2100
Seattle, WA 98104
Telephone:    (206) 741-4862
Facsimile:    (206) 957-9549

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| ASHLEIGH HEFFNER, individually and as the Personal Representative of the Estate of Liam Birchfield, | NO. |
| Plaintiff, | COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP, AND FOR VIOLATIONS OF THE |
| v. | CALIFORNIA UNFAIR COMPETITION LAW, BUS. & PROF. CODE §§17200, *ET. SEQ* |
| META PLATFORMS, INC., formerly known as FACEBOOK, INC.; SNAP, INC., | |
| Defendants. | JURY DEMAND |

> In these digital public spaces, which are privately owned and tend to be run for profit, there can be tension between what's best for the technology company and what's best for the individual user or for society. Business models are often built around maximizing user engagement as opposed to safeguarding users' health and ensuring that users engage with one another in safe and healthy ways. . . . Technology companies must step up and take responsibility for creating a safe digital environment for children and youth. Today, most companies are not transparent about the impact of their products, which prevents parents and young people from making informed decisions and researchers from identifying problems and solutions.

*Protecting Youth Mental Health*, United States Surgeon General Advisory, December 7, 2021

Plaintiff Ashleigh Heffner, individually and as the Personal Representative of the Estate of Liam Birchfield, brings this action against Meta Platforms, Inc., formerly known as Facebook, Inc. ("Meta"), doing business as Instagram ("Instagram"), and Snap, Inc., doing business as Snapchat ("Snapchat"), and alleges as follows:

COMPLAINT FOR WRONGFUL DEATH
AND SURVIVORSHIP - 1

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

## I.    INTRODUCTION

1.    This product liability action seeks to hold Defendants' products responsible for causing and contributing to the burgeoning mental health crisis perpetrated upon the children and teenagers of the United States by Defendants and, specifically, for the wrongful death of 11-year-old Liam Birchfield caused by his addictive use of and exposure to Defendants' unreasonably dangerous and defective social media products. On July 6, 2021, after struggling with the harmful effects of social media, Liam took his own life.

2.    Liam Birchfield's death was a symptom of the current mental health crisis among American youth caused by social media. On December 7, 2021, the United States Surgeon General issued an advisory cataloging a dramatic increase in teen mental health crises including suicides, attempted suicides, eating disorders, anxiety, depression, self-harm, and inpatient admissions. Between 2007 and 2018, for example, suicide rates among youth ages twelve to sixteen in the U.S. increased a staggering 146 percent!

3.    The most significant and far-reaching change to the lives of young people during this period was the widespread adoption of mobile social media platforms, most prominently the Instagram and Snapchat products designed and distributed by Defendants. By 2014, 80 percent of high school students said they used a social media platform daily, and 24 percent said that they were online "almost constantly." Millions of children and teenagers spend hours throughout the day and night using Defendants' unreasonably dangerous and defective social media products.

4.    Peer reviewed studies and the available medical science have identified social media use associated with major mental health injuries among youth, including depression, self-harm, eating disorders, suicide attempts and ideation, dissatisfaction with life, depression, and sleep deprivation. Both large observational studies and experimental results point to the heavy use of Defendants' social media products as a cause of increased depression, suicidal ideation, and sleep deprivation among minors.

5.    Defendants' own research also points to their social media products as a cause of increased depression, suicidal ideation, sleep deprivation, and other serious harms. Meta researchers, for example, found that Instagram is "worse" than many competitor products and "is

COMPLAINT FOR WRONGFUL DEATH
AND SURVIVORSHIP - 2

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

seen as having the highest impact [on negative body and appearance comparison], and Snapchat isn't far behind."

6.     Defendants have invested billions of dollars to intentionally design and develop their products to encourage, enable, and push content to children and teenagers that Defendants know to be problematic and highly detrimental to their minor users' mental health.

7.     Internal, non-public data collected by Instagram and Facebook reveal large numbers of its users are engaging in "problematic use" of its products. This problematic use identified in the medical literature is precisely the type of use Defendants have designed their products to encourage through psychological manipulation techniques—sometimes referred to as persuasive design—that is well-recognized to cause all the hallmarks of clinical addiction.

8.     Likewise, each of Defendants' products contains unique product features which are intended to and do encourage addiction, and unlawful content and use of said products, to the detriment of Defendants' minor users.

9.     Plaintiff brings claims of strict liability based upon Defendants' defective design of their social media products that renders such products not reasonably safe for ordinary consumers in general and minor users in particular. It is technologically feasible to design social media products that substantially decrease both the incidence and magnitude of harm to minors arising from their foreseeable use of Defendants' products with a negligible increase in production cost.

10.     Plaintiff also brings claims for strict liability based on Defendants' failure to provide adequate warnings to minor users and their parents of the danger of mental, physical, and emotional harms and sexual abuse arising from foreseeable use of their social media products. The addictive quality of Defendants' products and the impacts of their harmful algorithms are unknown to minor users and their parents.

11.     Plaintiff also brings claims for common law negligence arising from Defendants' unreasonably dangerous social media products and their failure to warn of such dangers. Defendants knew, or in the exercise of ordinary care should have known, that their social media products were harmful to a significant percentage of their minor users and failed to redesign their

COMPLAINT FOR WRONGFUL DEATH
AND SURVIVORSHIP - 3

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

products to ameliorate these harms or warn minor users and their parents of dangers arising out of the foreseeable use of their products.

12.     Many of Defendants' own former and/or current developers do not allow their own children and teenagers to use Defendants' products. For many years, Defendants have had actual knowledge that their social media products are dangerous and harmful to children and teenagers, but actively concealed these facts from the general public and government regulators and failed to warn parents about this known harm for continued economic gain.

13.     Plaintiff brings claims under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code, §§17200, *et seq*. The conduct and omissions alleged herein constitute unlawful, unfair, and/or fraudulent business practices prohibited by the UCL.

14.     Finally, Plaintiff brings claims under 47 U.S.C. § 1595 based on Defendants' financial benefit derived from knowingly assisting, supporting, and facilitating the sexual solicitation and exploitation of Liam Birchfield and similarly situated children. Defendants have actual knowledge of, and knowingly benefit from, the large number of adult predators who regularly use Defendants' platforms to solicit and groom minor users to engage in commercial sex acts with minors

15.     Defendants have actual knowledge that adult predators use their social media platforms to facilitate commercial sex acts, yet have purposefully failed to undertake reasonable efforts to redesign their social media products to protect minor users such as Liam Birchfield from sex abuse; failed to warn minor users and their parents that sexual predators are using their platforms to recruit minors to perform commercial sex acts; and failed to notify law enforcement despite knowledge of illegal sex acts performed on and through their platforms.

## II.     PARTIES

16.     Plaintiff Ashleigh Heffner is an individual residing in Bluff City, Tennessee, and has been appointed the administrator of the Estate of her son Liam Birchfield, who died of suicide on July 6, 2021.

17.     Plaintiff Ashleigh Heffner has not entered into a User Agreement or other contractual relationship with any of the Defendants herein in connection with Liam Birchfield's

COMPLAINT FOR WRONGFUL DEATH
AND SURVIVORSHIP - 4

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

use of their social media products. As such, in prosecuting this action Plaintiff is not bound by any arbitration, forum selection, choice of law, or class action waiver set forth in said User Agreements. Additionally, as Personal Representative of the Estate of Liam Birchfield, Plaintiff expressly disaffirms any and all User Agreements with Defendants that her son may have entered into.

18.     Defendant Meta Platforms, Inc., formerly known as Facebook, Inc., is a Delaware corporation with its principal place of business in Menlo Park, CA. Defendant Meta Platforms owns and operates the Instagram social media platform, an application that is widely available to users throughout the United States.

19.     Defendant Snap, Inc. is a Delaware corporation with its principal place of business in Santa Monica, CA. Defendant Snap owns and operates the Snapchat social media platform, an application that is widely marketed by Snap and available to users throughout the United States.

### III.     JURISDICTION AND VENUE

20.     This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and Plaintiff and Defendants are residents of different states. Venue is proper in this District under 28 U.S.C. § 1391(b)(2)

21.     This Court has personal jurisdiction over Defendants because they are each headquartered and have their principal place of business in the State of California. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendant Meta's principal place of business is in the Northern District of California and Defendant Snap, Inc. is a resident of the State of California.

### IV.     DIVISIONAL ASSIGNMENT

22.     The case is properly assigned to the San Francisco Division pursuant to Civ. L. R. 3-2(c)–(d) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in San Mateo County, where Defendant Meta Platforms, Inc. maintains its primary place of business.

COMPLAINT FOR WRONGFUL DEATH
AND SURVIVORSHIP - 5

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

## V.    FACTUAL ALLEGATIONS

**A.    Meta Background**

23.    Facebook is an American online social network service that is part of the Defendant Meta Platforms. Facebook was founded in 2004 and became the largest social network in the world, with nearly three billion users as of 2021, and about half that number were using Facebook every day. The company's headquarters are in Menlo Park, California.

24.    Instagram is a photo sharing social media application that originally enabled users to post and share photos that could be seen by other users who "follow" the user. A user's followers could "like" and post comments on the photos. Instagram was purchased by Facebook, Inc. for approximately $1 billion in 2012.

25.    Facebook recently changed its name to, and is referred to herein and collectively with Instagram, as Meta.

26.    A user's "feed" is comprised of a series of photos and videos posted by accounts that the user follows, along with advertising and content specifically selected and promoted by Instagram. Meta exerts control over a user's Instagram "feed," including through certain ranking mechanisms, escalation loops, and/or promotion of advertising and content specifically selected and promoted by Meta based on, among other things, its ongoing planning, assessment, and prioritization of the types of information most likely to increase user engagement. In the case of minor users, this translates to Meta's deliberate and repeated promotion of harmful and unhealthy content, which Meta knows or has reason to know is causing harm to its minor users.

27.    Instagram also features a "discover" feature where a user is shown an endless feed of content that is selected by an algorithm designed by Meta based upon the users' demographics and prior activity in the application. Meta has designed its product in a manner such that it promotes addictive use and harmful and/or unhealthy content. Meta is aware of these inherently dangerous product features and has repeatedly decided against changing them and/or implementing readily available and relatively inexpensive safety measures, for the stated purpose of ensuring continued growth, engagement, and revenue.

28.    Users' profiles on Instagram may be public or private. On public profiles, any user

COMPLAINT FOR WRONGFUL DEATH
AND SURVIVORSHIP - 6

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

is able to view the photos, videos, and other content posted by the user. On private profiles, the users' content may only be viewed by the user's followers, which the user is able to approve. During the relevant period, Instagram profiles were public by default and Instagram allowed all users to message and send follow request to underage users, including Liam Birchfield.

29. Defaulting profiles to public served no critical purpose in terms of product functionality and/or a user's ability to access content. Instead, this product feature increased user engagement during onboarding (when a user first starts using Instagram) by increasing user connections. However, Meta also has actual knowledge that harmful and/or undesirable, even dangerous, contacts could be made through this public setting feature, particularly for users under the age of 18, including Liam Birchfield.

30. During the last five years, Instagram has added features and promoted the use of short videos and temporary posts. The latter are referred to as "Reels" while the former is referred to as Instagram "Stories."

31. Instagram creates images and GIFs for users to incorporate into their videos and picture postings. Instagram has also acquired publishing rights to thousands of hours of music which it provides to its users to attach to the videos and pictures that they post on Instagram. These GIFs, images, and music supplied and created by Instagram frequently make a material contribution to the creation or development of its users' Instagram posts. Indeed, in many cases, the *only* content in a user's Instagram post is the image, GIF, or music supplied by Instagram. When users' GIFs and music supplied by Instagram make a material contribution to the creation and/or development of its users' postings, Instagram becomes a co-publisher of such content. These GIFs, images, and music created by Instagram frequently enhance the psychic harm and defamatory sting that minor users experience from malign third-party postings on Defendant's platform.

32. Based on individualized data collected from their users' social media habits, the social media activity of users' friends and cohorts, and surreptitious monitoring of users online and offline, Instagram independently selects content for its users and notifies them of such content through text and email. Instagram's notifications to individual users are specifically designed to

COMPLAINT FOR WRONGFUL DEATH
AND SURVIVORSHIP - 7

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

and do prompt users to open Instagram and view the content selected by Instagram which increases the users' screen time and resulting profits to Instagram.

33.     Meta has developed artificial intelligence technology that detects adult users of Instagram who both send sexually explicit content to children and receive sexually explicit images from children. This technology furnishes Meta with actual knowledge that a significant number of minor users of Instagram are solicited to send, and actually do send, sexually explicit photos and videos of themselves to adult users in violation of 18 U.S.C. § 1591(a)(1)-(2).

34.     Over time, Instagram has become the most popular photo sharing social media platform amongst teenagers and young adults in the United States, with over 57 million users below the age of eighteen—meaning that 72 percent of America's youth use Instagram. Instagram's president Adam Mosseri testified under oath on December 8, 2021, that Instagram is not addictive. This is untrue.

**B.     Snapchat Background**

35.     Snapchat is a photo and short video sharing social media application that allows users to form groups and share posts or "Snaps" that disappear after being viewed by the recipients. The Snapchat product is well-known for its self-destructing content feature. Specifically, the Snapchat product allows users to form groups and share posts or "Snaps" that disappear after being viewed by the recipients.

36.     Snapchat's self-destructing content design feature is specifically intended to appeal to minor users by evading parents' ability to monitor their children's social media activity and thwart the exercise of their parental responsibility. Snapchat's self-destructing content design feature permits minor users to exchange harmful, illegal, and sexually explicit images with adults and provides sexual predators with a safe and efficient vehicle to recruit victims.

37.     Snapchat also features a series of rewards including trophies, streaks, and other signals of social recognition similar to the "likes" metrics available across other platforms. These features are designed to encourage users to share their videos and posts with the public. Snapchat designed these features to be addictive, and they are. Users also have an "Explore" feed that displays content created by other users around the world. All of these product features are designed

COMPLAINT FOR WRONGFUL DEATH
AND SURVIVORSHIP - 8

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

to grab and keep users' attention for as long as possible each day, and have led many people, from psychologists to government officials, to describe Snapchat as "dangerously addictive." Snapchat was founded in 2011 by current president and CEO Evan Spiegel and several other co-founders while they were attending Stanford University.

38.     In 2014, Snapchat added "Stories" and "Chat" features that allowed users to post longer stories that could be viewed by users outside the user's friends. In 2014, Snapchat also released a feature called Snapcash that allowed users to send money to other users without regard to user age, identify verification, and/or parental consent.

39.     Snapchat allows users to enable the sharing of their location, through a tool called Snap Map, which allows the users' followers (and the public for Snaps submitted by the users) to see the user's location on a map. This feature is available to all users, including minors.

40.     Snapchat has developed images for users to decorate the pictures or videos they post. Snapchat has also developed Lenses which are augmented reality-based special effects and sounds for users to apply to pictures and videos they post on Snapchat, and World Lenses to augment the environment around posts. Snapchat also has acquired publication rights to music, audio, and video content that its users can incorporate in the pictures and videos they post on Snapchat.

41.     These images, Lenses, and licensed audio and video content supplied and created by Snapchat frequently make a material contribution to the creation or development of the user's Snapchat posts. Indeed, in many cases, the *only* content in a user's Snapchat post are images, Lenses, and licensed audio and video content supplied and created by Snapchat. When users incorporate images, Lenses, music, audio, and video content supplied by Snapchat posts, Snapchat makes a material contribution to the creation and/or development of their Snapchat postings and becomes a co-publisher of such content. When malign users incorporate images, Lenses, music, audio, and video content supplied by Snapchat to their posts, this enhances the psychic harm and defamatory sting that minor users experience from third-party postings on Defendant's platform.

42.     By 2015, Snapchat had over 75 million monthly active users and was considered to be the most popular social media application amongst American teenagers in terms of number

COMPLAINT FOR WRONGFUL DEATH
AND SURVIVORSHIP - 9

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

of users and time spent using the platform.

43. Snap has developed artificial intelligence technology that detects adult users of Snapchat who send sexually explicit content to children and receive sexually explicit images from children. This technology furnishes Snap with actual knowledge that a significant number of minor users of Snapchat are solicited to send, and actually do send, sexually explicit photos and videos of themselves to adult users in violation of 18 U.S.C. § 1591(a)(1)-(2).

**C.     Defendants' Applications Are Products**

44. Instagram and Snapchat are products that are designed and manufactured by Meta and Snap, respectively. These products are designed to be used by children and are actively marketed to children throughout the world.

45. Defendants' products are designed to be used by minors and are actively marketed to minors across the United States. Defendants market to minors through their own marketing efforts and design. But also, Defendants work with and actively encourage advertisers to create ads targeted at and appealing to teens, and even to children under the age of 13. Defendants spend millions of dollars researching, analyzing, and experimenting with young children to find ways to make their products more appealing and addictive to these age groups, as these age groups are seen as the key to Defendants' long-term profitability and market dominance.

46. Defendants are aware that large numbers of children under the age of 18 use their products without parental consent. They design their products in a manner that allows and/or does not prevent such use to increase user engagement and, thereby, their own profits.

47. Defendants are aware that large numbers of children under the age of 13 use their products despite user terms or "community standards" that purport to restrict use to individuals who are 13 and older. They have designed their products in a manner that allows and/or does not prevent such use to increase user engagement and, thereby, their own profits.

**D.     Defendants' Business Model is Based on Maximizing User Screen Time**

48. Defendants advertise their products as "free," because they do not charge their users for downloading or using their products. What many users do not know is that, in fact, Defendants make a profit by finding unique and increasingly dangerous ways to capture user attention and

COMPLAINT FOR WRONGFUL DEATH
AND SURVIVORSHIP - 10

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

target advertisements to their users. Defendants receive revenue from advertisers who pay a premium to target advertisements to specific demographic groups of users in the applications. Defendants also receive revenue from selling their users' data to third parties.

49.     The amount of revenue Defendants receive is based upon the amount of time and level of user engagement on their platforms, which directly correlates with the number of advertisements that can be shown to each user.

50.     Defendants use unknown and changing rewards that are designed to prompt users who consume their social media products in excessive and dangerous ways. Defendants know, or in the exercise of ordinary care should know, that their designs have created extreme and addictive usage by their minor users, and Defendants knowingly or purposefully designed its products to encourage such addictive behaviors. For example, all the achievements and trophies in Snapchat are unknown to users. The Company has stated that "[y]ou don't even know about the achievement until you unlock it." This design conforms to well-established principles of operant conditioning wherein intermittent reinforcement provides the most reliable tool to maintain a desired behavior over time.

51.     This design is akin to a slot machine but marketed toward minor users who are even more susceptible than gambling addicts to the variable reward and reminder system designed by Snapchat. The system is designed to reward increasingly extreme behavior because users are not actually aware of what action will unlock the next award.

52.     Instagram, like Snapchat, is designed around a series of features that do not add to the communication utility of the application, but instead seek to exploit minor users' susceptibility to persuasive design and unlimited accumulation of unpredictable and uncertain rewards, including "likes" and "followers." In the hands of children, this design is unreasonably dangerous to the mental well-being of underage users' developing minds.

53.     According to industry insiders, Defendants have employed thousands of psychologists and engineers to help make their products maximally addicting. For example, Instagram's "pull to refresh" is based on how slot machines operate. It creates an endless feed, designed to manipulate brain chemistry, and prevent natural end points that would otherwise

COMPLAINT FOR WRONGFUL DEATH
AND SURVIVORSHIP - 11

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

encourage users to move on to other activities.

54.     Defendant do not warn users of the addictive design of their product. On the contrary, Defendants actively try to conceal the dangerous and addictive nature of their products, lulling users and parents into a false sense of security. This includes consistently playing down their products' negative effects on teens in public statements and advertising, making false or materially misleading statements concerning product safety, and refusing to make their research public or available to academics or lawmakers who have asked for it.

55.     For example, in or around July 2018, Meta told BBC News that "at no stage does wanting something to be addictive factor into" its product design process. Similarly, Meta told U.S. Senators in November 2020 that "We certainly do not want our products to be addictive." Yet, Meta product managers and designers attend an annual conference held in Silicon Valley called the Habit Summit, the primary purpose of which is to learn how to make products more habit-forming.

56.     Defendants engineer their products to keep users, and particularly young users, engaged longer and coming back for more. This is referred to as "engineered addiction," and examples include features like bottomless scrolling, tagging, notifications, and live stories.

57.     Internal Meta documents identify the potential of reduction in usage by their minor users as an "existential threat" to their business and spend billions of dollars per year marketing their products to minors. Defendants have deliberately traded in user harm to protect the revenue stream their products generate.

**E.      Defendants Have Designed Complex Algorithms to Addict Teen Users.**

58.     Defendants have intentionally designed their products to maximize users' screen time, using complex algorithms designed to exploit human psychology and driven by the most advanced computer algorithms and artificial intelligence available to three of the largest technology companies in the world.

59.     Defendants' algorithms select content for minor users not based on what they anticipate the user will prefer or to enhance their social media experience, but rather for the express purpose of habituating users to the Defendants' social media products. Defendants' algorithms do

COMPLAINT FOR WRONGFUL DEATH
AND SURVIVORSHIP - 12

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

not provide a neutral platform but rather specify and prompt the type of content to be submitted and determine particular types of content its algorithms promote.

60.     Defendants designed and have progressively modified their products to promote problematic and excessive use that they know is indicative of addictive and self-destructive use.

61.     One of these features—present in Snapchat and Instagram—is the use of complex algorithms to select and promote content that is provided to users in an unlimited and never-ending "feed." Defendants are well aware that algorithm-controlled feeds promote unlimited "scrolling"—a type of use those studies have identified as detrimental to users' mental health—however, this type of use allows Defendants to display more advertisements and obtain more revenue from each individual user.

62.     Defendants know that content that generates extreme psychological reactions in minor users is more likely to trigger their engagement than content that is benign. Defendants have designed algorithm-controlled feeds to promote content most likely to increase user engagement, which often means content that Defendants know to be psychologically stressful to their users. Content is selected not just based on individual users' viewing history but also on the viewing history of their linked friends. Users are exposed to content that they would otherwise never see but for Defendants' affirmative pushing of such content to their accounts.

63.     The addictive nature of Defendants products and the complex and psychologically manipulative design of their algorithms is unknown to ordinary consumers, particularly minors.

64.     Defendants go to significant lengths to prevent transparency, including posing as a "free" social media platform, burying advertisements in personalized content, and making public statements about the safety of their products that simply are not true.

65.     Defendants also have developed unique product features designed to limit, and have in other ways limited, parents' ability to monitor and prevent problematic use by their children.

66.     Defendants' algorithms adapt to promote whatever content will trigger minor users' engagement and maximize their screen time. Defendants' algorithm designs do not distinguish, rank, discriminate, or prioritize between particular content based on whether it is helpful or

COMPLAINT FOR WRONGFUL DEATH
AND SURVIVORSHIP - 13

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

harmful to the psychic well-being of their minor users. Once a minor user engages with abusive, harmful, or destructive content, Defendants' algorithms will direct the minor user to content that is progressively more abusive, harmful, and destructive to maximize the user's screen time.

67.     Defendants' algorithms are not simply tools meant to facilitate the communication and content of others but are content in and of themselves. Defendants' algorithms do not function like traditional search engines that select particular content for users based on user inputs; they direct minor users to content based on far more than the individual users' viewing history. Defendants' algorithms make recommendations not simply based on minor users' voluntary actions but also the demographic information and social media activity of the users' friends, followers, and cohorts. The user data that Defendants' algorithms use to select content therefore encompasses far more information than voluntarily furnished by the particular user and include private information about the user that Defendants discover through undisclosed surveillance of their behavior both online and offline.

**F.     Minor Users' Incomplete Brain Development Renders Them Particularly Susceptible to Manipulative Algorithms with Diminished Capacity to Eschew Self-Destructive Behaviors and Less Resiliency to Overcome Negative Social Media Influences**

68.     The human brain is still developing during adolescence in ways consistent with adolescents' demonstrated psychosocial immaturity. Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotional regulation, and impulse control.

69.     The frontal lobes—and in particular the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control, and executive decision-making. These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses. MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature.

70.     During childhood and adolescence, the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways connecting

different parts of the brain become insulated with white fatty tissue called myelin. Second, during childhood and adolescence, the brain is undergoing "pruning"—the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and into young adulthood.

71.     In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition. As such, the part of the brain that is critical for control of impulses, emotions, and mature, considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

72.     The algorithms in Defendants' social media products are designed to exploit minor users' diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency caused by users' incomplete brain development. Defendants know, or in the exercise of reasonable care should know, that because their minor users' frontal lobes are not fully developed, they experience enhanced dopamine responses to stimuli on Defendants' social media platforms and are therefore much more likely to become addicted to Defendants' products; exercise poor judgment in their social media activity; and act impulsively in response to negative social media encounters. Defendants also know, or in the exercise of reasonable care should know, that minor users of their social media products are much more likely to sustain serious physical and psychological harm through their social media use than adult users. Nevertheless, Defendants knowingly designed their social media products to be addictive to minor users and failed to include in their product design any safeguards to account for and ameliorate the psychosocial immaturity of their minor users.

COMPLAINT FOR WRONGFUL DEATH
AND SURVIVORSHIP - 15

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

**G.     Defendants Misrepresent the Addictive Design and Effects of their Social Media Products**

73.     During the relevant time period, Defendants stated in public comments that their products are not addictive and were not designed to be addictive. Defendants knew or should have known that those statements were untrue.

74.     Neither Instagram or Snapchat warned users or their parents of the addictive and mentally harmful effects that the use of their products was known to cause amongst minor users, like Liam Birchfield. On the contrary, Defendants have gone to significant lengths to conceal and/or avoid disclosure as to the true nature of their products.

**H.     Plaintiff Expressly Disclaims Any Claim That Defendants Are Liable as the Publisher or Speaker of Any Content Provided, Posted or Created by Third Parties**

75.     Plaintiff is not alleging that Defendants are liable for what the third parties said, but for what Defendants did or did not do. None of Plaintiff's claims rely on treating Defendants as the publisher or speaker of any third-party's words or content. Plaintiff's claims seek to hold Defendants accountable for their own allegedly wrongful acts and omissions, not for the speech of others or for Defendants' good faith attempts to restrict access to objectionable content.

76.     Plaintiff seeks to hold Defendants accountable for their own alleged acts and omissions. Plaintiff's claims arise from Defendants' status as the designer and marketer of dangerously defective social media products, as well as Defendants' own statements and affirmative acts, not as the speaker or publisher of third-party content.

77.     Defendants also failed to warn minor users and their parents of known dangers arising from anticipated use of their social media platforms. These dangers which are unknown to ordinary consumers, do not arise from third-party content contained on Defendants' social media platform but rather from their algorithms' designs that 1) addict minor users to Defendants' products; 2) affirmatively select and promote harmful content to vulnerable users based on their individualized demographic data and social media activity; and 3) put minor users in contact with dangerous adult predators.

78. Plaintiff's product defect claims arising from Defendants' addictive social media products are content neutral. For example, Defendants design and operate their algorithms in a manner intended to and that does change behavior and addict users, including through a natural selection process that does not depend on or require any specific type of third-party content.

79. Defendants' product features are designed to be and are addictive and harmful in themselves, without regard to any content that may exist on Defendants' platforms. For example, Meta's "like" feature and Snapchat's "Snapstreaks" are content neutral and based solely on the user's level of activity on Defendants' platforms, not the content of the material they see.

80. Defendants have designed other product features for the purpose of encouraging and assisting children in evasion of parental oversight, protection, and consent, which features are wholly unnecessary to the operation of Defendants' products.

81. Defendants affirmatively promote, encourage, and/or otherwise contribute to the development of harmful content. In an October 2021 Senate Hearing it was revealed that Meta documents provided by a whistleblower demonstrate that Defendants promote, encourage, and/or otherwise contribute to the development of harmful content. The Senate hearing revealed that

   a. Defendants approve of ads that contain harmful content, for example, "designed to encourage and promote anorexia" and encourage children to abuse prescription or illegal drugs, which ads Defendants then target specifically at children in exchange for payment.

   b. Defendants utilize private information of their minor users to "precisely target [them] with content and recommendations, assessing what will provoke a reaction," including encouragement of "destructive and dangerous behaviors." Defendants specifically select and push this harmful content, for which they are paid, to increase user engagement. "That's how [defendants] can push teens into darker and darker places." (Senator Blumenthal, October 5, 2022).

   c. Defendants "know[] that [their] amplification algorithms, things like engagement based ranking … can lead children from very innocuous topics like healthy recipes … all the way from just something innocent like healthy recipes to anorexia

COMPLAINT FOR WRONGFUL DEATH
AND SURVIVORSHIP - 17

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

promoting content over a very short period of time." Defendants have knowledge that their products and the content they are encouraging and helping to create is harmful to young users and choose "profits over safety."

82.     Defendants have information and knowledge that can determine with reasonable certainty each user's age, habits, and other personal information, regardless of what information the user provides at the time of account setup.

83.     Defendants' algorithms identify minor users by age and gender and, on information and belief, race, ethnicity, sexual orientation, and economic status and direct specific content to specific users based upon these factors. User data obtained through Defendants' algorithms, particularly age and gender, affirmatively directs predatory adults to vulnerable minor users. In this way, the Defendant's algorithms promote responses from predatory adult users that violate state and federal law. Because Defendants' social media products themselves generate the options for selecting a user based on predatory criteria, they materially contributed to the unlawfulness of the posted content described herein.

84.     None of Plaintiff's Claims for Relief set forth herein treat Defendants as a speaker or publisher of content posted by third parties. Rather, Plaintiff seeks to hold Defendants liable for their own speech and their own silence in failing to warn of foreseeable dangers arising from anticipated use of their products. Defendants could manifestly fulfill their legal duty to design reasonably safe social media products and furnish adequate warnings of foreseeable dangers arising out of the use of their products without altering, deleting, or modifying the content of a *single* third-party post or communication.

COMPLAINT FOR WRONGFUL DEATH
AND SURVIVORSHIP - 18

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862



## I. Liam Birchfield Died of Suicide Proximately Caused by Defendants' Defective Social Media Products

85.     Liam Birchfield was born on April 21, 2004, in Elizabethton, Tennessee, the child of Ashleigh Heffner and Paul Adam Birchfield. Liam's father, Paul Birchfield, predeceased him.

86.     Liam attended Sullivan East High School in Elizabethton, Tennessee. He enjoyed playing guitar, listening to music, and playing video games. He planned to join the Air Force after high school.

87.     Liam Birchfield began using Instagram and Snapchat in middle school. As he grew older, he became increasingly addicted to social media in general, and Instagram and Snapchat specifically. He would stay up until the early morning hours scrolling through endless feeds and communicating with anonymous people introduced to him through Snapchat and Instagram. As his addiction grew, he became sleep deprived and anxious. Content pushed to him through Snapchat and Instagram, including content about firearms, fed his depression, and he began to have suicidal thoughts and engage in self-harm. On July 6, 2021, Liam Birchfield took his own life with a firearm in St. George, South Carolina. He was 17 years old.

88.     Throughout the period of Liam's use of social media, Ashleigh Heffner was unaware of the clinically addictive and mentally harmful effects of Instagram and Snapchat.

89.     Defendants designed Instagram and Snapchat to frustrate and prevent parents like Ashleigh Heffner from exercising her right and duty as a parent to monitor and limit her child's use of their social media products.

COMPLAINT FOR WRONGFUL DEATH
AND SURVIVORSHIP - 19

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

90.     Defendants knowingly designed Instagram and Snapchat to enable minor users such as Liam Birchfield to use, become addicted to, and abuse their products without the knowledge and consent of their parents.

91.     Defendants designed Instagram and Snapchat to be attractive nuisances to users below the age of 13 but failed to exercise ordinary care owed to underage business invitees to prevent the rampant solicitation of underage users by anonymous older users who do not disclose their real identities, and mass message underage users with the goal of grooming and sexually exploiting minors.

92.     Defendants not only failed to warn Ashleigh Heffner and Liam Birchfield of the dangers of addiction, sleep deprivation, sexual abuse, and problematic use of their applications, but affirmatively misrepresented the safety, utility, and addictive properties of their products to minor users and their parents

## VI.     PLAINTIFF'S CLAIMS

## COUNT I - STRICT PRODUCT LIABILITY (Design Defect)

93.     Plaintiffs reallege each and every allegation contained in paragraphs 1 through 92 as if fully stated herein.

94.     Under Restatement (Second) of Torts § 402(a), California and Tennessee law, one who sells any product in a defective condition unreasonably dangerous to the user is subject to liability for physical harm thereby caused to the user if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition which it was sold.

95.     Defendants designed, manufactured, marketed, and sold products that were unreasonably dangerous because they were designed to be addictive to the minor users to whom Defendants actively marketed and because the foreseeable use of Defendants' products causes mental and physical harm to minor users.

96.     Defendants' products were unreasonably dangerous because they contained numerous design characteristics that are not necessary for the utility provided to the user but are unreasonably dangerous and implemented by Defendants solely to increase the profits they derived

COMPLAINT FOR WRONGFUL DEATH
AND SURVIVORSHIP - 20

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

from each additional user and the length of time they could keep each user dependent on their product.

## A. Inadequate Safeguards from Harmful and Exploitative Content

97.     As designed, Snapchat and Instagram algorithms are not reasonably safe because they intentionally direct minor users to harmful and exploitative content while failing to deploy feasible safeguards to protect vulnerable teens from such harmful exposures. It is feasible to design an algorithm that substantially distinguishes between harmful and innocuous content and protects minor users from harmful content without altering, modifying, or deleting a *single* third-party posting on Defendants' social media platforms. The cost of designing Defendants' algorithms to incorporate this safeguard would be negligible, while the benefit would be high in terms of reducing the quantum of mental and physical injury sustained by minor users such as Liam Birchfield and their families.

98.     Snapchat and Meta also engage in conduct, outside of the algorithms themselves, which is designed to promote harmful and exploitative content as a means of increasing their revenue from advertisements. This includes, but is not limited to, efforts to encourage advertisers to design ads that appeal to minors, including children under the age of 13; and product design features intended to attract and engage minor users to these virtual spaces where harmful advertising content is then pushed to those users in a manner intended to increase user engagement, thereby increasing revenue to Defendants at the direct cost of user well-being.

99.     Reasonable users (and their parents) would not expect that Defendants would knowingly direct them to such harmful content, much less in the manipulative and coercive manner that they do. Defendants have and continue to knowingly use their algorithms on minor users in a manner designed to affirmatively change their behavior, which methods are particularly effective on (and harmful to) Defendants' youngest users, like Liam Birchfield.

## B. Failure to Verify Minor Users' Age and Identity

100.     As designed, Defendants' products are not reasonably safe because they do not provide for adequate age verification by requiring users to document and verify their age and identity.

COMPLAINT FOR WRONGFUL DEATH
AND SURVIVORSHIP - 21

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

101.    Adults frequently set up user accounts on Defendants' social media products disguising their identity and/or posing as minors to groom unsuspecting minors to exchange sexually explicit content and images, which frequently progresses to sexual exploitation and trafficking, and commercial sex acts.

102.    Minor users of social media and their parents do not reasonably expect that prurient adults set up fraudulent accounts on Defendants' social media products and pose as minors for malign purposes.

103.    Likewise, minor users whose parents have taken affirmative steps to keep them away from Defendants' products often open multiple accounts, such that Defendants know or have reason to know that the user is underage and/or does not have parental permission to use their product. Defendants already have the information and means they need to ascertain with reasonable certainty their users' actual age. Defendants utilize these tools to investigate, assess, and report on percentages and totals of underage users for internal assessment purposes. They then choose to simply do nothing about that information as it relates to the specific, underaged users themselves.

104.    Reasonably accurate age and identity verification is not only feasible but widely deployed by online retailers and internet service providers. Defendants not only have the ability to estimate the age of their users, but actually do so.

105.    The cost of incorporating age and identify verification into Defendants' products would be negligible, whereas the benefit of age and identity verification would be a substantial reduction in severe mental health harms, sexual exploitation, and abuse among minor users of Defendants' products.

**C.    Inadequate Parental Control and Monitoring**

106.    Defendants have intentionally designed products to frustrate the exercise of parental responsibility by their minor users' parents. Parents have a right to monitor their children's social media activity to protect them from harm. Defendants have designed products that make it difficult, if not impossible, for parents to exercise parental responsibility.

107.    Defendants' products are also defective for lack of parental controls, permission,

COMPLAINT FOR WRONGFUL DEATH
AND SURVIVORSHIP - 22

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

and monitoring capability available on many other devices and applications.

108.   Defendants' products are designed with specific product features intended to prevent and/or interfere with parents' reasonable and lawful exercise of parental control, permission, and monitoring capability available on many other devices and applications.

**D.   Intentional Direction of Minor Users to Harmful and Exploitative Content**

109.   Default "recommendations" communicated to new minor users, including Liam Birchfield, purposefully steered him toward content Defendants knew to be harmful to children of his age and gender.

110.   Advertising content pushed to new minor users, including Liam Birchfield, because of their age and vulnerability, purposefully steer those users toward content Defendants know to be harmful to children of their age and gender.

**E.   Inadequate Protection of Minors from Sexual Exploitation and Abuse**

111.   Defendants' products are not reasonably safe because they do not protect minor users from sexually explicit content and images, report sex offenders to law enforcement, or allow users' parents to readily report abusive users to law enforcement.

112.   Parents do not expect their children will use Defendants' products to exchange sexually explicit content and images and minor users do not expect that prurient adults pose as minors for malign purposes or that exchange of such content will be deleterious to their personal safety and emotional health.

113.   Minor users of Defendants' products lack the cognitive ability and life experience to identify online grooming behaviors by prurient adults and the psychosocial maturity to decline invitations to exchange salacious material.

114.   Defendants' products are unreasonably dangerous and defective as designed because they allow minor children to use "public" profiles, in many cases default "public" profiles, that can be mass-messaged by anonymous and semi-anonymous adult users for the purposes of sexual exploitation and grooming, including the sending of encrypted, disappearing messages and cash rewards through Defendants' integrated design features.

COMPLAINT FOR WRONGFUL DEATH
AND SURVIVORSHIP - 23

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

## F.  Design of Addictive Social Media Products

115.  As designed, Defendants' social media products are addictive to minor users as follows: When minors use design features such as "likes" or "streaks" it causes their brains to release dopamine, which creates short term euphoria. However, as soon as dopamine is released, minor users' brains adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated and their euphoria is countered by dejection. In normal stimulatory environments, this dejection abates, and neutrality is restored. However, Defendants' algorithms are designed to exploit users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria. As this pattern continues over a period of months and the neurological baseline to trigger minor users' dopamine responses increases, they continue to use Instagram, not for enjoyment, but simply to feel normal. Once they stop using Instagram, minor users experience the universal symptoms of withdrawal from any addictive substance including anxiety, irritability, insomnia, and craving.

116.  Addictive use of social media by minors is psychologically and neurologically analogous to internet gaming disorder as described in the American Psychiatric Association's 2013 *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5), which is used by mental health professionals to diagnose mental disorders. Gaming addiction is a recognized mental health disorder by the World Health Organization and International Classification of Diseases and is functionally and psychologically equivalent to social media addition.

117.  The diagnostic symptoms of social media addiction among minors are the same as the symptoms of addictive gaming referenced in DSM 5 and include:

  d.  Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when device is taken away or not possible.

  e.  Tolerance, the need to spend more time using social media to satisfy the urge.

  f.  Inability to reduce social media usages, unsuccessful attempts to quit gaming.

  g.  Giving up other activities, loss of interest in previously enjoyed activities due to social media usage.

  h.  Continuing to use social media despite problems.

COMPLAINT FOR WRONGFUL DEATH
AND SURVIVORSHIP - 24

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

i. Deceiving family members or others about the amount of time spent on social media.

j. The use of social media to relieve negative moods, such as guilt or hopelessness; and

k. Jeopardized school or work performance or relationships due to social media usage.

118.   Defendants' advertising profits are directly tied to the quantity of their users' online time and engagement, and their algorithms and other product features are designed to maximize the time users spend using the product by directing them to content that is progressively more and more stimulative. Defendants enhance advertising revenue by maximizing users' time online through a product design that addicts them to the platform. However, reasonable minor users and their parents do not expect that online social media platforms are psychologically and neurologically addictive.

119.   It is feasible to make Defendants' products not addictive to minor users by turning off the algorithms, limiting the frequency and duration of access, and suspending service during sleeping hours. Designing software that limits the frequency and duration of minor users' screen use and suspends service during sleeping hours could be accomplished at negligible cost; whereas the benefit of minor users maintaining healthy sleep patterns would be a significant reduction in depression, attempted and completed suicide, and other forms self-harm among this vulnerable age cohort.

## G.   Inadequate Notification of Parents of Dangerous and Problematic Social Media Usage by Minor Users

120.   Defendants' products are not reasonably safe as designed because they do not include any safeguards to notify users and their parents of usage that Defendants know to be harmful and likely to cause negative mental health effects to users, including excessive passive use and use disruptive of normal sleep patterns.

121.   It is reasonable for parents to expect that social media products that actively promote their platforms to minors will undertake reasonable efforts to notify parents when their child's use becomes excessive or occurs during sleep time. It is feasible for Defendants to design

COMPLAINT FOR WRONGFUL DEATH
AND SURVIVORSHIP - 25

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

products that identify a significant percentage of its minor users who are using the product more than three hours per day or using it during sleeping hours at negligible cost.

122.    Defendants' products are not reasonably safe as designed because, despite numerous reported instances of child sexual solicitation and exploitation by adult users, Defendants have not undertaken reasonable design changes to protect underage users from this abuse, including notifying parents of underage users when they have been messaged or solicited by an adult user or when a user has sent inappropriate content to minor users. Defendants' entire business is premised upon collecting and analyzing user data and it is feasible to use Defendants' data and algorithms to identify and restrict improper sexual solicitation, commercial sex acts, exploitation, and abuse by adult users.

123.    It is reasonable for parents to expect that platforms such as Instagram and Snapchat which actively promote their services to minors, will undertake reasonable efforts to identify users suffering from mental injury, self-harm, or sexual abuse and implement technological safeguards to notify parents by text, email, or other reasonable means that their child is in danger.

124.    As a proximate result of these dangerous and defective design attributes of Defendants' products, Liam Birchfield suffered severe mental harm, leading to physical injury and death, from his use of Instagram and Snapchat.

125.    As a result of these defective design attributes of Defendants' products, Liam Birchfield has suffered serious damages in the form of emotional distress, diagnosed mental health conditions, medical expenses, loss of income and earning capacity, pain and suffering, and reputational harm.

126.    As a result of these dangerous and defective design attributes of Defendants' products, Plaintiff Ashleigh Heffner has suffered loss of consortium, emotional distress, past and future medical expenses, and pain and suffering.

127.    Defendants are further liable to Plaintiff for punitive damages based upon the willful and wanton design of their products that were intentionally marketed and sold to underage users, whom they knew would be seriously harmed through their use of Instagram and Snapchat.

COMPLAINT FOR WRONGFUL DEATH
AND SURVIVORSHIP - 26

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

**H.      Defendants' Creation of Harmful Content**

128.     Defendants create and/or license images, GIFs, music, audio, and video content that materially contribute to the creation and/or development of the content in social media postings that minor users such as Liam Birchfield send and receive.

129.     The images, GIFs, music, audio, and video content created and/or licensed by Defendants and incorporated into their social media platforms are substantial factors in making Defendants' social media products addictive to minor users such as Liam Birchfield. Without images, GIFs, music, audio, and video content created and/or licensed by Defendants and incorporated into their social media platforms, minor users would not experience the level of dopamine response that renders Defendants' social media products addictive. The images, GIFs, music, audio, and video content created and/or licensed by Defendants and incorporated into their social media platforms therefore make Defendants' social products unreasonably dangerous in violation of Tennessee and California law and substantially contribute to the product defect claims alleged herein.

130.     The images, GIFs, music, audio and video content images, GIFs, music, audio, and video content created and/or licensed by Defendants and incorporated into their social media platforms substantially contribute to the psychologically harm experienced by minor users such as Liam Birchfield. Without images, GIFs, music, audio, and video content created and/or licensed by Defendants and incorporated into their social media platforms, minor users would not experience the level of psychological distress they sustain from Defendants' social media products. The images, GIFs, music, audio, and video content created and/or licensed by Defendants and incorporated into their social media platforms therefore make Defendants' social products unreasonably dangerous in violation of Tennessee and California law and substantially contribute to the product defect claims alleged herein.

## COUNT II – STRICT PRODUCT LIABILITY (Failure to Warn)

131.     Plaintiffs reallege each and every allegation contained in paragraphs 1 through 130 as if fully stated herein.

132.     Meta's product is defective because of inadequate instructions or warnings because

COMPLAINT FOR WRONGFUL DEATH
AND SURVIVORSHIP - 27

Social Media Victims Law Center PLLC
821 2nd Avenue, Suite 2100
Seattle, WA 98104
Telephone: 206.741.4862

the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the manufacturer and the omission of the instructions or warnings renders the product not reasonably safe. This defective condition rendered the product unreasonably dangerous to persons or property, existed at the time the product left Defendant's control, reached the user or consumer without substantial change in the condition in which it was sold, and was a cause of Liam Birchfield's injury.

133. Snapchat's product is defective because of inadequate instructions or warnings because the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the manufacturer and the omission of the instructions or warnings renders the product not reasonably safe. This defective condition rendered the product unreasonably dangerous to persons or property, existed at the time the product left Defendant's control, reached the user or consumer without substantial change in the condition in which it was sold, and was a cause of Liam Birchfield's injury.

134. Defendants' products are unreasonably dangerous and defective because they contain no warning to users or parents regarding the addictive design and effects of Snapchat and, Instagram.

135. Defendants' social media products rely on highly complex and proprietary algorithms that are both undisclosed and unfathomable to ordinary consumers who do not expect that social media platforms are physically and/or psychologically addictive.

136. The magnitude of harm from addiction to Defendants' products is horrific, ranging from simple diversion from academic, athletic, and face-to-face socialization to sleep loss, severe depression, anxiety, self-harm, and suicide.

137. The harms resulting from minors' addictive use of social media platforms have been not only well-documented in the professional and scientific literature, but Meta had actual knowledge of such harms. On information and belief, Snap also conducted internal studies documenting the addictive quality and harmful effects of its social media products on minor users.

138. Defendants' products are unreasonably dangerous because they lack any warnings that foreseeable product use can disrupt healthy sleep patterns or specific warnings to parents when

COMPLAINT FOR WRONGFUL DEATH
AND SURVIVORSHIP - 28

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

their child's product usage exceeds healthy levels or occurs during sleep hours. Excessive screen time is harmful adolescents' mental health and sleep patterns and emotional well-being. Reasonable and responsible parents are not able to accurately monitor their child's screen time because most adolescents own or can obtain access to mobile devices and engage in social media use outside their parents' presence.

139.    It is feasible for Defendants' products to report the frequency and duration of their minor users' screen time to their parents without disclosing the content of communications at negligible cost, whereas parents' ability to track the frequency, time and duration of their minor child's social media use are better situated to identify and address problems arising from such use and to better exercise their rights and responsibilities as parents.

140.    Defendants knew about these harms, knew that users and parents would not be able to safely use their products without warnings, and failed to provide warnings that were adequate to make the products reasonably safe during ordinary and foreseeable use by minors.

141.    As a result of Defendants' failure to warn, Liam Birchfield suffered severe mental harm, leading to physical injury and death, from his use of Instagram and Snapchat.

142.    As a result of Defendants' failure to warn, Liam Birchfield suffered serious damages in the form of emotional distress, diagnosed mental health conditions, medical expenses, loss of income and earning capacity, pain and suffering, and reputational harm.

143.    As a result of Defendants' failure to warn, Plaintiff Ashleigh Heffner has suffered loss of consortium, emotional distress, past and future medical expenses, and pain and suffering.

144.    Defendants are further liable to Plaintiff for punitive damages based upon their willful and wanton failure to warn of known dangers of their products that were intentionally marketed and sold to minor users, whom they knew would be seriously harmed through their use of Instagram and Snapchat.

### COUNT III – NEGLIGENCE

145.    Plaintiffs reallege each and every allegation contained in paragraphs 1 through 144 as if fully stated herein.

146.    At all relevant times, Defendants had a duty to exercise reasonable care and caution

COMPLAINT FOR WRONGFUL DEATH
AND SURVIVORSHIP - 29

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

to protect users from foreseeable harms arising out of use of their social media products.

147.    Defendants owe a heightened duty of care to minor users of their social media products because adolescents' brains are not fully developed, which results in a diminished capacity to make good decisions regarding their social media usages, eschew self-destructive behaviors, and overcome emotional and psychological harm from negative and destructive social media encounters. Defendants intentionally designed and marketed their social media platforms to be both attractive and harmful to underage users, sometimes referred to an "attractive nuisance." Rather than take reasonable precautions to prevent minors from harmful and problematic behaviors, Defendant intentionally designed its platforms to attract and addict vulnerable minor users.

148.    As California product manufacturers marketing and selling products to residents of Tennessee, Defendants owed a duty to exercise ordinary care in the manufacture, marketing, and sale of their products, including a duty to warn minor users and their parents of hazards that Defendants knew to be present, but not obvious, to underage users and their parents.

149.    As business owners, Defendants owe their users—who visit Defendants' social media platforms and from whom Defendants derive billions of dollars per year in advertising revenue—a duty of ordinary care substantially similar to that owed by physical business owners to their business invitees.

150.    Defendants were negligent, grossly negligent, reckless, and/or careless in that they failed to exercise ordinary care and caution for the safety of underage users, like Liam Birchfield, using their Instagram and Snapchat products.

151.    Defendants were negligent in failing to conduct adequate testing and failing to allow independent academic researchers to adequately study the effects of their products and levels of problematic use amongst minor users. Defendants' have extensive internal research indicating that their products are harmful, cause extensive mental harm, and that minor users are engaging in problematic and addictive use that their parents are helpless to monitor and prevent.

152.    Defendants were negligent in creating and/or licensing images, GIFs, music, audio, and video content that materially contribute to the creation and/or development of the content in

COMPLAINT FOR WRONGFUL DEATH
AND SURVIVORSHIP - 30

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

social media postings that minor users such as Liam Birchfield send and receive and substantially contribute to the minor users' addiction to Defendants' social media products and the psychologically harm experienced by minor users such as Liam Birchfield.

153. Defendants were negligent in failing to provide adequate warnings about the dangers associated with the use of social media products and in failing to advise users and their parents about how and when to safely use their social media platforms and features.

154. Defendants were negligent in failing to fully assess, investigate, and restrict the use of Instagram and Snapchat by adults to sexually solicit, abuse, manipulate, and exploit minor users of their Instagram and Snapchat products.

155. Defendants were negligent in failing to provide users and parents the tools to ensure their social media products were used in a limited and safe manner by underage users.

156. As a result of Defendants' negligence, Liam Birchfield suffered severe mental harm, leading to physical injury and death, from his use of and exposure to Instagram and Snapchat.

157. As a result of Defendants' negligence, Liam Birchfield suffered serious damages in the form of emotional distress, diagnosed mental health conditions, medical expenses, loss of income and earning capacity, pain and suffering, and reputational harm.

158. As a result of Defendants' negligence, Plaintiff Ashleigh Heffner has suffered loss of consortium, emotional distress, past and future medical expenses, and pain and suffering.

159. Defendants are further liable to Plaintiff for punitive damages based upon their willful and wanton conduct toward underage users, including Liam Birchfield, whom they knew would be seriously harmed through the use of Instagram and Snapchat.

## COUNT IV – VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW
### (Cal. Bus. & Prof Code §§ 17200, *et seq.*)

160. Plaintiff realleges each and every allegation contained in paragraphs 1 through 159 as if fully stated herein.

161. Defendants are each a "person" as defined under California Business & Professions Code § 17201.

162. The UCL prohibits all conduct that is unlawful, unfair, or fraudulent.

163. Defendants' conduct is unlawful as set forth in Counts I-III, above.

164. Defendants engaged in fraudulent and deceptive business practices in violation of the UCL by promoting products to underage users, including Liam Birchfield, while concealing critical information regarding the addictive nature and risk of harm these products pose. Defendants knew and should have known that their statements and omissions regarding the addictive and harmful nature of their products were misleading and therefore likely to deceive the members of the public who use Defendants' products and who permit their underage children to use Defendants' products. Had Plaintiff known of the dangerous nature of Defendants' products, she would have taken early and aggressive steps to stop or limit her son's use of Defendants' products.

165. Defendants' practices are unfair and violate the UCL because they offend established public policy, and because the harm these practices cause to consumers greatly outweighs any benefits associated with them.

166. Defendants' conduct has resulted in a substantial injury that Plaintiff could not reasonably have avoided because of Defendants' deceptive conduct. This substantial harm is not outweighed by any countervailing benefits to consumers or competition.

167. As a direct and proximate result of the foregoing acts and practices, Defendants have received, or will receive, income, profits, and other benefits, which they would not have received if they had not engaged in the violations of the UCL described in herein. As a direct and proximate result of the foregoing acts and practices, Defendants have also obtained an unfair advantage over similar businesses that have not engaged in such practices.

168. As a result of Defendants' UCL violations, Plaintiff suffered an injury in fact and lost money as set forth above and detailed in her prayer for relief.

169. Accordingly, Plaintiff seeks injunctive and equitable relief to halt and remedy Defendants' unlawful, fraudulent, and unfair conduct.

## COUNT V – VIOLATION OF 18 U.S.C. § 1595 and 1591

### (Against all Defendants)

170.     Plaintiff realleges each and every allegation contained in paragraphs 1 through 169 as if fully stated herein. Plaintiff brings claims under 18 U.S.C. § 1595 based on Defendants' financial benefit garnered from knowingly assisting, supporting, and facilitating the sexual solicitation and exploitation of Liam Birchfield for commercial sex acts. Defendants knowingly used the instrumentalities of interstate commerce to violate 18 U.S.C. § 1591. Defendants knowingly received something of value from participation in a venture which recruits or entices a person knowing, or in reckless disregard of the fact, that Liam Birchfield had not attained the age of 18 years and was caused to engage in a commercial sex act as defined by 18 U.S.C. § 1591(a).

171.     Defendants are aware of, and knowingly benefit, from a large number of predatory users who regularly use Defendants' platforms to solicit and groom minor users such as Liam Birchfield into sexually compromising situations and lure them into being sexually exploited and trafficked for the purposes of commercial sex acts as defined in 18 U.S.C. § 1591.

172.     Defendants had actual knowledge that Liam Birchfield was under the age of 18 based on his user history, photographs, and videos, and repeated statements made on Defendants' social media platforms. Defendants also had actual knowledge that the people with whom he was communicating on their platforms were adults based on their user history and profiles. Defendants' technology provided them with actual knowledge that Liam was exchanging sexually explicit photographs and video with adults in a manner that constituted commercial sex acts under 18 U.S.C. § 1591.

173.     Defendants have designed and marketed their products in such a way as to appeal to and make clear that predatory users may use their products for these illegal purposes. This includes, for example, Snapchat's development and marketing of disappearing messages (which feature Instagram also now offers). Many of Defendants' users are sexual predators—adults who use Defendants' products to prey on underage children.

174.     Defendants' greatest source of revenue also comes from advertisements, and Defendants are paid in direct correlation to how much time a user stays on their product.

COMPLAINT FOR WRONGFUL DEATH
AND SURVIVORSHIP - 33

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

Defendants lack the financial incentive to create a product that denies access to underage users and, likewise, Defendants make money each time their predatory users solicit, exploit, or otherwise engage young children through their social media platforms.

175.    Defendants have failed to undertake reasonable efforts to redesign their social media platforms to protect their minor users, such as Liam Birchfield, against such harms.

176.    To the contrary, Defendants knowingly provide sexual predators with tools such as anonymity, encrypted and/or disappearing messaging, selected content involving minors, financial transfer, and location features that are used by adults to target minor users for commercial sex acts. Defendants' products are designed to and do work in concert with each other. Defendants know that these tools in its social media platforms make it easier for adult predators to efficiently and anonymously identify and recruit large numbers of minors to engage in commercial sex acts than if these abusers did not have access to Defendants' platforms.

177.    For example, a common practice among predatory users is to find a minor user through Instagram's public profile, recommendation, and other information sharing features. Once contact is established, the predator asks "What's your Snap" or a similar question, designed to obtain the child's Snapchat information. Or, in cases where the child does not have a Snapchat account, the predator will encourage them to open one. The predator then moves the discussion onto Snapchat because they know that Snapchat's product design and practices will enable them to send harmful and illegal content to minors that then simply disappears.

178.    Defendants knowingly implemented policies and design features that obstructed, interfered with, and prevented the enforcement of the child sexual exploitation protections set forth in 18 U.S.C. § 1591.

179.    As a result of Defendants' violations of 18 U.S.C. § 1595 and 1591, Liam Birchfield suffered severe mental harm, leading to physical injury, emotional harm, and death from sexual exploitation and solicitation of commercial sex acts directed toward him because of Instagram and Snapchat, specifically, because of the defects and/or inherently dangerous features and design of Defendants' products.

180.    As a result of Defendants' violations of 18 U.S.C. § 1595 and 1591, Ashleigh

COMPLAINT FOR WRONGFUL DEATH
AND SURVIVORSHIP - 34

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

Heffner has suffered loss of consortium, emotional distress, past and future medical expenses, and pain and suffering.

181. As a result of Defendants' violations of 18 U.S.C. § 1595 and 1591, Plaintiff is entitled to full compensatory and punitive damages against Defendants for the mental and physical injuries suffered by Liam Birchfield.

182. Defendants are further jointly and severally liable to Plaintiff for punitive damages and attorneys' fees and costs based upon their knowing, intentional, willful, and wanton conduct toward Liam Birchfield and other minor users whom they knew were being seriously harmed through improper solicitation for commercial sex acts through the use of, or threatened use of, force, fraud, and/or coercion through Instagram and Snapchat.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants for relief as follows:

a) Past physical and mental pain and suffering of Liam Birchfield, in an amount to be more readily ascertained at the time and place set for trial;

b) Loss of enjoyment of life, in an amount to be more readily ascertained at the time and place set for trial;

c) Past medical care expenses for the care and treatment of the injuries sustained by Liam Birchfield, in an amount to be more readily ascertained at the time and place set for trial;

d) Past and future impairment to capacity to perform everyday activities;

e) Plaintiff's pecuniary loss and loss of Liam Birchfield's services, comfort, care, society, and companionship to Ashleigh Heffner;

f) Loss of future income and earning capacity of Liam Birchfield;

g) Punitive damages;

h) Injunctive relief, including, but not limited to, ordering Defendants to stop the harmful conduct alleged herein, remedy the unreasonably dangerous algorithms in their social media products, and provide warnings to minor users and their parents that Defendants'

social media products are addictive and pose a clear and present danger to unsuspecting minors;

i) Reasonable costs and attorney and expert/consultant fees incurred in prosecuting this action; and

j) Such other and further relief as this Court deems just and equitable.

Dated: July 29, 2022.

SOCIAL MEDIA VICTIMS LAW CENTER PLLC

By:     */s/ Laura Marquez-Garrett*
         Laura Marquez-Garrett, SBN 221542

Laura Marquez-Garrett
laura@socialmediavictims.org
Matthew Bergman
matt@socialmediavictims.org
Glenn Draper
glenn@socialmediavictims.org
SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 Second Avenue, Suite 2100
Seattle, WA 98104
Telephone: (206) 741-4862
Facsimile: (206) 957-9549

COMPLAINT FOR WRONGFUL DEATH
AND SURVIVORSHIP - 36

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

# Exhibit A-4

Laura Marquez-Garrett, SBN 221542
laura@socialmediavictims.org
SOCIAL MEDIA VICTIMS LAW CENTER
1390 Market St, Suite 200
San Francisco, CA 94102
Ph: 206-294-1348

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| ALEXANDRA, BENJAMIN, and JENNIFER MARTIN, | Case No. _____ |
| Plaintiff(s), | COMPLAINT FOR PERSONAL INJURIES |
| v. | |
| META PLATFORMS, INC., formerly known as FACEBOOK, INC., | JURY DEMAND |
| Defendant. | |

"In these digital public spaces, which are privately owned and tend to be run for profit, there can be tension between what's best for the technology company and what's best for the individual user or for society. Business models are often built around maximizing user engagement as opposed to safeguarding users' health and ensuring that users engage with one another in safe and healthy ways. . . ."

*Protecting Youth Mental Health,* The U.S. Surgeon General's Advisory (December 7, 2021)

Plaintiffs Alexandra ("Alex") Martin and her parents, Benjamin ("Ben") and Jennifer Martin, bring this action for personal injury and loss of consortium against Meta Platforms, Inc., formerly known as Facebook, Inc. ("Facebook"), doing business as Instagram ("Instagram") (collectively, "Meta"), and allege as follows:

# I.   INTRODUCTION

**A.   Plaintiffs' Claims**

1.     This product liability action seeks to hold Defendant Meta's Instagram product responsible for causing and contributing to burgeoning mental health crisis perpetrated upon the children and teenagers of the United States by Meta and, specifically for the injuries it caused Alex Martin beginning in 2014, when Alex was only twelve years old. Those injuries, proximately caused by Meta's unreasonably dangerous Instagram social media product, include but are not limited to, addiction, anxiety, depression, eating disorders, and, ultimately, suicide attempts.

2.     Meta's Instagram social media product likewise caused foreseeable harms to Plaintiffs Ben and Jennifer Martin. Ben and Jennifer Martin took affirmative steps to protect their daughter, were unaware that Meta's Instagram product was addictive and harmful and were emotionally and financially harmed by Meta's addictive design and harmful distribution and provision of multiple Instagram accounts to their child.

3.     Plaintiffs' harms were all caused by Alex's exposure to and use of Meta's unreasonably dangerous and defective social media product, Instagram. Alex was 12 years old when she opened her first Instagram account. Meta knew or should have known that she was under the age of 13, however, Meta designed its product to encourage such illegal and unauthorized use, and in a manner that encouraged Alex to eventually open multiple accounts, including secret accounts her parents did not know about.

4.     Meta created a "perfect storm" of addiction, social comparison, and exposure to incredibly harmful content and product features, then operated its algorithms to push and promote harmful content via Alex's Feed, Explore, Stories, and Reels features. Meta programmed and operated its product to prioritize engagement over user safety, and Alex suffered several emotional, physical, and financial harms as a result, as did her parents—all of which are a symptom of the current health crisis among American youth caused by certain harmful social media products, specifically in this case, Instagram.

**B.   Meta's Internal Documents Targeting Children**

5.      In late 2021, a Facebook whistleblower disclosed thousands of internal Meta documents to the United States Securities Exchange Commission (the "SEC") and Congress. The Facebook Papers prove known dangerous designs and design defects as well as operational decisions and calculations, and a causal relationship between use of Meta's Instagram social media product in its current form and resulting addiction, anxiety, depression, eating disorders, exploitation and grooming, and what Meta internally refers to as "SSI" (Suicide and Self Injury). Examples of the Facebook papers include and can be found at the following locations, to name only some examples:

6.      The Wall Street Journal and Digital Wellbeing published several of the Facebook Papers in November 2021,[1] including but not limited to,

  a.  Social Comparison: Topics, celebrities, Like counts, selfies [Jan 2021 internal document reporting findings from a 9-country user survey (n=100,000) in Australia, Brazil, France, Germany, Great Britain, India, Japan, Korea, USA].

  b.  Appearance-based Social Comparison on Instagram [Feb 2021 internal document reporting finding from a 10-country user survey (n=50,590) across Australia, Brazil, France, Germany, Great Britain, India, Japan, Korea, Mexico, USA].

  c.  Mental Health Findings: Deep dive into the reach, intensity, Instagram impact, self-reported usage and support of mental health issues [2019 internal document reporting findings from a 6-country user survey (n=22,410) across Brazil, India, Indonesia, Japan, Turkey, USA].

  d.  Teen Mental Health Deep Dive [2019 internal document reporting findings from a 2-country (UK and US) qualitative research study (n = 40 in-person interviews, with follow-up video calls (n = 8) with young Instagram users (aged 13-17), supplemented by online survey (n = 2,503)].

---

[1] https://digitalwellbeing.org/the-facebook-files-on-instagram-harms-all-leaked-slides-on-a-single-page/

   e. <u>Teens and Young Adults on Instagram and Facebook</u> [2021 internal document reporting findings from a five-country study (Australia, France, Great Britain, Japan, USA) with user data].

  7. Gizmodo has been publishing the Facebook Papers, several at a time, also starting in November 2021,[2] including but not limited to,

   a. Why We Build Feeds

   b. Is Ranking Good

   c. Big Levers Ranking Experiment

   d. [LAUNCH] Civic Ranking: Engagement-Based Worth Your Time

   e. MSI Metric Note Series

   f. The Meaningful Social Interactions Metric Revisited: Part 2

   g. The Meaningful Social Interactions Metric Revisited: Part 4

   h. The Meaningful Social Interactions Metric Revisited: Part 5

   i. Meaningful Social Interactions Useful Links

   j. MSI Documentation

   k. Evaluating MSI Metric Changes with a Comment-Level Survey

   l. Surveying The 2018 Relevance Ranking Holdout

   m. Overview of MSI + Pages and Survey Research

   n. Is Multi-Group Picker "Spammy?"

   o. Filtering Out Engagement-Bait, Bullying, and Excessive Comments From MSI Deltoid Metric

   p. [LAUNCH] Using p(anger) to Reduce the Impact Angry Reactions Have on Ranking Levers

   q. Planned MSI Metric Changes in 2020

   r. MSI Metric Changes for 2020 H1

   s. Should We Reduce the MSI Weight of Sticker Comments?

   t. Max Reshare Depth Experiment

---

[2] https://gizmodo.com/facebook-papers-how-to-read-1848702919

u.  "Understand This Post's Ranking" —How I Miss Thee!

v.  Facebook and Responsibility

w.  The Surprising Consequences to Sessions and MSI Caused by Turning Off Video Autoplay on News Feed

x.  One-Go Summary Post for Recent Goaling and Goal Metric Changes for News Feed

y.  News Feed UXR Quarterly Insights Roundup

z.  What Happens If We Delete Ranked Feed?

aa.  News Feed Research: Looking Back on H2 2020

bb.  Content from "Political" Pages in In-Feed Recommendations

cc.  Political Content in In-Feed Recommendations (IFR)

dd.  In-Feed Recommendations HPM —April 15 2021

These documents are all incorporated by reference into this Complaint and the sole reason they are not attached is length and file size. However, the contents of these documents and other Facebook Papers are material to Plaintiffs' claim.

8.    On information and belief, Meta has knowledge about the harms its products cause users, particularly teen, child, and other vulnerable user populations, and continues to operate those products in a harmful and dangerous manner anyway and in the interest of competitive advantage and increasing its already astronomical profits. Moreover, only a small fraction of relevant Meta documents has been disclosed. Plaintiffs anticipate literal truckloads of additional evidence that will support these claims and show precisely what Meta done in the name of corporate greed.

9.    Meta has actual knowledge that children under the age of 13 are using its social media products; that its social media products are highly addictive and harmful to a significant population of all users, but especially teens and children; that certain design features that serve no functional, informational, societal, or educational purpose (for example, "likes") are causing harm to users, but especially teens and children; and that algorithms and algorithm-driven product features are dangerous and harmful by design and as designed. Meta knew about these harms,

could have made its Instagram product safer at minimal expense, and opted to stay the course instead and to increase user engagement and already astronomical revenue.

10.     Despite knowledge of the dangerous and harmful characteristics of its product, Meta has made and continues to make calculated cost-benefit business decisions and is consistently prioritizing their already astronomical profits over human life.

11.     The harms at issue in this case all arise from Defendants' product designs and/or inadequate warnings.

## C.     The Social Media Epidemic Among Children

12.     On December 7, 2021, the United States Surgeon General issued an advisory cataloging a dramatic increase in teen mental health crises including suicides, attempted suicides, eating disorders, anxiety, depression, self-harm, and inpatient admissions. Between 2007 and 2018, for example, suicide rates among youth ages 12 to 16 in the U.S. increased a staggering 146 percent. Several cities across the United States have been experiencing teen suicide rates in the range of 1 every year or other year, which is an absolute crisis for our country—the death by suicide of a child is something that should be an exception and not a rule. The incidence of serious depression and dissatisfaction with life in this age group has likewise increased dramatically, and there is no question that these harms relate in no small part to companies like Meta.

13.     The most significant and far-reaching change to the lives of young people in the last ten years has been the widespread adoption of social media platforms and prominently, for purposes of this lawsuit, the Instagram product which launched in 2010 and was acquired by Facebook (now Meta) in 2012, and which is designed and distributed by Meta.

14.     By 2014, 80 percent of high-school students said they used social media daily, and 24 percent said that they were online "almost constantly." Moreover, there are an estimated 24.5 million teen internet users in the U.S. alone. What this means tens of millions of U.S. teens (aged 13 to 17) using Meta's social media product on a regular basis.

15.     By 2018, an estimated 63% of all children in the United States aged 13 to 14 and 78% of all children in the United States aged 15 to 17 used Instagram specifically. Current estimates put the total number of all US teens using Instagram at 76%.

16.     Current estimates put the number of teen Instagram users in the US over 20 million – in other words, there are more than 20 million at-risk teen Instagram users in the U.S. alone.

**D.     Disparities Between Meta's Public Statements and Internal Research on Harm to Children**

17.     Peer reviewed studies and available medical science have also identified a particular type of social media and electronic device use associated with major mental health injuries, including depression, self-harm, eating disorders, suicide attempts and ideation, dissatisfaction with life, depression, and sleep deprivation. Large observational studies and experimental results also point to heavy use of certain social media products as the cause of increased depression, suicidal ideation, and sleep deprivation among teenagers, particularly teenage girls. Again, Meta has spent years publicly denying these findings—while internally confirming them.

18.     Specifically, Meta leadership has vehemently denied that its products are harmful or addictive. Meta has gone to great lengths to assure the world that its social media products are safe. Even its Terms of Use (effective January 4, 2022) represent that Meta is "Fostering a positive, inclusive, and safe environment," and that Meta uses its "teams and systems … to combat abuse and violations of our Terms and policies, as well as harmful and deceptive behavior. We use all the information we have—including our information—to try to keep our platform secure." (Effective January 4, 2022). However, Meta's own internal research and "experiments" show the opposite. The Facebook Papers include years' worth of studies and reports, often referred to by Meta as "experiments," discussing the fact that Meta's social media products are addictive and harmful, and that use of those products can and does lead to serious mental health issues in a significant number of users, including things like anxiety, depression, eating disorders, and what Meta refers to as Suicide and Self Injury (or, SSI). The following are just a few examples.

19.     The Facebook Papers, however, include years' worth of studies and reports discussing the fact that Meta's social media products are addictive and harmful, and that use of those products can and does lead to serious mental health issues in a significant number of users, including things like anxiety, depression, eating disorders, and SSI. This includes research

confirming that higher engagement (*i.e.* more sessions and/or time spent over a certain threshold) causes higher negative effect for users, and other hallmarks of addiction (referred to by Meta as "problematic use"). In late 2019, Meta conducted an "exploratory study" in the United States, aimed at examining "Teen Girls Body Image and Social Comparison on Instagram."[3] The resulting Power Point found that use of Defendants' social media products made certain social comparison-based harms worse for a significant percentage of teen girls. *See, supra*, "Teen Girls Body Image and Social Comparison on Instagram – An Exploratory Study in the US," p. 29 (referring to its own product mechanics as "addicting."



---

[3] *See* https://digitalwellbeing.org/wp-content/uploads/2021/10/Facebook-Files-Teen-Girls-Body-Image-and-Social-Comparison-on-Instagram.pdf



*Id*. at p. 29, 30. More to the point, Meta knows that "Aspects of Instagram exacerbate each other to create a perfect storm." *Id*. at p. 33 and 34. According to Meta, the "social comparison sweet spot" (*id*.)—a place of considerable harm to users, particularly teens and teen girls—lies at the center of Meta's product model and product features,



*Id.* at p. 33 and 34.

20.　The user harms acknowledged in these slides relate, ultimately, to Meta product features like "Feed + Profile and Explore" (*id.*), filters, and teen-targeted marketing and accessibility. Meta refers to its "product mechanics" as "addicting" and recognizes that it is not certain body-focused celebrity content shown on Instagram causing harm, but rather, the sheer volume at which Meta's social media product identifies and targets individual users (in particular, teen girls) with that body-focused content. Indeed, this is not even content these users have searched for or, in many cases, want to see – but rather, it is content (including advertisements) Meta itself has programmed its product, algorithms, and other technologies to target at individual users as a means of increasing engagement and addiction; and, in turn, Meta's revenue and competitive positioning.　Meta knows exactly the harms that its products are causing to its teen users, yet Meta leadership has made the decision to stay focused on engagement and growth, at the expense of safety (aptly referred to by Meta as "Integrity").

21.　Meta also knows that its recommendations and other product features, like Feed and Explore, result in disproportionate harms to vulnerable users including children, teens, teen girls, and women (known as "algorithmic bias" and/or "algorithmic discrimination")/ Yet Meta continues to reap astronomical profits at the expense of these users.

22.　To name only one example, Meta knows that its algorithm is identifying and pushing harmful social comparison content to teen <u>girls</u> at significantly higher rates than what it is

identifying and pushing to teen <u>boys</u>. Meta's algorithm is discriminating in a manner that disproportionally targets girls between the ages of 13 and 17, as compared to similarly situated boys between the ages of 13 and 17. And Meta has no intention of stopping, because this discrimination has proven lucrative and until it is more expense for Meta to keep discriminating against young women it will continue to do so.

23.     In the words of the Facebook Whistleblower, Meta is "morally bankrupt."

24.     Meta knows of several other product features that are harming its users, and which Meta could reasonably make safer – but where Meta has chosen engagement and growth over integrity every time. Another example is the "friend" recommendation product feature, which is a feature Meta has in both its Facebook and Instagram social media products. Meta knows that this feature is harmful to children in that it contributes to a significant amount of the grooming and exploitation that occurs on and because of Meta's platforms. In other words, Meta affirmatively directs and connects predatory adult users who do not know and would not be able to find minors otherwise to Meta's minor users via its recommendation algorithms, and vice versa (directing minors to adult users). Meta is aware of the harm this product is causing to a substantial number of its minor users. However, Meta has refused to simply turn this function off for minor users – which it can easily do – because of other and more general findings that the more connections Meta can make for new users, the more likely those users are to keep using its product.

25.     Meta's own research has also been quite conclusive in determining that its teen, female users are disproportionately impacted by these products features and resulting harms,



*Id.* at p. 9.

26.    According to an article published by the *Wall Street Journal*,[4]

> For the past three years, Facebook has been conducting studies into how its photo-sharing app affects its millions of young users. Repeatedly, the company's researchers found that Instagram is harmful for a sizable percentage of them, most notably teenage girls.
>
> "We make body image issues worse for one in three teen girls," said one slide from 2019, summarizing research about teen girls who experience the issues.
>
> "Teens blame Instagram for increases in the rate of anxiety and depression," said another slide. "This reaction was unprompted and consistent across all groups."
>
> Among teens who reported suicidal thoughts, 13% of British users and 6% of American users traced the desire to kill themselves to Instagram, one presentation showed.

27.    Meta documents also discuss the fact that "Constant comparison on Instagram is 'the reason' why there are higher levels of anxiety and depression in young people,"

---

[4] https://www.wsj.com/articles/facebook-knows-instagram-is-toxic-for-teen-girls-company-documents-show-11631620739



*See, supra,* "Teen Mental Health Deep Dive," p. 27. (October 10, 2019), at p. 53. As illustrated in the Facebook Papers, this constant and harmful social comparison is the result of social media's design and operation, and not any one piece of content or interaction on its platform.

28.   Meta documents also report that 13.5% of teen girls on Instagram say that the platform makes thoughts of Suicide and Self Injury (SSI) worse; while 17% of teen girls on Instagram say that the platform makes "Eating Issues" (*e.g.* anorexia and bulimia) worse,

*See*, https://digitalwellbeing.org/the-facebook-files-on-instagram-harms-all-leaked-slides-on-a-single-page/, Slide 14 of "Hard life moment – mental health deep dive."

29. Meta knows that its product is contributing to teen depression, anxiety, even suicide and self-harm. Why doesn't it change these harmful product features and stop utilizing algorithms in connection, at least, with teen accounts? Because Meta's priority is growth and competition concerns, and it sees "acquiring and retaining" teens as essential to its survival. As made clear in the Facebook Papers, teenagers spend significantly more time on social media than adults (both total time and user sessions—which are usage patterns Meta links to addiction), represent Meta's greatest (if not only) growth opportunity in the US, and can be used by Meta to recruit older and younger family members and friends.

30. Meta also knows that its Instagram product is widely used by pre-teens under the age of 13. Despite it being illegal for Meta to knowingly permit persons under the age of 13 to use its platform, Meta has spent millions (if not billions) of dollars over the last decade studying "tweens" to determine how to make its product more appealing to and increase engagement among them. Meta sees children under 13 as a tappable and valuable market, which it must capture and use to increase revenue and ensure competitive positioning in the long-term.

31. For Meta, young users are a priority demographic, and Meta leadership will do anything to increase and maintain engagement. Indeed, on October 26, 2021, the New York Times reported on a 2018 internal Meta marketing report lamenting loss of teenage users to competitors' platforms as "an existential threat."[5]

32. Meta spends billions on these efforts, going so far as to identify vulnerabilities and other areas where it can adjust its products and approach to appeal more to the teen demographic. For example, in December of 2021, Insider reported on an internal Meta document titled "The Power of Identities: Why Teens and Young Adults Choose Instagram." It is clear from this document that Meta, and its competitors, are marketing to children and teens – including in ways meant to exploit the differences between teens and adults.

33. Identified among Meta's internal documents are other product features that cause

---

[5] https://www.nytimes.com/2021/10/16/technology/instagram-teens.html

harm to teen users, which product features are relatively standard among Defendants' products. For example, product features that enable users to like or love other user's content results in increased addiction and social comparison harms, which Meta considered hiding for the benefit of its users (referred to as "Project Daisy") but ultimately did not.[6]

34.     In May 2022, Instagram head Adam Mosseri told reporters that that research he had seen suggests the app's effects on teen well-being is likely "quite small."[7] Upon information and belief, Mr. Mosseri's statement was false and Meta leadership, including Mr. Mosseri, has been made aware of the significant and far-reaching effects of Instagram on teen well-being.

> The features that Instagram identifies as most harmful to teens appear to be at the platform's core.
>
> The tendency to share only the best moments, a pressure to look perfect and an addictive product can send teens spiraling toward eating disorders, an unhealthy sense of their own bodies and depression, March 2020 internal research states. It warns that the Explore page, which serves users photos and videos curated by an algorithm, can send users deep into content that can be harmful.
>
> "Aspects of Instagram exacerbate each other to create a perfect storm," the research states.
>
> The research has been reviewed by top Facebook executives, and was cited in a 2020 presentation given to Mr. Zuckerberg, according to the documents.

*See https://www.wsj.com/articles/facebook-knows-instagram-is-toxic-for-teen-girls-company-documents-show-11631620739* (to name only one example).

35.     In a more recent interview, Mr. Mosseri said that some features of Instagram could be harmful to some users, and they aren't easily addressed.[8] This statement was also false, as Meta's leadership, including Mr. Mosseri, have been presented with numerous recommendations from Meta's employees and even teens themselves as to how they could <u>easily</u> make the Instagram product safer for children and teens. Examples of this include but are not limited to things such as,

a.  Verification of age and identify for all users.

b.  Email verification for all users.

c.  Not allowing multiple accounts.

---

[6] *See https://www.nytimes.com/2020/01/17/business/instagram-likes.html*

[7] https://www.wsj.com/articles/facebook-knows-instagram-is-toxic-for-teen-girls-company-documents-show-11631620739

[8] *Id.*

d.  Not allowing public profiles for minors, or defaulting minors to private ones.

e.  Not allowing direct messaging with minors, or not allowing direct messaging with minors and persons not on their "friends" list.

f.  Turning off recommendation algorithms for minor accounts.

g.  Turning off content algorithms for minor accounts.

h.  Reducing amount of certain content categories Meta's algorithms identify and direct to minor users (where Meta has determined that even a small reduction to quantity would have a large impact for users, and where Meta can make such a change essentially by turning a level on its current settings).

i.  Not creating, approving, and directing harmful advertisements to minors.

j.  Adoption of SSI (Suicide and Self-Injury) tools Meta employees have recommended and, again, that Meta could implement on a unilateral basis and that would reduce the incidence of SSI caused by Instagram.

36.  Meta knows that teens are more vulnerable and suffer harms from use of the Instagram social media product at higher rates than adult Instagram users. At the same time, however, teens access social media longer and more often than adults. Advertisers are willing to pay a premium for unfettered access to child and teens so Meta, in turn, works hard to make its Instagram social media product as appealing to teens as possible, even though it is harmful to teens.

**E.   Meta's Singular Focus on Profits Over Safety**

37.  Meta knows the harmful impact its products have. Instead of warning users and/or re-designing its product to make it safer, however, Meta senior leadership conducts extensive economic calculations and chooses enhancing profits over protecting human life.

38.  Meta knows that large numbers of its users are "addicted" to its social media products. Indeed, the problematic use identified in medical literature is precisely the type of use Meta has designed its product to encourage through psychological manipulation techniques—sometimes referred to as persuasive design—that is well-recognized to cause all the hallmarks of clinical addiction.

39.  Meta also slowly switched its News Feed (in its Facebook and Instagram products)

from maximizing time-spent to maximizing sessions, even though it knew that maximizing sessions is harmful to its users.

40.     Meta likewise knows that its "like" button causes harmful social comparison, and results in anxiety and depression in teens. Meta has tested and proved these theories and is aware of product fixes that would cost Meta virtually nothing but that, in turn, would reduce the harms to Meta's teen users – users like Alex Martin. But Meta leadership refused such changes due to the potential for decreased revenues from advertisers and influencers. In other words, Meta made a calculated business decision and chose profits over human life.

41.     Meta likewise engages in a constant cost-benefit analysis when it comes to user safety vs. engagement—with engagement winning every time. For example, Meta does not incorporate reasonable and necessary safety protocols and checks into its design and development processes. It also then fails to make its product and product features safer after concerns are voiced and/or actual harms are known. It opts instead for profits and engagement, consistent with its well-known motto, "Move fast and break things." On information and belief, there will be multiple examples of this once discovery is had in this case.

42.     Meta is perfectly capable of enforcing its own Terms of Service, Community Standards, and other guidelines. It can adjust controls in a manner that would better protect its users, especially children and teens, from certain, significant harms caused by Meta's user setting options, recommendations, and other algorithmic-driven product features. Yet, Meta repeatedly conducts its engagement-driven, cost-benefit analysis and repeatedly chooses profit over human life. That is not a choice Meta has the right to make.

43.     Nor does Meta intend to make the changes necessary to protect young users. For example, after the Facebook Whistleblower came forward and the first products liability lawsuits were filed, Meta began making small product changes, in an effort to mimize the impact of the truth about the harmfulness of its products. But Meta's new claims of prioritizing user safety are as false as the prior ones. The following are just some examples.

44.     Meta now claims that it requires age verification, which claim is misleading. Meta simply asks its users to input their birthdate, as it did upon opening of the account. This form of

"verification" is no more effective than it was the first time. Meta is unwilling to actually verify age and identification, however, as this would prevent anyone under the age of 16 from opening an account without parental consent and would stop those same users from opening multiple accounts – which would have significant impact on Meta's engagement numbers and resulting revenue. It would also decrease engagement among predatory users, as many would not sign up for fear of getting caught and those who did would be easier to identify.

45. Meta also claims that it has parental controls in place, which "parental controls" Meta knows to be ineffective. For example,

    a. Parental controls do not work when users open accounts without their parents' knowledge or consent (which is many if not most teen users);

    b. Parental controls do not work when users open FINSTAS (or secret, secondary accounts) which their parents do not know about, which again, refers to more than half of all teens using Meta's Instagram product.

    c. Parental controls do not work because, as Meta also knows, most parents do not understand how to use Meta's social media products in the first place, and cannot or do not use what they do not understand. *See, supra,* "Teen Mental Health Deep Dive" (p. 50),



At the same time, parents can't understand and don't know how to help

- Today's parents came of age in a time before smartphones and social media, but social media has fundamentally changed the landscape of adolescence.
- Social media amplifies many of the age-old challenges of being a teenager.
- The always-on nature of social media means that teens' social lives have infiltrated into every part of life without a break.
- Sharing more parts of life means more points of comparison.

"Talking to your family doesn't help because they can't understand and don't get what you need. How are you going to tell the people who **literally gave you life** that you don't want it anymore?"
- UK Female

That is, actual user safety requires implementing more than just a tool aimed at putting safety in the hands of parents, since most do not understand the tool or know it exists in the first place.

        d.    Whatever the reason for parents not using parental controls, that misses the point entirely – which is that Meta does not have the right to distribute inherently dangerous and defective products to children in the first place, and parental controls do not address harmful product features like algorithms and social comparison content, to name a few.

## F.    Overview of Claims

46.    Plaintiffs bring claims of strict liability based upon Meta's defective design of its Instagram social media product that renders such product not reasonably safe for ordinary consumers or minor users. It is technologically feasible to design social media products that substantially decrease both the incidence and magnitude of harm to ordinary consumers and minors arising from their foreseeable use of Meta's product with a negligible increase in production cost. In fact, Meta's employees have made proposals for product changes time and time again, as is also proven by Meta's internal documents, only for Meta controlling shareholder and CEO Mark Zuckerberg to refuse such changes based solely on the potential impact they might have to Meta's engagement and revenue numbers. The following is from a Wall Street Journal article published September 15, 2021,[9]

> Anna Stepanov, who led a team addressing those issues, presented Mr. Zuckerberg with several proposed changes meant to address the proliferation of false and divisive content on the platform, according to an April 2020 internal memo she wrote about the briefing. One such change would have taken away a boost the algorithm gave to content most likely to be reshared by long chains of users.
>
> "Mark doesn't think we could go broad" with the change, she wrote to colleagues after the meeting. Mr. Zuckerberg said he was open to testing the approach, she said, but "We wouldn't launch if there was a material tradeoff with MSI impact."

47.    What's clear from all of these reports and documents is that Meta and its competitors in the social media space *could* provide social media products that do not promote or

---

[9] https://www.wsj.com/articles/facebook-algorithm-change-zuckerberg-11631654215

amplify harmful content to teens and children – these companies simply choose to not do so as that would mean not relying on harmful algorithms and fewer billions of dollars in revenue.

48.     Meta has consistently and knowingly placed its own profit over the health and welfare of its teen and child users, recognizing astronomical gains at their expense.

49.     Plaintiffs also bring claims for strict liability based on Meta's failure to provide adequate warnings to minor users and their parents of danger of mental, physical, and emotional harms arising from foreseeable use of its Instagram social media product. The addictive quality of Instagram and its harmful algorithms are unknown to minor users and their parents.

50.     Plaintiffs also bring claims for common law negligence arising from Meta's unreasonably dangerous Instagram social media product and its failure to warn of such dangers. Meta knew, or in the exercise or ordinary care should have known, that its social media product was harmful to a significant percentage of its minor users and failed to redesign its product to ameliorate these harms. Meta also failed to warn minor users and their parents of foreseeable dangers arising out of use of its Instagram product.

51.     Meta's own former and/or current developers often do not allow their own children and teenagers to use the Instagram product.[10] For many years, Meta has had actual knowledge that its Instagram social media product is dangerous and harmful to children but actively concealed these facts from the public and government regulators and failed to warn parents about this known harm for continued economic gain.

52.     Plaintiffs also bring claims under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code, §§17200, et seq. The conduct and omissions alleged herein constitute unlawful, unfair, and/or fraudulent business practices prohibited by the UCL.

53.     Plaintiffs also bring a claim for unjust enrichment. Defendant received a direct benefit from Alex Martin's problematic and harmful use of its product, both from the amount of time she spent on Instagram and from her creation of multiple accounts. Under the circumstances stated herein, it would be unjust and inequitable for Defendant to retain those ill-gotten benefits.

---

[10] *See, e.g.,* https://www.foxnews.com/tech/former-facebook-exec-wont-let-own-kids-use-social-media-says-its-destroying-how-society-works

54. Plaintiffs bring a claim for invasion of privacy under California law. Defendant's conduct detailed herein frustrated and intruded upon Ben and Jennifer Martin's fundamental parental rights to protect their child and to monitor and control their child's use of social media, and this intrusion occurred in a manner that was highly offensive to a reasonable person.

55. Finally, Plaintiffs bring claims for fraud and fraudulent concealment. Meta spent years lying to Congress and the public about the nature of its products and harms they cause. Meta made affirmative statements and material omissions of fact designed to lull potential users into trusting that their social media products were safe, and that Meta was prioritizing user safety over its own profits. Meta not only knew that these statements were false but was actively concealing the truth by creating a corporate culture of fear – conscientious Meta employees were made to believe that they would be ruined and not believed, and that their actions would result in others not being able to make Meta's products safer if they revealed the truth. Meta knew that its products were not safe, and knew that children, like Alex Martin, would be harmed by their use.

56. Plaintiffs' claims do not arise from third party content, but rather, Meta's product features and designs, including but not limited to algorithms and other product features that addict minor users, amplify and promote harmful social comparison, affirmatively select and promote harmful content to vulnerable users based on its individualized demographic data and social media activity, put minor users in contact with dangerous adult predators, and otherwise prioritize engagement (and Meta profits) over user safety.

## II. PARTIES

57. Plaintiffs Alex Martin, and her parents Ben and Jennifer Martin, reside in Georgetown, Kentucky. Alex opened her first Instagram account sometime in 2014, when she was 12 years old. Upon information and belief, Meta required her to assent to its Terms of Service at that time. Alex no longer uses the Instagram social media product and disaffirms any contractual terms Meta might claim. Disaffirmation was made within a reasonable time of Alex's eighteenth birthday.

58. Defendant Meta is a Delaware corporation with its principal place of business in Menlo Park, California. Meta owns and operates the Facebook and Instagram social media

platforms, applications that are widely available to users throughout the United States.

### III.    JURISDICTION AND VENUE

59.    This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, and Plaintiffs and Meta are residents of different states.

60.    This Court has general jurisdiction over Defendant Meta because Meta's principal place of business is California and Meta is "at home" in this State. This Court also has specific jurisdiction over Meta because Plaintiffs' claims set forth herein arise out of and relate to Meta's activities in the State of California.

61.    Venue is proper in this District under 28 U.S.C. § 1391(b) because Meta resides in the Northern District of California and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

### IV.    FACTUAL ALLEGATIONS RELATING TO PRODUCT DEFECTS

**A.    Facebook and Instagram Background**

62.    Facebook is an American online social network service that is part of the Meta Platforms. Facebook was founded in 2004 and became the largest social network in the world, with nearly three billion users as of 2021, and about half that number were using Facebook every day. The company's headquarters is in Menlo Park, California. Facebook recently changed its name to, and is referred to herein and collectively with Instagram, as Meta.

63.    Instagram is a photo sharing social media application. Its original focus was to facilitate communication through images by featuring photos taken on mobile devices. Instagram launched in October 2010 and Facebook acquired it for $1 billion in April 2012. Once acquired, Instagram experienced exponential growth, design, and development changes. It went from 10 million monthly active users in September of 2012 to 50 million weeks after the acquisition, to more than 600 million by December of 2016, and it continues to grow. Meta instituted dozens of product changes (also known as "growth hacks") that drove this increased engagement, but at the expense of the health and well-being of Instagram's users—especially teens and children.

**News Feed Product**

64.     Both the Facebook and Instagram products show users a "feed." A user's "feed" is a comprised of a series of photos and videos posted by accounts that the user follows, along with advertising and content specifically selected and promoted by Instagram.

65.     Meta exerts control over a user's Instagram "feed," including through certain ranking mechanisms, escalation loops, and/or promotion of advertising and content specifically selected and promoted by Meta based on, among other things, its ongoing planning, assessment, and prioritization of the types of information most likely to increase engagement. In the case of certain user groups, like teens, this control translates to deliberate and repeated promotion of harmful and unhealthy content, which Meta knows is causing harm to its young users.

66.     Over time, Meta slowly switched its News Feed (in its Facebook and Instagram products) from maximizing time-spent to maximizing sessions, even though Meta knows that maximizing sessions is harmful to its users.

67.     Recommendation-based feeds and product features also promote harmful content, particularly where, as in the case of Meta, the algorithm is being programmed to prioritize number of interactions and not quality of interactions.

68.     In 2021, Senators Richard Blumenthal, Marsha Blackburn and Mike Lee tested and confirmed the fact that Meta's recommendation-based feeds and product features promote harmful content by having several accounts opened while providing information indicating that the users were teenage girls,

"Within an hour all of our recommendations promoted pro-anorexia and eating disorder content," Blumenthal said. "Nothing has changed. It's all still happening."

Sen. Mike Lee, R-Utah, said his office created an account for a 13 year old girl. Shortly afterward, the algorithm recommended a famous female celebrity to follow and when they did, Lee said, "It went dark fast."

The fake account was flooded with content about diets, plastic surgery and other damaging material for an adolescent girl, he said.

In another example this week, Blackburn's staff exposed a flaw in Instagram's setting for teens under 16.

According to Instagram's policies, new teenage accounts should automatically default to a private setting. But when Blackburn's team set up a phony account for a 15 year old girl, it automatically defaulted to public.

Mosseri acknowledged the error, explaining the mistaken default setting was triggered because the account was created on a web browser, as opposed to a mobile app.

"We will correct that," he said.

*See* https://www.npr.org/2021/12/08/1062576576/instagrams-ceo-adam-mosseri-hears-senators-brush-aside-his-promises-to-self-poli.

69. And again, Meta's recommendations are not coincidence, nor are they the product of third-party speech or even Meta's speech. Meta is exerting a degree of manipulation and control over its users via its unchecked technologies that far exceeds anything the world could have contemplated even a decade ago. Meta regularly "experiments" on users—users with no idea that they are being monitored and examined—to test product ideas, but also, to identify mechanisms through which Meta can control user behavior for its own profit. Moreover, Meta is not targeting millions, thousands, or even hundreds of users with its product. Meta's technologies allow it to target every single user (billions of people) simultaneously and on an individual basis, which fact makes its algorithmic and social media products far more dangerous than anything American courts and lawmakers have ever seen or could even have conceived of until Meta's internal

documents were released in late 2021. Even now, there are tens of thousands if not millions of additional Meta documents and data sources that the world will need to see to fully appreciate and understand how Meta's products function and what Meta (and its primary competitors in the social media industry) have knowingly done to our children and teens.

70.     Meta not only tracks user actions, it tracks every conceivable detail of usage, including intentional vs. nonintentional actions, every message sent and received, every like, detailed usage and engagement and growth statistics *for every single user*, which data Meta can then access, organize, and utilize based on date, location, and age. In short, and upon information and belief, Meta's systems provide Meta with actual knowledge as to virtually everything that occurs on its platform.

71.     Meta is willing to addict its users if it means Meta's own long-term success.

72.     Meta has had almost a decade to fix the type of product defects identified Senators Richard Blumenthal, Marsha Blackburn and Mike Lee in late 2021, but has not—instead, its products have severely harmed millions of teens in the U.S. alone, including Alex Martin.

## **Explore Product**

73.     Instagram has a search feature, called "Explore," where a user is shown an endless feed of content that is selected by an algorithm designed by Meta based upon the users' demographics and prior activity in the application. Again, Meta designed and operates its product in a manner that promotes harmful and/or unhealthy content. Meta is aware of these inherently dangerous product features and has repeatedly decided against changing them and/or implementing readily available and relatively inexpensive safety measures, for purpose of ensuring continued growth, engagement, and revenue increase.



*See, supra*, "Teen Mental Health Deep Dive," p. 54.

74. Meta also has conducted studies to identify precisely which of its algorithmically promoted content is most harmful to users, and the degree of harm that content causes. *See, e.g.*, *supra*, "Social Comparison: Topics, celebrities, Like counts, selfies" and "Appearance-based Social Comparison on Instagram." Despite being able to identify the harmful categories, as well as volume and amplification product defects causing harm, Meta ultimately determined that its promotion of such content is a large part of what makes the Instagram product appealing to teens. Meta decided against changing its current product as a result, and irrespective of identified harms.

75. Meta also knows that these harms (caused by Instagram) disproportionately impact protected groups, including young women; and that its product disproportionately targets protected groups, including young women.

**Profile Settings**

76. Instagram profile default settings also cause harm. Users' profiles on Instagram may be public or private, which is a product feature over which Meta exercises complete control. On public profiles, any user can view the photos, videos, and other content posted by the user. On private profiles, the user's content may only be viewed by the user's followers, which the user must approve. During the relevant period, Instagram profiles were public by default and Instagram allowed all users to message and send follow requests to underage users.

77.     Defaulting profiles to public served no critical purpose in terms of product functionality and/or a user's ability to access content. Instead, this product feature increases user engagement during onboarding (when a user first starts using Instagram) by increasing user connections. Unfortunately for young children and teens, a numerically significant percentage of those would-be connections are harmful. Meta is aware of the harm and has opted to not make necessary and cost-effective changes to prevent it.

### Direct Messaging Product Feature and Access to Vulnerable Users

78.     Meta's Direct Message settings also permit and encourage harm to vulnerable users. Harmful and dangerous interactions occur because of the Instagram direct message feature and current user settings, that is, Meta's chosen settings provide predators and other bad actors with direct and unsupervised access to children and teens.

79.     Meta's direct messaging feature is where most unwanted interactions happen, including bullying and sexual exploitation of minors, which Meta knows, yet it has once again opted to not make necessary and cost-effective changes to prevent these harms – opting for engagement over safety.

### Push Notifications and Emails

80.     Meta's push notifications and emails encourage addictive behavior and are designed specifically to increase use of its Instagram product. Based on individualized data Meta collects, it then selects content and notification frequency for its users and notifies them via text and email. Instagram's notifications to individual users are designed to, and do, prompt them to open Instagram and view the content Instagram selected, increasing sessions, and resulting in greater profits to Instagram. More to the point, even the format of these notifications has been designed and re-designed with the specific purpose of pulling users back onto the social media platform—irrespective of a user's health or wellbeing.

81.     Upon information and belief, Meta has programmed its systems such that its programs send more of these notifications to its most addicted users, knowing that these users are the ones who have a harder time resisting the allure of this product feature.

**Reels and Stories**

82.     Instagram has also added features and promoted the use of short videos and temporary posts. The latter are referred to as "Reels" while the former is referred to as Instagram "Stories." These products were developed to appeal to teens and Meta knows that these products are addictive, as well as defective.

83.     To name only one example, Meta has not yet implemented certain, basic safety-related technologies across all product features – despite public representations to the contrary – while the algorithmic bias it operates within its algorithms is identifying and promoting these inherently riskier products in greater numbers to teens, women, and other minority groups. This means, for example, that Meta is identifying and recommending harmful and eating-disorder promoting content to young girls in higher numbers – as it did with Alex Martin. This is content these users would never have seen but for Meta's identification and promotion, which harms Meta knew about but did nothing to correct as it prioritized keeping the attention of those teen users.

**Marketing to Kids and Social Comparison Product Features**

84.     Instagram also incorporates several unique product features that serve no functional purpose, but that do make Meta's product more appealing to children and teens (*i.e.*, "likes" and filters, as well as avatars, emojis, and games) while simultaneously increasing social comparison pressure and resulting harm (*i.e.*, "likes" and filters). Meta knows that these product features disproportionally harm teen girls and young women, yet Meta leadership—singularly focused on its economic bottom line—rejects product change recommendations that would have better protected users against these harms and at minimal implementation cost to Meta.

85.     Another example involves Meta's "like" button feature. Meta has determined that its "like" product feature is a source of social comparison harm for many of its users. This is not surprising given that several of the Meta employees involved in creating that feature have since left Meta and have spoken publicly about the product's addictive nature and harmfulness.[11] What is surprising, however, is that Meta identified the harmful feature (the "like" button), is aware of a low to no-cost solution that would reduce the harms to its users, and still made the business

---

[11] *See, e.g.*, https://www.theguardian.com/technology/2017/oct/05/smartphone-addiction-silicon-valley-dystopia.

decision to *not* launch that product fix. This is another blatant example of Meta choosing profits over human life and, specifically, the health and well-being of teens.

86. Upon information and belief, multiple Meta employees recommended and/or supported the launch of this product change for the Instagram product, but Meta leadership said no. And this specific feature was a source of significant emotional and mental harm to Alex Martin.

## **Meta's Ownership and/or Licensing Rights in all User Content**

87. Instagram also creates images and GIFs for users to post on their videos and pictures. Meta has also acquired publishing rights to thousands of hours of music, which it provides to its users to attach to the videos and pictures that they post on Instagram. The GIFs, images, and music are integral to the user's Instagram post and are, in fact, designed to encourage posting. Indeed, in many cases, the only content in a user's Instagram post is the image, GIF or music supplied by Meta. When users incorporate images, GIFs, and music supplied by Meta into their postings, Meta is functioning as a co-publisher of such content. An Instagram user who incorporates images, GIFs, or music supplied by Meta into their post is functionally equivalent to a novelist who incorporates illustrations into their story. Instagram can no longer characterize the images, GIFs, and music it supplies to its users as third-party content, just as the novelist cannot disclaim responsibility for illustrations contained in their book. Meta has made the deliberate decision to collaborate with its users in this regard and, as evidenced by Meta's internal documents, Meta's decision is motivated by the fact that such collaboration results in increased engagement and more profits for Meta itself.

88. Meta also has legal rights in all third-party content, such that it is not "third-party content" at all. In 2012, Meta revised its Instagram Terms of Service to the following,[12]

To help us deliver interesting paid or sponsored content or promotions, you agree that a business or other entity may pay us to display your username, likeness, photos (along with any associated metadata), and/or actions you take, in connection with paid or sponsored content or promotions, without any compensation to you.

---

[12] https://www.theverge.com/2012/12/18/3780158/instagrams-new-terms-of-service-what-they-really-mean

89.     Its current terms (effective January 4, 2022) are different, but still grant Meta the right to use all third-party content at Meta's sole and unilateral discretion,

- **We do not claim ownership of your content, but you grant us a license to use it.** Nothing is changing about your rights in your content. We do not claim ownership of your content that you post on or through the Service and you are free to share your content with anyone else, wherever you want. However, we need certain legal permissions from you (known as a "license") to provide the Service. When you share, post, or upload content that is covered by intellectual property rights (like photos or videos) on or in connection with our Service, you hereby grant to us a non-exclusive, royalty-free, transferable, sub-licensable, worldwide license to host, use, distribute, modify, run, copy, publicly perform or display, translate, and create derivative works of your content (consistent with your privacy and application settings). This license will end when your content is deleted from our systems. You can delete content individually or all at once by deleting your account. To learn more about how we use information, and how to control or delete your content, review the Data Policy and visit the Instagram Help Center.

90.     Meta directly profits from the videos and pictures its users create in collaboration with Meta, as described above.

91.     Meta knows that it is harming teens yet, when faced with recommendations that will reduce such harms, Meta's leadership consistently opts for prioritization of profit over the health and well-being of its teen users—that is, the millions of teen users who continue to use its inherently dangerous and defective social media product every, single day.

92.     Meta's products are used by many millions of children every day.

**B.     Meta's Instagram Application is a Product**

93.     There can be no dispute that Meta designs, manufactures, and distributes Instagram. Meta refers to Instagram and its various product features internally and in public facing documents as a "product."

94.     Meta's Instagram product is designed to be used by minors and is actively marketed to teens across the United States.

95.     Meta has obtained countless patents in connection with its Instagram product, which legal protection it would not be entitled to for mere editorial decisions.

96.     The Instagram product is designed to be used by minors and is actively marketed to minors across the United States. Meta markets to minors through its own marketing efforts and design. In addition, Meta works with and actively encourage advertisers to create ads targeted at

and appealing to teens, and even to children under the age of 13. Meta spends millions of dollars researching, analyzing, and experimenting with young children to find ways to make its product more appealing and addictive to these age groups, as these age groups are seen as the key to Meta's long-term profitability and market dominance.

97.     Meta also is aware that large numbers of children under the age of 18 use its product without parental consent. Indeed, Meta designs its social media product in a manner intended to allow and not prevent such use.

98.     Meta is likewise aware that large numbers of children under the age of 13 use its product despite user terms or "community standards" that purport to restrict use to individuals who are 13 and older. They have designed their product in a manner that allows and/or does not prevent such use to increase user engagement and, thereby, increase its own profits.

**C.      Meta Knows That Its Facebook and Instagram Products are Highly Addictive**

99.     Meta and its leadership have repeatedly represented to the public and governments around the world that their Instagram and Facebook products are safe and not addictive.

100.    In September of 2017, Meta CEO Mark Zuckerberg spoke out on the issue of opioid addiction, making general addiction-related statements, including that "Communities all across the country have a long road ahead, but as someone told me at the end, 'I'm hopeful because we're talking about it.' Me too."[13]

101.    In April of 2018, Meta CEO Mark Zuckerberg testified under oath to Congress that Meta does not design its products to be addictive and that he is not concerned with social media addiction as it relates to teens. He stated,

> I view our responsibility as not just building services that people like but as building services that are good for people and good for society as well … we study a lot of effects of well-being, of our tools, and broader technology, and like any tool there are good and bad uses of it. What we find in general is that if you are using social media to build relationships then that is associated with all the long term measures of well-being that you'd intuitively think of … but if you are using the internet and

---

[13] https://www.northpointrecovery.com/blog/mark-zuckerberg-discusses-view-addiction-facebook/

social media to just passively consume content and are not engaging with other people then it doesn't have those positive effects and it could be negative.[14]

102.    In November of 2020, Meta CEO Mark Zuckerberg again testified under oath to Congress that Meta does not design its products to be addictive and that research on addictiveness of social media has not been conclusive.15

103.    In March of 2021, Meta CEO Mark Zuckerberg testified under oath to Congress that Instagram is not addictive and that it does not cause harm to children and teens.

He was asked:

> "So Mr. Zuckerberg, yes or no: Do you agree too much time in front of screens, passively consuming content, is harmful to children's mental health? ..."

He responded:

> "I don't think that the research is conclusive on that…"

He was asked:

> "Do you agree that you make money off of creating an addiction to your platforms?"

He responded:

> "Congressman, no. I don't agree with that."

He was asked:

> "Do you believe that your platform harms children?"

He responded:

> "Congresswoman, I don't believe so.  This is something that we study and we care a lot about; designing products that  peoples' well-being is very important to us.  And what our products do is help people stay connected to people they care about, which I think is one of the most fundamental and important human things that we do, whether that is for teens or for people who are older than that. And again, our policies on the main apps that we offer generally prohibit people under the age of 13 from using the services."[16]

104.    On September 30, 2021, Meta's Head of Safety, Antigone Davis, testified under oath to Congress that Instagram is not addictive. She testified that she "disagree[d] with calling our product addictive.  I also think  that's not  how  we  build  products."[17]  She denied Meta's

---

[14] https://www.youtube.com/watch?v=AB4mB-K7-xY

[15] https://www.tampafp.com/great-news-facebook-is-not-designed-to-be-addictive-according-to-zuckerberg/

[16] https://www.congress.gov/117/meeting/house/111407/documents/HHRG-117-IF16-Transcript-20210325.pdf, at p. 67, 107, 175.

[17] https://www.rev.com/blog/transcripts/facebook-head-of-safety-testimony-on-mental-health-effects-full-senate-hearing-transcript ("Sept. 30, 2021, Senate Hearing Transcript"), at 2:06:35; *see also id.* at 02:07:44 and 02:07:59 (Ms. Davis also denied that Meta's business model includes getting users engaged for longer amounts of time).

marketing to children under 13, repeatedly denied the existence of causal research regarding harms to teens from Instagram use and testified that Meta's overreaching goal is child safety: "We work tirelessly to put in place the right policies, products, and precautions so [young users] have a safe and positive experience."[18]

105.    On December 8, 2021, Instagram's president Adam Mosseri provided written testimony and testified under oath to Congress that Instagram is not addictive.[19] He testified that teens come to Instagram while dealing with difficult things and that Instagram makes things better for them. Mr. Mosseri downplayed the significance of the documents disclosed by the Facebook Whistleblower, characterizing Meta's numerous studies as involving input from small numbers of teens and not measuring "causal relationships between Instagram and real-world issues."[20] Indeed, he testified that Meta's overarching goal is child safety: "But I want to assure you that we do have the same goal. We want all teens to be safe online."[21]

106.    In truth, Meta has been studying its "addicting" product mechanics for years, and Meta leadership—including and specifically Meta CEO Mark Zuckerberg—had actual knowledge that these products are addictive and harmful to children and teens. Moreover, Meta's own estimates reflect known addiction by a significant number of children and teens. For example, if we assume an addiction rate among US teen users only of 3%—which is *far lower* than Meta's estimated—that means that more than *half a million* American teenagers (age 13 to 17) are currently addicted to Instagram to the point where their addiction is causing sleep deprivation, actively interfering in their friendships, family relationships, employment, and education, and is causing other physical and emotional harms.

107.    In March of 2020, Meta internally published a document titled "Social Comparison Exploratory Research" (*see, supra*, as published by WSJ) based on a US Exploratory Study it

---

[18] *Id*. at 24:58, 01:47:29, 1:48:07, 1:48:20, 2:10:47, 33:46, and 40:41.

[19] https://www.commerce.senate.gov/2021/12/protecting-kids-online-instagram-and-reforms-for-young-users, recording of December 8, 2021 Senate Hearing.

[20] https://www.commerce.senate.gov/services/files/3FC55DF6-102F-4571-B6B4-01D2D2C6F0D0, written Testimony of Adam Mosseri, Head of Instagram, dated December 8, 2021.

[21] https://www.npr.org/2021/12/08/1062576576/instagrams-ceo-adam-mosseri-hears-senators-brush-aside-his-promises-to-self-poli

1   conducted titled "Teen Girls Body Image and Social Comparison on Instagram,"



7   108.   In that document, Meta refers to its Instagram product mechanics as "addicting,"



14  *Id*. at p. 29.

15  109.   Among the published Facebook Papers are other documents detailing studies

16  specific to the issue of teen users and mental health, including the fact that teens "have an addicts'

17  narrative about their use – it can make them feel good, feel bad. They wish they could spend less

18  time caring about it, but they can't help themselves …" and "Teens recognize the amount of time

19  they spend online isn't good for them but at the same time they know they lack the willpower to

20  control the time spent themselves."



*See, supra*, "Teen Mental Health Deep Dive," p. 53.

110.   In short, Meta employees and Meta leadership know that Instagram is addictive and harmful, in part, because it was designed that way (addictive design) and, also, because the billions of dollars Meta has spent researching user addiction has said so. Meta has never released this information on addiction and/or problematic use to the public; instead, its leadership lied repeatedly to Congress and the parents of its tens of millions of child and teen users.

111.   Meta advertises its product as "free," because they do not charge its users for downloading or using its product. What many users do not know is that, in fact, Meta makes a profit by finding unique and increasingly dangerous ways to capture user attention and target advertisements to its users. Meta receives revenue from advertisers who pay a premium to target advertisements to specific demographic groups of users in the applications including, and specifically, users under the age of 18. Meta also receives revenue from selling its users' data to third parties.

112.   The amount of revenue Meta receives is based upon the amount of time and user engagement on its platforms, which directly correlates with the number of advertisements that can be shown to each user. In short, Meta opted for user engagement over the truth and user safety.

113.   Instagram is built around a series of design features that do not add to the communication and communication utility of the application, but instead seek to exploit users'

susceptibility to persuasive design and unlimited accumulation of unpredictable and uncertain rewards (including things like "likes" and "followers" and "views" in Stories). This design is unreasonably dangerous to the mental well-being of underage users' developing minds.

114.　Meta has also employed thousands of engineers to help make its products maximally addicting. One example is Instagram's "pull to refresh" feature, which is based on how slot machines operate. It creates an endless feed, designed to manipulate brain chemistry, and prevent natural end points that would otherwise encourage users to move on to other activities.

115.　Meta knows that is product is addictive, and it knows that millions of teen users want to stop using Instagram but cannot.

116.　Meta does not warn users of the addictive design of its product. On the contrary, Meta actively conceals the dangerous and addictive nature of its product, lulling users and parents into a false sense of security. This includes consistently playing down its products' negative effects on teens in public statements and advertising, making false or materially misleading statements concerning product safety, and refusing to make its research public or available to academics or lawmakers who have asked for it.

117.　For example, in or around July 2018, Meta told BBC News that "at no stage does wanting something to be addictive factor into" its product design process. Similarly, Meta told U.S. Senators in November of 2020 that "We certainly do not want our products to be addictive." Yet, Meta product managers and designers attended and even presented at an annual conference held in Silicon Valley called the Habit Summit, which started in 2014 and ran until recently, and the primary purpose of the Summit was to learn how to make products more habit forming.

118.　Meta's Terms of Use also state that Meta is "Fostering a positive, inclusive, and safe environment," and represent that Meta uses its "teams and systems … to combat abuse and violations of our Terms and policies, as well as harmful and deceptive behavior. We use all the information we have—including our information—to try to keep our platform secure." Yet, that is not the truth. Meta *does* have the technology to protect its users, but only employs that technology when and to the extent it can do so without decreasing user engagement and its own profits.

119.　Meta also engineers its product to keep users, and particularly young users, engaged

longer and coming back for more. This is referred to as "engineered addiction," and examples include features like bottomless scrolling, tagging, notifications, and live stories.

120.  Meta spends billions of dollars marketing its products to minors and has deliberately traded in user harm for the sake of its already astronomical revenue stream.

**D.  Meta Has Designed Complex Algorithms to Addict Teen Users and Its Business Model is Based on Maximizing User Screen Time**

121.  Meta has intentionally designed its product to maximize users' screen time, using complex algorithms designed to exploit human psychology and driven by the most advanced computer algorithms and artificial intelligence available to the largest technology companies in the world.

122.  Meta has designed and progressively modified its product to promote problematic and excessive use that they know is indicative of addictive and self-destructive use. More specifically, Meta knows that many teens feel as though they cannot stop their use of Meta's product, even though they want to stop. *See,* Section B, *supra*.

123.  One of these features, present in Instagram, is the use of complex algorithms to select and promote content that is provided to users in an unlimited and never ending "feed." Meta is well-aware that algorithm-controlled feeds promote unlimited "scrolling"—a type of use those studies have identified as detrimental to users' mental health. However, this type of use allows Meta to display more advertisements and obtain more revenue.

124.  Meta has also designed algorithm-controlled feeds to promote content most likely to increase user engagement, which often means content that Meta knows to be harmful to its users. This is content that users might otherwise never see but for Meta's affirmative pushing of such content to their accounts.

125.  In the words of one, high-level departing Meta employee,

In September 2006, Facebook launched News Feed. In October 2009, Facebook switched from chronological sorting to an algorithmic ranking. 10 years later, in July 2019, Sen. Josh Hawley introduced a bill to the US Senate that would ban features in app feeds, such as infinite scroll.

The response in 2006 was largely positive; the response in 2009 was negative from a vocal minority, but still largely positive; the response in 2019 was largely "lol, wut?" If I had to guess, the response to government regulation around engagement centric information feeds in 2026 will be "Omg finally".

"Why We Build Feeds" (October 4, 2019), at p. 1.[22]

126. The addictive nature of Meta's product and the complex and psychologically manipulative design of its algorithms is unknown to ordinary users.

127. Meta goes to significant lengths to prevent transparency, including posing as a "free" social media platform, burying advertisements in personalized content, and making knowingly false public statements about the safety of its product.

128. Meta also has developed unique product features that are designed to limit, and that do limit, parents' ability to monitor and prevent problematic use by their children.

129. Meta's addiction-driven algorithms are designed to be content neutral. They adapt to the social media activity of individual users to promote *whatever* content will trigger a particular user's interest and maximize their screen time. That is, prior to the point when Meta has addicted its user and is then able to influence user preferences, its algorithm designs do not distinguish, rank, discriminate, or prioritize between types of content. For example, if the algorithm can increase User One engagement with elephants and User Two engagement with moonbeams, then Meta's algorithm design will promote elephant content to User One and moonbeam content to User Two. Meta's above-described algorithms are solely quantitative devices and make no qualitative distinctions between the nature and type of content they promote to users – as long as those promotions increaser user engagement.

---

[22] https://www.documentcloud.org/documents/21600853-tier1_rank_exp_1019

**E. Minor Users' Incomplete Brain Development Renders Them Particularly Susceptible to Manipulative Algorithms with Diminished Capacity to Eschew Self-Destructive Behaviors and Less Resiliency to Overcome Negative Social Media Influences**

130. The human brain is still developing during adolescence in ways consistent with adolescents' demonstrated psychosocial immaturity. Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotional regulation, and impulse control.

131. The frontal lobes—and, in particular, the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control, and executive decision-making. These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses. MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature.

132. During childhood and adolescence, the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated with white fatty tissue called myelin. Second, during childhood and adolescence, the brain is undergoing "pruning"—the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and into young adulthood.

133. In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition. As such, the part of the brain that is critical for control of impulses and emotions and for mature, considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

134. The algorithms in Meta's social media products exploit minor users' diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency

caused by users' incomplete brain development. Meta knows that because its minor users' frontal lobes are not fully developed, such users are much more likely to sustain serious physical and psychological harm through their social media use than adult users. Nevertheless, Meta has failed to design its product with any protections to account for and ameliorate the psychosocial immaturity of its minor users. On the contrary, Meta specifically designs its product with these vulnerabilities in mind.

**F.  Meta Misrepresents the Addictive Design and Effects of its Social Media Product**

135.    At all times relevant, Meta has advertised and represented that its product is appropriate for use by teens and has stated in public comments that its product is not addictive and was not designed to be addictive. Meta knows that those statements are untrue.

136.    Meta did not warn users or their parents of the addictive and mentally harmful effects that the use of its product was known to cause amongst minor users, like Alex Martin. On the contrary, Meta has gone to significant lengths to conceal and/or avoid disclosure of the true nature of its product.

**G.  Plaintiffs Expressly Disclaim Any and All Claims Seeking to Hold Meta Liable as the Publisher or Speaker of Any Content Provided, Posted or Created by Third Parties**

137.    Plaintiffs seeks to hold Meta accountable for its own alleged acts and omissions. Plaintiffs' claims arise from Meta's status as the designer and marketer of dangerously defective social media products, as well as Meta's own statements and actions, not as the speaker or publisher of third-party content.

138.    Meta has designed its product to be addictive. For example, Meta has developed and modified product features like the continuous loop feed and push notifications, to incentivize users to stay on the product as long as possible and to convince users to log back on. Meta's algorithm even calculates the most effective time to send such notifications, which in the case of teen and tween users often means in the middle of the night and/or during school hours. Essentially, the times they are least likely to have access to Meta's social media product, which also—as Meta knows—are the times that their health and well-being necessitate them not being on Meta's social media product. Meta's product is designed to and does addict users on a content neutral basis.

139.    Meta's algorithm structure is by itself harmful to users, again, irrespective of content. For example, a primary purpose of Meta's algorithm design is to determine individual user preferences first so that Meta can then influence user behavior and choices second—which is particularly dangerous in the case of teens.

140.    It is clear from Meta's records that Meta uses its product both to "experiment" on and test its users in ways heretofore unimagined, but also, it seeks to control user behavior through product features and capabilities and for the specific purpose of acquiring and retaining users.

141.    On a content neutral basis, the manipulation and control Meta knowingly wields over its users daily is profoundly dangerous.

142.    Meta's Integrity Team employees regularly provide Meta leadership with warnings and recommendations, which Meta leadership regularly ignores. As explained in the employee departure memos previously discussed, Meta imposes insurmountable hurdles when it comes to making their existing and in-development products safer, while it imposes no user safety requirements when it comes to making its products more engaging.

143.    Meta is responsible for these harms. These harms are caused by Meta's designs and design-decisions, and not any single incident of third-party content. According to public statements made by the Facebook Whistleblower and other departed Meta employees, Meta's Integrity Team routinely flags these types of issues for Meta leadership and are consistently ignored.

144.    Meta failed to warn minor users and their parents of known dangers arising from anticipated use of its Instagram product. These dangers are unknown to ordinary consumers but are known to Meta and its employees. Moreover, these dangers do not arise from third-party content contained on Meta's social media platform. This lawsuit does not involve a suit against a web browser provider for making available third-party content. To the contrary, Meta,

      a.   Designed and constantly redesigns its Instagram product to attract and addict teens and children, its "priority" user group.

      b.   Designed and continues to operate its Instagram product to ensure that teens and children can obtain unfettered access, even over parental objection.

      c.   Knows when teens and children are opening multiple accounts and when they are

accessing its product excessively and in the middle of the night – which Meta considers to be a "value add proposition."

    d.    Works with advertisers and influencers to create and approve harmful content and provides direct access to its "acquired" teens and children – a user population Meta itself recognizes as being "vulnerable."

    e.    Operates and provides the above Instagram product with the single-minded goal of increasing user engagement, including but not limited to things like maintaining harmful social comparison features and approving algorithm programming that promotes harmful content over clear dangers to user safety.

145.    While it may be a third-party creates a particular piece of harmful content, the teens and children harmed by Instagram are not being harmed by a single piece of harmful content. They are being harmed by Instagram's algorithmic programming and business decisions to show teens and children a constant barrage of harmful content to obtain more advertising revenue and increase engagement.

146.    Alex Martin and children like her do not open Instagram accounts in the hopes of becoming addicted. Nonetheless, such children *do* become addicted, leading them to engage in foreseeable addict behaviors, such as lying to their parents, hiding their use of Instagram and/or secret Instagram accounts, losing control and becoming irritable, and feeling like they want to stop using Instagram but being unable to stop to the point where they continue to keep using even though they want to stop. These and other behaviors can and do result in serious harm to Instagram's minor users.

147.    Alex Martin and children like her do not start using Instagram in the hopes of being exposed to product features that cause harm to them. Yet Instagram use involves harmful forms of social comparison and inevitably pushes such children towards harmful "rabbit holes," causing anxiety, depression, eating disorders, and self-harm—harms Meta itself has acknowledged repeatedly in internal documents.

148.    The harms at issue in this case do not relate to or arise from third party content, but rather, Meta's product features and designs, including algorithms that (a) addict minor users to

Meta's product; (b) amplify and promote harmful social comparison through Instagram product features; (c) affirmatively select and promote harmful content to vulnerable users based on its individualized demographic data and social media activity; and (d) put minor users in contact with dangerous adult predators. Indeed, the foregoing are merely examples of the kinds of harms at issue in this case.

149.    Meta's product is addictive on a content neutral basis. Meta designs and operates its algorithms in a manner intended to and that does change behavior and addict users, including through a natural selection process that does not depend on or require any specific type of third-party content.

150.    Meta has designed other product features for the purpose of encouraging and assisting children in evasion of parental oversight, protection, and consent, which features are wholly unnecessary to the operation of Meta's product. This includes but is not limited to Meta's failure to check identification or verify validity of user-provided email credentials, while simultaneously implementing product design features (such as easier ability to switch between accounts) meant to ensure easy access by children and teens, irrespective of parental consent.

151.    Meta also promotes, encourages, and/or otherwise contributes to the development of harmful content. This Complaint quotes from just a few of the thousands of Meta documents disclosed by the Facebook Whistleblower, which establish this.

152.    Meta also approves ads that contain harmful content, for example, and as discussed at the Senate hearing held on October 5, 2021,[23]

---

[23] https://www.rev.com/blog/transcripts/facebook-whistleblower-frances-haugen-testifies-on-children-social-media-use-full-senate-hearing-transcript

**Senator Mike Lee: (01:21:34)**
Now, since that exchange happened last week, there are a number of individuals and groups, including a group called the Technology Transparency Project or TTP, that have indicated that that part of her testimony was inaccurate. That it was false. TTP noted that TTP had conducted an experiment just last month, and their goal was to run a series of ads that would be targeted to children ages 13 to 17, to users in the United States. Now, I want to emphasize that TTP didn't end up running these ads. They stopped them from being distributed to users, but Facebook did in fact approve them. As I understand it, Facebook approved them for an audience of up to 9.1 million users, all of whom were teens.

**Senator Mike Lee: (01:22:31)**
I brought a few of these to show you today. This is the first one I wanted to showcase. This first one has a colorful graphic encouraging kids to, "Throw a Skittles party like no other," which as the graphic indicates, and as the slang jargon also independently suggests, this involves kids getting together randomly to abuse prescription drugs. The second graphic displays an ana tip. That is a tip specifically designed to encourage and promote anorexia. It's on there. Now the language, the ana tip itself independently promotes that. The ad also promotes it in so far as it was suggesting. These are images you ought to look at when you need motivation to be more anorexic, I guess you could say. Now the third one invites children to find their partner online and to make a love connection. "You look lonely. Find your partner now to make a love connection."

153.    In other words, Meta approves advertisements "designed to encourage and promote anorexia" and encouraging children to abuse prescription or illegal drugs, which ads Meta then targets specifically at children in exchange for payment from the advertisers.

154.    Meta utilizes private information of its minor users to "precisely target [them] with content and recommendations, assessing what will provoke a reaction," including encouragement of "destructive and dangerous behaviors."[24] Again, Meta specifically selects and pushes this harmful content, for which it is then paid, and does so both for that direct profit and also to increase user engagement, resulting in more profits down the road. "That's how [Meta] can push teens into darker and darker places."[25] Meta "knows that its amplification algorithms, things like engagement

---

[24] *See* https://www.rev.com/blog/transcripts/facebook-whistleblower-frances-haugen-testifies-on-children-social-media-use-full-senate-hearing-transcript. ("October 5, 2021, Senate Hearing Transcript"), Mr. Chairman Blumenthal at 00:09:02.

[25] *Id.*

based ranking ... can lead children ... all the way from just something innocent like healthy recipes to anorexia promoting content over a very short period of time."[26] Meta has knowledge that its product and the content they are encouraging and helping to create is harmful to young users and chooses "profits over safety."[27]

155.   Meta has information and knowledge that can determine with reasonably certainty each user's age, habits, and other personal information, regardless of what information the user provides at the time of account setup. Meta can also determine on a mass scale and with reasonably certainty which of its users are teens, regardless of what information they provide at the time of account setup. Meta has used this capability for its own economic gain.

156.   None of Plaintiffs' claims rely on treating Meta as the publisher or speaker of any third party's words or content. Plaintiffs' claims seek to hold Meta accountable for its own allegedly wrongful acts and omissions, not for the speech of others or for Meta's good faith attempts to restrict access to objectionable content.

157.   Plaintiffs are not alleging that Meta is liable for what the third parties said, but for what Meta did.

158.   None of Plaintiffs' Claims for Relief set forth herein treat Meta as a speaker or publisher of content posted by third parties. Rather, Plaintiffs seek to hold Meta liable for its own speech and its own silence in failing to warn of foreseeable dangers arising from anticipated use of its product. Meta could manifestly fulfill its legal duty to design a reasonably safe social media product and furnish adequate warnings of foreseeable dangers arising out of the use of its products without altering, deleting, or modifying the content of a single third- party post or communication. Some examples include,

   a. Not using its addictive and inherently dangerous algorithm in connection with any account held by a user under the age of 18.

   b. Not permitting any targeted advertisements to any user under the age of 18.

   c. Fixing or removing all features that currently do not implement the tools Meta uses

---

[26] October 5, 2021, Senate Hearing Transcript, Ms. Francis Haugen at 00:37:34.

[27] *Id.* at 02:47:07.

to identify and remove harmful content (particularly since Meta knows that its algorithms and other systems are pushing these higher risk features disproportionately to protected classes).

d. Prioritizing internally its removal of harmful content over the risk of losing some user engagement – i.e. users who might be offended when Meta takes down what it believes to be harmful content.

e. Requiring identification upon opening of a new account, and restricting users under the age of 18 to a single account. This is something teens have even asked Meta to do *for their safety*, "

f. Requiring verification by email when a user opens a new account. Not requiring verification allows underage users to access Instagram and does not stop bad actors.

g. Immediate suspension of accounts where Meta has reason to know that the user is under the age of 13, including when the user declares that they are under the age of 13 in their bio or comments and where Meta determines an "estimated" age of under 13 based on other information it collects; and not allowing the account to resume until the user provides proof of age and identity and/or parental consent.

h. Suspension of accounts where Meta has reason to know that the user is over the age of 18, but where they are providing information to suggest that they are minors and/or are representing themselves as minors to other Instagram users; and not allowing the account to resume until the user provides proof of age and identity

i. Launching Project Daisy and Pure Daisy, meaning that each user could see their own likes but would be unable to see the likes on any other user's posts and comments.

j. Instituting advertising safeguards to ensure that Meta is not profiting directly from or otherwise pushing or endorsing harmful advertising content.

k. Requiring that all teen user accounts be set to private and not allowing any user under the age of 18 to change user settings to public.

l. Not permitting direct messaging with any user under the age of 18 if that minor

1  user is not already on a user's friend list.

2   m.  Requiring parental consent and restricting account access for users under the age of

3      18 to prevent usage at night and during regular school hours.

4  159.  These are just some examples, all of which could be accomplished easily and/or at

5  commercially reasonable cost. Meta itself has discussed and considered many of these, but its

6  leadership ultimately declined to make such product changes because such changes—while better

7  for the health and wellbeing of Instagram users—could result in a relatively small decrease to

8  Meta's more than $200 billion in annual revenue.

9       **V.    PLAINTIFF-SPECIFIC ALLEGATIONS**

10  160.  Alex Martin was born February 17, 2003, and grew up in Georgetown, Kentucky.



27  161.  She was an outgoing and athletic child, who loved school and excelled at school,

28  and enjoyed sports and spending time with her group of friends, many of whom she had known

since kindergarten. She wanted to work in the health care field when she grew up, so that she could make peoples' lives better.

162.    Alex got her first cell phone when she was 12, as she started riding the bus and her parents wanted to make sure that she had a way to contact them. Instagram was the first application she downloaded onto her new phone, and she was very excited about opening an account as all her friends had one. Alex knew she had to say that she was 13 to open an account, but that it was not an issue and that she could still tell people her real age on Instagram. In fact, it is relatively common for kids to open an account before 13 then put their actual age in their bio and elsewhere, and the general understanding is that Instagram doesn't care and won't do anything about it.

163.    Plaintiffs at the time believed that Instagram was like Facebook for kids and was used primarily by kids to coordinate social events, stay in touch, and post fun photos. They reasonably believed Alex would be safe as long as she stayed away from strangers.

164.    Ben Martin is a police officer and spoke with his daughter about the responsibility of a phone, and the potential danger of strangers when using any product that allowed for interaction with strangers. He made sure she understood to not engage with people she did not know and to not send suggestive photos to anyone via her phone or social media. Alex's parents had this conversation with her more than once, and regularly checked in to make sure that everything was okay. And in 2014 and 2015, everything seemed to be okay.

165.    Alex was still a star student, and still enjoyed school, participating in dance and cross country, and spending time with her close group of friends. However, she also started sneaking out at night to get her cell phone. Her parents did not allow Alex to keep her cell phone with her at night, so she would wait until they fell asleep, sneak out and get her phone, stay up all night on social media, and make sure to put her phone back before her parents were awake. In short, unbeknownst to Alex and her parents, she was addicted to Instagram and that addiction was slowly worsening.

166.    In 2012, Meta purchased Instagram for $1 billion dollars and began making significant changes to the Instagram social media product. In 2016 alone, Meta made it easier to switch between multiple accounts (February 2016), switched its Feed from chronological to

algorithmically-driven (March 2016), and launched of Instagram Stories (August) – a feature Meta designed to be like Snapchat Stories because of Snapchat's success with teens.

167. Ben and Jennifer Martin were not aware of Meta's changes and continued to reasonably rely on Meta's representations that its product was safe and Meta's continued distribution to children and teens. They had no reason to think that Meta was knowingly making and distributing harmful products to anyone, much less to kids. But in 2016, as Meta continued implementing more addictive and more harmful product features in its goal to increase engagement, everything changed for Alex and her parents.

168. It was also understood that Instagram wouldn't close your account for being under 13, you just had to say you were 13 when opening an account and could then put your real age in your bio. In fact, this is something many kids do even to this day. It was also understood that Instagram did not object to kids using more than one account, which made it easier to hide more personal content and the existence of secondary accounts from parents and family—which accounts Instagram and its young users refer to as FINSTAs (short for "fake Instagram").

169. In 2015 or 2016, Alex opened her second Instagram account, which account her parents did not know about.

170. Alex had as many as three Instagram accounts at any given time, and occasionally opened new accounts, for example, when she forgot her password and would get logged out. Having to open a new account was a hassle, but Instagram didn't verify email so kids, including Alex, often used fake emails or created email accounts solely for the purpose of opening secondary Instagram accounts. This made it difficult to retrieve passwords when accidentally logged out of an account and, on information and belief, Meta knew and this happens often, *i.e.* short lived multiple accounts resulting from the user not having access to the email used to sign up. In fact, Alex did not even open an email account, she simply typed random letters and added an @yahoo or @gmail, and Meta allowed her to open Instagram accounts anyway.

171. In 2016, Meta's algorithm exposed Alex to massive amounts of eating disorder and other unhealthy content, including pro-ana content, as well as social comparison product features. Alex began using Instagram more. She received recommendations for pro-ana groups and content

to follow and spent hours looking at that content. Alex started by eating healthier, then eating less and exercising more, fueled on by the images that Meta's algorithm bombarded her with in her Feed, Stories, and Explore. She began thinking that she wasn't good enough, and that she needed to look like the models she saw on Instagram.

172.     She also got anxious and depressed every time she tried to post something on her account, afraid that it wouldn't get enough likes and, as time went on, she began to feel worse and worse about herself. She obsessed over likes every time she posted. For example, if she posted one thing and received ten "likes" in a minute, then the next time she posted, if it received only five "likes" in a minute she would delete the post. It became a higher and higher bar for Alex to feel good about herself, and one that eventually was impossible to reach. Her day and her mood turned on those posts and how much people liked them, which eventually destroyed her confidence and self-esteem both on Instagram and in the world outside of Instagram.

173.     Her parents began noticing changes in August or September of 2016. Alex was always active in sports and dance, so regular exercise was typical for her. However, in the Fall of 2016 she started exhibiting symptoms of anxiety and began withdrawing from spending time with her friends. She went through phases of depression and her exercise routine became more and more extreme. At the same time, she started eating less which is when her parents realized something was going on – however, Alex told them everything was fine.



Jennifer, Alex, and Ben (September 3, 2016)

174. Alex would make up what she had eaten that day, so that her parents did not worry. She would take food out of wrappers and hide the food at the bottom of the garbage can, while putting the empty wrappers at the top. She would pretend to eat at dinner with her family, but then spit food into her napkin or feed it the family's dogs.

175. By November of 2016, Alex was noticeably thinner. She is 5 foot tall and went from about 110 pounds in mid-2016 to under 100 pounds in November 2016. Ben and Jennifer Martin took Alex to a doctor, and she was referred to a dietician.

176. They thought things were getting better, but Alex was not gaining weight. In fact, in the next month she lost more than another ten pounds and her parents took her to the emergency room in December 2016.



Alex (December 26, 2016)

177.    Alex's resting heart rate was in the 20s and the doctors told her parents that her heart was failing. Alex stayed in the hospital for 21 days, in the hopes that they could get her heart stronger. She was also diagnosed with anorexia at that time.

178.    When Alex was released from the hospital, in late December 2016, she began seeing a therapist and continued seeing a dietician. She also started keeping journals and set goals for the year to come. Her goals included (1) running a half marathon before the years' end so that she could "achieve something big," (2) making the high school dance team because "I love to dance," (3) continuing her 4.0 GPA in school so that she could "get a scholarship," (4) living in the moment so that she would be "more happy," (5) becoming closer to God because "he is the most important," (6) building stronger relationships with friends and meeting new people "so I'm not lonely," and (7) becoming better at photography "to get good at a new hobby."



179. However, by January of 2017 she still wouldn't eat. No matter how hard she tried, Alex could not stop comparing herself to the images Instagram's algorithm promoted, amplified, and bombarded her with, which she had come to think of as the norm and the way she was supposed to look, which meant not eating food. Whenever she tried to eat, Alex saw those images.

180. In January 2017, Alex's doctors told Ben and Jennifer that Alex required inpatient treatment immediately. There were no facilities in Kentucky, so they were referred to Veritas Collaborative in Durham, North Carolina. Veritas did not permit patients to have cell phones, which turned out to be much needed break for Alex. At first it was difficult. Alex felt like something was missing, but eventually it started to feel like a weigh lifted off her shoulders. She started to feel better, felt like she could think clearly again, and began to accept that what she was doing was unhealthy and that she needed to try to eat.

181. During this time, Alex's parents drove to North Carolina every other weekend and would stay in a hotel so that they could visit Alex, which caused them financial hardship.

182.    Then, in May 2017, Alex transitioned to outpatient care and her parents rented an apartment for five weeks for that purpose and so that they could stay with her during the transition. She was discharged home to Kentucky in June 2017, where she continued with intensive outpatient therapy and her dietician.



Alex, Ben, Christian, and Jennifer (June 4, 2017, post-discharge from Veritas Collaborative)

183.    Alex finally seemed to be doing better. She did not want to keep seeing the images Instagram pushed at her via her Instagram accounts, but it was a daily struggle to stay off Instagram. Several times Alex tried to stop using Instagram. She would delete the application from her phone then get it back then delete it and get it back again. She was afraid that no one would know who she was without Instagram, but she also knew that she felt better without Instagram.

184.    Alex also opened a "recovery" account during this time – which is an Instagram account she opened to try to focus on recovery from her eating disorder and connect with others who were in recovery. Instead, however, this account made things worse as Instagram kept sending her the same images, and the same harmful content and recommendations.

185. This went on for almost two years then, in May of 2019 Alex attempted to commit suicide by overdosing on pills.

186. Alex was hospitalized medically for ten days then transferred to Good Samaritan Psych Ward for two days, when her parents fought to bring her home. Leaving their daughter in the psychiatric facility was one of the most difficult things her parents ever had to do, and it pained them to see her there. They brought her home and continued to take her to therapy and other medical services but did not know what they could do to help her. None of this made sense.

187. In November 2019, Alex tried to commit suicide a second time, also with pills, and was admitted to Good Samaritan for five days. After that Alex got back in recovery, attended her therapist and dietician appointments, and started to get better … until she relapsed in May of 2020 and then started eating and purging (bulimia). After Ben and Jennifer found out about the bulimia, they got her admitted to a facility in Tennessee called Fairhaven, and she was admitted for inpatient treatment until sometime in July 2020.

188. Alex did not have access to Instagram at Fairhaven either. A few months after being released from Fairhaven, Alex made the difficult decision to delete her Instagram account for good, by deleting the account itself and not just the application on her phone.

189. Through her use of Instagram Alex also received explicit sexual communications and images from adult users and was messaged and solicited for sexual exploitive content and acts on numerous occasions by adult users of Instagram. These adult users are encouraged to use Instagram to sexually solicit and abuse minors due to Meta's refusal to verify identity and age for new users or implement feasible safeguards to protect minor users from receiving inappropriate sexual content.

190. At all times relevant, Meta knew that some of its Instagram users would become addicted to). Meta also knew that children and teenagers would be particularly susceptible, and Meta knew or should have known what an addiction like this would do those children and teenagers and their families.

191. Alex's social media use coincided with a steady, but severe, decline in her mental health. She was addicted to Instagram and could not stop using Instagram, even when the social

media product was directing increasing amounts of harmful content and amplifying that harmful content via Alex's Instagram accounts and product features. Specifically, Alex was repeatedly bombarded with and exposed to content recommended and/or made available to her by Meta, which increasingly included underweight models, unhealthy eating, and eating disorder content.

192.　From 2012 through 2015, Meta developed and implemented technologies and features designed to increase engagement (and its own profits) but which were harmful to users, including Alex Martin. This included but is not limited to things like new advertising features, which allowed advertisers to target Alex based on her age, location, gender, and other characteristics. Meta failed to exercise reasonable care to ensure that the advertisements were safe. Meta profited from its advertising practices and product features, while Alex was exposed to and harmed by harmful advertising content. For example,

　　　a.　Alex was only 12 when she opened her first Instagram account and, as such, was particularly vulnerable and the impact of her developing addiction to Instagram and the harmful content Instagram was amplifying was made worse as a result.

　　　b.　Meta designed its Instagram product to default minors to public profiles, exposing 12-year-old Alex to inappropriate sexual content and serving her up for access to complete strangers who Meta knew posed the risk of bullying and exploitation.

　　　c.　Instagram's product design, including things like search and explore and photo editing and filtering features, and Instagram's emphasis on advertiser content caused Alex to question her appearance and worth, and made her increasingly anxious and depressed.

193.　In 2016, Meta added several additional product features that Meta knew or should have known would be harmful to minor users of its Instagram product. For example,

　　　a.　In February 2016, Instagram started enabling users to easily switch between multiple accounts. Alex opened FINSTAs (secret Instagram accounts) and Meta exposed Alex to addictive design, harmful advertising, and other, Meta-backed content through those accounts too.

　　　b.　In February 2016, Instagram added view counters to videos, increasing the social

comparison harms already caused to Alex by Instagram.

c.   In March 2016, Meta switched its feed from chronological to algorithm-driven ordering. Alex no longer simply saw posts made by "friends" in the order they were made but, instead, Meta prioritized and escalated certain posts and content in Alex's Instagram feed. More specifically, it promoted and prioritized harmful content based on the determination that such content was more likely to keep Alex's attention, thereby increasing her use of its product and its resulting revenue. While Meta's prior product design was pushing constant social comparison and eating disorder content to Alex, the new design bombarded her with it and Alex's exposure to super thin models and eating disorder increased exponentially.

d.   In August and November 2016, Instagram implemented Stories and Live product features, respectively, which again increased Alex's exposure to harmful content, as well as her social pressure to participate and engage with Instagram.

e.   In December 2016, Instagram implemented the ability to mark comments as liked, which was initially available only on the mobile application, which is how Alex accessed Instagram most of the time by 2016—via her cell phone. The "like" feature was particularly harmful to young users, as Meta discovered, and this product feature resulted in increased feelings of depression, anxiety, and low self-worth.

194.   The more Alex accessed and used the Instagram social media product, the worse her mental and physical health became, which eventually included a life-threatening eating disorder and two suicide attempts.

195.   Alex had always been slender but after Instagram's algorithm and design started pushing extreme weight loss content and bulimia purging instructions and recommending pages featuring excessively thin models, Alex became obsessed with her weight and, at one point, weighed less than 80 pounds. At one point, Alex's Explore page was filled with nothing but overly thin models and thigh gaps.

196.   Meta amplified and pushed Alex toward harmful content through various

recommendation mechanisms built into its Instagram product. For example, Meta sent Alex recommendations to eating disorder themed pages and groups. Meta also sent Alex recommendations for "friends" who were, in fact, adult Instagram users either suffering from these mental health issues themselves or using the Instagram product to find and exploit young girls; and, likewise, Meta recommended Alex to these same types of adult users, who then sought to connect with her. These product features are harmful to a significant percentage of Instagram users, particularly teens and young women

197.    Meta also harmed Alex through specific product features like direct messaging and group chat. For example, Instagram's Direct Message and group chat features allowed adult users to message Alex directly. These product features are harmful to a significant number of underage users. They also are not necessary to Instagram's operation and are features Meta can restrict and/or disable – but Meta makes calculated and economic-based decisions to keep them in place because Meta knows that restricting or disabling them would negatively impact engagement.

198.    Meta was providing Alex with constant, harmful access to multiple Instagram accounts, and had designed and was operating Instagram in a manner that ensured that there was nothing Alex's parents could do to protect her – in fact, her parents did not even know the source of the harm, nor could they have discovered it given the degree to which Meta was concealing its findings from the public. Meta did not disclose the fact of its addictive design and its own efforts to addict young children and what it was learning about the harm its specific product features were causing to children and teens—the precise types of harms that were now happening to Alex because of Instagram.

199.    Alex's parents had no way to determine Instagram's role in Alex's ongoing battle with severe depression, anxiety, self-harm, and eating disorders.

200.    Alex, once an A student, struggled to graduate from high school. She spent some of her high school years doing on-line school because of her treatment, as well as alternative school. Then she almost did not graduate due to a class she was failing, which she was able to test out of just before graduation. But also, Alex lost her lifelong friendships. She began pulling away from those friends when her eating disorders became known and they from her. Her friends did

not know how to help her and felt powerless and scared, as did Alex.

201.    Alex did graduate from high school, in May of 2021, and started at University of Kentucky in August 2021. Alex had dreamed of running in college, but that was no longer an option. She had stopped with sports in high school and for long periods could not participate in sports because of her eating disorder. She lost significant stamina and strength and began suffering from severe social anxiety. Where Alex was once outgoing, she began having difficulty going to the grocery store. She also no longer thought about the future and what she wanted to be when she grew up. Her life became a day-to-day struggle to survive, as it had become for her parents who were there with her every step of the way.

202.    Alex did not get scholarships and is not on track for a career in health care, but she is in school and, being Instagram-free for the last year, she got a 3.7 GPA her first year of college.

203.    She also now struggles with social interactions, especially ones that involve meals, and while she tries to make plans with colleagues, those often fall through due to the anxiety and fear Alex feels when trying to navigate social situations.

204.     Alex is aware of the challenges ahead and works hard every day to not slip back into her eating disorder.

205.    Alex's addiction and resulting mental health disorders were the proximate result of the unreasonably dangerous Instagram product Meta made accessible to her and that she used. As set forth in detail below, Meta's products were not reasonably safe due to their defective design and inadequate warnings.

206.    To this day, Meta has actively concealed the fact and has "sought to stonewall and block this information [information about the dangerousness of their products, especially to young users] from becoming public."[28] Meta "intentionally"[29] hid vital information in its possession from the public, the US government, and governments, including information relating to the safety of children and the role of its algorithms and other Instagram product features in causing addiction, depression, anxiety, eating disorders, and other harms.

---

[28] October 5, 2021, Senate Hearing Transcript, Mr. Chairman Blumenthal at 00:05:21.

[29] Id. at 00:29:25.

207.    Meta made false statements to the press and public, designed to cover up the inherent dangers of their products and, even when asked direct questions as to how those products "impact the health and safety of our children, they choose to mislead and misdirect."[30]

208.    Plaintiffs did not discover, or in the exercise of reasonable diligence could not have discovered, that Alex's addiction, depression, anxiety, eating disorders, attempted suicides, and other harms were caused by Meta's unreasonably dangerous products until June of 2022, when they saw Alexis Spence and Kathleen Spence on the news talking about the harms suffered by Alexis Spence due to Instagram.

209.    Alex disaffirms all contracts Instagram may purport to have with her and does not currently have an Instagram account.

210.     As a result of Alex Martin's social media addiction and the harmful content and features Instagram relentlessly promoted and provided to her in its effort to increase engagement, she had to undergo professional counseling, inpatient programs, outpatient programs, and eating disorder programs.

211.    Alex must stay in constant contact with doctors and dieticians, fights to stay in recovery every day, and will suffer permanent mental and emotional damages because of what Instagram has done. Long term physical damage is also likely, and Alex suffers from lapses in her memory during her periods of illness.

212.    These harms are a direct and proximate result of the social media addiction Instagram fostered and encouraged for its own financial gain and harms that resulted therefrom.

213.    But also, Alex's parents have suffered medical conditions as a direct result of the social media addiction Instagram fostered and encouraged for its own financial gain and harms that resulted therefrom. This includes blood pressure mediation Jennifer Martin was put on while Alex was at Veritas and for stress-related high blood pressure, as well as a second anxiety medication she was prescribed in 2020 just after Alex relapsed. Likewise, in 2020 and amidst Alex's relapse, Ben Martin was prescribed anxiety medication. Both of her parents have done everything they can to help keep Alex alive, and what the Instagram product has done to their

---

[30] October 5, 2021, Senate Hearing Transcript, Ms. Francis Haugen, at 00:32:20.

daughter has taken an incredible emotional, financial, and physical toll on their lives, as one would expect and as Meta could and should have anticipated.

## VI.     PLAINTIFFS' CLAIMS

### COUNT I - STRICT PRODUCT LIABILITY (Design Defect)

214.     Plaintiffs reallege each and every allegation contained in paragraphs 1 through 213 as if fully stated herein.

215.     Meta's product is defective because the foreseeable risks of harm posed by the product's design could have been reduced or avoided by the adoption of a reasonable alternative design by Meta and the omission of the alternative design renders the product not reasonably safe. This defective condition rendered the product unreasonably dangerous to persons or property and existed at the time the product left the Meta's control, reached the user or consumer without substantial change in the condition and its defective condition was a cause of Plaintiffs' injury.

216.     Meta designed, manufactured, marketed, and sold a social media product that was unreasonably dangerous because it was designed to be addictive to the minor users to whom Meta actively marketed and because the foreseeable use of Meta's product causes mental and physical harm to minor users.

217.     Meta's product was unreasonably dangerous because it contained numerous design characteristics that are not necessary for the utility provided to the user but are unreasonably dangerous and implemented by Meta solely to increase the profits they derived from each additional user and the length of time they could keep each user dependent on its product.

## A.     Inadequate Safeguards From Harmful and Exploitative Content

218.     As designed, Instagram algorithms and other product features are not reasonably safe because they affirmatively direct minor users to harmful and exploitative content while failing to deploy feasible safeguards to protect vulnerable teens from such harmful exposures. It is feasible to design an algorithm that substantially distinguishes between harmful and innocuous content and protects minor users from being exposed to harmful content without altering, modifying, or deleting any third-party content posted on Meta's social media product. The cost of designing Meta's algorithms to incorporate this safeguard would be negligible while benefit would be high

in terms of reducing the quantum of mental and physical harm sustained by minor users and their families.

219.    Meta also engages in conduct, outside of the algorithms themselves, that is designed to promote harmful and exploitative content as a means of increasing its revenue from advertisements. This includes but is not limited to efforts to encourage advertisers to design ads that appeal to minors, including children under the age of 13; and product design features intended to attract and engage minor users to these virtual spaces where harmful ad content is then pushed to those users in a manner intended to increase user engagement, thereby increasing revenue to Meta at the direct cost of user wellbeing.

220.    Reasonable users (and their parents) would not expect that Meta's product would knowingly expose them to such harmful content and/or that Meta's product would direct them to harmful content at all, much less in the manipulative and coercive manner that they do. Meta has and continues to knowingly use its algorithms on users in a manner designed to affirmatively change their behavior, which methods are particularly effective on (and harmful to) Meta's youngest users, like Alex Martin.

**B.    Failure to Verify Minor Users' Age and Identity**

221.    As designed, Meta's product is not reasonably safe because they do not provide for adequate age verification by requiring users to document and verify their age and identity.

222.    Adults frequently set up user accounts on Meta's social media product posing as minors to groom unsuspecting minors to exchange sexually explicit content and images, which frequently progresses to sexual exploitation and trafficking.

223.    Minor users of social media and their parents do not reasonably expect that prurient adults set up fraudulent accounts on Meta's social media product and pose as minors for malign purposes.

224.    Likewise, minor users who are under the age of 13 and/or whose parents have taken affirmative steps to keep them away from Meta's product often open multiple accounts, such that Meta knows or has reason to know that the user is underage and/or does not have parental permission to use its product. Meta already has the information and means it needs to ascertain

with reasonable certainty each user's actual age and, at least in some cases, Meta utilizes these tools to investigate, assess, and report on percentages and totals of underage users for internal assessment purposes. They simply choose to do nothing about that information as it relates to the specific, underaged users themselves.

225. By way of example only, Meta has dashboards that enable it to identify and track every detail of user activity by date, location, and age—not the age provided to Meta upon account opening, but rather, "Age prediction" technologies Meta has developed and that can determine age with reasonable certainty based on user data, online activity, and/or similar sources of information Meta collects with regard to every Meta user on a constant and ongoing basis.

226. Again, Meta exercises an unprecedented level of control over its users and possesses and unprecedented level of knowledge—including the estimated actual age of each user, irrespective of what a user states when opening an account. Meta cannot, in good faith, disclaim knowledge or responsibility for the harms its social media product is causing, including the harms it caused to Alex Martin and that are at issue in this Complaint.

227. Moreover, reasonably accurate age and identity verification is not only feasible but widely deployed by online retailers and internet service providers.

228. The cost of incorporating age and identify verification into Meta's product would be negligible, whereas the benefit of age and identity verification would be a substantial reduction in severe mental health harms, sexual exploitation, and abuse among minor users of Meta's product.

**C. Inadequate Parental Control and Monitoring**

229. Meta's product is also defective for lack of parental controls, permission, and monitoring capability available on many other devices and applications.

230. Meta's product is designed with specific product features intended to prevent and/or interfere with parents' reasonable and lawful exercise of parental control, permission, and monitoring capability available on many other devices and applications.

**D.   Intentional Direction of Minor Users to Harmful and Exploitative Content**

231.   Default "recommendations" communicated to new teenage users, including Alex Martin, purposefully steered her toward content Meta knew to be harmful to children of her age and gender.

232.   Ad content pushed to new teenage users, including Alex Martin, because of their age and vulnerability, purposefully steer those users toward content Meta knows to be harmful to children of their age and gender.

**E.   Inadequate Protection of Minors from Sexual Exploitation and Abuse**

233.   Meta's product is not reasonably safe because it does not protect minor users from sexually explicit content and images or report sex offenders to law enforcement or allow users' parents to readily report abusive users to law enforcement.

234.   Parents do not expect their children will use Meta's product to exchange sexually explicit content and images, and minor users do not expect that prurient adults pose as minors for malign purposes or that exchange of such content will be deleterious to their personal safety and emotional health.

235.   Minor users of Meta's product lack the cognitive ability and life experience to identify online grooming behaviors by prurient adults and lack the psychosocial maturity to decline invitations to exchange salacious material.

236.   Meta's product is unreasonably dangerous and defective as designed because it allows minor children to use "public" profiles, in many cases default "public" profiles, that can be mass messaged by anonymous and semi-anonymous adult users for the purposes of sexual exploitation, and grooming, including the sending of encrypted, disappearing messages and cash rewards through Meta's integrated design features.

**F.   Design of Addictive Social Media Products**

237.   As designed, Meta's social media product is addictive to minor users as follows: When minors use design features such as "likes" it cause their brains release dopamine which creates short term euphoria. However, as soon as dopamine is released, minor users' brains adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated and their

euphoria is countered by dejection. In normal stimulatory environments, this dejection abates, and neutrality is restored. However, Meta's algorithms are designed to exploit users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria. As this pattern continues over a period of months and the neurological baseline to trigger minor users' dopamine responses increases, they continue to use Instagram, not for enjoyment, but simply to feel normal. Once they stop using Instagram, minor users experience the universal symptoms of withdrawal from any addictive substance including anxiety, irritability, insomnia, and craving.

238.    Addiction is not restricted to a substance abuse disorders. Rather, the working definition of addiction promulgated in the seminal article *Addictive behaviors: etiology and Treatment* published by the American Psychological Association in its 1988 *Annual Review of Psychology* defines addiction as,

> a repetitive habit pattern that increases the risk of disease and/or associated personal and social problems. Addictive behaviors are often experienced subjectively as 'loss of control' – the behavior contrives to occur despite volitional attempts to abstain or moderate use. These habit patterns are typically characterized by immediate gratification (short term reward), often coupled with delayed deleterious effects (long term costs). Attempts to change an addictive behavior (via treatment or self-initiation) are typically marked with high relapse rates.

239.    Addiction researchers agree that addiction involves six core components: (1) salience—the activity dominates thinking and behavior; (2) mood modification—the activity modifies/improves mood; (3) tolerance—increasing amounts of the activity are required to achieve previous effects; (4) withdrawal—the occurrence of unpleasant feelings when the activity is discontinued or suddenly reduced; (5) conflict—the activity causes conflicts in relationships, in work/education, and other activities; and (6) relapse—a tendency to revert to earlier patterns of the activity after abstinence or control.

240.    Social media addiction has emerged as a problem of global concern, with researchers all over the world conducting studies to evaluate how pervasive the problem is. Addictive social media use is manifested when a user (10 becomes preoccupied by social media (salience); (2) uses social media in order to reduce negative feelings (mood modification); (3) gradually uses social media more and more in to get the same pleasure from it (tolerance/craving);

(4) suffers distress if prohibited from using social media (withdrawal); (5) sacrifices other obligations and/ or cases harm to other important life areas because of their social media use (conflict/functional impairment); and (6) seeks to curtail their use of social media without success (relapse/loss of control).

241.    The Bergen Facebook Addiction Scale (BFAS) was specifically developed by psychologists in to assess subjects' social media use using the aforementioned addiction criteria and is by far the most widely used measure of social media addiction. Originally designed for Facebook, BFAS has since been generalized to all social media. BFAS has been translated into dozens of languages, including Chinese, and is used by researchers throughout the world to measure social media addiction.

242.    BFAS asks subjects to consider their social media usage with respect to the six following statements and answer either (1) very rarely, (2) rarely, (3) sometimes, (4) often, or (5) very often,

      a.    You spend a lot of time thinking about social media or planning how to use it .

      b.    You feel an urge to use social media more and more.

      c.    You use social media in order to forget about personal problems.

      d.    You have tried to cut down on the use of social media without success.

      e.    You become restless or troubled if you are prohibited from using social media.

      f.    You use social media so much that it has had a negative impact on your job/studies.

Subjects who score a "4" or "5" on at least 4 of those statements are deemed to suffer from social media addiction

243.    Addictive use of social media by minors is psychologically and neurologically analogous to addiction to internet gaming disorder as described in the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5), which is used by mental health professionals to diagnose mental disorders. Gaming addiction is a recognized mental health disorder by the World Health Organization and International Classification of Diseases and is functionally and psychologically equivalent to social media addition. The diagnostic symptoms of social media addiction among minors are the same as the symptoms of

addictive gaming promulgated in DSM 5 and include:

244. Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when the device is taken away or access is not possible (sadness, anxiety, irritability), including,

    a. Tolerance, the need to spend more time using social media to satisfy the urge.

    b. Inability to reduce social media usages, unsuccessful attempts to quit gaming.

    c. Giving up other activities, loss of interest in previously enjoyed activities due to social media usage.

    d. Continuing to use social media despite problems.

    e. Deceiving family members or others about the amount of time spent on social media.

    f. The use of social media to relieve negative moods, such as guilt or hopelessness.

    g. Jeopardized school or work performance or relationships due to social media usage.

245. Meta's advertising profit is directly tied to the amount of time that its users spend online, and its algorithms and other product features are designed to maximize the time users spend using the product by directing them to content that is progressively more and more stimulative. Meta enhances advertising revenue by maximizing users' time online through a product design that addicts them to the platform. However, reasonable minor users and their parents do not expect that on-line social media platforms are psychologically and neurologically addictive.

246. It is feasible to make Meta's product less addictive to minor users by limiting the frequency and duration of access and suspending service during sleeping hours.

247. At negligible cost, Meta could design software that limits the frequency and duration of minor users' screen use and suspends service during sleeping hours; the benefit of minor users maintaining healthy sleep patterns would be a significant reduction in depression, attempted and completed suicide and other forms self-harm among this vulnerable age cohort.

**G.    Inadequate Notification of Parents of Dangerous and Problematic Social Media Usage by Minor Users**

248.    Meta's product is not reasonably safe as designed because it does not include any safeguards to notify users and their parents of usage that Meta knows to be problematic and likely to cause negative mental health effects to users, including excessive passive use and use disruptive of normal sleep patterns. This design is defective and unreasonable because:

249.    It is reasonable for parents to expect that social media companies that actively promote their platforms to minors will undertake reasonable efforts to notify parents when their child's use becomes excessive or occurs during sleep time. It is feasible for Meta to design a product that identifies a significant percentage of its minor users who are using the product more than three hours per day or using it during sleeping hours at negligible cost.

250.    Meta's product is not reasonably safe as designed because, despite numerous reported instances of child sexual solicitation and exploitation by adult users, Meta has not undertaken reasonable design changes to protect underage users from this abuse, including notifying parents of underage users when they have been messaged or solicited by an adult user or when a user has sent inappropriate content to minor users.

251.    Meta's entire business is premised upon collecting and analyzing user data and it is feasible to use Meta's data and algorithms to identify and restrict improper sexual solicitation, exploitation, and abuse by adult users.

252.    Moreover, it is reasonable for parents to expect that platforms such as Instagram, which actively promote its services to minors, will undertake reasonable efforts to identify users suffering from mental injury, self-harm, or sexual abuse and implement technological safeguards to notify parents by text, email, or other reasonable means that their child is in danger.

253.    As a proximate result of these dangerous and defective design attributes of Meta's product, Alex Martin suffered severe mental harm. Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, of these defective design in Meta's product until 2022.

254.    As a result of these dangerous and defective design attributes of Meta's product, Plaintiffs Ben and Jennifer Martin, have suffered emotional distress and pecuniary hardship due

to their daughter's mental harm resulting from her social media addiction.

255.    Meta is further liable to Plaintiffs for punitive damages based upon the willful and wanton design of its product that was intentionally marketed and sold to underage users, whom they knew would be seriously harmed through their use of Instagram.

### COUNT II – STRICT PRODUCT LIABILITY (Failure to Warn)

256.    Plaintiffs reallege each and every allegation contained in paragraphs 1 through 255 as if fully stated herein.

257.    Meta's product is defective because of inadequate instructions or warnings because the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the manufacturer and the omission of the instructions or warnings renders the product not reasonably safe. This defective condition rendered the product unreasonably dangerous to persons or property, existed at the time the product left Meta's control, reached the user or consumer without substantial change in the condition in which it was sold, and was a cause of Plaintiffs' injury.

258.    Meta's product is unreasonably dangerous and defective because it contains no warning to users or parents regarding the addictive design and effects of Instagram.

259.    Meta social media product relies on highly complex and proprietary algorithms that are both undisclosed and unfathomable to ordinary consumers, who do not expect that social media platforms are physically and/or psychologically addictive.

260.    The magnitude of harm from addiction to Meta's product is horrific, ranging from simple diversion from academic, athletic, and face-to-face socialization to sleep loss, severe depression, anxiety, self-harm, and suicide.

261.    The harms resulting from minors' addictive use of social media platforms have been not only well-documented in the professional and scientific literature, but Meta had actual knowledge of such harms.

262.    Meta's product is unreasonably dangerous because it lacks any warnings that foreseeable product use can disrupt healthy sleep patterns or specific warnings to parents when their child's product usage exceeds healthy levels or occurs during sleep hours. Excessive screen

time is harmful to adolescents' mental health and sleep patterns and emotional well-being. Reasonable and responsible parents are not able to accurately monitor their child's screen time because most adolescents own or can obtain access to mobile devices and engage in social media use outside their parents' presence.

263.    It is feasible for Meta's product to report the frequency and duration of their minor users' screen time to their parents without disclosing the content of communications at negligible cost, whereas parents' ability to track the frequency, time and duration of their minor child's social media use are better situated to identify and address problems arising from such use and to better exercise their rights and responsibilities as parents.

264.    Meta knew about these harms, knew that users and parents would not be able to safely use its product without warnings, and failed to provide warnings that were adequate to make the product reasonably safe during ordinary and foreseeable use by children.

265.    As a result of Meta's failure to warn, Alex Martin suffered severe mental harm, leading to physical injury from her use of Instagram.

266.    As a result of Meta's failure to warn, Plaintiffs Ben and Jennifer Martin, have suffered emotional distress and pecuniary hardship due to their daughter's mental harm resulting from social media addiction.

267.    Meta is further liable to Plaintiffs for punitive damages based upon its willful and wanton failure to warn of known dangers of its product that was intentionally marketed and sold to teenage users, whom they knew would be seriously harmed through their use of Instagram.

## COUNT III – NEGLIGENCE

268.    Plaintiffs reallege each and every allegation contained in paragraphs 1 through 267 as if fully stated herein.

269.    At all relevant times, Meta had a duty to exercise reasonable care and caution for the safety of individuals using its product, such as Alex Martin.

270.    Meta owes a heightened duty of care to minor users of its social media product because adolescents' brains are not fully developed, which results in a diminished capacity to make good decisions regarding their social media usages, eschew self-destructive behaviors, and

overcome emotional and psychological harm from negative and destructive social media encounters.

271.    As a product manufacturer marketing and selling products to consumers, Meta owed a duty to exercise ordinary care in the manufacture, marketing, and sale of its product, including a duty to warn minor users and their parents of hazards that Meta knew to be present, but not obvious, to underage users and their parents.

272.    As a business owner, Meta owes its users who visit Meta's social media platform and from whom Meta's derive billions of dollars per year in advertising revenue a duty of ordinary care substantially similar to that owed by physical business owners to its business invitees.

273.    Meta was negligent, grossly negligent, reckless and/or careless in that they failed to exercise ordinary care and caution for the safety of underage users, like Alex Martin using its Instagram product.

274.    Meta was negligent in failing to conduct adequate testing and failing to allow independent academic researchers to adequately study the effects of its product and levels of problematic use amongst teenage users. Meta has extensive internal research indicating that its product is harmful, causes extensive mental harm and that minor users are engaging in problematic and addictive use that their parents are helpless to monitor and prevent.

275.    Meta is negligent in failing to provide adequate warnings about the dangers associated with the use of social media products and in failing to advise users and their parents about how and when to safely use its social media platform and features.

276.    Meta is negligent in failing to fully assess, investigate, and restrict the use of Instagram by adults to sexually solicit, abuse, manipulate, and exploit minor users of its Instagram product.

277.    Meta is negligent in failing to provide users and parents the tools to ensure its social media product is used in a limited and safe manner by underage users.

278.    As a result of Meta's negligence, Alex Martin suffered severe mental harm from her use of Instagram.

279.    As a result of Meta's negligence, Plaintiffs Ben and Jennifer Martin have suffered

emotional distress and pecuniary hardship due to their daughter's mental harm resulting from social media addiction.

280.    Meta is further liable to Plaintiffs for punitive damages based upon its willful and wanton conduct toward underage users, including Alex Martin, whom they knew would be seriously harmed through the use of its social media product.

## COUNT IV - VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW
### (Cal. Bus. & Prof. Code §§ 17200, *et seq.*)

281.    Plaintiff realleges each and every allegation contained in paragraphs 1 through 280 as if fully stated herein.

282.    Defendant Meta is a corporation, and thus a "person," as defined by California Business & Professions Code § 17201.

283.    The UCL prohibits all conduct that is unlawful, unfair, or fraudulent.

284.    Defendant's conduct is unlawful as set forth in Counts I–III, above.

285.    Defendant's conduct is unlawful also because it has knowledge of users under the age of 13 on its platform and, in fact, actively targets, markets to, and encourages use of its social media product by minors under the age of 13

286.    Defendant engaged in fraudulent and deceptive business practices in violation of the UCL by promoting products to underage users, including Alex Martin, while concealing critical information regarding the addictive nature and risk of harm these products pose. Defendant knew and should have known that its statements and omissions regarding the addictive and harmful nature of its product were misleading and therefore likely to deceive the members of the public who use Defendant's product and who permit their underage children to use Defendant's product. Had Ben and Jennifer Martin known of the dangerous nature of Defendant's product, they would have taken early and aggressive steps to stop or limit their daughter's use of Defendant's product.

287.    Defendant's practices are unfair and violate the UCL because they offend established public policy, and because the harm these practices cause to consumers greatly outweighs any benefits associated with them.

288.    Defendant's conduct has resulted in substantial injuries that Plaintiffs could not

reasonably have avoided because of Defendant's deceptive conduct. This substantial harm is not outweighed by any countervailing benefits to consumers or competition.

289.    As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits, which it would not have received if it had not engaged in the violations of the UCL described herein. As a direct and proximate result of the foregoing acts and practices, Defendant has also obtained an unfair advantage over similar businesses that have not engaged in such practices.

290.    As a result of Defendant's UCL violations, Plaintiffs have suffered injury in fact and lost money as set forth herein.

291.    Accordingly, Plaintiffs seek injunctive and equitable relief to halt and remedy Defendant's unlawful, fraudulent, and unfair conduct.

### COUNT V – UNJUST ENRICHMENT

292.    Plaintiff realleges each and every allegation contained in paragraphs 1 through 291 as if fully stated herein.

293.    As a result of Defendant's conduct detailed herein, Defendant received a benefit. Because Defendant's advertising profits are directly tied to the number of user accounts and the amount of time those users spend on Instagram, Defendant benefited directly from Alex Martin's problematic use of its product, both from the amount of time she spent on Instagram and from her creation of multiple Instagram accounts.

294.    It would be unjust and inequitable for Defendant to retain the ill-gotten benefits at Plaintiffs' expense, in light of Defendant's acts and omissions described herein.

295.    Accordingly, Plaintiffs seek damages in an amount to be proven at trial.

### COUNT VI – INVASION OF PRIVACY

### (California Constitutional Right to Privacy, Cal. Const. Art. 1, § 1)

296.    Plaintiff realleges each and every allegation contained in paragraphs 1 through 295 as if fully stated herein.

297.    Defendant intentionally intruded upon Plaintiffs' solitude, seclusion, or private affairs by knowingly designing its product with features that were intended to, and did, frustrate

Case: 1:22-cv-03098 Document #: 1 Filed: 08/04/22 Page 75 of 315 PageID #:426

parents' ability to monitor and control their children's social media usage.

298.    These intrusions are highly offensive to a reasonable person, particularly given Defendant's interference with the fundamental right of parenting and its exploitation of children's special vulnerabilities for commercial gain.

299.    Plaintiffs were harmed by Defendant's invasion of privacy, as detailed herein.

300.    Plaintiffs therefore seek compensatory and punitive damages in amounts to be determined at trial, as well as injunctive relief requiring Defendant to cease the harmful practices described throughout this complaint.

### COUNT VII – FRAUD and FRAUDULENT CONCEALMENT

301.    Plaintiff realleges each and every allegation contained in paragraphs 1 through 300 as if fully stated herein.

302.    At all times relevant, Meta designed, developed, operated, marketed, made publicly available, and benefitted from its Instagram social media product and therefore owed a duty of reasonable care to avoid causing harm to those that it used it.

303.    Defendants marketing, promotions, and advertisements contained deceptive and/or misleading statements, implications, images, and portrayals that the Instagram product was safe, improved social connectivity, and improved the mental and physical health of its users. For example, in April of 2018, Meta CEO Mark Zuckerberg testified under oath to Congress that Meta does not design its products to be addictive and that he is not concerned with social media addiction as it relates to teens. He stated,

> I view our responsibility as not just building services that people like but as building services that are good for people and good for society as well … we study a lot of effects of well-being, of our tools, and broader technology, and like any tool there are good and bad uses of it. What we find in general is that if you are using social media to build relationships then that is associated with all the long term measures of well-being that you'd intuitively think of … but if you are using the internet and social media to just passively consume content and are not engaging with other people then it doesn't have those positive effects and it could be negative.[31]

304.    In November of 2020, Meta CEO Mark Zuckerberg again testified under oath to

---

[31] https://www.youtube.com/watch?v=AB4mB-K7-xY

Congress that Meta does not design its products to be addictive and that research on addictiveness of social media has not been conclusive.[32]

305.    In March of 2021, Meta CEO Mark Zuckerberg testified under oath to Congress that Instagram is not addictive and that it does not cause harm to children and teens.[33]

306.    On September 30, 2021, Meta's Head of Safety, Antigone Davis, testified under oath to Congress that Instagram is not addictive[34] and repeatedly denied the existence of causal research regarding harms to teens from Instagram use and testified that Meta's overreaching goal is child safety: "We work tirelessly to put in place the right policies, products, and precautions so [young users] have a safe and positive experience."[35]

307.    On December 8, 2021, Instagram's president Adam Mosseri provided written testimony and testified under oath to Congress that Instagram is not addictive[36] and he downplayed the significance of the documents disclosed by the Facebook Whistleblower, characterizing Meta's numerous studies as involving input from small numbers of teens and not measuring "causal relationships between Instagram and real-world issues."[37] He testified that Meta's overarching goal is child safety.[38]

308.    Meta's Terms of Use also represent that Meta is "Fostering a positive, inclusive, and safe environment," and represent that Meta uses its "teams and systems … to combat abuse and violations of our Terms and policies, as well as harmful and deceptive behavior. We use all the information we have—including our information—to try to keep our platform secure."

---

[32] https://www.tampafp.com/great-news-facebook-is-not-designed-to-be-addictive-according-to-zuckerberg/

[33] https://www.congress.gov/117/meeting/house/111407/documents/HHRG-117-IF16-Transcript-20210325.pdf, at p. 67, 107, 175.

[34] https://www.rev.com/blog/transcripts/facebook-head-of-safety-testimony-on-mental-health-effects-full-senate-hearing-transcript ("Sept. 30, 2021, Senate Hearing Transcript"), at 2:06:35; *see also id.* at 02:07:44 and 02:07:59 (Ms. Davis also denied that Meta's business model includes getting users engaged for longer amounts of time).

[35] *Id.* at 24:58, 01:47:29, 1:48:07, 1:48:20, 2:10:47, 33:46, and 40:41.

[36] https://www.commerce.senate.gov/2021/12/protecting-kids-online-instagram-and-reforms-for-young-users, recording of December 8, 2021 Senate Hearing.

[37] https://www.commerce.senate.gov/services/files/3FC55DF6-102F-4571-B6B4-01D2D2C6F0D0, written Testimony of Adam Mosseri, Head of Instagram, dated December 8, 2021.

[38] https://www.npr.org/2021/12/08/1062576576/instagrams-ceo-adam-mosseri-hears-senators-brush-aside-his-promises-to-self-poli

309.   The above statements are indicative and reflective of the deceptive and/or misleading statements Meta has been feeding to the public for years in order to convince people that its products were safe for use by teenagers, like Alex Martin. When in fact, Meta knew that its products were not safe. Meta knew that its products are addictive and harmful to a significant portion of users, including teen girls, like Alex Martin.

310.   Meta's public statements and other marketing and advertising materials failed to disclose the truth, in fact, Meta has gone to considerable lengths to conceal the truth. This includes creating a corporate culture that convinced thousands of Meta employees that if they went public with what they knew they would lose their careers, no one would believe them, and that Meta would then lock down internal communications in a manner that would make it impossible for the employees left behind to work toward effectuating change from the inside. When in fact, Meta never intended to allow change from the inside. It intended to pursue engagement and growth at the expense of human lives and did everything it could to hide these facts from the world.

311.   Meta lied about the harm its products are causing.

312.   Meta's omissions were also misleading and deceptive in every respect, for example, talking about how Instagram makes some users' lives better and ignoring the fact that Instagram is causing serious harms to other users, including but not limited to what Meta calls SSI, Suicide and Self-Injury. Meta failed to disclose, and spent years actively concealing, the fact that its social media products cause addiction, sleep deprivation, anxiety, depression, anger, eating disorders, self-harm, suicidal ideation, and suicide, among other harms.

313.   These representations were false and material, as were Meta's omissions. These representations were communicated to Plaintiffs via the media, the internet, advertising, websites, and the platforms themselves and Plaintiffs reasonably relied on these representations to their detriment. Meta intended for members of the public, including plaintiffs, to rely on these misrepresentations and omissions, and Plaintiffs did, and these misrepresentations and omissions were a substantial factor in causing Plaintiffs' harm.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demands a trial by jury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs prays for judgment against Meta for monetary damages for the following harm:

1. Past physical and mental pain and suffering of Alex Martin, in an amount to be more readily ascertained at the time and place set for trial.

2. Loss of future income and earning capacity of Alex Martin.

3. Past and future medical expenses of Alex Martin.

4. Past physical and mental pain and suffering of Ben and Jennifer Martin, in an amount to be more readily ascertained at the time and place set for trial.

5. Monetary damages suffered by Ben and Jennifer Martin.

6. Punitive damages.

7. For the reasonable costs and attorney and expert/consultant fees incurred in this action.

8. For injunctive relief.

9. For such other and further relief as this Court deems just and equitable.

1    DATED this 25th day of July 2022.

2                            SOCIAL MEDIA VICTIMS LAW CENTER

3                            PLLC

4                By:_____

5                            Laura Marquez-Garrett, SBN 221542
laura@socialmediavictims.org

6                            Matthew Bergman
matt@socialmediavictims.org

7                            Glenn Draper
glenn@socialmediavictims.org

8                            821 Second Avenue, Suite 2100
Seattle, WA 98104

9                            Telephone: (206) 741-4862
Facsimile: (206) 957-9549

10

11                        SEEGER WEISS LLP

12                        Christopher A. Seeger
cseeger@seegerweiss.com

13                      Christopher Ayers
cayers@seegerweiss.com

14                      55 Challenger Road
Ridgefield Park, NJ 07660

15                      Telephone: 973-639-9100
Facsimile: 973-679-8656

16

17                      Robert H. Klonoff
klonoff@usa.net

18                      2425 S.W. 76th Ave.
Portland, Oregon 97225

19                      Telephone: (503) 702-0218
Facsimile: (503) 768-6671

20

21                      Attorneys for Plaintiffs

22

23

24

25

26

27

28

# Exhibit A-5

Laura Marquez-Garrett, SBN 221542
laura@socialmediavictims.org
SOCIAL MEDIA VICTIMS LAW CENTER
1390 Market St, Suite 200
San Francisco, CA 94102
Ph: 206-294-1348

Attorney For Plaintiffs

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

|  |  |
|---|---|
| BRANDY ROBERTS and TONEY ROBERTS, individually, and BRANDY ROBERTS, as the Personal Representative of the Estate of Englyn Roberts, | CIVIL ACTION NO. |
| Plaintiff, | COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP |
| v. |  |
| META PLATFORMS, INC., formerly known as FACEBOOK, INC.; SNAP, INC.; TIKTOK, INC.; and BYTEDANCE, INC., | JURY DEMAND |
| Defendants. |  |

"In these digital public spaces, which are privately owned and tend to be run for profit, there can be tension between what's best for the technology company and what's best for the individual user or for society. Business models are often built around maximizing user engagement as opposed to safeguarding users' health and ensuring that users engage with one another in safe and healthy ways. . . ."

*Protecting Youth Mental Health,* The U.S. Surgeon General's Advisory (December 7, 2021)

Plaintiffs Brandy Roberts and Toney Roberts, individually, and Brandy Roberts, as the Personal Representative of the Estate of Englyn Roberts, brings this action against Meta Platforms, Inc., formerly known as Facebook, Inc. ("Meta"), doing business as Instagram ("Instagram"), Snap, Inc., doing business as Snapchat ("Snapchat"), TikTok, Inc. and ByteDance, Inc. (collectively, "TikTok") and alleges as follows:

## I.     INTRODUCTION

### A.     Plaintiffs' Claims

1.     This product liability action seeks to hold Defendants' products responsible for causing and contributing to burgeoning mental health crisis perpetrated upon the children and teenagers of the United States by Defendants and, specifically, for injuries they caused Englyn Roberts beginning in 2017, when Englyn was only 11-years-old, and her resulting wrongful death.

2.     Injuries Englyn suffered, proximately caused by Defendants' unreasonably dangerous and defective social media products, include but are not limited to, addiction, anxiety, depression, self-harm, suicidal ideation, and ultimately death. On August 29, 2020, after struggling with the harmful effects of Defendants' social media products, 14-year-old Englyn tried to take her own life. On September 9, 2020, Englyn died with her parents and family beside her.

3.     Defendants' social media products likewise caused foreseeable harms to Plaintiffs Brandy and Toney Roberts. Brandy and Toney Roberts did not consent to Defendants distributing or otherwise providing their child with access to harmful social media products and were emotionally and financially harmed by Defendants' addictive design and distribution and provision of harmful social media products to their minor child.

4.     Each of Defendants' products contains unique product features which are intended to and do encourage addiction, and unlawful content and use of said products, to the detriment of Defendants' minor users.

5.     These social media products create a "perfect storm" of addiction, social

2

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

comparison, and/or exposure to incredibly harmful content and harmful product features. Defendants program and operate their algorithms and social media products more generally in a manner that prioritizes engagement and profits over user safety. This includes designing and distributing inherently dangerous products that appeal to kids, and operating algorithms and other technologies in a manner that promotes and amplifies harmful content.

6.      Defendants also advertise their products in misleading ways, assuring parents and the public that their products are safe and fun and that they utilize their technologies to ensure a safe and age-appropriate experience. Nothing could be further from the truth.

7.      Plaintiffs suffered several emotional, physical, and financial harms as a result—all of which are a symptom of the current health crisis among American youth and, by natural and foreseeable extension, American families, caused by certain, harmful social media products such as the ones at issue in this case.

**B.      Defendants Know or Should Know of the Harm Their Products Cause**

8.      In late 2021, a Facebook whistleblower disclosed thousands of internal Meta documents to the United States Securities Exchange Commission (the "SEC") and Congress. The Facebook Papers prove known dangerous designs and design defects as well as operational decisions and calculations, and a causal relationship between use of Defendants' various social media products in their current form and resulting addiction, anxiety, depression, eating disorders, exploitation and grooming, and what Meta internally refers to as "SSI" (Suicide and Self Injury). While the Facebook Papers originate from Meta, they prove dangerous designs and design defects as well as other dangers caused by the social media products of all Defendants.  Examples of the Facebook papers include and can be found at the following locations, to name only some examples:

9.      The Wall Street Journal and Digital Wellbeing published several of the Facebook Papers in November 2021,[1] including but not limited to,

a.      <u>Social Comparison: Topics, celebrities, Like counts, selfies</u> [Jan 2021 internal

---

[1] https://digitalwellbeing.org/the-facebook-files-on-instagram-harms-all-leaked-slides-on-a-single-page/

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

document reporting findings from a 9-country user survey (n=100,000) in Australia, Brazil, France, Germany, Great Britain, India, Japan, Korea, USA].

b. <u>Appearance-based Social Comparison on Instagram</u> [Feb 2021 internal document reporting finding from a 10-country user survey (n=50,590) across Australia, Brazil, France, Germany, Great Britain, India, Japan, Korea, Mexico, USA].

c. <u>Mental Health Findings: Deep dive into the reach, intensity, Instagram impact, self-reported usage and support of mental health issues</u> [2019 internal document reporting findings from a 6-country user survey (n=22,410) across Brazil, India, Indonesia, Japan, Turkey, USA].

d. <u>Teen Girls Body Image and Social Comparison on Instagram – An Exploratory Study in the US</u> [2020 internal document reporting findings from a one-country (US) qualitative research study (n = 15 for focus groups) with young Instagram users (aged 13-21, supplemented by online diaries (n = 10) and video interviews (n = 7)].

e. <u>Teen Mental Health Deep Dive</u> [2019 internal document reporting findings from a 2-country (UK and US) qualitative research study (n = 40 in-person interviews, with follow-up video calls (n = 8) with young Instagram users (aged 13-17), supplemented by online survey (n = 2,503)].

f. <u>Teens and Young Adults on Instagram and Facebook</u> [2021 internal document reporting findings from a five-country study (Australia, France, Great Britain, Japan, USA) with user data].,

10. Gizmodo has been publishing the Facebook Papers, several at a time, also starting in November 2021,[2] including but not limited to,

a. Why We Build Feeds

b. Is Ranking Good

c. Big Levers Ranking Experiment

d. [LAUNCH] Civic Ranking: Engagement-Based Worth Your Time

e. MSI Metric Note Series

f. The Meaningful Social Interactions Metric Revisited: Part 2

g. The Meaningful Social Interactions Metric Revisited: Part 4

h. The Meaningful Social Interactions Metric Revisited: Part 5

i. Meaningful Social Interactions Useful Links

j. MSI Documentation

---

[2] https://gizmodo.com/facebook-papers-how-to-read-1848702919

4

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

k.  Evaluating MSI Metric Changes with a Comment-Level Survey

l.  Surveying The 2018 Relevance Ranking Holdout

m.  Overview of MSI + Pages and Survey Research

n.  Is Multi-Group Picker "Spammy?"

o.  Filtering Out Engagement-Bait, Bullying, and Excessive Comments From MSI Deltoid Metric

p.  [LAUNCH] Using p(anger) to Reduce the Impact Angry Reactions Have on Ranking Levers

q.  Planned MSI Metric Changes in 2020

r.  MSI Metric Changes for 2020 H1

s.  Should We Reduce the MSI Weight of Sticker Comments?

t.  Max Reshare Depth Experiment

u.  "Understand This Post's Ranking" —How I Miss Thee!

v.  Facebook and Responsibility

w.  The Surprising Consequences to Sessions and MSI Caused by Turning Off Video Autoplay on News Feed

x.  One-Go Summary Post for Recent Goaling and Goal Metric Changes for News Feed

y.  News Feed UXR Quarterly Insights Roundup

z.  What Happens If We Delete Ranked Feed?

aa. News Feed Research: Looking Back on H2 2020

bb. Content from "Political" Pages in In-Feed Recommendations

cc. Political Content in In-Feed Recommendations (IFR)

dd. In-Feed Recommendations HPM —April 15 2021

11.    These documents are all incorporated by reference into this Complaint and the sole reason they are not attached is length and file size. However, the contents of these documents and other Facebook Papers are material to Plaintiffs' claims.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

12.     On information and belief, all Defendants have some degree of knowledge about the harms their products cause users, particularly teen, child, and other vulnerable user populations, and all Defendants continue to design, market, sell and operate those products in a harmful and dangerous manner anyway and in the interest of competing with one another and increasing already astronomical profits. Meta is simply the only one whose documents have been disclosed; even then, only a small fraction of relevant Meta documents has been disclosed. Plaintiffs anticipate literal truckloads of additional evidence that will support these claims and show precisely what these social media designers and distributors have done in the name of corporate greed.

13.     All Defendants have actual knowledge that children under the age of 13 are using their social media products; that Defendants' social media products are highly addictive and harmful to a significant population of all users, but especially teens, children, and certain protected classes (women, people of color, and low socioeconomic status ("SES")); that certain design features that serve no functional, informational, societal, or educational purpose (for example, "likes" and "streaks") are causing harm to users; and that algorithms and algorithm-driven product features are dangerous and harmful by design and as designed. Defendants knew about these harms, could have made their products safer at minimal cost and expense, and opted to stay the course instead and to increase user engagement and already astronomical revenue.

14.     Despite knowledge of the dangerous and harmful characteristics of their products, Defendants have made and continue to make calculated cost-benefit business decisions and are consistently prioritizing their already astronomical profits over human life.

**C.    The Social Media Epidemic Among Children**

15.     On December 7, 2021, the United States Surgeon General issued an advisory cataloging a dramatic increase in teen mental health crises including suicides, attempted suicides, eating disorders, anxiety, depression, self-harm, and inpatient admissions. Between 2007 and 2018, for example, suicide rates among youth ages 12 to 16 in the U.S. increased

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

a staggering 146 percent. Several cities across the United States have been experiencing teen suicide rates in the range of 1 every year or other year, which is an absolute crisis for our country—the death by suicide of a child is something that should be an exception and not a rule. The incidence of serious depression and dissatisfaction with life in this age group has likewise increased dramatically, and there is no question that these harms relate in no small part to companies like Defendants.

16.     The most significant and far-reaching change to the lives of young people in the last ten years has been the widespread adoption of social media platforms and prominently, for purposes of this lawsuit,

      a.  The Instagram product which launched in 2010 and was acquired by Facebook (now Meta) in 2012, and which is designed and distributed by Meta.

      b.  The Snapchat product which launched in 2011, and which is designed and distributed by Snap, Inc.

      c.  The TikTok product which launched in 2016, and which is designed and distributed by TikTok.

17.     By 2014, 80 percent of high-school students said they used social media daily, and 24 percent said that they were online "almost constantly." Moreover, there are an estimated 24.5 million teen internet users in the U.S. alone. What this means for each of these defendants is more than 15 million U.S. teens (aged 13 to 17) using their social media product on a regular basis.

18.     Teens make up a significant percentage of all social media users and, in the United States, they also represent Defendants' only significant opportunity for growth due to saturation of the adult market. Defendants see them as a gateway for other potential users, that is, they use U.S. teens to recruit parents and adult relatives as well as younger siblings – including pre-teen siblings Defendants are not permitted provide accounts to but to whom Defendants do provide accounts, by simply refusing to verify age and identification on the

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

front end and by turning a blind eye to public comments, posted videos, and other instances where these underage users openly announce that they are underage. On information and belief, U.S. teens also are the most lucrative for Defendants when it comes to advertising revenue as well. While all reasons for this are not yet known, it is known that teens spend more time on average than other users and, further, Defendants report exponentially higher revenue per user in connection with United States users on an annual basis.

**D.  Disparities Between Public Statements and Harm to Children**

19.     Peer reviewed studies and available medical science have also identified a particular type of social media and electronic device use associated with major mental health injuries, including depression, self-harm, eating disorders, suicide attempts and ideation, dissatisfaction with life, depression, and sleep deprivation. Large observational studies and experimental results also point to heavy use of certain social media products as cause of increased depression, suicidal ideation, and sleep deprivation among teenagers, particularly teenage girls. Defendants have spent years publicly denying these findings—while internally confirming them.

20.     Defendants have denied for years that their products are harmful or addictive while, in fact, Defendants' products *are* harmful and addictive, facts that the social media industry has been aware of for years. Defendants knew the truth and chose to conceal it and not disclose to the public or parents of young users, as Defendants knew that such disclosure would prevent them from further growth and development of these products and product features.

21.     In Meta's case, for example only, the Facebook Papers include years' worth of studies and reports discussing the fact that Meta's social media products are addictive and harmful, and that use of those products can and does lead to serious mental health issues in a significant number of users, including things like anxiety, depression, eating disorders, and SSI. This includes research confirming that higher engagement (*i.e.* more sessions and/or time spent over a certain threshold) causes higher negative effect for users, and other

8

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

hallmarks of addiction (referred to by Meta as "problematic use"). In late 2019, Meta conducted an "exploratory study" in the United States, aimed at examining "Teen Girls Body Image and Social Comparison on Instagram."[3] The resulting Power Point found that use of Defendants' social media products made certain social comparison-based harms worse for a significant percentage of teen girls. *See id*. at p. 29 (referring to its own product mechanics as "addicting" and noting that TikTok users often spend more than four hours on TikTok every day).[4]

22. Moreover, the type of harms described in the Facebook Papers relate to specific product mechanisms and product features. Defendants have designed each of their products to contain unique product features which are intended to and do encourage addiction, and unlawful content and use of said products, to the detriment of Defendants' minor users and their families.

23. Defendants know exactly the harms that their products are causing yet remain focused on maintaining and increasing user engagement which translates into greater profits for Defendants. On information and belief, there have been studies dating back almost a decade on related topics, which studies are not known or, in some cases, even made available to the general public; but Defendants knew or should have known about these studies as, often times, they related to the products being designed and developed by Defendants and Defendants' scientists and/or engineers.[5]

24. Defendants also know that their recommendations and other product features, that is, features whereby Defendants promote and/or send content to users and otherwise try to connect users who, in fact, are often complete strangers, result in disproportionate harms to vulnerable users including children, teens, teen girls, and women. Yet Defendants continue to reap astronomical profits at the expense of these users.

---

[3] *See* https://digitalwellbeing.org/wp-content/uploads/2021/10/Facebook-Files-Teen-Girls-Body-Image-and-Social-Comparison-on-Instagram.pdf
[4] *Id*.
[5] *See, e.g.*, Sept. 30, 2021, Senate Hearing Transcript, at 1:07:47 (reference to study published in National Academy of Sciences "way back in 2014.").

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

25.     For example, each of these Defendants has a "friend" and/or "follow" recommendation feature in their social media product. This refers to a feature whereby Defendants recommend to users other users they may "want" to friend or follow, with the intent that these users will then connect via a friend request mechanism, direct messaging, and similar product features meant to increase engagement among users. These recommendation systems serve the singular purpose of making more money for Defendants in that they are meant to keep users engaged through connections, which connections are suggested, prompted, and encouraged by Defendants. But also, which connections involve complete strangers and where Defendants' own recommendation systems frequently make and perpetuate harmful recommendations.

26.     In terms of harms to young girls,

    a.   3.5% of teen girls on Instagram say the platform makes thoughts of "Suicide and Self Injury" worse.

    b.   17% of teen girl Instagram users say the platform makes "Eating Issues" (e.g. anorexia and bulimia) worse;

    c.   "We make body image issues worse for 1 in 3 teen girls."

*See* "Mental Health Findings," *supra*.

27.     Plaintiffs do not yet have access to internal documents for all defendants, but those are not needed to infer that these defendants employ similar–equally harmful–social media features. Meta research concludes that Meta is not the only one causing harm to teens and children. *See, supra,* "Teen Girls Body Image and Social Comparison on Instagram – An Exploratory Study in the US" (March 2020) ("Instagram is seen as having the highest impact, although TikTok and Snapchat aren't far behind").

28.     On information and belief, all Defendants are aware of algorithmic bias and know or should know that each of their products are defective in this regard.

29.     Specifically, Defendants' algorithm products also suffer from algorithmic bias, including as it relates to race. Algorithmic bias in these social media products is a a

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

dangerous, even, deadly, issue for protected classes – and one that warranted immediate disclosure once identified. Upon information and belief, Meta, Snap, and TikTok's social media products also are directing and promoting harmful and violent content in greater numbers to African American users and did direct and promote harmful and violent content in greater numbers to Englyn Roberts than what they promoted and amplified to other, Caucasian users of similar age, gender, and state of residence – which harmful and violent content directly contributed to Englyn Roberts' addiction to Defendants' social media products and resulting death.

30. On information and belief, all Defendants are aware of algorithmic discrimination and know or should know that their products are defective in this regard.

31. Defendants also know that their products are contributing to teen depression, anxiety, suicidal ideation, self-harm, and even suicide. Why don't they change these harmful product features and stop utilizing algorithms in connection, at least, with teen accounts? Because Defendants' top priority is growth and competition concerns, and Defendants see "acquiring and retaining" teens as essential to their survival. As Defendants know, teenagers spend significantly more time on social media than adults (both total time and user sessions—which are usage patterns linked to addiction), represent Defendants' greatest (if not only) growth opportunity in the US, and can be used by Defendants to recruit older and younger family members and friends.

32. In TikTok's case, TikTok internal documents show that children 14 and under comprise half—if not more—of TikTok's entire U.S. user base.[6]

33. Meta, Snap, and TikTok also know that they cannot expect significant growth in the U.S. beyond the estimated four million teens that begin using the internet each year.

34. Meta, Snap, and TikTok also believe that teens are the best way to capture household adults and children. Pre-teens look to their older siblings in terms of which social

---

[6] Raymond Zhong & Sheera Frenkel, *A Third of TikTok's U.S. Users May Be 14 or Under, Raising Safety Questions*, N.Y. Times, Aug. 14, 2020, *available at* https://www.nytimes.com/2020/08/14/technology/tiktok-underage-users-ftc.html

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

media products to use and how to use them, and often obtain guidance from them to open their first account, while parents and grandparents are influenced by teen household members and open accounts to participate in their child's life.

35.     Meta, Snap, and TikTok likewise know that children under 13 are using their products, and see these children as a tappable and valuable market, which they must capture and use to increase revenue and ensure competitive positioning in the long-term; *see also* https://www.nytimes.com/2020/08/14/technology/tiktok-underage-users-ftc.html   (insiders report knowledge of underage users posting and TikTok's failure to act).

36.     Defendants go so far as to study brain and identify vulnerabilities and other areas where they can adjust their products and approach to appeal more to the teen demographic. For example, in December of 2021, Insider reported on an internal Meta document titled "The Power of Identities: Why Teens and Young Adults Choose Instagram." It is clear from this document that Meta, and its competitors, are marketing to children and teens – including in ways meant to exploit the differences between teens and adults.

37.     Identified among Meta's internal documents are other product features that cause harm to teen users, which product features are relatively standard among Defendants' products. For example, product features that enable users to like or love other user's content results in increased addiction and social comparison harms, which Meta considered hiding for the benefit of its users (referred to as "Project Daisy") but ultimately did not.[7]

38.     Another example is Direct Message feature possessed by Defendants' social media products, and lack of restrictions when it comes to teens and children. Defendants' products do something no other product does: they encourage children and teens to use their product, then they make those children and teens accessible to strangers (for example, by permitting public profiles and/or viewing of content posted by these children and teens), then they provide predators with a direct means of communication (Direct Messaging features) that is both unfettered and, according to Defendants, unmonitored. In fact, Defendants

---

[7] *See* https://www.nytimes.com/2020/01/17/business/instagram-likes.html

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

monitor and/or have the technology needed to detect critical harm areas, such as sexual exploitation, bullying, and even underage use.

39. On information and belief, Defendants are incredibly guarded when it comes to the types of data they collect, to the point where they will not even disclose certain, critical information to parents and/or police and other law enforcement upon request.

40. In the case of Defendant Snap, its product is even more harmful in this regard *because* of its disappearing design. The Snap product is designed in a manner that encourages and enables such abuse, which dangerous and defective design serves Snap's economic interests by increasing its user base. For example, one common pattern among predators– which Defendants know or should know about–is to find children and teens on Instagram and encourage them to open or move the discussion to Snapchat, as it is generally understood that it is easier to get away with child exploitation and abuse through Snap's disappearing message feature.

41. At the same time, Defendant Snap's disappearing design and marketing of that feature is particularly harmful to teens who rely on Snap's representations when taking and sending photos, only learning after the fact that recipients have means to save photos.

42. Defendants are aware of the harms resulting from certain of their product designs and features and are aware of product changes that would make their social media products safer for young users, and that would have made them safer for Englyn Roberts. Defendants' routinely refuse and/or disregard such safety measures, however, in the name of corporate profit and engagement. Defendants are unwilling to risk losing popularity and engagement among teen users, even if it means causing affirmative (sometimes fatal) harm to other teens and children as a result.

43. One example includes access features each defendant has and makes available even in the case of minors. For example, instant messaging where defendants not only proactively recommend connecting with certain users, but then knowingly provide adult users and other strangers with unfettered access to children and teens.

13

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

44. Defendants know that teens are more vulnerable and suffer harms from use of their social media products at higher rates than adult users. Defendants also know that teens access social media longer and more often than adults.

45. Advertisers are willing to pay a premium for unfettered access to child and teens users so Meta, Snap, and Tiktok, in turn, work hard to make their social media products as appealing and addictive to children and teens as possible, even though it knows that they are harmful to children and teens.

**E. Defendants' Focus on Profits Over Safety**

46. Defendants know the harmful impact their social media products have. Instead of warning users and/or re-designing their products to make them safer, however, Defendants choose enhancing profits over protecting human life.

47. Indeed, the problematic use identified in medical literature is precisely the type of use Defendants have designed their products to encourage through psychological manipulation techniques—sometimes referred to as persuasive design—that is well-recognized to cause all the hallmarks of clinical addiction.

48. Defendant Meta slowly switched its News Feed (in its Facebook and Instagram products) from maximizing time-spent to maximizing sessions, even though it knew that maximizing sessions is harmful to its users. Defendant Meta also knows that its "like" button causes harmful social comparison, and results in anxiety and depression in teens, and Meta leadership ultimately rejected recommendations to launch Project Daisy due to the risk of engagement decrease, advertising revenue loss, and similar economic reasons. Meta has repeatedly refused to protect its users from harm for fear of offending other users, decreasing teen engagement, and/or losing revenue from its advertisers as a result.

49. Defendant Snap has designed product features that serve no utility but that help children and predators hide harmful content from parents and authorities, and that promote illegal and dangerous behavior. It's failure to enforce its one account rule further promotes and amplifies bullying and other unwanted interactions, making it impossible for

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

victims to escape the ill effects of the Snap product. Defendant Snap also has implemented inherently addictive and dangerous product features, such as Snap Streaks and various trophies and unknown rewards systems, meant to hook teens at any cost. Likewise, it has implemented various inherently dangerous features, non-communication features over the years, such as Snap Cash and Snap Maps.

50.     Defendant TikTok has designed and implemented inherently addictive product features, as well as technologies that go above and beyond standard algorithms utilized by many of its competitors. It knows or has reason to know (a) when underage children are utilizing its social media product, (b) that its product exposes children to unwanted interactions through direct messaging features, and (c) that features of its product addict children to its product

51.     Ultimately, Defendants all have control over their technology and product design and how it is used and implemented. In all cases, Defendants can monitor and protect children, but in every case, Defendants have chosen instead to make their products more popular and more accessible – at the cost of the health and wellbeing of their young users. In other words, Defendants know that their products are harmful and dangerous, could make them less harmful and less dangerous, but opt instead for attracting and retaining new users (valuing profits ahead of safety).

52.     Meta, Snap, and TikTok all represent to users and parents that they utilize technologies to keep users safe and Meta Snap, and TikTok have all developed and implemented such technologies to a limited degree. These technologies do not require content moderation, but rather, function automatically and as part of the product itself. Moreover, such identification is only made necessary *because* of the content Defendants' themselves are recommending. For example, if Defendants utilized their technologies – as they have told users they do and will – they would be able to stop themselves from identifying and directing young users to some of the most violent, harmful, and disturbing content.

53.     Defendants are perfectly capable of enforcing their own Terms of Service,

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

Community Standards, and other guidelines, with minimal cost. They can adjust controls in a manner that would better protect their users, especially children and teens, from certain, significant harms caused by Defendants' product features, user setting options, recommendations, and algorithmic-driven product features. Yet, Defendants repeatedly ignore these issues, choosing profits over human life. That is not a choice Defendants have the right to make.

54. On information and belief, Defendants Meta, Snap, and TikTok do not employ adequate safety controls in the development of their social media products and product features and, once invested in and/or launched, do not address safety issues as those become known.

55. This is the business model utilized by all Defendants – engagement and growth over user safety – as evidenced by the inherently dangerous design and operation of their social media products. At any point any of these Defendants could have come forward and shared this information with the public, but they knew that doing so would have given their competitors an advantage and/or would have meant wholesale changes to their products and trajectory. Defendants chose to continue causing harm and concealed the truth instead.

**F.  Overview of Claims**

56. Plaintiffs bring claims of strict liability based upon Defendants' defective design of their social media products that render such products not reasonably safe for ordinary consumers or minor users. It is technologically feasible to design social media products that substantially decrease both the incidence and magnitude of harm to ordinary consumers and minors arising from their foreseeable use of such products with a negligible increase in production cost.

57. What's the world has learned from the Facebook Papers is that Meta and its competitors in the social media space *could* provide social media products that do not promote or amplify harmful content to teens and children – these companies simply choose to not do so as that would mean not relying on harmful algorithms and fewer billions of

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

dollars in revenue.

58. Plaintiffs also bring claims for strict liability based on Defendants' failure to provide adequate warnings to minor users and their parents of danger of mental, physical, and emotional harms and sexual abuse arising from foreseeable use of their social media products. The addictive quality of these products and their harmful algorithms are unknown to minor users and their parents.

59. Finally, Plaintiffs also bring claims for common law negligence arising from Defendants' unreasonably dangerous Instagram social media products and their failure to warn of such dangers. Defendants knew, or in the exercise or ordinary care should have known, that their social media products were harmful to a significant percentage of their minor users and failed to re-design their products to ameliorate these harms. Defendants also failed to warn minor users and their parents of foreseeable dangers arising out of use of their social media products.

60. Defendants' own former and/or current developers often do not allow their own children and teenagers to use these social media products.[8] For many years, Defendants have had actual knowledge that their social media products are dangerous and harmful to children but have actively concealed these facts from the public and government regulators and failed to warn parents about these known harms for continued economic gain.

61. Plaintiffs' claims do not arise from third party content, but rather, Defendants' product features and designs, including but not limited to algorithms and other product features that addict minor users, amplify and promote harmful social comparison, affirmatively select and promote harmful content to vulnerable users based on their individualized demographic data and social media activity, direct harmful content in great concentrations to vulnerable user groups, put minor users in contact with dangerous adult predators, enable and encourage minors to hide harmful content from their family and

---

[8] *See*, *e.g.*, https://www.foxnews.com/tech/former-facebook-exec-wont-let-own-kids-use-social-media-says-its-destroying-how-society-works

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

friends, encourage and facilitate exploitation and abuse of minors through marketing, recommendation and messaging features, and data policies involving the concealment and/or destruction of information necessary to the protection of minors, and otherwise prioritize engagement (and Defendants' profits) over user safety.

## II.    PARTIES

62.    Plaintiffs Brandy and Toney Roberts are individuals residing in New Iberia, Louisiana, and Plaintiff Brandy Roberts is in the process of being appointed the administrator of the Estate of their daughter, Englyn Roberts, who died on September 9, 2020. Plaintiffs have not entered into any User Agreements or other contractual relationship with any of the Defendants herein in connection with Englyn Roberts' use of their social media products. As such, in prosecuting this action Plaintiffs are not bound by any arbitration, forum selection, choice of law, or class action waiver set forth in said User Agreements. Additionally, Plaintiffs expressly disaffirm all User Agreements with Defendants into which their daughter may have entered.

63.    Defendant Meta Platforms, Inc., formerly known as Facebook, Inc., is a Delaware corporation with its principal place of business in Menlo Park, CA. Defendant Meta Platforms owns and operates the Facebook and Instagram social media platforms, application that are widely available to users throughout the United States.

64.    Defendant Snap, Inc. is a Delaware corporation with its principal place of business in Santa Monica, CA. Defendant Snap owns and operates the Snapchat social media platform, an application that is widely marketed by Snap and available to users throughout the United States.

65.    Defendant TikTok, Inc. is a California corporation with its principal place of business in Culver City, CA. Defendant TikTok owns and operates the TikTok social media platform, an application that is widely marketed by TikTok and available to users throughout the United States.

66.    Defendant ByteDance Inc. is a Delaware corporation with its principal place

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

of business in Mountain View, CA. Defendant ByteDance owns and/or operates TikTok, Inc., and owns and/or operates the TikTok social media platform, an application that is widely marketed by TikTok and available to users throughout the United States.

### III. JURISDICTION AND VENUE

67. This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, and Plaintiffs and Defendants are residents and citizens of different states.

68. This Court has personal jurisdiction over Defendants because they are each headquartered and have their principal place of business in the State of California. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendants Meta and Bytedance's principal places of business are in the Northern District of California and Defendants Snap, Inc. and TikTok Inc are residents of the State of California.

### IV. DIVISIONAL ASSIGNMENT

69. The case is properly assigned to the San Francisco Division pursuant to Civ. L. R. 3-2(c)–(d) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in San Mateo County, where Defendant Meta Platforms, Inc. maintain its primary place of business.

### V. FACTUAL ALLEGATIONS

#### A. Facebook and Instagram Background and Products

70. Facebook is an American online social network service that is part of the Meta Platforms. Facebook was founded in 2004, at which time, Facebook was nothing like the product it is today. In fact, when Facebook was first founded, only students at certain colleges and universities could use the social media product – which changed by 2006, such that anyone with an email address could now use it. Facebook became the largest social network in the world, with nearly three billion users as of 2021, and about half that number were using Facebook every day. The company's headquarters is in Menlo Park, California. Facebook recently changed its name to, and is referred to herein and collectively with

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

Instagram, as Meta.

71.    Instagram is a photo sharing social media application. Its original focus was to facilitate communication through images by featuring photos taken on mobile devices. Instagram launched in October 2010 and Facebook acquired it for $1 billion in April 2012. Once acquired, Instagram experienced exponential growth, design, and development changes. It went from 10 million monthly active users in September of 2012 to 50 million weeks after the acquisition, to more than 600 million by December of 2016, and it continues to grow. Meta instituted dozens of product changes (also known as "growth hacks") that drove this increased engagement, but at the expense of the health and well-being of Instagram's users—especially teens and children.

72.    Meta's recommendation-based feeds and product features promote harmful content. Meta's algorithms are programmed to prioritize number of interactions and not quality of interactions. Worded otherwise, Defendants promote and amplify content based on engagement objectives and not the health and well-being of their users, which renders their social media products inherently dangerous and defective, particularly when used by teens and children.

73.    Both the Facebook and Instagram products show users a "feed." A user's "feed" is a comprised of a series of photos and videos posted by accounts that the user follows, along with advertising and content specifically selected and promoted by Instagram.

74.    Meta exerts control over a user's Instagram "feed," including through certain ranking mechanisms, escalation loops, and/or promotion of advertising and content specifically selected and promoted by Meta based on, among other things, its ongoing planning, assessment, and prioritization of the types of information most likely to increase engagement. In the case of certain user groups, like teens, this control translates to deliberate and repeated promotion of harmful and unhealthy content, which Meta knows is causing harm to its young users.

75.    In 2021, Senators Richard Blumenthal, Marsha Blackburn and Mike Lee

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

tested and confirmed the fact that Meta's recommendation-based feeds and product features promote harmful content by having several accounts opened while providing information indicating that the users were teenage girls,

"Within an hour all of our recommendations promoted pro-anorexia and eating disorder content," Blumenthal said. "Nothing has changed. It's all still happening."

Sen. Mike Lee, R-Utah, said his office created an account for a 13 year old girl. Shortly afterward, the algorithm recommended a famous female celebrity to follow and when they did, Lee said, "It went dark fast."

The fake account was flooded with content about diets, plastic surgery and other damaging material for an adolescent girl, he said.

In another example this week, Blackburn's staff exposed a flaw in Instagram's setting for teens under 16.

According to Instagram's policies, new teenage accounts should automatically default to a private setting. But when Blackburn's team set up a phony account for a 15 year old girl, it automatically defaulted to public.

Mosseri acknowledged the error, explaining the mistaken default setting was triggered because the account was created on a web browser, as opposed to a mobile app.

"We will correct that," he said.

*See* https://www.npr.org/2021/12/08/1062576576/instagrams-ceo-adam-mosseri-hears-senators-brush-aside-his-promises-to-self-poli. Meta has had almost a decade to fix these product defects but has not – instead, its products have severely harmed millions of teens in the U.S. alone.

76. The Instagram product also has a search feature called "Explore," where a user is shown an endless feed of content that is selected by an algorithm designed by Meta based upon the users' demographics and prior activity in the application. This is not content the user has searched for our requested. Instead, it is content Meta selects via its algorithms

(which Meta in turn programs to increase engagement and in other ways Meta knows to be harmful to users, but more profitable to Meta, as well as paid advertisements created with Meta's assistance or approval, and the like.

77.     Meta designs and operates its Explore product in a manner that promotes harmful and/or unhealthy content. Meta is aware of these inherently dangerous product features and has repeatedly decided against changing them and/or implementing readily available and relatively inexpensive safety measures, for the purpose of ensuring continued growth, engagement, and revenue increase.

78.     The Instagram product also has features known as "Reels" and "Stories, which promote the use of short videos and temporary posts, respectively. These products were developed to appeal to teens and Meta knows that these products are addictive, as well as defective.

79.     Meta prioritizes and promotes harmful content through these product features.

80.     The promotion of harmful content has become so central to Defendants' business models that Defendants regularly opt to conceal the truth and continue harming users instead of making their products safer and less harmful.

81.     Worded otherwise, it is not any single or even multiple pieces of body-focused or celebrity content harming young Instagram users, but rather, the formatting and presentation utilized by Meta in its effort to increase engagement and growth at any cost. For example, no single celebrity post is problematic, but instead, the harm arises from seeing countless pieces of content and Meta's amplifying effect. For example, Meta uses artistic content from celebrities like Cardi B, an artist young girls look up to and admire, and uses that content as bait in a manner it has internally identified as harmful to a significant percentage of its young, female users. It is not the content itself which is harmful. In fact, the content in its originally intended form is not harmful at all. Instead, it is a combination of Meta's product design, algorithmic identification and promotion system, targeting tools, and the sheer volume of body-focused imagery Meta pushes on its youngest users without their

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

knowledge or consent (much less the knowledge of consent of their parents or the artists providing this material) that is harming these young users. And Meta knows it.

82.     Meta also pushes these content types or themes to young girls in exponentially higher numbers despite knowledge of the resulting harm to a significant percentage of those same young, female users.

83.     Instagram profile and privacy settings also cause harm. Users' profiles on Instagram may be public or private, which is a product feature over which Meta exercises complete control. On public profiles, any user can view the photos, videos, and other content posted by the user. On private profiles, the user's content may only be viewed by the user's followers, which the user must approve. At all times relevant, Instagram profiles were public by default and Instagram allowed all users to message and send follow requests to underage users. But even now, when Instagram claims that it is defaulting certain categories of users into private profiles, all a user need do is change the profile setting and, once again, Instagram will allow all users to message and send follow requests to underage users. Meta can protect users from this specific harm, can do so immediately, and chooses to not do so as a matter of engagement and growth.

84.     Permitting public profiles for underage users serves no critical purpose in terms of product functionality but, instead, it increases user engagement during onboarding (when a user first starts using a social media product) by increasing user connections and generally by providing all users with greater access to other users, in this case, irrespective of their age. Unfortunately for young children and teens, a numerically significant percentage of those would-be connections are harmful. Defendants are aware of these harms and have opted to not make necessary and cost-effective changes to prevent it.

85.     Defendant Meta's Direct Message settings also permit and encourage harm to vulnerable users. Harmful and dangerous interactions occur because of the Instagram direct message feature and current user settings, that is, Meta's chosen settings provide strangers (good or bad) with direct and unsupervised access to children and teens. Again,

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

however, Meta opts for engagement over safety.

86.    Meta's allowance of multiple accounts, refusal to verify age, identity, even authenticity of email addresses further exacerbates the harms by making it impossible to avoid unwanted interactions. Other users can literally open accounts as fast as those accounts can be blocked and, when coupled with the excessive and addictive usage habits Meta promotes among teens, these features create a perfect storm for depression, anxiety, and Suicide and Self-Harm.

87.    Meta's push notifications and emails encourage addictive behavior and are designed specifically to increase use of its social media products. In the case of Instagram, Defendant Meta collects individualized data – not just about the user, but also about the user's friends and contacts – and then selects content and notification frequency for its users and notifies them via text and email. Meta's notifications to individual users are specifically designed to, and do, prompt them to open Instagram and view the content Instagram selected, increasing sessions, and resulting in greater profits to Instagram. More to the point, even the format of these notifications has been designed and re-designed with the specific purpose of pulling users back onto the social media platform—irrespective of a user's health or wellbeing.

88.    Instagram also incorporates several product features that serve no functionality purpose, but that do make Meta's product more appealing to children and teens (*i.e.*, "likes" and filters, as well as avatars, emojis, and games) while simultaneously increasing social comparison pressure and resulting harm (*i.e.*, "likes" and filters). The harm from these product features does not relate to a single "like" or filter, or any specific series of content or potential content.  Rather, it is the product itself. Meta knows that these product features disproportionally harm teen girls and young women.[9]

89.    Instagram also creates images and GIFs for users to post on their videos and

---

[9] *See, e.g.*, the documents disclosed at https://digitalwellbeing.org/wp-content/uploads/2021/10/Facebook-Files-Appearance-based-Social-Comparison-on-Instagram-.pdf, *supra*.

pictures. Meta has also acquired publishing rights to thousands of hours of music, which it provides to its users to attach to the videos and pictures that they post on Instagram. The GIFs, images, and music are integral to the user's Instagram post and are, in fact, designed to encourage posting. Indeed, in many cases, the only content in a user's Instagram post is the image, GIF or music supplied by Meta. When users incorporate images, GIFs, and music supplied by Meta into their postings, Meta is functioning as a co-publisher of such content. An Instagram user who incorporates images, GIFs or music supplied by Meta into their post is functionally equivalent to a novelist who incorporates illustrations into their story. Instagram can no longer characterize the images, GIFs, and music it supplies to its users as third-party content, just as the novelist cannot disclaim responsibility for illustrations contained in their book. Meta has made the deliberate decision to collaborate with its users in this regard and, as evidenced by Meta's internal documents, Meta's decision is motivated by the fact that such collaboration results in increased engagement and more profits for Meta itself.

90.     Meta also has ownership and/or licensing, and other legal, rights in all third-party content, such that it is not "third-party content" at all. In 2012, Meta revised its Instagram Terms of Service to the following,[10]

> To help us deliver interesting paid or sponsored content or promotions, you agree that a business or other entity may pay us to display your username, likeness, photos (along with any associated metadata), and/or actions you take, in connection with paid or sponsored content or promotions, without any compensation to you.

91.     Its current terms (effective January 4, 2022) are different, but still grant Meta the right to use all third-party content at Meta's sole and unilateral discretion,

---

[10] https://www.theverge.com/2012/12/18/3780158/instagrams-new-terms-of-service-what-they-really-mean

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

- **We do not claim ownership of your content, but you grant us a license to use it.** Nothing is changing about your rights in your content. We do not claim ownership of your content that you post on or through the Service and you are free to share your content with anyone else, wherever you want. However, we need certain legal permissions from you (known as a "license") to provide the Service. When you share, post, or upload content that is covered by intellectual property rights (like photos or videos) on or in connection with our Service, you hereby grant to us a non-exclusive, royalty-free, transferable, sub-licensable, worldwide license to host, use, distribute, modify, run, copy, publicly perform or display, translate, and create derivative works of your content (consistent with your privacy and application settings). This license will end when your content is deleted from our systems. You can delete content individually or all at once by deleting your account. To learn more about how we use information, and how to control or delete your content, review the Data Policy and visit the Instagram Help Center.

92.     Meta directly profits from the videos and pictures its users create in collaboration with Meta, as described above.

93.     Meta knows that it is harming teens yet, when faced with recommendations that will reduce such harms, Meta's leadership consistently opts for prioritization of profit over the health and well-being of its teen users—that is, the millions of teen users who continue to use its inherently dangerous and defective social media product every, single day.

94.     Meta's products are used by many millions of children every day.

**B.     Snapchat Background**

95.     Snapchat was founded in 2011, by three Stanford college students, and quickly became a wildly popular social media product among U.S. teens. It is one of the most widely used social media products in the world and is used by more than 69% of all U.S. teens (age 13 to 17).[11] Snap's headquarters is in Santa Monica, California.

96.     Snapchat started as a photo and short video sharing social media application that allows users to form groups and share posts or "Snaps" that disappear after being viewed by the recipients. The Snapchat product became well-known for its self-destructing content feature. Specifically, the Snapchat product allows users to form groups and share posts or "Snaps" that disappear after being viewed by the recipients. However, the Snapchat social

---

[11] *See* https://www.smartinsights.com/social-media-marketing/social-media-strategy/snapchat-statistics/

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

media product quickly evolved from there, as its leadership made design changes and rapidly developed new product features intended to and that did increase Snapchat's popularity among teen users.

97.     In 2012, Snap added video capabilities to its Snapchat product, pushing the number of "snaps" to 50 million per day; in 2013, "Stories" and "Chat" features; in 2014, live video chat capabilities, "Our Story," Geofilters and Community Geofilters, and Snapcash.

98.     By 2015, advertisements were pervasive on Snapchat and, by 2018, 99% of Snap's total revenue came from advertising, according to internal company records. In other words, like Meta, Snap decided to monetize its userbase and, from that point forward, began changing its product in ways that made its product even more harmful to users but that paved the way for growth, engagement, and profits for Snap and its leadership and investors.

99.     By 2015, Snapchat had over 75 million monthly active users and was the most popular social media application amongst American teenagers in terms of number of users and time spent using the platform. Snap currently estimates having between 92.8 and 96.6 million users in the United States, with at least 17 to 17.7 million of those being children under the age of 18. Against this backdrop, Snap advertises and promotes its product as safe and fun—which could not be further from the truth.

100.    Snap uses an algorithm or similar technology to suggest connections, that is, Snap sends messages to users based on some secret formula Snap uses to determine whether someone should "friend" someone else. This is known as "Quick Add," and these Snap-initiated messages result in exposure to harmful contacts, bullying, and dangerous predators. This feature contributes nothing to the product itself and serves no informational or communication purpose. Similar to Meta's product, this product is designed to reinforce addiction and increase the odds of maintaining more users for longer.

101.    Snapchat users also have an "Explore" feed that displays content created by other users around the world. These product features are designed to grab and keep users'

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

attention for as long as possible each day, and have led many people, from psychologists to government officials, to describe Snapchat as "dangerously addictive."

102.    As with Defendant Meta, Snap's algorithms and/or similar technologies determine the content that gets recommended and/or populates its user experience on the Snapchat social media product. This includes content sent directly from Snap to its users, for Snap's own purposes, and prior to any sort of user search or request for such content. And as with Defendant Meta, Snap knows or should know that its algorithms are promoting and amplifying harmful content to children and teens and are operating with a degree of algorithmic discrimination that is particularly harmful to Snap's most vulnerable user groups.

103.    Snapchat offers several unique messaging and data features. It is perhaps most famous for its self-destructing content design feature, which appeals to minors and makes it more difficult for parents to monitor their children's social media activity. This is an inherently dangerous product feature because it both encourages and allows minor uses to exchange harmful, illegal, and sexually explicit images with adults, and provides those same adults with a safe and efficient vehicle to recruit victims. Snapchat is a go-to application for sexual predators because of this product feature.[12]

104.    For years Snap has received reports of child abuse and bullying occurring through its product and because of its product features,[13] yet has kept those features in place as removing them would result in considerable impact on the popularity of Snap's social media product.

105.    Harmful and dangerous interactions likewise occur because of these and other Snapchat messaging features, which provide direct and unsupervised access to children and teens.

106.    But also, this is a dangerous product feature because it does not operate as

---

[12] *See, e.g.*, https://phonespector.com/blog/what-are-the-dangers-of-snapchat-to-avoid/
[13] *See, e.g.*, https://www.forbes.com/sites/zakdoffman/2019/05/26/snapchats-self-destructing-messages-have-created-a-haven-for-child-abuse/?sh=411b8e1d399a (Snapchat Has Become A 'Haven for Child Abuse' With Its 'Self-Destructing Messages').

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

advertised. Snap's disappearing design and marketing of this feature is particularly harmful to teens who rely on Snap's representations when taking and sending photos, only learning after the fact that recipients have means to save photos – and are often bullied, exploited, and/or sexually abused as a direct result. These are harms known to Snap.

107.    In 2014, Snapchat added "Stories" and "Chat" features that allowed users to post longer stories that could be viewed by users outside the user's friends. As with Meta's algorithms, Snap's technology promotes and amplifies harmful content as a means of increasing user engagement and growth opportunities. Snap has actual knowledge of the harm it is causing its users, and consistently prioritizes its own profits regardless.

108.    Snapchat also allows users to enable the sharing of their location, through a tool called Snap Map, which allows the users' followers (and the public for Snaps submitted by the users) to see the user's location on a map. At all times relevant, this feature was available to all users, including minors. This is an inherently dangerous product feature, which serves no practical purpose – but that does provide strangers and predators with access to the location of minor victims. This product feature has directly contributed to stalking and other, physical harms and assaults perpetrated on minors, and these are harms known to Snap.

109.    But also, Snap has developed artificial intelligence technology that detects adult users of Snapchat who send sexually explicit content to children and receive sexually explicit images from children. This technology furnishes Snap with actual knowledge that a significant number of minor users of Snapchat are solicited to send, and do send, sexually explicit photos and videos of themselves to adult users in violation of 18 U.S.C. § 1591(a)(1)-(2). Snap *could* protect its minor users, but in many instances, does not.

110.    Snap also has a "My Eyes Only" product, which many parents do not know about – including Plaintiffs in this case. Snap's My Eyes Only Product encourages and enables young users to hide harmful content from parents by allowing them to hide content in a special tab that requires a passcode, and where content cannot be recovered – even by Snap itself – without the correct passcode. The content self-destructs if a user attempts to

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

access the hidden folder with the wrong code. My Eyes Only has no practical purpose or use, other than to hide potentially harmful content from parents and/or legal owners of the devices used to access Snap. Moreover, while this information and evidence should be in Snap's possession and control, it has designed thus product in a way that causes the permanent loss of relevant and often incredibly material and incriminating evidence in the event of products liability lawsuit, like this one.

111. On information and belief, Snap's disappearing messages are defective for this reason as well. Snap has possession, custody, or control of that data, knows that it will be relevant and material in the event of products liability litigation, but has designed its technologies – *i.e.* its advertised "disappearing" functionality which suggests that Snap itself no longer has access to such data – in a manner that frustrates and actively prevents parents from monitoring the activity of their underage children on Snap's social media product. These are serious defects, which Snap should be required to remedy immediately.

112. Like Meta, Snap also sends push notifications and emails to encourage addictive behavior and to increase use of its Snapchat product. Snap's communications are triggered and based upon information Snap collects from and about its users, and Snap "pushes" these communications to teen users in excessive numbers and disruptive times of day. These notifications are specifically designed to, and do, prompt them to open Snapchat and view the content Snapchat selected, increasing sessions, and resulting in greater profits to Snap. Even the format of these notifications has been designed to pull users back on to the social media platform—irrespective of a user's health or wellbeing.

113. The Snapchat social media product also features a series of rewards including trophies, streaks, and other signals of social recognition like the "likes" metrics available across other platforms. These features are designed to encourage users to share their videos and posts with the public. Moreover, these features serve no communication or informational purposes. They are designed to be addictive, and to encourage greater use of the Snap product without regard to any other content or third-party communication. But also, they have been

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

repeatedly recognized by organizations and even government agencies around the world as being among the most addictive products when it comes to teen social media users.

114. These product features serve no purpose other than creating dependencies on Snap's product by children and teens, which dependencies in turn cause sleep deprivation, anxiety, depression, anger, shame, interpersonal conflicts, and other serious harms to mental and physical health.

115. Snapchat incorporates several other product features that serve no functionality purpose, but that do make Snap's product more appealing to children and teens (*i.e.*, avatars, emojis, and games) while simultaneously using known mechanisms to addict those same children and teens (*i.e.* streaks and trophies offering unknown rewards). These features and the ones discussed above were particularly addictive to Enlgyn Roberts, and were targeted to underage users like Englyn Roberts.

116. The Snap Streak feature is unique to Snap's product and is one of the most – if not the most – addictive products available "especially to teenagers."[14] *See also* FBD 37/21, "Teen Meaningful Interactions and Feed post Feedback – Focus Groups" (May 2018), at p. 5 ("Streaks are a very important way for teens to stay connected. They are usually with your closest friends and they are addictive.") Snap knows that its Snap Streak product is addictive and has known for years but continues to provide that product to teens and children.

117. These are just some examples of Snapchat's harmful product features.

118. Snap has also developed images for users to decorate the pictures or videos they post, and Snap has developed Lenses which are augmented reality-based special effects and sounds for users to apply to pictures and videos users post on Snapchat, and World Lenses to augment the environment around posts. Snap also has acquired publication rights to music, audio, and video content that its users can incorporate in the pictures and videos they post on Snapchat.

119. These images, Lenses, and licensed audio and video content supplied and

---

[14]*See* https://abcnews.go.com/Lifestyle/experts-warn-parents-snapchat-hook-teens-streaks/story?id=48778296

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

created by Snapchat frequently make a material contribution to the creation or development of the user's Snapchat posts. Indeed, in many cases, the *only* content in a user's Snapchat post are images, Lenses, and licensed audio and video content supplied and created by Snapchat. When users incorporate images, Lenses, music, audio, and video content supplied by Snapchat posts, Snapchat makes a material contribution to the creation and/or development of their Snapchat postings and becomes a co-publisher of such content. When malign users incorporate images, Lenses, music, audio, and video content supplied by Snapchat to their posts, this enhances the psychic harm and defamatory sting that minor users experience from third-party postings on Defendant's platform.

120.     Moreover, Snap contracts for legal rights in this third-party content, such that it is not "third-party content" at all. Snap's current Terms of Service grant Snap several, sweeping sets of legal rights, from licensing to ownership, as follows (and for example only as there are several provisions in Snap's Terms of Service that address legal rights over user content, comments, and other usage and activities),

### 3. Rights You Grant Us

Many of our Services let you create, upload, post, send, receive, and store content. When you do that, you retain whatever ownership rights in that content you had to begin with. But you grant us a license to use that content. How broad that license is depends on which Services you use and the Settings you have selected.

For all content you submit to the Services, you grant Snap and our affiliates a worldwide, royalty-free, sublicensable, and transferable license to host, store, cache, use, display, reproduce, modify, adapt, edit, publish, analyze, transmit, and distribute that content. This license is for the purpose of operating, developing, providing, promoting, and improving the Services and researching and developing new ones. This license includes a right for us to make your content available to, and pass these rights along to, service providers with whom we have contractual relationships related to the provision of the Services, solely for the purpose of providing such Services.

121.     Snap directly profits from the videos and pictures and other content its users create in collaboration with Snap, as described above.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

122.     Snap knows that it is harming teens yet consistently opts for prioritization of profit over the health and well-being of its teen users—that is, the millions of teen users who continue to use its inherently dangerous and defective social media product every, single day.

**C.    TikTok Background**

123.     TikTok is a video sharing social media application where users create, share, and view short video clips. Known in China as Douyin, TikTok hosts a variety of short-form user videos, from genres like pranks, stunts, tricks, jokes, dance, and entertainment with durations from 15 seconds to ten minutes. TikTok is the international version of Douyin, which was originally released in the Chinese market in September 2016. In 2017, TikTok was launched for iOS and Android in most markets outside of mainland China; however, it became available worldwide only after merging with another Chinese social media service, Musical.ly, on August 2, 2018.

124.     TikTok has been downloaded more than 130 times in the U.S. and it was ranked by Cloudflare as the most popular website of 2021. "TikTok was the world's most-visited website in 2021, overtaking YouTube in US watch time and Facebook in app downloads for the first time."[15]

125.     Users on TikTok who open the TikTok application are automatically shown an endless stream of videos selected by an algorithm developed by TikTok to show content on the "for you" based upon the user's demographics, likes, and prior activity on the app.

126.     TikTok is like Meta and Snap in that it has designed its algorithms to addict users and cause them to spend as much time on the application as possible through advanced analytics that create a variable reward system tailored to user's viewing habits and interests.

127.     There are four main goals for TikTok's algorithm: which the company translates as "user value," "long-term user value," "creator value," and "platform value."

---

[15] Emily Baker-White, *Inside Project Texas, TikTok's Big Answer To US Lawmakers' China Fears*, Buzzfeed, Mar. 10, 2022, https://www.buzzfeednews.com/article/emilybakerwhite/tiktok-project-texas-bytedance-user-data

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

128.    An internal TikTok document was leaked, which document is titled "TikTok Algo 101." This document was created by TikTok's engineering team in Beijing and offers details about both the app's mathematical core and insight into the company's understanding of human nature. The document explains that in the pursuit of the company's "ultimate goal" of adding daily active users, it has chosen to optimize for two closely related metrics in the stream of videos it serves: "retention" — that is, whether a user comes back — and "time spent." The document offers a rough equation for how videos are scored, in which a prediction driven by machine learning and actual user behavior are summed up for each of three bits of data: likes, comments and playtime, as well as an indication that the video has been played.

129.    A recent Wall Street Journal report revealed how TikTok relies heavily on how much time users spend watching each video to steer them toward more videos that will keep them scrolling, and that process can sometimes lead young viewers down dangerous rabbit holes, and toward content that promotes suicide or self-harm.

130.    Another article, by the New York Times, explained how TikTok markets itself as an "artificial intelligence company." "The most obvious clue is right there when you open the app: the first thing you see isn't a feed of your friends, but a page called 'For You.' It's an algorithmic feed based on videos you've interacted with, or even just watched. It never runs out of material. It is not, unless you train it to be, full of people you know, or things you've explicitly told it you want to see. It's full of things that you seem to have demonstrated you want to watch, no matter what you actually say you want to watch … Imagine a version of Facebook that was able to fill your feed before you'd friended a single person. That's TikTok." [16]

131.    TikTok's algorithm also, often works in concert with Meta's. For example, a teen may first learn about a harmful topic through Meta's algorithm, which potential harm is

---

[16] John Herrman, *How TikTok is Rewriting the World*, N.Y. Times, Mar. 10, 2019, *available at* https://www.nytimes.com/2019/03/10/style/what-is-tik-tok.html

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

then identified by TikTok's algorithm, based on any number of unknown factors, and the TikTok product will amplify and promote that same harm through a virtual series of how-to videos. These are inherently dangerous and harmful product features, particularly when aimed at children.

132. TikTok also features and promotes various "challenges" where users film themselves engaging in behavior that mimics and "one ups" other users posting videos related to a particular challenge. TikTok promotes users creating and posting videos of challenges identified by a system of hashtags that are promoted within TikTok's search feature.

133. TikTok's app and algorithm have created an environment in which TikTok "challenges" are widely promoted and result in maximum user engagement and participation, thus financially benefitting Defendants. At the same time TikTok "challenges" involve users filming themselves engaging in behavior that mimics and often times "one-ups" other users posting videos performing the same or similar conduct, and these TikTok "challenges" routinely involve dangerous or risky conduct.

134. TikTok's algorithm presents these often-dangerous "challenges" to users on their FYP and encourages users to create, share, and participate in the "challenge."

135. Moreover, TikTok's algorithm products suffer from serious algorithmic bias, including as it relates to race and low SES. Upon information and belief, TikTok is aware of these harms, including the fact that its algorithm pushes higher volumes of violent and dangerous content to members of protected classes. This is harmful content these users, including and specifically Englyn Roberts, would not have seen but for TikTok's product design and programming.

136. Upon information and belief, the TikTok product is causing harms to protected classes based on their protected status, including the promotion and amplification of harmful and violent content in greater numbers to African American users, like Englyn Roberts. Upon information and belief, TikTok's social media product did direct and promote

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

harmful and violent content in greater numbers to Englyn Roberts than what they promoted and amplified to other, Caucasian users of similar age, gender, and state of residence – which harmful and violent content directly contributed to Englyn Roberts' addiction to its social media product and resulting death.

137. These are just some examples of how TikTok operates its product to generate profit, at the expense of the health and well-being of its users, particularly its child and teen users.

138. Until mid 2021, TikTok also and by default made all users profiles "public," meaning that strangers, often adults, could view and message underage users of the TikTok app. This also meant that those strangers could then contact children directly, as happened in this case.

139. TikTok has also developed artificial intelligence technology that detects adult users of TikTok who send sexually explicit content to children and receive sexually explicit images from children. This technology furnishes TikTok with actual knowledge that a significant number of minor users of TikTok are solicited to send and actually do send sexually explicit photos and videos of themselves to adult users in exchange for consideration in violation of 18 U.S.C. § 1591(a)(1)–(2). Yet, like Snap and Meta, TikTok uses this technology selectively and only when it is to the benefit of TikTok, enabling harms through its social media products in the interest of engagement.

140. Like Meta and Snap, TikTok also sends push notifications and emails to encourage addictive behavior and to increase use of their TikTok product and sent such notices to Englyn Roberts. TikTok's communications are triggered and based upon information TikTok collects from and about its users, and TikTok "pushes" these communications to teen users in excessive numbers and disruptive times of day. These notifications are specifically designed to, and do, prompt them to open TikTok and view the content TikTok selected, increasing sessions, and resulting in greater profits to TikTok. Even the format of these notifications has been designed to pull users back on to the social media

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

platform—irrespective of a user's health or wellbeing.

141. TikTok markets itself as a family friendly social media application, and markets to children and teens.

142. TikTok exclusively controls and operates the TikTok platform for profit, which like Instagram and Snapchat, creates advertising revenue through maximizing the amount of time users spend on their platforms. Accordingly, while TikTok purports to have a minimum age requirement of 13-years-old, it does little to verify user age or enforce its age limitations despite knowledge that underage use is widespread.

143. In fact, underage TikTok users will often post videos of themselves in which they clearly are not old enough to be using the TikTok social media product. On information and belief, TikTok's sophisticated algorithms can identify when a user has crooked teeth or a crack in their bedroom wall, so there is little question that those same algorithms can identify underage children in posted videos. But also, TikTok has actual knowledge of underage users. For example, in July 2020, TikTok reported that more than a third of its 49 million daily users in the United States were 14 years old or younger. And while some of those users were 13 or 14, at least one former employee reported that TikTok had actual knowledge of children even younger based on videos posted on the TikTok platform – yet failed to promptly take down those videos or close those accounts.[17] In fact, TikTok regularly knows or should know of underage users with accounts and who post videos on its platform, whether because of its algorithms, viewing by TikTok employees, and/or flagging by other TikTok users. In many such instances, TikTok not suspend the account, require age verification, or notify the underage user's parents of such prohibited use.

144. TikTok does not seek parental consent for underage users or provide warnings or adequate controls that would allow parents to monitor and limit the use of TikTok by their children. TikTok does not verify user age, enabling and encouraging teens and children to

---

[17] Raymond Zhong & Sheera Frenkel, *A Third of TikTok's U.S. Users May Be 14 or Under, Raising Safety Questions*, N.Y. Times, Aug. 14, 2020, *available at* https://www.nytimes.com/2020/08/14/technology/tiktok-underage-users-ftc.html

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

open TikTok accounts, providing any age they want, and without parental knowledge or consent. TikTok does not include the deliberately addictive design of its product, which is addictive and did addict Englyn Roberts, to the point where she hid from her parents her usage of the TikTok social media product.

145.    Further, based on TikTok data leaked to the New York Times, internal TikTok documents show that the number of daily U.S. users in July of 2020 estimated by TikTok to be 14 or young—18 million—was almost as large as the number of over-14 users, around 20 million. While the rest of TikTok's U.S. users were classified as being "of unknown age."[18]

146.    TikTok also does not rely on users' self-reported age to categorize them, and knows when it has underage users engaged in harmful activities on its platform. Like Meta, TikTok has algorithms through which is creates estimated or approximate age for its users, including facial recognition algorithms that scrutinize profile pictures and videos, as well as other methods through which it can estimate age with reasonable certainty. TikTok knows that users under the age of 13 are using its social media product, including to post videos of themselves, which videos are public by default and result in harm to these underage users.[19]

147.    Like Meta and Snap, TikTok has tried to boost engagement and keep young users hooked to its social media product by any means necessary.

148.    TikTok has developed images and memes to enact images for users to decorate the videos they post. TikTok has also developed memes and other images for users to apply to images they post on TikTok. TikTok also has acquired publication rights to music that its users can incorporate in the pictures and videos they post on TikTok. When users incorporate images, memes and music supplied by TikTok into their postings, TikTok becomes a co-publisher of such content. A TikTok user who incorporates images, memes and musical content supplied by TikTok into their posts is functionally equivalent to a

---

[18] *Id.*
[19] *Id.*

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

novelist who incorporates illustrations into her story. TikTok can no longer characterize the images, memes, and musical content it supplies to its users as third-party content as the novelist can disclaim responsibility for illustrations contained in her book.

149.    And like Snap and Meta, TikTok contracts for legal rights to this third-party content, such that it is not "third-party content" at all. TikTok's current Terms of Service grant TikTok sweeping sets of rights as follows, and for example only,

> You or the owner of your User Content still own the copyright in User Content sent to us, but by submitting User Content via the Services, you hereby grant us an unconditional irrevocable, non-exclusive, royalty-free, fully transferable, perpetual worldwide licence to use, modify, adapt, reproduce, make derivative works of, publish and/or transmit, and/or distribute and to authorise other users of the Services and other third-parties to view, access, use, download, modify, adapt, reproduce, make derivative works of, publish and/or transmit your User Content in any format and on any platform, either now known or hereinafter invented.

150.    TikTok directly profits from the videos and pictures and other content its users create in collaboration with TikTok, as described above.

151.    TikTok knows that it is harming teens yet consistently opts for prioritization of profit over health and well-being of its teen users— the millions of teen users who continue to use its inherently dangerous and defective social media product every, single day.

**D.    Defendants' Applications Are Products**

152.    There is no dispute that the above-described social media products are designed and manufactured by Defendants, and further, Defendants refer to them as such.

153.    These products are designed to be used by minors and are actively marketed to teens *and tweens* across the United States and were marketed to Englyn Roberts.

154.    Defendants' user terms and federal law prohibit use of these social media products by any person under the age of 13. Regardless, Defendants know that children under 13 are using their products, and actively study and market to that population.

155.    Defendants' products are designed to be used by minors and are actively marketed to minors across the United States. Defendants market to minors through their own

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

marketing efforts and design, and through their approval and permission to advertisers who create and target ads to young users. Meta documents establish that Meta spends millions of dollars researching, analyzing, and experimenting with young children to find ways to make its product more appealing and addictive to these age groups, as these age groups are seen as the key to Meta's long-term profitability and market dominance. But also, Meta documents establish that it is not the only one, and that other social media companies, including Meta's co-defendants in this case, invest heavily to appeal to teens and underage users. *See, e.g.*, https://www.businessinsider.com/leaked-docs-facebook-papers-instagram-competition-tiktok-youtube-snapchat-2021-12?op=1#whats-so-great-about-tiktok-one-slide-said-2 (quoting from Facebook Papers that address the reasons why teens love Snapchat and TikTok),



COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP



156.    Defendants also are aware that large numbers of children under the age of 18 use its product without parental consent. At least in the case of TikTok and Snap, parental consent is required for use of their social media products and based on their own user terms. Yet all Defendants design their social media products in a manner intended to allow and not

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

prevent such use, including failure to verify age and identification and allowing and encouraging multiple accounts.

157.     Defendants have designed their products in a manner that allows and/or does not prevent such use to increase user engagement and, thereby, increase their own profits.

**E.     Defendants' Business Model is Based on Maximizing User Screen Time and Defendants Know That their Products are Addictive**

158.     Defendants advertise their products as "free," because they do not charge their users for downloading or using their products. What many users do not know is that, in fact, Defendants make a profit by finding unique and increasingly dangerous ways to capture user attention and target advertisements to their users. Defendants receive revenue from advertisers who pay a premium to target advertisements to specific demographic groups of users in the applications. Defendants also receive revenue from selling their users' data to third parties.

159.     The amount of revenue Defendants receive is based upon the amount of time and level of user engagement on their platforms, which directly correlates with the number of advertisements that can be shown to each user.

160.     Defendants use unknown and changing rewards that are designed to prompt users who consume their social media products in excessive and dangerous ways. Defendants know, or in the exercise of ordinary care should know, that their designs have created extreme and addictive usage by their minor users, and Defendants knowingly or purposefully designed its products to encourage such addictive behaviors. For example, all the achievements and trophies in Snapchat are unknown to users. The Company has stated that "[y]ou don't even know about the achievement until you unlock it." This design conforms to well-established principles of operant conditioning wherein intermittent reinforcement provides the most reliable tool to maintain a desired behavior over time.

161.     This design is akin to a slot machine but marketed toward minor users who are even more susceptible than gambling addicts to the variable reward and reminder system

designed by Snapchat. The system is designed to reward increasingly extreme behavior because users are not actually aware of what action will unlock the next award.

162.    Instagram, like Snapchat and TikTok, is designed around a series of features that do not add to the communication utility of the application, but instead seek to exploit minor users' susceptibility to persuasive design and unlimited accumulation of unpredictable and uncertain rewards, including "likes" and "followers." In the hands of children, this design is unreasonably dangerous to the mental well-being of underage users' developing minds. This design proximately caused Englyn Roberts' death.

163.    According to industry insiders, Defendants have employed thousands of psychologists and engineers to help make their products maximally addicting. For example, Instagram's "pull to refresh" is based on how slot machines operate. It creates an endless feed, designed to manipulate brain chemistry and prevent natural end points that would otherwise encourage users to move on to other activities.

164.    Defendants do not warn users of the addictive design of their product. On the contrary, Defendants actively try to conceal the dangerous and addictive nature of their products, lulling users and parents into a false sense of security. This includes consistently playing down their products' negative effects on teens in public statements and advertising, making false or materially misleading statements concerning product safety, and refusing to make their research public or available to academics or lawmakers who have asked for it.

165.    Defendants have repeatedly represented to the public and governments around the world that their products are safe and not addictive. Even now, TikTok represents in its community guidelines that its priority is "safety, diversity, inclusion, and authenticity."[20] Snaps Terms of Service claim "We try hard to keep our Services a safe place for all users."[21]

166.    Again, the amount of revenue Defendants receive is based upon the amount

---

[20] https://www.tiktok.com/community-guidelines?lang=en
[21] *See* Snap, Inc. Terms of Service, ¶ 9.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

of time and user engagement on their platforms, which directly correlates with the number of advertisements that can be shown to each user. In short, Defendants opted for user engagement over the truth and user safety.

167. Defendants' social media products are built around a series of design features that do not add to the communication and communication utility of the applications, but instead seek to exploit users' susceptibility to persuasive design and unlimited accumulation of unpredictable and uncertain rewards (including things like "likes" and "followers" and "views" and "streaks" and "trophies"). This design is unreasonably dangerous to the mental well-being of underage users' developing minds, and these social media companies know it.

168. Defendants know that their products are addictive, and that millions of teen users want to stop using them but cannot.

169. Defendants engineer their products to keep users, and particularly young users, engaged longer and coming back for more. This is referred to as "engineered addiction," and examples include features like bottomless scrolling, tagging, notifications, and live stories.

170. Defendants spend billions of dollars marketing their products to minors, and have deliberately traded in user harm for the sake of their already astronomical revenue stream.

**F. Defendants Have Designed Complex Algorithms to Addict Teen Users and Their Business Models Are Based on Maximizing User Screen Time**

171. Defendants have intentionally designed their products to maximize users' screen time, using complex algorithms designed to exploit human psychology and driven by the most advanced computer algorithms and artificial intelligence available to three of the largest technology companies in the world.

172. Defendants' algorithms select content for minor users not based on what they anticipate the user will prefer or to enhance their social media experience, but rather for the express purpose of habituating users to the Defendants' social media products. Defendants'

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

algorithms do not provide a neutral platform but rather specify and prompt the type of content to be submitted and determine particular types of content its algorithms promote.

173. Defendants designed and have progressively modified their products to promote problematic and excessive use that they know is indicative of addictive and self-destructive use.

174. One of these features—present in Snapchat, Instagram, and TikTok—is the use of complex algorithms to select and promote content that is provided to users in an unlimited and never-ending "feed." Defendants know that algorithm-controlled feeds promote unlimited "scrolling"—a type of use those studies have identified as detrimental to users' mental health—however, this type of use allows Defendants to display more advertisements and obtain more revenue from each individual user.

175. Defendants' algorithm-controlled features are designed to promote content likely to increase user engagement, which often means content Defendants know to be harmful. This is content that users might otherwise never see but for Defendants' sorting, prioritizing, and/or affirmative pushing of such content to their accounts.

176. In the words of one, high-level departing Meta employee,

> In September 2006, Facebook launched News Feed. In October 2009, Facebook switched from chronological sorting to an algorithmic ranking. 10 years later, in July 2019, Sen. Josh Hawley introduced a bill to the US Senate that would ban features in app feeds, such as infinite scroll.
>
> The response in 2006 was largely positive; the response in 2009 was negative from a vocal minority, but still largely positive; the response in 2019 was largely "lol, wut?" If I had to guess, the response to government regulation around engagement centric information feeds in 2026 will be "Omg finally".

"Why We Build Feeds" (October 4, 2019), at p. 1.[22]

---

[22] https://www.documentcloud.org/documents/21600853-tier1_rank_exp_1019

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

177. The addictive nature of Defendants' products and the complex and psychologically manipulative design of their algorithms is unknown to ordinary consumers, particularly minors.

178. Defendants go to significant lengths to prevent transparency, including posing as a "free" social media platform, burying advertisements in personalized content, and making public statements about the safety of their products that simply are not true.

179. Defendants also have developed unique product features designed to limit, and have in other ways limited, parents' ability to monitor and prevent problematic use by their children.

180. Defendants' algorithms adapt to promote whatever content will trigger minor users' engagement and maximize their screen time. Defendants' algorithm designs do not distinguish, rank, discriminate, or prioritize between particular content based on whether it is helpful or harmful to the psychic well-being of their minor users. Once a minor user engages with abusive, harmful, or destructive content, Defendants' algorithms will direct the minor user to content that is progressively more abusive, harmful, and destructive to maximize the user's screen time.

181. Defendants' algorithms are not simply tools meant to facilitate the communication and content of others but are content in and of themselves. Defendants' algorithms do not function like traditional search engines that select particular content for users based on user inputs; they direct minor users to content based on far more than the individual users' viewing history. Defendants' algorithms make recommendations not simply based on minor users' voluntary actions but also the demographic information and social media activity of the users' friends, followers, and cohorts. The user data that Defendants' algorithms use to select content therefore encompasses far more information than voluntarily furnished by the particular user and include private information about the user that Defendants discover through undisclosed surveillance of their behavior both online and offline.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

182.     These addiction-driven algorithms are designed to be content neutral. They adapt to the social media activity of individual users to promote *whatever* content will trigger a particular user's interest and maximize their screen time. That is, prior to the point when Defendants have addicted their users and are then able to influence user preferences, their algorithm designs do not distinguish, rank, discriminate, or prioritize between types of content. For example, if the algorithm can increase User One engagement with elephants and User Two engagement with moonbeams, then Defendants' algorithm design will promote elephant content to User One and moonbeam content to User Two. These types of algorithms are solely quantitative devices and make no qualitative distinctions between the nature and type of content they promote to users – as long as those promotions increaser user engagement.

**B. Minor Users' Incomplete Brain Development Renders Them Particularly Susceptible to Manipulative Algorithms with Diminished Capacity to Eschew Self-Destructive Behaviors and Less Resiliency to Overcome Negative Social Media Influences**

183.     The human brain is still developing during adolescence in ways consistent with adolescents' demonstrated psychosocial immaturity. Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotional regulation, and impulse control.

184.     The frontal lobes—and, in particular, the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control, and executive decision-making. These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses. MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature.

185.     During childhood and adolescence, the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

connecting different parts of the brain become insulated with white fatty tissue called myelin. Second, during childhood and adolescence, the brain is undergoing "pruning"—the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and into young adulthood.

186.     In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition. As such, the part of the brain that is critical for control of impulses and emotions and for mature, considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

187.     The algorithms in Defendants' social media products are designed to exploit minor users' diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency caused by users' incomplete brain development. Defendants know, or in the exercise of reasonable care should know, that because their minor users' frontal lobes are not fully developed, they experience enhanced dopamine responses to stimuli on Defendants' social media platforms and are therefore much more likely to become addicted to Defendants' products; exercise poor judgment in their social media activity; and act impulsively in response to negative social media encounters. Defendants also know, or in the exercise of reasonable care should know, that minor users of their social media products are much more likely to sustain serious physical and psychological harm through their social media use than adult users. Nevertheless, Defendants knowingly designed their social media products to be addictive to minor users and failed to include in their product design any safeguards to account for and ameliorate the psychosocial immaturity of their minor users.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

**G.    Defendants Misrepresent the Addictive Design and Effects of Their Social Media Product**

188.    During the relevant time period, Defendants stated in public comments that their products are not addictive and were not designed to be addictive. Defendants knew or should have known that those statements were untrue.

189.    During the relevant time period, Defendants advertised via commercials and/or third parties that their products were fun and safe to use, and that Defendants employed their technologies to ensure safe and age-appropriate experiences. Defendants knew or should have known that those statements were untrue.

190.    Neither Meta, TikTok, or Snapchat warned users or their parents of the addictive and mentally harmful effects that the use of their products was known to cause amongst minor users. On the contrary, Defendants have gone to significant lengths to conceal and/or avoid disclosure as to the true nature of their products.

**H.    Plaintiffs Expressly Disclaim Any and All Claims Seeking to Hold Defendants Liable as the Publisher or Speaker of Any Content Provided, Posted, or Created by Third Parties**

191.    Plaintiffs seeks to hold Defendants accountable for their own alleged acts and omissions. Plaintiffs' claims arise from Defendants' status as designers and marketers of dangerously defective social media product, as well as Defendants' own statements and actions, not as the speaker or publisher of third-party content.

192.    Defendants' have designed their products to be addictive. For example, Defendants have developed and modified product features like the continuous loop feed and push notifications, to incentivize users to stay on the product as long as possible and to convince users to log back on. Defendants even calculate the most effective time to send such notifications, which in the case of teen and tween users often means in the middle of the night and/or during school hours. Essentially, the times they are least likely to have access to Defendants' social media products, which also—as Defendants know—are the times that

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

their health and well-being necessitate them not being on Defendants' social media product. Defendants' products are designed to and do addict users on a content neutral basis.

193. The structure of these social media products and the technologies Defendants' design and utilize are, standing alone, harmful to users and irrespective of content. For example, a primary purpose of Defendants' algorithm designs is to determine individual user preferences first so that Defendants can then influence user behavior and choices second—which is particularly dangerous in the case of teens.

194. In the case of Meta, for example, Meta uses its product both to "experiment" on and test its users in ways heretofore unimagined, but also, it seeks to control user behavior through product features and capabilities and for the specific purpose of acquiring and retaining users. Defendants Snap and TikTok likewise seek to control user behavior through product features and capabilities and for the specific purpose of acquiring and retaining users.

195. On a content neutral basis, the manipulation and control these Defendants knowingly wield over their users daily is profoundly dangerous.

196. Defendants are responsible for these harms. These harms are caused by Defendants' designs and design-decisions, and not any single incident of third-party content.

197. Yet Defendants failed to warn minor users and their parents of known dangers arising from anticipated use of their social media products. These dangers are unknown to ordinary consumers but are known to Defendants. Moreover, these dangers do not arise from third-party content contained on Defendants' social media platforms. This lawsuit does not involve a suit against a web browser provider for making available third-party content. To the contrary, Defendants,

    a. Design and constantly re-design their social media products to attract and addict teens and children, their "priority" user group.

    b. Design and continue to operate their social media products to ensure that teens and children can obtain unfettered access, even over parental objection.

    c. Know when teens and children are opening multiple accounts and when they

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

are accessing their products excessively and in the middle of the night.

    d.   Work with advertisers and influencers to create and approve harmful content and provide direct access to teens and children – a user population Defendants know to be vulnerable.

    e.   Operate and provide the above social media products with the single-minded goal of increasing user engagement, including but not limited to things like maintaining harmful social comparison features and approving product programming that promotes harmful content over clear dangers to user safety.

198.    While it may be a third party creates a particular piece of harmful content, the teens and children harmed by Defendants' social media products are not being harmed by a single piece of harmful content. They are being harmed by Defendants' products, programming, and decisions to expose teens and children to harmful product features and to show teens and children a constant barrage of harmful content to obtain more advertising revenue and increase engagement.

199.    Englyn Roberts and children like her do not open social media accounts in the hopes of become addicted. Nonetheless, such children *do* become addicted, leading them to engage in foreseeable addict behaviors, such as lying to their parents, hiding their use of Defendants' products, losing control, becoming irritable and depressed when access is denied, and hyper-vigilance to avoid detection. These and other behaviors can and do result in serious harm to Defendants' minor users and resulted in serious harm to Englyn Roberts and her parents.

200.    Englyn Roberts and children like her do not start using social media in the hopes of being exposed to product features that cause harm to them. Yet the use of Instagram, Snapchat, and TikTok involves harmful forms of social comparison and inevitably pushes such children towards harmful "rabbit holes," causing anxiety, depression, eating disorders, and self-harm—harms at least some of these Defendants acknowledge in internal documents. Defendants' products caused these harms to Englyn Roberts and her parents.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

201.    The harms at issue in this case do not relate to or arise from third party content, but rather, Defendants' product features and designs, including algorithms and other technology that (a) addicts minor users to their products; (b) amplify and promote harmful social comparison through product features; (c) affirmatively select and promote harmful content to vulnerable users based on its individualized demographic data and social media activity; and (d) put minor users in contact with dangerous adult predators and otherwise expose to them to seemingly unstoppable unwanted interactions from persons not on their friend list or equivalent. Indeed, the foregoing are merely examples of the kinds of harms at issue in this case.

202.    Defendants' products are addictive on a content neutral basis. Defendants design and operate their social media products in a manner intended to and that does change behavior and addict users, including through a natural selection process that does not depend on or require any specific type of third-party content, as well as mechanisms and features meant to release dopamine. Defendants deliberately addict teen users and the harms resulting from these addictions are foreseeable, even known, to Defendants.

203.    Defendants have designed other product features for the purpose of encouraging and assisting children in evasion of parental oversight, protection, and consent, which features are wholly unnecessary to the operation of Defendants' product. This includes but is not limited to Defendants' wholesale failure to check identification or verify validity of user-provided email credentials, while simultaneously implementing product design features (such as easier ability to switch between accounts, in the case of Meta) meant to ensure easy access by children and teens, irrespective of parental consent. Likewise, Defendants—even those who claim to permit only one account—know that teen users are opening multiple accounts and fail to prevent such abuses.

204.    Defendants also promote, encourage, and/or otherwise contribute to the development of harmful content. This Complaint has quoted from just a few of the thousands of Meta documents disclosed by the Facebook whistleblower, which establish this, and

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

Plaintiffs anticipate finding the same types of evidence in discovery with TikTok and Snap. One of biggest hurdles to discovery of these claims and the harms Defendants have caused is that none of these defendants have ever been willingly transparent or cooperate regarding disclosure of their product designs and operations. In this manner too these defendants have actively concealed such harms.

205.     Defendants also approve ads that contain harmful content, for example, and as discussed at the Senate hearing held on October 5, 2021 regarding Meta,[23]

> **Senator Mike Lee: (01:21:34)**
> Now, since that exchange happened last week, there are a number of individuals and groups, including a group called the Technology Transparency Project or TTP, that have indicated that that part of her testimony was inaccurate. That it was false. TTP noted that TTP had conducted an experiment just last month, and their goal was to run a series of ads that would be targeted to children ages 13 to 17, to users in the United States. Now, I want to emphasize that TTP didn't end up running these ads. They stopped them from being distributed to users, but Facebook did in fact approve them. As I understand it, Facebook approved them for an audience of up to 9.1 million users, all of whom were teens.
>
> **Senator Mike Lee: (01:22:31)**
> I brought a few of these to show you today. This is the first one I wanted to showcase. This first one has a colorful graphic encouraging kids to, "Throw a Skittles party like no other," which as the graphic indicates, and as the slang jargon also independently suggests, this involves kids getting together randomly to abuse prescription drugs. The second graphic displays an ana tip. That is a tip specifically designed to encourage and promote anorexia. It's on there. Now the language, the ana tip itself independently promotes that. The ad also promotes it in so far as it was suggesting. These are images you ought to look at when you need motivation to be more anorexic, I guess you could say. Now the third one invites children to find your partner online and to make a love connection. "You look lonely. Find your partner now to make a love connection."

---

[23] https://www.rev.com/blog/transcripts/facebook-whistleblower-frances-haugen-testifies-on-children-social-media-use-full-senate-hearing-transcript ("October 5, 2021, Senate Hearing Transcript").

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

206.    In other words, Defendant Meta approves advertisements "designed to encourage and promote anorexia" and encouraging children to abuse prescription or illegal drugs, which ads Meta then targets specifically at children in exchange for payment from the advertisers. On information and belief, Snapchat and TikTok do as well.

207.    Defendants utilize private information of their minor users to "precisely target [them] with content and recommendations, assessing what will provoke a reaction," including encouragement of "destructive and dangerous behaviors." Again, Defendants specifically select and push this harmful content, for which they are then paid, and do so both for that direct profit and also to increase user engagement, resulting in more profits down the road. "That's how [Defendants] can push teens into darker and darker places."[24] Defendants know that their products can push children "all the way from just something innocent like healthy recipes to anorexia promoting content over a very short period of time."[25] Defendants know that their products the content they are encouraging and helping to create is harmful to young users and choose "profits over safety"[26] any way.

208.    None of Plaintiffs' claims rely on treating Defendants as the publisher or speaker of any third party's words or content. Plaintiffs' claims seek to hold these Defendants accountable for their own allegedly wrongful acts and omissions, not for the speech of others or for any good faith attempts on the part of these Defendants to restrict access to objectionable content.

209.    Plaintiffs is not alleging that Defendants are liable for what the third parties said, but for what Defendants did.

210.    None of Plaintiffs' Claims for Relief set forth herein treat Defendants as a speaker or publisher of content posted by third parties. Rather, Plaintiffs seek to hold Defendants liable for their own speech and their own silence in failing to warn of foreseeable dangers arising from anticipate use of their products. Defendants could manifestly fulfill

---

[24] *Id*.
[25] October 5, 2021, Senate Hearing Transcript, Ms. Francis Haugen at 00:37:34.
[26] *Id*. at 02:47:07.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

their legal duty to design a reasonably safe social product and furnish adequate warnings of foreseeable dangers arising out of the use of their products without altering, deleting, or modifying the content of a single third- party post or communication. Some examples include,

    a. Not using their addictive and inherently dangerous algorithm and similar technologies in connection with any account held by a user under the age of 18.

    b. Not permitting any targeted advertisements to any user under the age of 18.

    c. Prioritizing internally their removal of harmful content (content their systems are promoting and amplifying) over the risk of losing some user engagement.

    d. Requiring identification upon opening of a new account, requiring parental consent for users under the age of 18 (which Snap and Tiktok currently claim to do but do not actually enforce in any way), and restricting users under the age of 18 to a single account.

    e. Requiring verification by email when a user opens a new account. Not requiring verification allows underage users to access these social media products and does not stop bad actors.

    f. Immediate suspension of accounts where Defendants have reason to know that the user is under the age of 13, including when the user declares that they are under the age of 13 in their bio or comments or chats and/or messages with any third party and where Defendants can determine an "estimated" age of under 13 based on other information they collect and/or have in their possession (including, for example, posted videos that clearly feature children under 13); and not allowing the account to resume until the user provides proof of age and identity and/or parental consent.

    g. Suspension of accounts and, in some cases, user bans, where Defendants have reason to know that the user is over the age of 18, but where they are providing

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

information to suggest that they are minors and/or are representing themselves as minors to other users; and not allowing the account to resume until the user provides proof of age and identity.

h.  Removing social comparison features and/or hiding those features to reduce their harmful impact on teen users.

i.  Instituting advertising safeguards to ensure that Defendants are not profiting directly from or otherwise pushing or endorsing harmful advertising content, and removing advertising targeting tools so that advertisers cannot harm vulnerable user groups by aiming harmful advertisements at them.

j.  Requiring that all teen user accounts be set to private and not allowing any user under the age of 18 to change user settings to public.

k.  Removing all friend and group and content recommendation systems that involve teen users in any way (so, not recommending to teen users, but also, not recommending teen users to adults) and not permitting direct messaging, snaps, or other forms of direct communication with any user under the age of 18 not already hon the other user's friend list.

211.  These are just some examples, all of which could be accomplished easily and/or at commercially reasonable cost. Defendants know that they can make these change and, in many cases, have discussed these or similar changes internally. However, they have not instituted these types of safety features because they know that doing so would impact their astronomical revenue.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

1

2

### I.  Englyn Roberts' Death was Proximately Caused by Defendants' Social Media Products



3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

212.    Englyn Roberts was born on July 21, 2006, and grew up in New Iberia, Louisiana. She was the youngest of eight children.

213.    Englyn was a bubbly teenager. She loved spending time with family, eating at different restaurants, and travelling to different places. She enjoyed dancing, with hip hop and lyrical dance being her favorites, and had dreams of going to college and becoming a choreographer with her own dance studio someday.

214.    Englyn enjoyed getting together on weekends and cooking outside in the backyard. She would play her music loudly and sing and dance to entertain the family. She was the baby of the family, the center of attention, and the heart.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

1
2
3
4
5
6
7
8
9
10
11
12



13    215.    When Englyn was eleven years old, she was given her first cell phone and,

14  shortly thereafter, she downloaded Defendants' social media products without her parents'

15  knowledge or consent. Her parents provided her with the cell phone so that she would have

16  internet access, could take photos, and could stay in touch with family and friends. Not for

17  social media.

18    216.    Her parents required the access code to Englyn's phone and said that anytime

19  Englyn changed that code she needed to provide them with the new one, which she did.

20    217.    What Plaintiffs did not know is that Defendants make sure that underage

21  children can access their social media products, including by marketing to children, failing

22  to verify age or identity (even when the children openly admitted to being underage on their

23  public profile and/or in posts and comments which), and permitting opening of multiple

24  accounts. It was understood among children that Meta wouldn't close your account for being

25  under 13. You just had to say you were 13 when opening an account and could then tell

26  people your real age. In fact, this is something many kids still do. It also was understood

27  among children that Meta did not object to kids using more than one account, which made it

28

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

easier to hide more personal content and the existence of secondary accounts from parents and family—often referred to as a SPAM account or, in Instagram's case, a FINSTA (short for "fake Instagram").

218.    Defendants designed Instagram, TikTok, and Snapchat to frustrate and prevent parents like Brandy and Toney Roberts from exercising their rights and duties as parents to monitor and limit their child's use of their social media products. Plaintiffs were not aware when Englyn's social media usage started, nor did they ultimately know which products she used or how many accounts she opened without their knowledge or consent.

219.    Englyn's social media use coincided with a gradual decline in her mental health. Englyn became addicted to Defendants' products and spent increasing amounts of time communicating on social media, and engaged in the video, games, and reward features of Defendants' social media products.

220.    Shortly after Englyn got her phone, her mother realized that Englyn was staying up at night on her cell phone. Her parents thought she was watching videos on the internet and chatting with friends, as they still did not know about Englyn's social media use. Englyn had always been a well-behaved child, so her parents trusted her to use the phone responsibly. When they realized she was staying up on the phone, however, they instituted a 10:00 p.m. rule for all devices: Englyn's phone had to be turned off by 10:00 p.m. each night.

221.    Englyn agreed and told her parents that she would make sure her phone was off by 10:00 p.m. Unfortunately, she was already addicted to Defendants' social media products by that point – which addiction her parents had no knowledge of – and which caused her to break the 10:00 p.m. rule to use social media. One night, Englyn's mother couldn't sleep and caught her awake with the cell phone on in her room. Brandy and Toney Roberts now believe that Englyn had been regularly staying awake and was suffering from sleep deprivation due to her use of Defendants' social media products, and Defendants' failure to verify age and identity. Indeed, Defendants should not have been providing Englyn with access to their social media products at all as she was under the age of 13, which Defendants

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

knew or should have known based on her photos and other information in Defendants' possession, custody, and control.

222. Regardless, from that point forward Brandy Roberts took Englyn's phone downstairs with her each night when she went to bed. Englyn then started waiting until Brandy or both of her parents were asleep and would retrieve the phone so that she could use social media throughout the night. She was always careful to replace the phone before Brandy woke up in the morning, and never got caught.

223. Occasionally, Brandy Roberts would restrict Englyn's cell phone access, though usually not for more than a few hours or a day. Nonetheless, these efforts at exercising Plaintiff's parental rights and authority caused severe reactions in Englyn. Because of Englyn's social media addiction, she would panic without her cell phone and beg to get it back. She would tell her parents that they could do anything, except take her cell phone away. She would promise to do her chores, bring up her grades, or anything else that might get her the cell phone back – she said that she could not live without it. During these times when Englyn did not have social media access she would get anxious and depressed and would cry and sleep until she got her cell phone back. Once she had her phone back, everything seemed fine again.

224. Englyn's parents did not learn about her social media accounts and usage until more than a year after she got her phone.

225. The family was on vacation and Englyn could not go anywhere without her phone. Her parents told her that she needed to leave for several hours, while the family went out and so that they could spend time together and without electronic devices, and Englyn became anxious and stressed. She panicked. She said that she could not go out without her phone because she would lose her "streaks," and she needed to always have it with her. That is how Plaintiffs learned about Englyn's Instagram and Snapchat accounts.

226. Englyn's parents were not familiar with these social media products but had seen Snapchat commercials on TV and on their own phones and understood from those

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

commercials that Snapchat was a product used a lot by kids to send disappearing photos to friends. Based on Snapchat's advertisements, Brandy and Toney Roberts understood and reasonably believed that Snapchat was a product marketed to kids, and that it was a fun and safe photo sharing application. Their understanding of Instagram based on marketing and available information was that Instagram was also something widely used by kids, and to keep in touch with one another. They had some knowledge of Facebook, which was used to keep in touch with friends and family and understood that Instagram was basically a Facebook type product but marketed and used by kids more than adults.

227. They did not learn about Englyn's TikTok account until later.

228. What her parents also did not know at that time was that, as a proximate result of her use of Instagram, Snapchat, and TikTok, specifically due to the intentionally addictive nature of these products as well as the harmful content they were promoting and amplifying to Englyn via various algorithmically drive product features and harmful social comparison features, Englyn Roberts had begun to suffer from depression, anxiety, self-harm, and suicidal ideation.

229. On the outside, Englyn appeared to still be a happy child. She began having a few small issues at school and, of course, missed her friends when COVID started in early 2020. But otherwise, she continued to enjoy family parties on the weekend, and continued to entertain her loved ones with singing and dancing every chance she got.

230. On August 28, 2020 – one day before Englyn tried to take her life – she was goofing around with her mom. She took and sent a photo of herself with her favorite teddy,

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP



Then she found her mom napping, so took and sent a photo of her mom with her favorite teddy too,

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP



231. Plaintiffs had no way of knowing what Defendants' social media products were doing to their precious child while, in sharp contrast, Meta, Snap, and TikTok knew or should have known that they were causing this harm to Englyn, including based on her age, usage information, and usage patterns—which each of these defendants collects and, on information and belief, closely tracks—and content to which each of these defendants were repeatedly exposing her via unsolicited methods, such as push notifications and algorithmically driven recommendation systems.

232. Defendants provided eleven-year-old Englyn with access to multiple accounts on Defendants' social media platforms without her parents' knowledge or consent.

233. Defendants knew or should have known that Englyn was under the age of 13 and obtained (multiple) social media accounts yet failed to restrict her access or notify her parents of her account status.

234. Defendants promoted and amplified harmful content, resulting in self-harm, suicidal ideation, and, eventually, death.

235.     But for Meta, Snap, and TikTok's failure to conduct a reasonable age verification, Englyn Roberts would not have been exposed to the harmful features and design of their respective social media products.

236.     But for certain product features (to name only a few examples, Instagram and TikTok's "like" features and Snapchat's "Snap Streak" feature), Englyn Roberts would not have experienced the anxiety and depression that stem from harmful social comparison designs.

237.     But for the algorithmic discrimination contained in all three of the social media products at issue, including recommendation systems as well as content promotion and display systems, Englyn Roberts would not have been targeted and overwhelmed by disproportionately violent, sexual, and other harmful content.

238.     But for the recommendation, public profile, and direct messaging settings designed, implemented, and utilized by all three of the social media products at issue, Englyn Roberts would not have suffered exploitation and bullying by strangers utilizing Defendants' platforms for that purpose and in a foreseeably damaging manner – that is, the degree of harm caused by certain events is amplified exponentially by Defendants' products designs, additive characteristics, and available or default settings.

239.     But for the endless feed and explore features characteristic of all three of the social media products at issue, Englyn Roberts would not have experienced the harmful dependencies that these features were designed to promote.

240.     In 2019, Englyn was photographed at a family event using the Instagram social media product,

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP



241.    What no one knew at that time was that, while Englyn appeared to be doing fine to her parents and family, in fact, she was being bombarded by Instagram, Snapchat, and TikTok with harmful images and videos (ranging from harmful social comparison content to violent and disturbing content glorifying self-harm and suicide). She was also receiving sexual and exploitative direct messages from strangers, which are allowed and enabled by all three of the social media products at issue, along with Defendants' harmful connection and content recommendations – all of which would eventually kill her.

242.    These social media companies were not providing fun and safe photo sharing services, but rather, were dealing in incredibly addictive product features and pushing harmful algorithmically driven content, intended to keep Englyn hooked on their products by any means necessary.

243.    Meta, Snap, and TikTok's social media products also made harmful recommendations to and about Englyn Roberts, connecting her with strangers to increase

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

their own engagement and thereby their own profits, which recommendations had nothing to do with any communication or informational aspects of Defendants' products.

244. Meta, Snap, and TikTok's social media products also provided other users with unfettered access to Englyn through public profiles and features (in the case of Meta and TikTok), recommendation systems (in the case of Meta, Snap, and TikTok), and features that provided direct messaging access to Englyn regardless of her minor status, regardless of whether other users were on her "friends" list or equivalent, and regardless of duration, time of day, or frequency (Meta, Snap, and TikTok).

245. In 2018 and 2019, Englyn began interacting with and then sharing content about depression, suicidal ideation, and self-harm via Defendants' social media apps, unbeknownst to her parents and teachers. Defendants not only had knowledge as to what was happening, but in many cases, were the ones recommending the harmful content.

246. Meta, Snap, and TikTok also utilized algorithms and/or similar technologies to steer Englyn towards and otherwise promote and amplify harmful and unsolicited content. Defendants are not only aware of their promotion and amplification of harmful content but knew or should have known that the harms caused by their marketing and amplification systems would be exacerbated by Englyn's sleep deprivation. On information and belief, all three of these defendants collect and track usage information and know when teens and children are using their products, know when they are using them at night, and know when such use is harmful.

247. Defendants' algorithms and similar technologies are designed to exploit these social media caused vulnerabilities. The more addicted and sleep deprived a user becomes, the more Defendants' systems promote and amplify harmful content and the more push notifications Defendants' systems send.

248. In September 2019, Englyn and her friend began exchanging links to incredibly harmful and violent page and users they had found because of Instagram's algorithm and recommendation systems, which content Instagram hosted on its platform for

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

years while young users, like Englyn, continued sharing and viewing the incredibly harmful and violent content with alarming frequency. The content can no longer be found on Instagram, as Meta finally enforced its own Terms of Service and deleted the account in December of 2021 – but not before Meta's algorithms recommended this content to any number of children.

249.     In September of 2019, Englyn and her friend messaged each other with the harmful content recommended and/or promoted by Instagram,



COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

The posting person's username was **gasstati0nparty** though, on information and belief, this user's content is posted under more than one username. In one of the videos exchanged on September 19, 2019, the woman hung herself with an extension cord attached to a door,



This is the kind of material Instagram's algorithm was recommending to 13-year-old girls in September of 2019, and it remained in Englyn's Instagram messages until December of 2021, more than a year after Englyn's death, when Instagram finally deleted this account.

250.    The sleep deprivation caused by addiction and amplification of harmful content to which Englyn was exposed through her addiction to Defendants' social media products was a proximate cause of her depression, anxiety, self-harm, and suicidal ideation.

68

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

251.    On June 13, 2020, Englyn wrote to Instagram username **brayreggiontae_**, "right just think people be suicidal for no reason." **brayreggiontae_** replied, "And people still wouldn't understand."

252.    On July 15, 2020, Englyn wrote to Instagram username **lexy.paull**, "but if i ever hurt myself tell my parents that it wasn't there fault it's my problems with finding love."



253.    Around this same time, Englyn kept a list of mental health numbers (including a suicide hotline) in her "private story" feature on Instagram and was exchanging pictures showing self-harm with one or more of her "friends" on Instagram. Meta knew that Englyn was a minor and said and did nothing to alert her parents or teachers to what was transpiring on its platform and because of the harms caused by Defendants' social media products – harms Meta itself was already studying and knew about as being among the impacts and effects of use of the social media products at issue in this case.

254. July 21, 2019, Englyn and her family celebrated her 14th birthday.



The celebration started early in the day and finished with an evening game of Top Golf,

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP



255.    On August 11, 2020, Englyn typed an "emotional description" relating to her social media use into her cell phone's note pad application. She wrote,

Emotional description

It's only what the media sees I show ppl what they want to see but behind the social media life nobody knows the real me and how much I struggle to make sure everyone's good even though I'm not, if it's not one thing it's the other and when things are going wrong for me I just become so suicidal and I just need that emotional support I don't want anyone feeling bad for me just to support my choices I make in life, I want somebody to help me through my mental struggle bc if no ones there who do I have?



256.    On August 15, 2020, Englyn spent the day with her parents, as she often did,

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

257.    On August 21, 2020, Englyn spent the day at the beach having fun,



258.    On August 22, 2020, Englyn and her parents went on an outing to enjoy nature,

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15     259.    On August 23, 2020, Englyn and her family went out for dinner,

16
17
18
19
20
21
22
23
24
25
26
27
28



COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

260. On August 28, 2020, Englyn took goofy selfies for social media,



261. On August 29, 2020, at 3:30 a.m., Englyn took an extension cord and attached it to her door – just like she has seen in the Instagram video viewed countless times by herself and other young children – and attempted to choke herself – just like she had seen in the Instagram video viewed countless times by herself and other young children.

262. Englyn texted her boyfriend (with corrections and as taken from police report),

*I just want to die.*

*I can't satisfy anyone.*

*In the closet choking myself, wonder if I'm good enough to stay on Earth, because it's never enough, for anybody, nobody calls me, to check in on me, nobody, not even you, I have no reason but to die, call or I'm stepping off this stool, and I'll be done just like you wanted, never mind, see, take too long, dropping phone, so I won't get what you're saying, bye love you.*

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

263. She then used her phone and took a video of herself crying, in which the extension cord can be seen.

264. Brandy and Toney Roberts received a text message from Englyn's boyfriend's mother at 3:30 a.m., asking them to check on Englyn. They found their daughter hanging from the extension cord moments later. Toney picked her up and laid her on the floor, and Brandy began doing CPR, which she continued until the ambulance arrived.

265. The medics were able to get a pulse, and Englyn was rushed to the hospital, where she stayed on life support for nine days.



Her parents stayed by her side every possible moment, singing to her, playing music, and holding her hand. On September 7, 2020, they made the difficult decision to take Englyn off life support and continued to stay by her side as she left them.

266. Englyn's death devastated her entire family, and her friends. She was a bright

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

light and loved by everyone who knew her, and Plaintiffs had no choice but to assume that her death was caused by some sort of mental illness no one knew about and with no outward symptoms. They became active and vocal on issues of teen mental health awareness and made a commitment to help other families and children if they could. They also tried to reach out to Englyn's friends and other children on social media through postings and messages of positivity and hope.

267.     Then, one week after the anniversary of Englyn's death—the week of September 13, 2021—Toney Roberts was watching the news and learned about the Facebook Whistleblower, Francis Haugen. He began looking for and listening to news on this topic, learning about what Instagram's leadership knew about the harms its products are causing to teen users. To name only one example, Meta recognized that a significant percent of its users are addicted to its products, that children open multiple, secret accounts (referred to by Meta as a "unique value proposition"), and that use of Instagram increases thoughts of what Meta calls "SSI" (Suicide and Self-Injury) in a percentage of teen girls who use it – Englyn was nothing more than a statistic to Defendants, and Defendants chose profits and growth over the health and well-being of unsuspecting teen users like Englyn.

268.     That was when Toney Roberts charged Englyn's old cell phone to see whether the things they were describing on TV were what happened to his daughter. He was able to access some of her social media accounts from her phone and began scouring those with the information now in his possession.

269.     What became clear in September of 2021 is that Englyn's death was the proximate result of psychic injury caused by her addictive use of Instagram, Snapchat, and TikTok.

270.     Throughout the period of Englyn's social media use, Plaintiffs were unaware of the clinically addictive and mentally harmful effects of Instagram, Snapchat, and TikTok. In fact, they were not aware that Englyn was using these products at all until more than a year after she began.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

271.     Defendants designed Instagram, TikTok, and Snapchat to frustrate and prevent parents like Brandy and Toney Roberts from exercising their rights and duties as parents to monitor and limit their child's use of their social media products.

272.     Defendants knowingly designed Instagram, TikTok, and Snapchat to enable minor users such as Englyn Roberts to use, become addicted to, and abuse their products without the knowledge and consent of their parents. In fact, Snapchat's Snap Streaks product feature has been referred to as one of the addictive across all social media platforms, particularly when it comes to teens. Snap has been urged to remove that product feature for years, for the health and safety of children, and has refused.[27]

273.     Defendants designed Instagram, TikTok, and Snapchat to be attractive nuisances to users below the age of 13 such as Englyn Roberts but failed to exercise ordinary care owed to underage business invitees to prevent the recommendation, promotion, and amplification of dangerous and harmful content.

274.     Some if not all of these Defendants possessed actual knowledge that Englyn was below the age of 13 when she began using their products, included based on content in her posts and messages with others users; that she was addicted to their products; that she was being presented with and exposed to excessive amounts of dangerous and harmful content; and that there was a likelihood that she would attempt something dangerous as a result of her use of their social media products, yet Defendants took no steps to terminate her usage, inform her parents of her unauthorized use and exposure to dangerous and harmful content, or notify law enforcement officers.

275.     Defendants not only failed to warn Brandy, Toney, and Englyn Roberts of the dangers of addiction, sleep deprivation, sexual abuse, and problematic use of their applications, but affirmatively misrepresented the safety, utility, and addictive properties of their products to minor users and their parents, including Plaintiffs and Englyn Roberts.

---

[27] *See, e.g.*, https://www.bbc.com/news/technology-47623626 (Snapchat under scrutiny from MPs over "addictive" streaks), March 19, 2019.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

# VI. PLAINTIFF'S CLAIMS

## COUNT I - STRICT PRODUCT LIABILITY (Design Defect)

276. Plaintiffs reallege each and every allegation contained in paragraphs 1 through 275 as if fully stated herein.

277. Under Restatement (Second) of Torts § 402(a) and California law, one who sells any product in a defective condition unreasonably dangerous to the user is subject to liability for physical harm thereby caused to the user if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition which it was sold.

278. Defendants' products are defective because the foreseeable risks of harm posed by the product's design could have been reduced or avoided by the adoption of a reasonable alternative design by Defendants and the omission of the alternative design renders the product not reasonably safe. These defective conditions rendered these products unreasonably dangerous to persons or property and existed at the time the product left Defendants' control, reached the user or consumer without substantial change in the condition and its defective condition was a cause of Plaintiffs' injury.

279. Defendants designed, manufactured, marketed, and sold social media products that were unreasonably dangerous because they were designed to be addictive to the minor users to whom Defendants actively marketed and because the foreseeable use of Defendants' products causes mental and physical harm to minor users.

280. Defendants' products were unreasonably dangerous because they contained numerous design characteristics that are not necessary for the utility provided to the user but are unreasonably dangerous and implemented by Defendants solely to increase the profits they derived from each additional user and the length of time they could keep each user dependent on their product.

### A. Inadequate Safeguards From Harmful and Exploitative Content

281. Snapchat, TikTok, and Instagram are defectively designed.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

282.     As designed, Snapchat, TikTok, and Instagram algorithms and other product features are not reasonably safe because they affirmatively direct minor users to harmful and exploitative content while failing to deploy feasible safeguards to protect vulnerable teens from such harmful exposures. It is feasible to design an algorithm and technologies that substantially distinguish between harmful and innocuous content and protect minor users from being exposed to harmful content without altering, modifying, or deleting any third-party content posted on Defendants' social media products. The cost of designing these products to incorporate this safeguard would be negligible while benefit would be high in terms of reducing the quantum of mental and physical harm sustained by minor users and their families.

283.     As designed, Snapchat, TikTok, and Instagram algorithms and other product features are not reasonably safe because they affirmatively direct and recommend minor users to harmful groups and other users, while failing to deploy feasible safeguards to protect vulnerable teens from such harmful exposures. It is feasible to design an algorithm and technologies that do not make harmful connection recommendations to minor users, or any connection recommendations at all; it is feasible to design and algorithm and technologies that do not recommend harmful groups to minor users, or any group recommendations at all; and it is feasible to restrict access to minor users by strangers and adult users via direct messaging, to restrict and limit such access to users already on a minor user's "friend" list, or to prevent such access altogether. Defendants know that these product features cause a significant number of harms to their minor users, such as sexual exploitation, bullying, and encouragement of self-harm and suicide – all of which are at issue in this case.

284.     Defendants also engage in conduct, outside of the algorithms and related technologies themselves, that is designed to promote harmful and exploitative content as a means of increasing their revenue from advertisements. This includes but is not limited to efforts to encourage advertisers to design ads that appeal to minors, including teens like Englyn Roberts; and product design features intended to attract and engage minor users to

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

these virtual spaces where harmful ad content is then pushed to those users in a manner intended to increase user engagement, thereby increasing revenue to Defendants at the direct cost of user wellbeing.

285.    Reasonable users (and their parents) would not expect that Defendants' products would knowingly expose them to such harmful content and/or that Defendants' products would direct them to harmful content at all, much less in the manipulative and coercive manner that they do. Defendants have and continue to knowingly use their algorithms and other technologies on users in a manner designed to affirmatively change their behavior, which methods are particularly effective on (and harmful to) Defendants' youngest users.

**B.    Failure to Verify Minor Users' Age and Identity**

286.    Snapchat, Tiktok, and Instagram are defectively designed.

287.    As designed, Defendants' products are not reasonably safe because they do not provide for adequate age verification by requiring users to document and verify their age and identity.

288.    Adults frequently set up user accounts on Defendants' social media products disguising their identity and/or posing as minors to groom unsuspecting minors to exchange sexually explicit content and images, which frequently progresses to sexual exploitation and trafficking, and commercial sex acts.

289.    Minor users of social media and their parents do not reasonably expect that prurient adults set up fraudulent accounts on Defendants' social media products and pose as minors for malign purposes.

290.    Likewise, minor users whose parents have taken affirmative steps to keep them away from Defendants' products often open multiple accounts, such that Defendants know or have reason to know that the user is underage and/or does not have parental permission to use their product. Defendants already have the information and means they need to ascertain with reasonable certainty their users' actual age. Defendants utilize these

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

tools to investigate, assess, and report on percentages and totals of underage users for internal assessment purposes. They then choose to simply do nothing about that information as it relates to the specific, underaged users themselves.

291. Reasonably accurate age and identity verification is not only feasible but widely deployed by online retailers and internet service providers. Defendants not only can estimate the age of their users, but they do.

292. The cost of incorporating age and identify verification into Defendants' products would be negligible, whereas the benefit of age and identity verification would be a substantial reduction in severe mental health harms, sexual exploitation, and abuse among minor users of Defendants' products.

## C. Inadequate Parental Control and Monitoring

293. Snapchat, Tiktok, and Instagram are defectively designed.

294. Defendants have intentionally designed products to frustrate the exercise of parental responsibility by their minor users' parents. Parents have a right to monitor their children's social media activity to protect them from harm. Defendants have designed products that make it difficult, if not impossible, for parents to exercise parental responsibility.

295. It is feasible to design a social media product that requires parental consent for users under the age of 18 and prohibits users under the age of 13.

296. Defendants' products are also defective for lack of parental controls, permission, and monitoring capability available on many other devices and applications.

297. Defendants' products are designed with specific product features intended to prevent and/or interfere with parents' reasonable and lawful exercise of parental control, permission, and monitoring capability available on many other devices and applications.

## D. Intentional Direction of Minor Users to Harmful and Exploitative Content

298. Snapchat, Tiktok, and Instagram are defectively designed.

299. Default "recommendations" communicated to new teenage users, including

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

Englyn Roberts, purposefully steered her toward content Defendants knew to be harmful to children of her age and gender.

300. Ad content pushed to new minor users, including Englyn Roberts, because of their age and vulnerability, purposefully steer those users toward content Defendants know to be harmful to children of their age and gender. This defect is only worsened by the algorithmic discrimination that exists in Defendants' products, and operated to the detriment of Englyn Roberts.

**E. Inadequate Protection of Minors from Sexual Exploitation and Abuse**

301. Snapchat, Tiktok, and Instagram are defectively designed.

302. Defendants' products are not reasonably safe because they do not protect minor users from sexually explicit content and images, report sex offenders to law enforcement, or allow users' parents to readily report abusive users to law enforcement.

303. Parents do not expect their children will use Defendants' products to exchange sexually explicit content and images and minor users do not expect that prurient adults pose as minors for malign purposes or that exchange of such content will be deleterious to their personal safety and emotional health.

304. Minor users of Defendants' products lack the cognitive ability and life experience to identify online grooming behaviors by prurient adults and the psychosocial maturity to decline invitations to exchange salacious material.

305. Defendants' products are unreasonably dangerous and defective as designed because they allow minor children to use "public" profiles, in many cases default "public" profiles, that can be mass-messaged by anonymous and semi-anonymous adult users for the purposes of sexual exploitation and grooming, including the sending of encrypted, disappearing messages and cash rewards through Defendants' integrated design features.

**F. Design of Addictive Social Media Products**

306. Snapchat, Tiktok, and Instagram are defectively designed.

307. As designed, Defendants' social media products are addictive to minor users

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

as follows: When minors use design features such as "likes" or "streaks" it causes their brains to release dopamine, which creates short term euphoria. However, as soon as dopamine is released, minor users' brains adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated and their euphoria is countered by dejection. In normal stimulatory environments, this dejection abates, and neutrality is restored. However, Defendants' algorithms are designed to exploit users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria. As this pattern continues over a period of months and the neurological baseline to trigger minor users' dopamine responses increases, they continue to use the social media products at issue, not for enjoyment, but simply to feel normal. Once they stop using these products, minor users experience the universal symptoms of withdrawal from any addictive substance including anxiety, irritability, insomnia, and craving.

308. Addiction is not restricted to a substance abuse disorders. Rather, the working definition of addiction promulgated in the seminal article *Addictive behaviors: Etiology and Treatment* published by the American Psychological Association in its 1988 *Annual Review of Psychology* defines addiction as,

> a repetitive habit pattern that increases the risk of disease and/or associated personal and social problems. Addictive behaviors are often experienced subjectively as 'loss of control' – the behavior contrives to occur despite volitional attempts to abstain or moderate use. These habit patterns are typically characterized by immediate gratification (short term reward), often coupled with delayed deleterious effects (long term costs). Attempts to change an addictive behavior (via treatment or self-initiation) are typically marked with high relapse rates.

309. Addiction researchers agree that addiction involves six core components: (1) salience—the activity dominates thinking and behavior; (2) mood modification—the activity modifies/improves mood; (3) tolerance—increasing amounts of the activity are required to achieve previous effects; (4) withdrawal—the occurrence of unpleasant feelings when the activity is discontinued or suddenly reduced; (5) conflict—the activity causes conflicts in relationships, in work/education, and other activities; and (6) relapse—a tendency to revert to earlier patterns of the activity after abstinence or control.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

310. Social media addiction has emerged as a problem of global concern, with researchers all over the world conducting studies to evaluate how pervasive the problem is. Addictive social media use is manifested when a user (10 becomes preoccupied by social media (salience); (2) uses social media in order to reduce negative feelings (mood modification); (3) gradually uses social media more and more in to get the same pleasure from it (tolerance/craving); (4) suffers distress if prohibited from using social media (withdrawal); (5) sacrifices other obligations and/ or cases harm to other important life areas because of their social media use (conflict/functional impairment); and (6) seeks to curtail their use of social media without success (relapse/loss of control).

311. The Bergen Facebook Addiction Scale (BFAS) was specifically developed by psychologists in to assess subjects' social media use using the aforementioned addiction criteria, and is by far the most widely used measure of social media addiction. Originally designed for Facebook, BFAS has since been generalized to all social media. BFAS has been translated into dozens of languages, including Chinese, and is used by researchers throughout the world to measure social media addiction.

312. BFAS asks subjects to consider their social media usage with respect to the six following statements and answer either (1) very rarely, (2) rarely, (3) sometimes, (4) often, or (5) very often,

313. You spend a lot of time thinking about social media or planning how to use it.

314. You feel an urge to use social media more and more.

315. You use social media in order to forget about personal problems.

316. You have tried to cut down on the use of social media without success.

317. You become restless or troubled if you are prohibited from using social media.

318. You use social media so much that it has had a negative impact on your job/studies.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

Subjects who score a "4" or "5" on at least 4 of those statements are deemed to suffer from social media addiction.

319. Addictive use of social media by minors is psychologically and neurologically analogous to addiction to internet gaming disorder as described in the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5), which is used by mental health professionals to diagnose mental disorders. Gaming addiction is a recognized mental health disorder by the World Health Organization and International Classification of Diseases and is functionally and psychologically equivalent to social media addition. The diagnostic symptoms of social media addiction among minors are the same as the symptoms of addictive gaming promulgated in DSM 5 and include:

320. Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when device is taken away or not possible (sadness, anxiety, irritability).

    a. Tolerance, the need to spend more time using social media to satisfy the urge.

    b. Inability to reduce social media usages, unsuccessful attempts to quit gaming.

    c. Giving up other activities, loss of interest in previously enjoyed activities due to social media usage.

    d. Continuing to use social media despite problems.

    e. Deceiving family members or others about the amount of time spent on social media.

    f. The use of social media to relieve negative moods, such as guilt or hopelessness.

    g. and Jeopardized school or work performance or relationships due to social media usage.

321. Defendants' advertising profits are directly tied to the quantity of their users' online time and engagement, and their algorithms and other product features are designed to maximize the time users spend using the product by directing them to content that is progressively more and more stimulative. Defendants enhance advertising revenue by

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

maximizing users' time online through a product design that addicts them to the platform. However, reasonable minor users and their parents do not expect that online social media platforms are psychologically and neurologically addictive.

322. It is feasible to make Defendants' products not addictive to minor users by turning off the algorithms, limiting the frequency and duration of access, and suspending service during sleeping hours. Designing software that limits the frequency and duration of minor users' screen use and suspends service during sleeping hours could be accomplished at negligible cost; whereas the benefit of minor users maintaining healthy sleep patterns would be a significant reduction in depression, attempted and completed suicide, and other forms self-harm among this vulnerable age cohort.

## G. Inadequate Notification of Parents of Dangerous and Problematic Social Media Usage by Minor Users

323. Snapchat, Tiktok, and Instagram are defectively designed.

324. Defendants' products are not reasonably safe as designed because they do not include any safeguards to notify users and their parents of usage that Defendants knows to be problematic and likely to cause negative mental health effects to users, including excessive passive use and use disruptive of normal sleep patterns. This design is defective and unreasonable because:

325. It is reasonable for parents to expect that social media companies that actively promote their platforms to minors will undertake reasonable efforts to notify parents when their child's use becomes excessive or occurs during sleep time. It is feasible for Defendants to design a product that identifies a significant percentage of its minor users who are using the product more than three hours per day or using it during sleeping hours at negligible cost.

326. Defendants' products are not reasonably safe as designed because, despite numerous reported instances of child sexual solicitation and exploitation by adult users, Defendants have not undertaken reasonable design changes to protect underage users from this abuse, including notifying parents of underage users when they have been messaged or

soliticed by an adult user or when a user has sent inappropriate content to minor users.

327.    Defendants' entire business is premised upon collecting and analyzing user data and it is feasible to use Defendants' data and algorithms and other technologies to identify and restrict improper sexual solicitation, exploitation, and abuse by adult users.

328.    Moreover, it is reasonable for parents to expect that platforms such as Instagram, Snapchat, and TikTok, which actively promote their services to minors, will undertake reasonable efforts to identify users suffering from mental injury, self-harm, or sexual abuse and implement technological safeguards to notify parents by text, email, or other reasonable means that their child is in danger.

329.    As a proximate result of these dangerous and defective design attributes of Defendants' product, Englyn Roberts suffered severe mental harm. Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, of these defective design in Defendants' products until late 2021.

330.    As a result of these dangerous and defective design attributes of Defendants' products, Plaintiffs Brandy and Toney Roberts have suffered emotional distress and pecuniary hardship due to their child's mental harm and death resulting from her social media addiction.

331.    Defendants are further liable to Plaintiffs for punitive damages based upon the willful and wanton design of their products that were intentionally marketed and sold to underage users, whom they knew would be seriously harmed through their use of Instagram, Snapchat, and TikTok.

### COUNT II – STRICT PRODUCT LIABILITY (Failure to Warn)

332.    Plaintiffs reallege each and every allegation contained in paragraphs 1 through 325 as if fully stated herein.

333.    Defendants' products are defective because of inadequate instructions or warnings because the foreseeable risks of harm posed by these products could have been reduced or avoided by the provision of reasonable instructions or warnings by the

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

manufacturer and the omission of the instructions or warnings renders the product not reasonably safe. This defective condition rendered the products unreasonably dangerous to persons or property, existed at the time the products left Defendants' control, reached the user or consumer without substantial change in the condition in which they were sold, and were a cause of Plaintiffs' injuries.

334. Defendants' products are unreasonably dangerous and defective because they contain no warning to users or parents regarding the addictive design and effects of Instagram, Snapchat, and TikTok.

335. Defendants' social media product rely on highly complex and proprietary algorithms and similar technologies that are both undisclosed and unfathomable to ordinary consumers, who do not expect that social media platforms are physically and/or psychologically addictive.

336. The magnitude of harm from addiction to Defendants' product is horrific, ranging from simple diversion from academic, athletic, and face-to-face socialization to sleep loss, severe depression, anxiety, self-harm, and suicide.

337. The harms resulting from minors' addictive use of social media platforms have been not only well-documented in the professional and scientific literature, but Defendants had actual knowledge of such harms.

338. Defendants' products are unreasonably dangerous because they lack any warnings that foreseeable product use can disrupt healthy sleep patterns or specific warnings to parents when their child's product usage exceeds healthy levels or occurs during sleep hours. Excessive screen time is harmful to adolescents' mental health and sleep patterns and emotional well-being. Reasonable and responsible parents are not able to accurately monitor their child's screen time because most adolescents own or can obtain access to mobile devices and engage in social media use outside their parents' presence.

339. It is feasible for Defendants' products to report the frequency and duration of their minor users' screen time to their parents without disclosing the content of

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

communications at negligible cost, whereas parents' ability to track the frequency, time and duration of their minor child's social media use are better situated to identify and address problems arising from such use and to better exercise their rights and responsibilities as parents.

340.    Defendants knew about these harms, knew that users and parents would not be able to safely use their products without warnings, and failed to provide warnings that were adequate to make the product reasonably safe during ordinary and foreseeable use by children.

341.    As a result of Defendants' failure to warn, Englyn Roberts suffered severe mental harm, leading to physical injury from her use of Instagram, Snapchat, and TikTok.

342.    As a result of Defendants' failure to warn, Plaintiffs Brandy and Toney Roberts, have suffered emotional distress and pecuniary hardship due to their child's mental harm resulting from social media addiction.

343.    Defendants are further liable to Plaintiffs for punitive damages based upon their willful and wanton failure to warn of known dangers of their products that were intentionally marketed and sold to teenage users, whom they knew would be seriously harmed through their use of Instagram, Snapchat, and TikTok.

## COUNT III – NEGLIGENCE

344.    Plaintiffs reallege each and every allegation contained in paragraphs 1 through 337 as if fully stated herein.

345.    At all relevant times, Defendants had a duty to exercise reasonable care and caution for the safety of individuals using their products, such Englyn Roberts.

346.    Defendants owe a heightened duty of care to minor users of their social media products because adolescents' brains are not fully developed, which results in a diminished capacity to make good decisions regarding their social media usages, eschew self-destructive behaviors, and overcome emotional and psychological harm from negative and destructive social media encounters.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

347.    As product manufacturers marketing and selling products to consumers, Defendants owed a duty to exercise ordinary care in the manufacture, marketing, and sale of their products, including a duty to warn minor users and their parents of hazards that Defendants knew to be present, but not obvious, to underage users and their parents.

348.    As business owners, Defendants owe their users who visit their social media platforms and from whom they derive billions of dollars per year in advertising revenue a duty of ordinary care substantially similar to that owed by physical business owners to its business invitees.

349.    Defendants were negligent, grossly negligent, reckless and/or careless in that they failed to exercise ordinary care and caution for the safety of underage users, like Enlgyn Roberts, using their social media products.

350.    Defendants were negligent in failing to conduct adequate testing and failing to allow independent academic researchers to adequately study the effects of their products and levels of problematic use amongst teenage users. Defendants know that their products are harmful, cause extensive mental harm, and that minor users are engaging in problematic and addictive use that their parents are helpless to monitor and prevent.

351.    Defendants are negligent in failing to provide adequate warnings about the dangers associated with the use of social media products and in failing to advise users and their parents about how and when to safely use their social media platforms and features.

352.    Defendants are negligent in failing to fully assess, investigate, and restrict the use of their social media products by adults to sexually solicit, abuse, manipulate, and exploit minor users of their social media products.

353.    Defendants are negligent in failing to provide users and parents the tools to ensure their social media products are used in a limited and safe manner by underage users.

354.    As a result of Defendants' negligence, Englyn Roberts suffered severe mental harm from her use of Instagram, Snapchat, and TikTok.

355.    As a result of Defendants' negligence, Plaintiffs Brandy and Toney Roberts

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

have suffered emotional distress and pecuniary hardship due to their child's mental harm resulting from social media addiction.

356.   Defendants are further liable to Plaintiffs for punitive damages based upon its willful and wanton conduct toward underage users, including Englyn Roberts, whom they knew would be seriously harmed through the use of their social media products.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants for relief as follows:

a) Past physical and mental pain and suffering of Englyn Roberts, in an amount to be more readily ascertained at the time and place set for trial;

b) Loss of enjoyment of life, in an amount to be more readily ascertained at the time and place set for trial;

c) Past medical care expenses for the care and treatment of the injuries sustained by Englyn Roberts, in an amount to be more readily ascertained at the time and place set for trial;

d) Past and future impairment to capacity to perform everyday activities;

e) Plaintiffs' pecuniary loss and loss of Englyn Roberts's services, comfort, care, society, and companionship to Brandy and Toney Roberts;

f) Loss of future income and earning capacity of Englyn Roberts;

g) The $8,927.02 Plaintiffs paid to bury their 14-year-old daughter;

h) Punitive damages;

i) Injunctive relief, including, but not limited to, ordering Defendants to stop the harmful conduct alleged herein, remedy the unreasonably dangerous algorithms in their social media products, and provide warnings to minor users and their parents that Defendants' social media products are addictive and pose a clear and present danger to unsuspecting minors;

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

1      j)   Reasonable costs and attorney and expert/consultant fees incurred in prosecuting this

2          action; and

3      k)   Such other and further relief as this Court deems just and equitable.

4          Dated: July 20, 2022.

                                    SOCIAL MEDIA VICTIMS LAW CENTER
PLLC

By:*/s/ Laura Marquez-Garrett*
    Laura Marquez-Garrett, SBN 221542
    laura@socialmediavictims.org
    Matthew Bergman
    matt@socialmediavictims.org
    Glenn Draper
    glenn@socialmediavictims.org
    821 Second Avenue, Suite 2100
    Seattle, WA 98104
    Telephone: (206) 741-4862
    Facsimile: (206) 957-9549

    SEEGER WEISS LLP
    Christopher A. Seeger
    cseeger@seegerweiss.com
    Christopher Ayers
    cayers@seegerweiss.com
    55 Challenger Road
    Ridgefield Park, NJ 07660
    Telephone: 973-639-9100
    Facsimile: 973-679-8656

    Robert H. Klonoff
    klonoff@usa.net
    2425 S.W. 76th Ave.
    Portland, Oregon 97225
    Telephone: (503) 702-0218
    Facsimile: (503) 768-6671

    *Attorneys for Plaintiffs*

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP